### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

KEVIN LOWERY, on his behalf and
on behalf of similarly situated persons,

        Plaintiff,

JUDY LOVATO, DANNY GABALDON,
BARBARA THOMAS, each on his/her behalf
and on behalf of similarly situated persons,

        Plaintiffs-in-Intervention,

vs.                                                            No. CIV 09-0457 JB/WDS

CITY OF ALBUQUERQUE, MARTIN CHAVEZ,
in his individual capacity as mayor of the City of
Albuquerque, RAY SCHULTZ, in his individual
capacity chief of police of the City of Albuquerque
Police Department, JOHN OLMSTEAD, MARK
CRANDALL, and JOHN DOE POLICE OFFICERS,

        Defendants,

MICHELLE WALL, LARRY MOYA,

        Defendants-in-Intervention.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Plaintiffs Thomas and Gabaldon's Motion

and Memorandum in Support of Summary Judgment, filed July 13, 2010 (Doc. 36)("Thomas' and

Gabaldon's Motion"); (ii) Plaintiff Lovato's Motion and Memorandum in Support of Summary

Judgment, filed July 30, 2010 (Doc. 43)("Lovato's Motion"); and (iii) Plaintiff Lowery's Motion

and Memorandum in Support of Summary Judgment, filed August 6, 2010 (Doc. 45)("Lowery's

Motion"). The Court held a hearing on September 14, 2010. The primary issue is whether an

objective observer would believe that the violations for which the Plaintiffs were cited posed an immediate threat to the lives or safety of the occupants, the public or the officers such that an exception to the Fourth Amendment prohibition against warrantless searches and seizures was justified.  The Court concludes that there is insufficient evidence in the record to create a genuine issue of material fact on this issue and grants the Plaintiffs' motion for summary judgment on this issue.

**FACTUAL BACKGROUND**

As an initial matter, the Court notes that, although the parties substantially complied with Federal and local rules, in certain instances identified herein the parties did not comply with local rule 56.1, which  provides:

> **Statement of Material Facts.**  The moving party must file with the motion a written memorandum containing a short, concise statement of the reasons in support of the motion with a list of authorities relied upon.  A party opposing the motion must file a written memorandum containing a short, concise statement of the reasons in opposition to the motion with authorities.  The moving party may file a written reply memorandum.
>
> The memorandum in support of the motion must initially set out a concise statement of all of the material facts as to which movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies.
>
> A memorandum in opposition to the motion must contain a concise statement of the material facts as to which the party contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the opposing party relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the statement of the movant will be deemed admitted unless specifically controverted.

D.N.M.LR-Civ. 56.1 (emphasis added).  "[L]ocal rules of practice, as adopted by the district court, 'have the force and effect of law, and are binding upon the parties and the court which promulgated them . . . .'"  Smith v. Ford Motor Co., 626 F.2d 784, 796 (10th Cir. 1980)(quoting Wood Constr.

Co. v. Atlas Chem. Indus., Inc., 337 F.2d 888, 890 (10th Cir. 1964), cert. denied, 450 U.S. 918 (1981)). See Bylin v. Billings, 568 F.3d 1224, 1230 n.7 (10th Cir. 2009)("Although a district court's local rules of practice are technically binding on both the court and the parties, '[c]onsiderable deference is accorded to the [court's] interpretation and application of [its] own rules of practice and procedure.'" (quoting Smith v. Ford Motor Co., 626 F.2d at 796)(alterations in original)). In ruling on the purpose of a predecessor rule to D.N.M.LR-Civ. 56.1(b), the United States Court of Appeals for the Tenth Circuit observed:

> Consistent with Fed. R. Civ. P. 56, Local Rule 56.1(b) facilitates the district court's review of summary judgment motions by requiring nonmovants to specifically identify and properly support what nonmovants claim are material disputed facts and point out the movants' alleged facts that they dispute; otherwise, the movants' facts will be deemed admitted.

Smith v. E.N.M. Med. Ctr., 72 F.3d 138, at *4 (10th Cir. 1995).

When a party has failed to comply with local rule 56.1(b), the Court has so noted. Despite the procedural defects, the Court has carefully reviewed the briefs and record to determine whether any material issues are, in fact, in dispute.[1]

_____

[1] The Court has recently proposed amendments to D.N.M. LR-Civ 56.1(b) that will require the party responding to the motion for summary judgment to number any additional facts and the party moving for summary judgment to specify whether the additional facts are disputed in its reply. A "redline" version of the proposed revisions to the Local Rules of Civil Procedure of the United States District Court for the District of New Mexico is currently available on the Court's website at www.nmcourt.fed.us. The proposed revisions were posted for public comment. The period for public comment closed November 24, 2010. The Court will now consider the comments and further revisions, as necessary. The proposed version of D.N.M. LR-Civ 56.1(b) states:

> The Memorandum must set out a concise statement of all of the material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which the movant relies.

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each

At the September 14, 2010 hearing, the parties and the Court agreed that the Court would take the factual allegations in the inspectors' affidavits as true, consistent with settled law on summary-judgment motions.[2]  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and

---

> fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.  The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.
>
> The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. Each fact must be lettered, must refer with particularity to those portions of the record upon which the movant relies, and must state the letter of the non-movant's fact.  All material facts set forth in the Response will be deemed undisputed unless specifically controverted.

Proposed revisions to D.N.M. LR-Civ. 56.1(b)(emphasis added).  A "redline" version of the proposed revisions to the Local Rules of Civil Procedure of the United States District Court for the District of New Mexico is currently available on the Court's website at www.nmcourt.fed.us. The proposed revisions were posted for public comment. The period for public comment closed November 24, 2010. The Court will now consider the comments and further revisions, as necessary.

    [2]  At the hearing, the parties acknowledged that the Court is required to view the evidence in the light most favorable to the Defendants.  See Transcript of Hearing at 11:24-25, 12:1-4 (taken September 14, 2010)(Court, Levy)("Tr.")(the Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version; any final transcript may contain slightly different page and/or line numbers)(COURT: "Well, Mr, Kennedy will have a chance to respond in a moment, but I think he's going to stand up and say, fine, Judge.  Take -- take -- take the affidavits of the inspectors.  Take 'em as true, which I probably have to, anyway, -- " MS. LEVY: "Yes, sir.")(emphasis added).  See also Tr. 18:5-8 (Kennedy)("And now the Affidavits, and again the Court -- we accept the Court must view them in the light most favorable to Defendants, but they're completely inadequate of showing exigency.")(emphasis added); Tr.  25:8-12 (Court)("[I] will assume the facts as the – as the City has set 'em forth in the Affidavits, and then I will make a decision as to whether that satisfies the exigent circumstances exception to the Fourth Amendment, and that'll all -- that's all I will decide on these Motions."  (emphasis added)).

-4-

construe all evidence in the light most favorable to the non-moving party.).  The Court, therefore, takes as true the factual allegations in the inspectors' affidavits.[3]  The affidavits alone do not, however, provide all of the facts necessary for the Court to set forth a coherent factual background for deciding these motions.  The affidavits, for example, do not address or cover all of the facts to which the parties direct the Court in the briefs.  In the case of a statement of fact raised by a party that is not addressed in the affidavits, the Court has assessed the evidence under the guidance of D.N.M. LR-Civ 56.1(b) and Hunt v. Cromartie.  In any case, the Court does not accept as true conclusory assertions or conclusions of law in the affidavits.

      **1.**      **City Ordinances.**

      In 2004, Defendant City of Albuquerque, New Mexico, passed the Clean up of Laboratory Sites Ordinance, Ord. 36-2004 (hereinafter "Drug Lab Ordinance").  The purpose of the ordinance is to require remediation of clandestine drug laboratory sites "to assure the health, safety and welfare of the community."  Ord. 36-2004 § 11-1-1-42.  See Thomas' and Gabaldon's Motion ¶ 1, at 2 (setting forth this fact); Defendants' Response to Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment ¶ 1, at 1, filed August 29, 2010 (Doc. 52)("Thomas and Gabaldon Response")(admitting this fact).  Clandestine drug laboratories are defined in the ordinance as "property on which [a controlled substance] is being manufactured or on which there is an attempt to manufacture, or where a person is arrested for having on any property any chemicals

---

[3] The Plaintiffs allege that evidence of drug use in the Plaintiffs' homes was the sole basis for "red-tagging" a home.  The Defendants' affidavits deny this assertion.  See Affidavit of Mark Crandall ¶ 4, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-2); Affidavit of Larry Moya ¶ 7, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-1); Affidavit of Michelle Wall ¶¶ 4, 6, 7, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 53-1) ; Affidavit of Mark Crandall ¶ ¶ 4, 6, at 1 (executed August 27, 2010), filed August 27, 2010 (Doc. 51-1).  The Court has accepted the Defendants' assertion, and acknowledged throughout the statement of facts that the Notices and Orders include both drug-related and non-drug-related violations.

or equipment used in manufacturing [a controlled substance]."  Ord. 36-2004 § 11-1-1-42.  <u>See</u> Thomas' and Gabaldon's Motion ¶ 2, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 2, at 2 (admitting this fact).  The Substandard Building ordinance states that any building or portion of a building where there exists inadequate sanitation conditions "to the extent that endangers the life, limb, health, property, safety or welfare of the public or occupants thereof shall be deemed and declared a SUBSTANDARD BUILDING." Ord. 34-1985 § 14-3-4-1. <u>See</u> Thomas' and Gabaldon's Motion ¶ 5, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 5, at 2 (admitting this fact).  Substandard housing means that there is an immediate risk of harm to the resident. <u>See</u> Deposition of Mark Crandall at 25 (taken April 14, 2010), filed August 29, 2010 (Doc. 52-4).  Designation of a house as substandard through "posting" or "red tagging" requires same-day eviction of all residents.  <u>See</u> Crandall Depo. at 29:18-24;  Ord. § 14-3-5-3(D);  Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).  Residents and homeowners re-entering a property posted as substandard without a permit is a misdemeanor offense.  <u>See</u> Ord. § 14-3-5-3 (D); Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).

When a property is deemed substandard because of drug contamination, occupants and homeowners are barred from entering the property until homeowners pay for drug contaminant testing and remediation that can cost thousands of dollars. <u>See</u> Thomas' and Gabaldon's Motion ¶ 12, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 12, at 3 (admitting this fact). Residents and homeowners have an automatic right to reenter their homes upon an appeal. <u>See</u> Ord. 34-1986 § 14-3-5-4(D); Thomas' and Gabaldon's Motion ¶ 13, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 13, at 3 (admitting this fact).

2.    __Albuquerque Police Department's Criminal Nuisance Abatement Unit Practices.[4]__

City Inspector Joseph Martinez wrote the initial draft of the Drug Lab Ordinance.[5]

---

[4] The Plaintiffs include in the statement of facts the allegation that "[d]efendants have an admitted policy of implementing the housing code to deprive owners and tenant of property rights . . . ." Thomas' and Gabaldon's Motion ¶ 14, at 4. The Plaintiffs do not, however, in compliance with D.N.M. LR-Civ. 56.1(b) direct the Court to specific evidence that supports this statement. The Defendants dispute the statement on grounds that "there is no supporting citation for the purported 'fact.'" Thomas and Gabaldon Response ¶ 14, at 4. Because the Plaintiffs have failed to adduce evidence to support this assertion, the Court will not consider that contention. See D.N.M. LR-Civ. 56.1(b).

[5] In their Motions, the Plaintiffs assert that "members of the Nuisance Abatement Team have adopted a policy and practice of evicting homeowners and tenants based on evidence of drug use." Gabaldon and Thomas Motion ¶ 3, at 2. They cite as evidence the Plaintiffs' Motion for Class Certification ¶¶4-12, at 3–5 (filed June 4, 2010)(Doc. 32("Motion for Class Certification"). Paragraphs 4 through 12 of the Motion for Class Certification make a number of different assertions.

In their response, the Defendants contend that "the material cited in the Motion for Class Certification supports no such finding." Thomas and Gabaldon Response ¶ 3, at 2. The Defendants specifically dispute the assertions in paragraph 7 of the Motion for Class Certification, and admit those in paragraphs 9 and 10, but do not address with particularity paragraphs 4, 5, 6, 8, 11 or 12 of the Motion for Class Certification.

The Plaintiffs' assertion that there existed a "policy and practice" of evicting homeowners is conclusory. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 675 (10th Cir.1998)("Vague, conclusory statements do not suffice to create a genuine issue of material fact."). The Defendants, however, have for the most part countered with a statement that is also conclusory. The Court will therefore address each assertion of the Motion for Class Certification independently, with the exception of ¶ 12 of the Motion for Class Certification, which the Court will address in this footnote.

In paragraph 12 of the Motion for Class Certification, the Plaintiffs assert that inspectors evicted homeowners and tenants for "minor" or "easily remedied" code violations, including no water, electric or gas service, no light switches, and no verification that the water heater was inspected. The cited testimony supports the assertion that these code violations were among those for which the Plaintiffs were evicted. See Crandall Depo. at 73:8-17; id. at 86:8-18; Deposition of Michelle Wall at 19:16-20:21 (taken March 24, 2010), filed June 4, 2010)(Doc. 32-2). The cited testimony, however, does not characterize these violations as "minor" or "easily remedied."

In their response, the Defendants do not specifically dispute the assertions in paragraph 12 of the Motion for Class Certification. See Thomas and Gabaldon Response ¶ 3, at 2. Elsewhere in the Response, however, they dispute the characterization of the electrical code violations on Gabaldon's property as "easily remedied." Thomas and Gabaldon Response ¶ 25, at 5.

The Plaintiffs also assert in paragraph 12 of the Motion for Class Certification: "Using the Substandard Housing Ordinance to evict drug users from their homes results in citations for minor code violations as potentially life threatening conditions to justify the immediate eviction of the

occupants." Motion for Class Certification ¶ 12, at 5.  Thomas' and Gabaldon's Motion repeats this assertion.  <u>See</u> Thomas and Gabaldon Motion ¶ 8, at 3.  The Defendants dispute this statement, contending it "is not a fact but a statement of opinion."  Thomas and Gabaldon Response ¶ 8, at 3.

Moreover, the Plaintiffs do not direct the Court to evidence supporting the statement that "minor" code violations were intentionally mischaracterized as life threatening.  Crandall's cited testimony states, in relevant part:

> Q: Because I'm looking over the repairs that needed to be done.  Holes and cracks in the ceilings, you would agree that's not an immediate safety issue?
>
> A: No. sir.
>
> Q: So you agree with my statement that that is not an immediate safety issue?
>
> A: No, sir.
>
> Q: No? You disagree?
>
> A: No.  It is an immediate safety problem.
>
> Q: Light switch, electrical receptacles, plate covers in the dwelling.  Now, that could be a problem, I guess, if it's an outlet area?
>
> A: Very much so, yes.

<u>See</u> Crandall Depo. at 86:8-21.  Defendant City Inspector Larry Moya's cited testimony states, in relevant part:

> Q: Okay.  Were any of the code violations life threatening, as far as you were concerned, as you recall?
>
> A: There was some electrical code violations that I recall.  Because what he was -- I don't know exactly why he was doing this, but he was running like extension cords in through the attic and then drilling holes in the ceiling and bringing those wires back down. It wasn't Romex wire, which is approved electrical wire.  It was more like extension type of wire, and he just had this wire running to several different rooms.  And I'm not sure why he was doing that.  And there was some plumbing issues, yeah.
>
> Q: Okay.  Your recollection is the wire didn't have any covering, any rubber covering?

See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 3 (citing

Deposition of Joseph Martinez at 64:12-16 (taken March 23, 2010), filed June 3, 2010 (Doc. 32-3)));

Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Martinez included language

about possible contamination from drug use based on his belief that drug use could lead to property

contamination.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification

¶ 4, at 3 (citing Martinez Depo. at 94:2-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not

controverting this fact).  Martinez' belief was not founded on scientific evidence.  See Thomas' and

Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 4 (citing Martinez Depo.

---

> A: It did.  It's like an extension cord wire, but it wasn't the approved Romex wire,
> whatever you call it, 12-1.  It wasn't the gauge that it needed to be to be running that
> length and to run it in through the attic and down in through the walls.
>
> Q: So that's a situation that could be remedied by simply removing the wires, I
> guess?
>
> A: Correct.

Deposition of Larry Moya at 13:2-24 (taken March 24, 2010), filed July 13, 2010 (Doc. 36-3).
Because the Court must construe the evidence in the light most favorable to the non-moving party,
the Court will construe the assertion that inspectors use the Substandard Housing Ordinance to evict
drug users by characterizing minor infractions as threatening to life or safety as the Plaintiffs'
opinion.  See Hunt v. Cromartie, 526 U.S. at 551.
      The Plaintiffs' opinion stated in the Motions for Summary Judgment are not admissible into
the factual record and therefore "not suitable grist for the summary judgment mill."  Thomas v.
International Business Machines, 48 F.3d 478, 486 (10th Cir. 1995).  Under rule 701 of the Federal
Rules of Evidence, opinion testimony by a witness may be admissible when they "are (a) rationally
based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony
or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized
knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Here, the expressed opinion is not
that of a witness but is instead a conclusory assertion by the Plaintiffs.  A party cannot "avoid
summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or
speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June
2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d
1193, 1199 (10th Cir. 2006)).  Hence, the Court will not consider the asserted fact that the inspectors
characterized minor code violations as life threatening to evict residents.

at 94:9-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Martinez enforced the draft ordinance he had written and not the ordinance that the City of Albuquerque put into law.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:11-18)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Martinez did not read the final version of the Drug Lab Ordinance that the City of Albuquerque passed until about a year after it had been in effect.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:1-6)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Members of the Nuisance Abatement Unit enforced Martinez' draft and not the ordinance that the City of Albuquerque gave legal effect.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:19-25)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Some members of the Nuisance Abatement Unit evicted residents and homeowners from their home based on the belief of drug use in the home.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 6, at 4 (citing Wall Depo. at 33:4-7; Crandall Depo. at 41:21-42:17; Moya Depo. at 16:23-17:5)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Possible contamination because of drug use in a home was, in some cases, the sole basis for "red tagging" a home.[6]  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing

---

[6] The Defendants dispute that Crandall's testimony supports the Plaintiffs' assertion that "possible contamination due to drug use in a home can be the sole basis for 'red tagging' a home." Thomas and Gabaldon Response ¶ 3, at 2.  The Defendants contend that the Plaintiffs "fully ignor[e]" additional testimony by Crandall about this issue.  The Defendants cite Crandall's testimony at 40:16-21 in addition to which the Plaintiffs cite at 40:22-25:

Q: So since that time, you're certainly included in your inspections for substandard buildings and the red tagging of buildings as substandard the determination that

Motion for Class Certification ¶ 7, at 4 (citing Crandall Depo. at 40:22-25)).  Some members of the

Nuisance Abatement Unit posted houses where there was evidence that drug use had occurred, even

if the drug use was a onetime occurrence.[7]  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing

_____

drug usage creates a hazard?

A: That it creates a hazard, but it's not the sole purpose to red tag something, correct.

Q:  Could it be the sole purpose in your mind?

Ms. Levy: Objection to form.

A:  It's hard to say.  It's really a case-by-case thing.  Potentially, I think anything could happen.  The frequency of it happening I would say would be low.

Crandall Depo. at 40:16-25.  The cited testimony does not controvert the Plaintiffs' assertion that drug use "can" be the sole basis for deeming a house substandard.  Although Crandall states that the frequency of such an occurrence would be low, he also states that "anything can happen."  The Defendants therefore fail to controvert this assertion, and the Court deems the fact admitted.

[7] See also Thomas and Gabaldon Motion ¶ 10, at 4 (asserting that "members of the Nuisance Abatement Team are instructed to deem a property substandard due to drug contamination even if the drug use was a one-time occurrence or restricted to one room in the house.").  The Defendants allege that the evidence cited by the Plaintiffs does not support this assertion.  The Defendants cite Moya's testimony that he refused to cite homes for drug use.  See Thomas and Gabaldon Response ¶¶ 3, 10, at 2, 4.  After careful review of the record, the Court finds that the testimony which the Defendants referenced regarding Moya's personal refusal to cite homes for drug use does not controvert his testimony that some inspectors did so.  See Moya Depo. at 17:3-10:

Q: I'm trying to find out – I'm going to trying to figure out where this idea originated from, what person or group of people this idea originated from.  Is there anything that you know, evidence-wise, that you can tell me?

A: I think it all started with Mark Crandall.  That's where it started.  He came up with this brainy idea that we could do that.  And I refused to do that, and I discussed it with my supervisor.  I discussed it with Pete Dinelli.

And I thought there had been an agreement that we were no longer going to do that.  But then – I don't know if the practice ever stopped.  I didn't – I think when you first met with Pete or – I don't know.  There was something going on.

Motion for Class Certification ¶ 7, at 4 (citing Moya Depo. at 16:1-12; id. at 19:1-4)).

Members of the Nuisance Abatement Unit knew that the Drug Lab Ordinance applied only to drug labs and expressed concerns that the Drug Lab Ordinance did not apply to drug use.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:3-12; Moya Depo. at 4:10-22; id. at 5:1-23; id. at 6:21-24)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  When a member of the Nuisance Abatement Unit expressed concern that the Drug Lab Ordinance did not extend to evictions based on drug use, he was told that the Substandard Building Ordinance could be used to deem a house substandard based on drug use.  See Thomas' and Gabaldon's Motion ¶¶ 3, 4, at 2 (setting forth this fact)(citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:21-32: 20; Moya Depo. at 6:2-6)); Thomas and Gabaldon Response ¶ 4, at 3 (not controverting this assertion).[8]  Members of the Nuisance

---

[8] The Defendants dispute the Plaintiffs' statement that, "when some members of the Nuisance Abatement Team expressed concern that the Drug Lab Ordinance did not extend to drug use, they were told by their supervisors to use the Substandard Housing Ordinance to continue to evict landlords and tenants based on evidence of drug use."  Thomas' and Gabaldon's Motion ¶ 4, at 2.  The Defendants contend that the "cited testimony does not support the 'fact.'" Thomas and Gabaldon Response ¶ 4, at 3.  The Defendants further state "Defendant Moya's testimony is that he refused to post houses for drug usage.  He also believed there was an agreement that there would not be posting based on drug usage."  Thomas and Gabaldon Response ¶ 4, at 3.  The Defendants do not direct the Court to evidence to support their statement, but upon careful review of the record, the Court found testimony to this effect.  See Moya Depo. at 17:5-9.  The Court notes, however, that the Defendants' cited testimony does not specifically controvert the Plaintiffs' assertion about the expression of concern and the supervisor's response, and finds that the evidence adduced by the Plaintiffs includes testimony to support the Plaintiffs' assertion.  Moya stated in his deposition testimony:

> And I brought that to the attention of a supervisor at the time at a meeting that we had, because there was a couple of us inspectors that did not agree with that.  At that time, we were told that if we use a different ordinance, which I believe was 4-2(L), which is something about maintenance or something, unsanitary, that we could do it under that.  That's how we would be able to get around that.

Moya Depo. at 5:24-6:6.  Because the Defendants have failed to specifically controvert the

Abatement Unit were told that, if they found drug paraphernalia, they should post those homes because there might be contamination. <u>See</u> Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Moya Depo. at 16:8-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Inspectors have used the Drug Lab Ordinance to evict suspected drug users from their homes. <u>See</u> Motion for Class Certification ¶ 11, at 5 (citing Crandall Depo. at 24:6-23; Wall Depo. 33:4-7); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). On at least one occasion, one inspector did not wear protective clothing or gear when conducting a search of a property.[9]

### 3.  **Plaintiff Danny Gabaldon**.

At all times relevant, Gabaldon was the owner and resident of 11101 Mahlon Ave N.E. in Albuquerque.  <u>See</u> Affidavit of Danny Gabaldon ¶ 3, at 1 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-2); Thomas' and Gabaldon's Motion ¶¶ 15, 17, at 4, 5 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 15, 17, at 4 (admitting this fact).  On September 9, 2008, the

---

Plaintiffs' statement, the Court will deem this fact admitted.  <u>See</u> D.N.M. LR-Civ. 56.1(b).

The Defendants also challenge the Plaintiffs' assertion on grounds that it is "immaterial for the purposes of the specific motion as is shown by the affidavits of Mark Crandall . . . and of Larry Moya . . . ."  Thomas and Gabaldon Response ¶ 4, at 3.  Both affidavits state that the Orders to Vacate given to Gabaldon and Thomas were based at least in part on code violations unrelated to drug use.  <u>See</u> Crandall Aff. ¶¶ 4-6, at 1; Moya Aff. ¶¶ 4, 7, at 1.  Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis.

[9] The Plaintiffs assert that the inspectors "deem a property substandard and unsafe to occupy even though they wear no protective gear and do not fear for their own safety while conducting the administrative search of these properties."  Thomas and Gabaldon Motion ¶ 11, at 4.  The Defendants dispute this fact, asserting that Defendant City Inspector Michelle Wall's testimony "was limited to the inspection of a particular building by Defendant Wall."  Thomas and Gabaldon Response ¶ 11, at 4.  Review of the cited testimony shows that Wall was asked about her behavior during inspection of a particular house and a specific part of that house.  <u>See</u> Wall Depo. at 26:3-23.  Because the Court must construe the evidence in the light most favorable to the non-moving party, <u>see</u> Hunt v. Cromartie, 526 U.S. at 551, the Court will deem admitted the fact that Wall did not wear protective gear on one occasion.

Albuquerque Police Department's Criminal Nuisance Abatement Unit (the "Nuisance Abatement Unit") searched Gabaldon's home.  See Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  The inspectors did not see evidence that methamphetamine had been "cooked" in the house or that there was a methamphetamine lab operating in the house.  See Moya Depo. at 12:17-23; Thomas' and Gabaldon's Motion ¶¶ 27, 28, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 27, 28, at 5 (admitting this fact).  Moya noted that the house smelled of methamphetamine.[10]  See Moya Depo. at 12:8-15.  Gabaldon told Moya that his wife, who was in jail at the time, struggled with methamphetamine addiction.  See Thomas' and Gabaldon's Motion ¶ 21, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 21, at 4 (admitting this fact); Moya Depo. at 12:4-6.  After a search of Gabaldon's home, members of the Nuisance Abatement Unit ordered Gabaldon to leave his home, and seized the property through a nuisance abatement "Notice and Order."  See Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 18, at

---

[10] Paragraphs 23 and 24 of the Thomas' and Gabaldon's Motion admit the Defendants' assertion that the house smelled of methamphetamine. Thomas' and Gabaldon's Motion ¶¶ 23, 24, at 5 (stating that the smell of the house was the "factual basis" for the Notice and Order, and that "only" the living room and kitchen smelled). Furthermore, the Plaintiffs Thomas and Gabaldon's Reply to the Defendants' Response to Thomas and Gabaldon's Motion for Summary Judgment does not dispute the Defendants' assertion that there was a strong methamphetamine smell in the house. See Plaintiffs Thomas and Gabaldon's Reply to the Defendants' Response to Thomas and Gabaldon's Motion for Summary Judgment, filed Sept. 13, 2010 (Doc. 57)("Thomas and Gabaldon Reply"). The Defendants dispute both assertions. See Thomas and Gabaldon Response ¶¶ 23, 24, at 4 (denying that the smell was the only basis for the order, and that the smell was limited to the living room and kitchen); Moya Aff. at ¶ 4 (stating that "life safety" code violations were also causes for the order to vacate); Moya Depo. at 14:11-15 (stating that the living room and kitchen "reeked.")  After a careful review of the record, the Court finds that there were code violations not related to the smell in the house and that the testimony of the inspector was that the smell was concentrated in the living/kitchen area. See Moya Aff. at ¶ 4 (stating that "life safety" code violations were also causes for the order to vacate); Moya Depo. at 14:11-13 ("The whole house reeked like – actually, it wasn't the whole house.  I take that back.  It was more in the living/kitchen area that it really reeked.").

4 (admitting this fact).  They also posted on the property a notice that the house was a "substandard building."  Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact).  See Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  The Notice given to Gabaldon and the sign on the property stated that entry into the home was a criminal violation of trespass.  See Thomas' and Gabaldon's Motion ¶ 19, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 19, at 4 (admitting this fact).

The order to vacate the property cited electrical and plumbing violations in addition to suspected methamphetamine contamination.[11]  See Moya Aff. ¶ 7, at 1.  The Notice and Order required Gabaldon to retain "an industrial or environmental hygienist firm" to test the property for "contamination."  Thomas' and Gabaldon's Motion ¶ 22, at 5 (setting forth this fact).  See Gabaldon Aff. ¶ 11, at 2 (stating that testing was required); Moya Aff. ¶ 6, at 1 (stating that testing was required).  The environmental testing company Gabaldon later hired found that one room of the house was contaminated.  See Gabaldon Aff. ¶ 12, at 2 (stating the finding of the testing company); Thomas' and Gabaldon's Motion ¶ 31, at 6 (setting forth that the testing company found one room contaminated); Thomas and Gabaldon Response ¶ 31, at 5 (admitting this fact).  The environmental testing company quoted Gabaldon a remediation cost of between $18,000.00 and $20,000.00 for

---

[11] Neither party submitted the Notice and Order to the Court.  The Plaintiffs assert that "the factual basis" for the eviction was the smell in the house and the admission that a drug user had lived on the property.  Moya Depo. at 12:4-6, 12:8-14, 14:22-25; Thomas' and Gabaldon's Motion ¶ 23, at 5.  The Plaintiffs also assert that Moya cited the property for "electrical violations and plumbing issues."  Thomas' and Gabaldon's Motion ¶ 25, at 5.  The Defendants dispute the assertion that the smell and drug use was the "factual basis" for seizing the property, and direct the Court to Moya's testimony.  Moya Aff. ¶ 7, at 1 ("I did not base my decision to have the property vacated because a 'drug user' had lived on the property . . . ."); Moya Depo. at 13:1-14 ("There was [sic] some electrical code violations that I recall.").  Both parties therefore appear to admit that the order to vacate included citations for both drug-related and non-drug related issues.

-15-

removal and replacement of the carpets and cleaning of the entire house.[12]  See Gabaldon Aff. ¶¶ 13, 14, at 2; Thomas' and Gabaldon's Motion ¶¶ 32, 33, at 6.  Gabaldon did think that he had the money to pay for the cleaning.  See Thomas' and Gabaldon's Motion ¶ 34, at 6.[13]  Removal of the electrical cords Gabaldon had installed could have fixed the electrical code violations.[14]  See Moya

---

[12] The Defendants dispute the admissibility of Gabaldon's recitation of the remediation requirements and cost, contending that the statements are inadmissable hearsay.  Thomas' and Gabaldon's Response ¶ 32 and 33.  See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." (internal quotations and citations omitted)).  Under rule 803 of the Federal Rules of Evidence, statements are not inadmissable when they are "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition."  Fed. R. Evid. 803(3).  Here, the evidence offered supports Gabaldon's assertion whether he believed he could pay for the cleaning.  The Court will therefore consider what Gabaldon understood the cost of the remediation to be, but will not consider Gabaldon's statement of the quoted costs for the truth of the matter they asserted.  Cf. Fed. R. Evid. 105 ("When evidence which is admissable as to one party or for one purpose but not admissable as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.")

[13] The Defendants dispute this fact by stating that it is immaterial and based on inadmissable evidence.  Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis.  Under rule 803 of the Federal Rules of Evidence, statements are not inadmissable when they are "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition."  Fed. R. Evid. 803(3).  Here, the evidence offered supports Gabaldon's assertion whether he believed he could pay for the cleaning.  The Court will therefore consider what Gabaldon understood the cost of the remediation to be, but will not consider Gabaldon's statement of the quoted costs for the truth of the matter they asserted.

[14] The Plaintiffs maintain that the electrical and plumbing issues "could have been easily remedied that same day if Gabaldon had not been barred from the property," Thomas' and Gabaldon's Motion ¶¶ 25, 26, at 5, 6, and cites Moya's description of the electrical violations in his deposition, apparently relying on Moya's agreement that the electrical issues could be resolved by removing the wires:

Q: Okay.  Your recollection is the wire didn't have any covering, any rubber covering?

A: It did.  It's like an extension cord wire, but it wasn't the approved Romex wire, whatever you call it, 12-1.  It wasn't the gauge that it needed to be to be running that length and to run it in through the attic and down in through the walls.

-16-

Depo. at 13:2-24.  The house went into foreclosure and was sold when Gabaldon did not pay the

mortgage.  See Thomas' and Gabaldon's Motion ¶¶ 35, 36, at 6 (setting forth this fact); Thomas and

Gabaldon Response ¶¶ 35, 36, at 5 (not controverting this fact).

### 4. **Plaintiff Judy Lovato**.

At all times relevant, Lovato is a resident of 4701 Burton Ave S.E. in Albuquerque.  See

Lovato Motion ¶¶ 2, 4, at 2 (setting forth these facts); Defendants Response to Plaintiff Lovato's

Motion and Memorandum in Support of Summary Judgment ¶¶ 2, 4, at 3, filed August 29, 2010

(Doc. 53)("Lovato Response")(admitting these facts).  The Nuisance Abatement Unit searched

Lovato's house on February 10, 2009 and deemed it substandard.  See Lovato's Motion ¶¶ 3 and 5,

at 2 (setting forth these facts); Lovato Response ¶¶ 3, 5, at 3 (admitting these facts).  The Nuisance

Abatement Unit posted on the property a public notice of this finding that same day, including a

notice that entry into the home was a criminal violation.  See Lovato's Motion ¶¶ 5, 7, at 2 (setting

forth these facts); Lovato Response ¶¶ 5, 7, at 3 (admitting these facts).  The Nuisance Abatement

Unit ordered Lovato to leave the home under threat of arrest.[15]  See Lovato's Motion ¶ 6, at 2

---

Q: So that's a situation that could be remedied by simply removing the wires, I
guess?

A: Correct.

Moya Depo. at 13:2-24.  The Defendants dispute the characterization of the violations as "easily
remedied."  Moya Aff. ¶ 8, at 1 (stating repairs "required a licensed electrician and plumber").  See
Thomas and Gabaldon Response ¶ 25 ("No where [sic] does it state the issues could be 'easily
remedied.'").  The Defendants do not dispute, however, that removing the wires would have
resolved the violations.  The Court therefore deems admitted that the electrical code violations
could have been fixed by removing the electrical cords which Gabaldon had installed.  See D.N.M.
LR-Civ. 56.1(b).

[15] The Plaintiffs allege that "Lovato had no real opportunity to collect her belongings."
Affidavit of Judy Lovato ¶ 6, at 2 (executed July 22, 2010), filed July 30, 2010 (Doc. 43-2);
Lovato's Motion ¶ 6, at 2.  The Defendants "deny Plaintiff Lovato was not permitted time to gather

(setting forth the fact of the order to vacate); Lovato Response ¶ 6, at 3 (not controverting the fact

of the order to vacate).  At the time of the inspection, the residents of the house included Lovato's

daughter (who was five months pregnant), two granddaughters, two grandsons, and three great-

grandchildren.  See Lovato Aff. ¶ 16, at 3; Lovato Motion ¶ 15, at 3 (setting forth this fact); Lovato

Response ¶ 15, at 4 (not controverting this fact).

Wall found some drug paraphernalia in a converted garage room.[16]  See Lovato Aff. ¶ 11,

at 2.  The Notice and Order was based on "life safety issues" as well as possible contamination

caused by controlled substances.[17]  See Lovato Notice and Order at 1-2 (executed February 12,

2009), filed July 30, 2010 (Doc. 43-1).  Specifically, the Notice and Order issued to Lovato states

---

possessions."  Lovato Response ¶ 6, at 3.  Neither party adduces evidence to support their
contentions.  These statements therefore are assertions without basis in evidence.  Because the Court
must construe the evidence in the light most favorable to the non-moving party, the Court will
accept the Defendants' version of the asserted fact as true.  See Hunt v. Cromartie, 526 U.S. at 551.

[16] The Defendants deny the Plaintiffs' statement that "based on the allegation that a
confidential informant had purchased drugs at that location and the discovery of drug paraphernalia
where her son's separate living space [sic] [Lovato was ordered to vacate the home and have the
home tested for contamination]."  Lovato's Motion ¶ 11, at 3.  The Defendants do not direct the
Court to evidence specifically contradicting the assertion that the paraphernalia was found in this
space.  See Lovato Response ¶ 11, at 3.  The Court will therefore deem the fact admitted.

[17] The parties dispute whether the possibility of drug contamination was the sole basis for
the Notice and Order.  The Plaintiffs allege that the "factual basis" for the Notice and Order was the
"'possible contamination associated with the use and/or sales of a controlled substance.'"  Lovato's
Motion ¶ 8, at 2 (quoting the Notice and Order).  In Lovato's Motion, however, she further alleges
that her "home was declared substandard due to code violations, such as the lack of . . . a quick
release for the wrought iron bars in bedroom windows . . . ."  Lovato's Motion ¶ 9, at 3,
     The Defendants deny, without elaboration, the statement in Lovato's Motion that possible
contamination was the basis for the order, citing the Wall Aff. ¶¶ 4, 7, at 1 ("My inspection revealed
life safety issues . . . . These issues included barred windows in the bedrooms which did not have
quick release latches"), and also direct the Court's attention to evidence that possible drug
contamination was a factor, see, e.g., Wall Aff., ¶¶ 6, 7, at 1 ("I was concerned with information
regarding drug usage in the residence and required testing for contamination.");  Lovato Response
¶ 8, at 3.  Both Lovato and Defendants thus appear to admit that there were drug-related and non-
drug-related code violations, and the record supports this fact.

the following requirements: (i) replace all missing or inoperative window cranks, the door knob on

the front security door, and a knob on the stove; (ii) replace all damaged molding, door jambs and

striker plates; (iii) "thoroughly clean" the home because "the entire dwelling was found to be

unsanitary. Id. at 2.  In addition, under the heading "Section 14-3-4-3(D) Structural hazards include

members of walls, partitions or other vertical supports that split, lean, list or buckle," the Notice

included the following note and order: "A POST FOR THE ATTACHED COVERED PATIO IS

HANGING OVER THE CONCRETE.  HAVE THE COVERED PATIO INSPECTED AND

REPAIRED BY A LICENSED CONTRACTOR OR HAVE THE COVER PERMANENTLY

REMOVED."  Lovato Notice and Order at 2.  Lovato was also required to repair all holes in the

walls and ceilings, including replacing insulation, installing sheet rock, "taping, texturing and

painting." Id. at 2.  All appliances, interior furniture and trash, as well as "miscellaneous items" on

the back patio were ordered removed.  Id. at 2.  An outdoor shed was ordered removed: "THE

REAR DETACHED STORAGE SHED IS LEANING AND IN OVERALL POOR CONDITION.

THE DOORS MUST ALSO BE LOCKED FOR SECURITY PURPOSES.  DUE TO THE BAD

CONDITION AND FOR THE SAFETY OF THE OCCUPANTS OF THIS DWELLING,

HAVE THE SHED PERMANENTLY REMOVED." Id. at 2.  The inspectors found electrical

code violations, including the following: (i) damaged or missing electrical receptacle and/or switch

covers; (ii) broken or missing interior and exterior light globes and lenses; and (iii) exposed wiring

on the rear patio light.  Id. at 2.  The Notice stated that "[t]he lack of [switch] covers leaves wiring

exposed that if touched could cause great bodily harm."  Id. at 2.  Finally, the Notice and Order

warned that the Albuquerque Animal Services Department may remove any animals on the property

while the owner is barred from entry.  Id. at 3.

**5.      Plaintiff Kevin Lowery**.

At all times relevant, Kevin Lowery was the owner of the residence at 8250 Northridge N.E.

in Albuquerque.  See Affidavit of John Lowery ¶ 3, at 1 (executed August 6, 2010), filed August 6,

2010 (Doc. 45-1); Lowery's Motion ¶ 2, at 2 (setting forth this fact); Defendants' Response to

Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment ¶ 2, at 2, filed

August 27, 2010 (Doc. 51)("Lowery Response")(admitting this fact).  On March 20, 2009, members

of the Nuisance Abatement Unit, including Crandall, arrived at K. Lowery's home.  See Lowery's

Motion ¶ 3, at 2 (setting forth this fact); Lowery Response ¶ 3, at 2 (admitting this fact).  After a

search of the home, Crandall ordered K. Lowery and his tenants to leave the home.  See Lowery's

Motion ¶ 4, at 2 (setting forth this fact); Lowery Response ¶ 4, at 2 (admitting this fact).  The

inspector placed a poster declaring the property to be "substandard" on the property.  Lowery's

Motion ¶ 5, at 2 (setting forth this fact); Lowery Response ¶ 5, at 2 (admitting this fact).  The poster

stated that entry into the home was a criminal violation of trespass.  See Lowery's Motion ¶ 7, at 2

(setting forth this fact); Lowery Response ¶ 7, at 2 (admitting this fact).  Crandall also issued a

Notice and Order for K. Lowery to leave his home immediately under threat of arrest.  See Lowery's

Motion ¶ 6, at 2 (setting forth this fact); Lowery Response ¶ 6, at 2 (admitting this fact).  The Notice

and Order cites "life safety" issues as well as "possible contamination associated with the use and

or sales of a controlled substance."  Notice and Order at 1 (executed March 10, 2009), filed August

6, 2010 (Doc. 45-1)("Lowery Notice and Order").[18]  The Notice and Order required that Lowery

---

[18] The Plaintiffs allege that "the basis for the immediate eviction of Kevin Lowery from his
home was that the officers 'noted that the tenant or guests were using or selling heroine [sic] in this
unit.'"  Lowery Aff. ¶ 9, at 2 (quoting Lowery Notice and Order at 1).  The Defendants appear to
deny that the alleged drug use was the basis for the order, referencing Crandall's Affidavit, in which
he states that the drug usage in the home "was not the primary reason the home was red-tagged."
Crandall Aff. ¶ 6, at 1.  See Lowery Response ¶ 8, at 3.  The Lowery Notice and Order includes a

"retain the industrial or environmental hygienist firm and the drug laboratory site remediation firm within thirty (30) days."  Lowery Notice and Order at 2-3.  The Notice and Order required that Lowery restore electrical, water and natural gas to the residence and stated that "the home cannot be occupied" without these services.  Lowery Notice and Order at 5-6.  The electrical system was found to have had "numerous modifications to the system that have not been performed by an electrician," and Lowery was ordered to have the system inspected by a licensed electrician.  See Lowery Notice and Order at  5.  In addition, he was required to replace missing light switch and electrical receptacle plate covers, light fixtures, and globe covers, because "there is exposed wiring where the fixtures have been removed."  Lowery Notice and Order at 5.  Finally, Lowery was ordered to replace or install smoke detectors in the bedrooms and in areas near the bedrooms, replace or recharge defective fire extinguishers, and remove "all outdoor storage and litter" and "inoperative vehicles" from the premises.  Lowery Notice and Order at 6-7.  Lowery was warned to remove any animals on the property for the duration of his absence from the home.  Id. at 7.

Lowery was barred from his home until he arranged for environmental testing and decontamination, if necessary, and repaired the electrical, plumbing, and other code violations.[19]

---

number of citations not related to the sale or use of heroin.  The Court will accept the Defendants' assertion.  See Hunt v. Cromartie, 526 U.S. at 551 (stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party); Lowery Notice and Order at 5-7.

[19] The Plaintiffs maintain that, "Based on the allegation that "the tenant or guests were using or selling heroine [sic]," Inspector Crandall ordered that Kevin Lowery be evicted from his home and that he be barred from the property until he arranged for 'an industrial or environmental hygienist firm' to test the property for 'contamination.'"  Lowery Aff. ¶ 10, at 2.  See Lowery Motion ¶ 9, at 3.  The Defendants deny this allegation, but do not state a basis for their denial.  See Lowery Response ¶ 9, at 3.  The Plaintiffs' statement therefore is deemed admitted.  See D.N.M. LR-Civ. 56.1(b).

In addition, a careful review of the record shows that the evidence supports the Plaintiffs' assertion that the suspicion of drug use prompted the order for testing and remediation.  The

See Lowery Notice and Order at 2.  The basis of the allegation of contamination was the presence

in the home of a spoon believed to be used for drug use.[20]  Lowery Aff. ¶ 11, at 2.  On the same day,

---

reference to which the Court is directed by the Defendants indicates that Crandall "was concerned
with information regarding the drug usage and the presence of drug paraphernalia in the residence
and required testing for contamination."  Crandall Aff. ¶ 6, at 1.  In addition, Crandall stated that
"the residents were required to vacate the property until repairs were performed," id. ¶ 5, at 1, which
requirement is also stated in the Notice and Order: "You . . . are hereby ordered to: vacate the
building . . . on or before March 20, 2009.  After vacating the building . . . you must repair the
building . . . ."  Lowery Notice and Order at 4.  Furthermore, the Notice and Order states that

> [the officers] noted that the tenant and guests were using and or selling heroine [sic]
> in this unit.  I have posted this property substandard due to possible contamination
> associated with the use and or sales of a controlled substance.  This property will
> need to be tested for contaminants associated with the manufacturing, use and or
> distribution of a controlled substance, heroine [sic].

Id. at 1.  Finally, the Notice and Order states: "DO NOT BEGIN REPAIRS UNTIL TESTING HAS
BEEN COMPLETED.  IF CONTAMINATES ARE FOUND, DO NOT BEGIN REPAIRS UNTIL
ALL AREAS WHICH TESTED POSITIVE FOR CONTAMINANTS HAVE BEEN
REMEDIATED."  Id. at 2.  Taken together, this evidence indicates that (i) Lowery could not reenter
the home until all repairs were completed; (ii) the repairs could not be begun until after the home
was tested and decontaminated, if necessary; and (iii) the basis for the testing and decontamination
order was the Inspector's finding of possible use or sale of controlled substances.

[20] The Plaintiffs allege that "the basis of the allegation of contamination was that police
officers had recovered a spoon that they believed had been used for cooking heroin."  Lowery's
Motion ¶ 10, at 3.  The Plaintiffs did not direct the Court with particularity to specific evidence in
the record in compliance with D.N.M. LR-Civ. 56.1(b).  The Court, however, finds a statement to
this effect in Lowery's affidavit: "I talked to police officers related to the situation and asked the
basis of the order in reference to contamination.  They informed me that they recovered a spoon used
for cooking heroin."  Lowery Aff. ¶ 11, at 2.  The Defendants deny this allegation, but did not
comply with D.N.M. LR-Civ. 56.1(b)'s particularity requirements.  Instead, the Defendants direct
the Court to Crandall's affidavit, in which Crandall states that he "was concerned with information
regarding drug usage and the presence of drug paraphernalia in the residence and required testing
for contamination."  Crandall Aff. ¶ 6, at 1.  Finally, the Notice and Order appears to indicate that
police officers responding to a call obtained the evidence of drug usage: "The Albuquerque Police
Department responded to a call reference [sic] the theft of electricity.  While officers were collecting
statements they noted that the tenant and guests were using and or selling heroine [sic] in this unit."
Lowery Notice and Order at 1.  It is not clear from the record when the police officers were called
to the home, if they were at the home at the same time as Crandall, or whether Crandall obtained
information about possible drug use from the officers or through his inspection.

Finally, Lowery alleges that the spoon was not tested to see if it contained the residue of
controlled substances.  See Lowery Aff. ¶ 11, at 2; Lowery's Motion ¶ 11, at 3.  The Defendants
deny but do not specifically controvert this assertion.  See Lowery Response ¶ 11, at 3.  Because the

Crandall ordered that Lowery's home be boarded with plywood.  <u>See</u> Lowery Aff. ¶ 13, at 2; Lowery's Motion ¶ 13, at 3 (setting forth this fact); Lowery Response ¶ 13, at 3 (admitting this fact).

Nine days after receiving the Notice and Order, Lowery filed a written appeal of the order with the Mayor's office.  <u>See</u> Lowery Aff. ¶ 12, at 2; Lowery's Motion ¶ 12, at 3 (setting forth this fact); Lowery Response ¶ 12, at 3 (admitting this fact).  In spite of the appeal, the plywood was not removed from the house.[21]  <u>See</u> Lowery Aff. ¶¶ 14, 16, at 3; Lowery's Motion ¶¶ 14, 16, at 3 (setting forth this fact); Lowery Response ¶ 14, at 3 (not controverting this fact).  As a result of these actions, Lowery was homeless and lost the means of his livelihood.  <u>See</u> Lowery Aff. ¶ 15, at 3; Lowery's Motion ¶ 15, at 3 (setting forth this fact); Lowery Response ¶ 15, at 3 (not controverting this fact).

**6.    <u>Plaintiff Barbara Thomas</u>.**

In February 2009, Thomas was a resident at 3000 Florida N.E. in Albuquerque.  <u>See</u> Thomas' and Gabaldon's Motion ¶ 37, at 7 (setting forth this fact); Thomas and Gabaldon Response

---

uncontroverted evidence supports Lowery's allegation that the spoon is the basis of the finding of contamination, the Court will deem this fact admitted.

[21] The Defendants deny that Lowery had no access to his home.  First, they deny without supporting evidence that the plywood was not removed from Lowery's home in spite of his appeal.  <u>See</u> Lowery Response ¶¶ 14 (denying Lowery's assertion that, "[d]espite the filing of an appeal, Inspector Crandall refused to take down the plywood." Lowery's Motion ¶ 14, at 3).  Second, they deny without supporting evidence the Plaintiffs' statement that "Plaintiff Lowery had no access to his home, his personal belongings or his work vehicle, product and equipment."  Lowery Response ¶ 16, at 3 (stating that "Plaintiff Lowery was allowed access to his property on the date he filed his appeal," but adducing no evidence to support this assertion).  The ordinance provides for a stay of the order to vacate for the duration of the appeal: "Staying of Order Under Appeal.  Enforcement of any notice and order of the Mayor issued under this code shall be stayed during the pendency of an appeal therefrom which is properly and timely filed."  Ord. 34-1986 § 14-3-5-4 (D).  Because the Defendants do not properly controvert the Plaintiffs' assertion that the plywood was not removed, the Court will accept this fact.  Although the Defendants also did not specifically controvert the assertion that Lowery had no access to his home, review of the ordinance reveals that the order to vacate was stayed on the filing of the appeal.  The Court therefore will not consider the Plaintiffs' assertion that he had no access to his home.

¶ 37, at 5 (admitting that Thomas is a resident of Albuquerque and not controverting that she was a resident at that address).  D.N.M. LR-Civ. 56.1(b).  Thomas' adult son lived on the property in the garage.[22]  See Thomas' and Gabaldon's Motion ¶¶ 38, 43, at 7; Thomas and Gabaldon Response ¶¶ 38, 43, at 5-6.  On February 26, 2009, the Nuisance Abatement Unit notified Thomas that the house was "substandard," that she must leave the house immediately under threat of arrest, and that entry into the home would be criminal trespass.  See Notice and Order (executed February 26, 2009), filed July 13, 2010 (Doc. 36-4)("Thomas Notice and Order"); Thomas' and Gabaldon's Motion ¶¶ 38, 39, 41, 42, at 7 (setting forth these facts); Thomas and Gabaldon Response ¶¶ 39, 41, 42, at 6 (admitting these facts); id. ¶ 38, at 5 (admitting that Thomas was ordered to leave her home after the house was found to be substandard).  A member of the Nuisance Abatement Unit conducting the inspection advised Thomas that she and her family could seek help from a shelter.[23]  See Thomas

---

[22]  The Plaintiffs describe the garage as "attached" and "converted," and cite to Thomas' affidavit.  Affidavit of Barbara Thomas ¶ 10, at 2 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-5)("The occupant was my son who lived in a converted garage.").  The Defendants dispute that the garage was converted or that there were two dwellings, stating that "for purposes of the housing code, the dwelling was one unit."  Crandall Aff. ¶ 3, at 1.  Review of the ordinance supports the Defendants' contention that the order covers the garage, regardless of whether converted.  The ordinance reads: "Any building or portion thereof, including any dwelling unit, guest room or suite of rooms, or the premises on which the same is located . . . ." (emphasis added).  Ord. 34-1986 § 14-3-4-1.  Because the Court must view the facts in the most favorable light to the non-moving party, the Court will assume that the garage was properly included in the inspection as one dwelling.  See also Hunt v. Cromartie, 526 U.S. at 551.

[23]  The Defendants dispute this fact on grounds that it is inadmissible hearsay.  Thomas and Gabaldon Response ¶ 52, at 6.  Under rule 801 of the Federal Rules of Evidence, statements are not inadmissible hearsay when they are "a statement by the party's agent [. . .] concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).  Here, the statements offered were made by members of the inspection team employed by Defendants Albuquerque Police Department and the City of Albuquerque, who were working under Crandall's supervision at the time of the inspection.  The statements are party opponent admissions and not hearsay.  Because the Defendants do not otherwise dispute this fact, the Court will deem this fact admitted.

Aff. ¶ 5, at 2; Thomas' and Gabaldon's Motion ¶ 52, at 8.  A public notice indicating the property was found to be substandard was posted on the property.  <u>See</u> Thomas' and Gabaldon's Motion ¶ 40, at 7 (setting forth this fact); Thomas and Gabaldon Response ¶ 40, at 6 (admitting this fact).

The Notice and Order to vacate was based at least in part on non-drug related code violations.  <u>See</u> Crandall Aff. ¶ 4, at 1 (stating that "the garage . . . was clearly used and occupied as a living area [and] did not provide the appropriate living conditions required per Ordinance and/or building code for occupancy by the residents."); Thomas' and Gabaldon's Motion ¶ 46, at 8 (setting forth this fact and describing the violations as "minor"); Thomas and Gabaldon Response ¶ 46, at 6 (disputing that the violations were "minor" but not controverting that the code violations were part of the basis for the order).  The Notice and Order required Thomas to remedy four violations not related to the presence of methamphetamine.  <u>See</u> Thomas Notice and Order at 3.  Specifically, the Notice and Order required Thomas to: (i) replace or repair inoperative smoke detectors "in each sleeping room . . . [and] outside each . . . sleeping area in the [same] vicinity"; (ii) replace or recharge old fire extinguishers with fire extinguishers approved by the fire marshall; (iii) "remove all outdoor storage, and litter from the premises"; and (iv) remove all inoperative vehicles from the property.  Thomas Notice and Order at 3.  In addition, the Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  <u>See</u> Thomas Notice and Order at 4.  The electrical code violation identified by Crandall was on the exterior of the home.[24]  <u>See</u> Crandall Depo. at 94:23.

_____

[24] The Defendants dispute the Plaintiffs' statement in Thomas' and Gabaldon's Motion ¶ 47, at 8 ("Plaintiff Thomas was barred from her home even though the electrical code violations were on the exterior of the house."), citing the Crandall Affidavit but no specific paragraph.  The cited evidence makes no reference to the location of the electrical code violation, nor does it address whether Thomas would have been allowed in the home to make repairs when the violation was on the exterior if that had been the only violation, stating only that "residents were required to vacate

The Notice and Order was also based in part on the finding of "paraphernalia in association with methamphetamines," and "possible contamination associated with the use and or sales of controlled substances."[25]   See Thomas Notice and Order at 2; Crandall Aff. ¶ 6, at 1.   The paraphernalia was found in the garage that Thomas' son occupied.   See Thomas' and Gabaldon's Motion ¶ 44, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 44, at 6 (denying this

---

the property until it was brought into compliance."   Crandall Aff. ¶ 5, at 1.   Crandall's deposition testimony states that the electrical code violation was on the exterior, and that Thomas did not have access to the home to make electrical repairs before the environmental testing and cleanup was complete:

> Q: Now, could that prior work have been done without the environmental hygienist testing?
>
> A: It's possible.   Once again, it depends on if they had to go enter the property to effect any repairs on the interior.   At this point, the wiring was on the exterior.   But I don't know if indeed they would go enter the property to make any changes on the inside.
>
> Q: But typically, based upon your -- I can't find the language in this order that notes repairs can't be done until the environmental testing is done though.
>
> A: No, there is not.
>
> Q: So these people had access to their home to do these repairs before the environmental testing?
>
> A: I would say no.   I didn't add that information till after the question was asked of me several times.   Then I added it in the order.

Crandall Depo. at 94:18-95:9.

   [25]   The Plaintiffs maintain that the drug paraphernalia and admission of an occupant of the use of methamphetamines was the "sol[e]" reason for the determination that the house was substandard in Motion ¶ 43 and 50, but admit that other code violations were also the basis of the order in Motion ¶ 46.   The Defendants specifically deny that the order was based solely on the drug paraphernalia and admission of drug use.   See Crandall Aff. ¶¶ 4, 6, at 1; Thomas and Gabaldon Response ¶¶ 43 and 50.   Because the Court must construe the evidence in the light most favorable to the non-moving party, the Court will accept Crandall's version of the asserted fact as true.   See Hunt v. Cromartie, 526 U.S. at 551.

fact, but failing to adduce contrary evidence).  The Order prohibited Thomas from re-entering her

home until environmental testing and, if necessary, decontamination had been completed.  See

Thomas Notice and Order at 2 ("DO NOT BEGIN REPAIRS UNTIL TESTING HAS BEEN

COMPLETED.  IF CONTAMINATES ARE FOUND, DO NOT BEGIN REPAIRS UNTIL ALL

AREAS WHICH TESTED POSITIVE FOR CONTAMINATES HAVE BEEN REMEDIATED.");

Thomas' and Gabaldon's Motion ¶ 48, at 8 (setting forth this fact); Thomas and Gabaldon Response

¶ 48, at 6 (admitting this fact).  Thomas was told that testing and remediation would cost thousands

of dollars.[26]  See Thomas Aff. ¶¶ 4, at 2; Thomas' and Gabaldon's Motion ¶ 49, at 8.

## PROCEDURAL BACKGROUND

On April 7, 2009, Lowery, on his behalf and on behalf of similarly situated persons, filed a

---

[26]  The Defendants dispute this fact by stating that it is inadmissible hearsay.  See Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." (internal quotations and citations omitted)).  Under rule 801 of the Federal Rules of Evidence, the statements are not inadmissible hearsay when they are "a statement by the party's agent [. . .] concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Fed. R. Evid. 801(d)(2)(D).  Here, members of the inspection team that the Albuquerque Police Department and the City of Albuquerque employed, who were working under Crandall's supervision at the time of the inspection, made the statements offered.  The statements are party opponent admissions and not hearsay.  Because the Defendants do not otherwise dispute this fact, the Court will deem this fact admitted.

Thomas also alleges that she "spent thousands to arrange alternative housing for herself and her family and to cover the costs of contamination testing and remediation, . . . and to repair the damage to her property caused by the environmental cleaning service."  Thomas' and Gabaldon's Motion ¶ 51, at 8.  See Thomas Aff. ¶ 14-21, at 2-3.  The affidavit references receipts for these costs, but the receipts were not attached.  See Thomas Aff. ¶ 14–15, at 2, ¶ 17-18, at 3.  The Defendants dispute this statement on grounds that it is "inadmissible hearsay and is immaterial to the issues."  Thomas and Gabaldon Response ¶ 51, at 6.  The Defendants also state: "Further, Plaintiff admits the dwelling was contaminated."  Id.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Here, Thomas' statement is offered to prove the amount Thomas spent on housing (and associated costs), testing and remediation.  The Court therefore will not consider this statement.  See Gross v. Burggraf Const. Co., 53 F.3d at 1541.

-27-

Complaint in the Second Judicial District of New Mexico.  See Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights, filed May 8, 2009 (Doc. 1-1)("Complaint").  The Defendants removed the matter on May 8, 2009.  See Notice of Removal, filed May 8, 2009 (Doc. 1).  The Notice of Removal asserts that the Court has jurisdiction over Lowery's federal law claims under 28 U.S.C. § 1331 and that removal was permitted under 28 U.S.C. §1441.  See Notice of Removal, ¶ 2, at 1.

        The Complaint contains 10 counts.  See Complaint at 4-14.  Count I alleges Defendants John Doe Police Officers deprived Lowery of his Fourth Amendment rights, because they seized his person without probable cause.  See Complaint at 4.  Count II states that the Nuisance Abatement Unit inspector and John Doe Police Officers violated Lowery's Fourth Amendment rights when they entered into the curtilage of his home.  See Complaint at 5. Count III alleges that the police and city inspectors entry and search of the home was unreasonable and therefore a deprivation of Lowery's Fourth Amendment rights.  See Complaint at 5.  Count IV alleges that the Defendants violated Lowery's Fourth Amendment rights through unreasonable seizure of his home.  See Complaint at 6.  In Count V, Lowery contends that the Defendants seized his property without procedural due process in violation of the Fourteenth Amendment.  Count V is an alternative to Count IV, alleging that the Defendants afforded him inadequate pre-deprivation procedure.  See Complaint at 6.  Count VI alleges a procedural due-process violation based on the Defendants' failure to release Lowery's property to him upon his filing a notice of appeal.  See Complaint at 7.  Count VII is a Fourteenth Amendment claim related to requiring environmental testing without sufficient factual basis.  See Complaint at 8.  Count VIII is a Fourteenth Amendment claim related to overall use of the Nuisance Abatement Unit to deprive property owners of property rights and a request to declare the Substandard Building Ordinance unconstitutional.  See Complaint at 9.  Count IX alleges that the

ordinance violates the New Mexico State Constitution and asserts tort claims on behalf of Lowery against the Defendants, including torts of false imprisonment for his detention, and trespass for entry into his curtilage and home and seizure of his home. See Complaint at 12. Count X alleges that the Defendants have a custom, practice, or policy of intentionally violating civil or constitutional rights. See Complaint at 12. Count X also seeks to represent all individuals or corporations whose property was seized or deprived of them by the City of Albuquerque's Nuisance Abatement Unit or through its enforcement of the housing code from three years of the filing of this Complaint until the alleged policy ceases, and seeks certification of Counts IV through X. See Complaint at 12.

On August 11, 2009, Gabaldon, Lovato, and Thomas filed a Complaint in Intervention. See Complaint in Intervention, filed August 11, 2009 (Doc. 11). On August 10, 2010, the Plaintiffs filed an Amended Complaint. See Amended Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights, filed August 10, 2010 (Doc. 48, at 6-16)("Amended Complaint"). The Amended Complaint modified the Complaint to (i) incorporate the Plaintiffs-in-Intervention Gabaldon, Lovato and Thomas into Counts IV, V, VII, VIII, IX, and X, see Amended Complaint at 6-16; (ii) add Lovato to Count VI, see Amended Complaint at 9; and (iii) add facts specific to the Plaintiffs-in-Intervention Gabaldon, Lovato, and Thomas, see Amended Complaint at 2-6.

On June 4, 2010, the Plaintiffs moved for class certification. In a hearing on September 14, 2010,[27] the parties agreed that the requirements of Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure were satisfied. See Fed. R. Civ. P. 23. See Tr. at 4:11-12 (Kennedy). The

---

[27] The hearing on September 14, 2010 included argument on the class certification and summary-judgment motions.

Defendants reserved the right to challenge the class at any time.  <u>See</u> Tr. at 7:11-21 (Court, Levy).

The parties agreed that the Defendants did not admit that there was an unconstitutional policy and

that there was no admission of liability of any kind.  <u>See</u> Tr. at 6:15-21 (Levy).  The Court orally

granted the motion for class certification at the hearing, <u>see</u> Tr. at 9:2-13 (Court), and entered a

written order approving class action notice and trial setting on December 14, 2010, <u>see</u> Order

Approving Class Action Notice and Trial Setting, filed December 14, 2010 (Doc. 67).

The Plaintiffs move for summary judgment.[28]  The Plaintiffs allege that the Defendants

violated the Plaintiffs' Fourth Amendment right to be free from unreasonable seizures because the

Plaintiffs were evicted from their homes based on alleged drug use without lawful authority or a

scientific basis, and because the Defendants were implementing a policy and practice that does not

comport with minimum due-process requirements.  <u>See</u> Thomas' and Gabaldon's Motion at 12.  In

support of this assertion, the Plaintiffs further allege that (i) the Defendants' policy and practice does

not provide any of the procedural protections of authorized nuisance abatement and is unreasonable,

because it is has no legitimate legal or scientific basis, <u>see</u> Thomas' and Gabaldon's Motion at 12;

(ii) the Defendants' policy and practice does not justify the existence of any legitimate emergency

that the Defendants are authorized by law to address, <u>see</u> Thomas and Gabaldon's Motion at 15; and

(iii) the Defendants exerted total dominion over the Plaintiffs' property and barred all access to the

---

[28] Gabaldon and Thomas moved for summary judgment on July 13, 2010.  Lovato and Lowery also submitted motions for summary judgment on July 30, 2010 and August 6, 2010, respectively.  With one exception, all of the motions make the same allegations.  The exception is the allegation in Thomas' and Gabaldon's Motion that the "Defendants exerted total dominion over the Plaintiffs' property and barred all access to the properties under threat of criminal trespass, violating the Fourth Amendment's prohibition against unreasonable seizures."  Thomas' and Gabaldon's Motion at 16.  This allegation is absent from the motions for Lowery and Lovato.  This difference is immaterial to the Court's analysis of the motion for summary judgment, however, because the parties agreed in the September 14, 2010 hearing that the sole question before the Court was whether there were exigent circumstances for the seizure of the homes of all of the Plaintiffs.

properties under threat of criminal trespass, violating the Fourth Amendment's prohibition against unreasonable seizures, see Thomas' and Gabaldon's Motion at 16.

The Plaintiffs also assert that the Defendants' policy and practice violates the Fourteenth Amendment prohibition against deprivations of property without due process of law. See Thomas' and Gabaldon's Motion at 17. Further, the Plaintiffs maintain that the Defendants' policy and practice shocks the conscience, because it is "extremely arbitrary" in violation of the Fourteenth Amendment's substantive due-process prohibition against unreasonable state action. See Thomas' and Gabaldon's Motion at 18. Finally, the Plaintiffs contend that they are entitled to summary judgment, because the undisputed material facts show that the Defendants ejected the Plaintiffs from their homes without legal authority. See Thomas' and Gabaldon's Motion at 19.

The Defendants responded to all of the Plaintiffs' motions in August 2010. The Defendants' Response to Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment was filed on August 27, 2010, followed by the Defendants' Response to Plaintiff Lovato's Motion and Memorandum in Support of Summary Judgment, and the Defendants' Response to Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment on August 29, 2010. In all their Responses, the Defendants argue that the Plaintiffs fail to support their allegations and that summary judgment is barred, because there are disputed issues of material fact. See, e.g., Lowery Response at 6; Thomas and Gabaldon Response at 7; Lovato Response at 4.

In their Response to Lowery's Motion, the Defendants argue that evidence does not support Lowery's contention that he was evicted solely based on the Defendants' allegations of drug use. See Lowery Response at 3. The Defendants also challenge the validity of the affidavit from John Lowery -- K. Lowery's father – that K. Lowery submitted in support of his allegations, although they did not raise this challenge in response to the specific numbered statement of facts. See Lowery

Response at 4.  They also contend, without supporting evidence, that K. Lowery had access to his home on the same day he filed his appeal.  See Lowery Response at 4.  The Defendants contend that the "Plaintiff's legal analysis is for naught in the face of the factual dispute at issue here" and that "all of the cases cited by Plaintiff actually weigh in favor of the lawfulness of the Defendants' actions."  Lowery Response at 4.  Finally, the Defendants argue that the K. Lowery's "argument[s] [are] based on the eviction being premised on 'alleged drug use,'" but that Crandall's affidavit "specifically sets forth the basis for his legal actions."  Lowery Response at 4.

In response to Lovato's motion, the Defendants maintain that, contrary to Lovato's contention, the evidence shows that the designation of Lovato's home as substandard was based on both possible contamination and "life safety" issues.  Lovato Response at 5.  The Defendants assert that the appeal process set forth in the Notice and Order gave Lovato "adequate notice and an opportunity to meaningfully participate," and therefore provided sufficient due process protections. Lovato Response at 6 (quoting Edmundson v. City of Tulsa, 152 Fed. Appx. 694, 697 (10th Cir. 2005)).  Finally the Defendants challenge Lovato's implication that enforcement of non-drug related code violations was a "subterfuge," contending that Lovato failed to provide evidence in support of the implication.  Lovato Response at 6.

In addition to allegations that Thomas and Gabaldon fail to adduce evidence in support of their allegations that they were evicted based on suspicion of drug use alone, the Defendants contend that Thomas and Gabaldon admitted that there was drug-related contamination in their homes and that the test of reasonableness of state action under the Fourth Amendment requires "a careful balancing of governmental and private interests."  Thomas Response at 8 (quoting Camuglia v. City of Albuquerque, 448 F. 3d 1214, 1220 (10th Cir. 2006)).  The Defendants further argue that there was a sufficient appeal process.  See Thomas Response at 8.

-32-

Thomas and Gabaldon replied on September 13, 2010.  They contend

> the City's response reveals two critical and determinative concessions from the
> Defendants: 1) the City seized Plaintiffs' homes; 2) the seizure would not be
> released in any manner until Plaintiffs retained environmental hygienists to test
> their homes.  Thus, while Defendants assert that the basis for the seizures were
> multi-faceted, the condition precedent for the release of a seizure was the order of
> costly environmental testing and remediation that has no basis in science or law.

Thomas and Gabaldon Reply at 2.  Thomas and Gabaldon allege that the seizure created by the
testing and decontamination requirement falls under the Fourth Amendment, and was "without court
order and without a showing of exigency."  Thomas and Gabaldon Reply at 3.  Thomas and
Gabaldon argue that, because the Defendants admitted in their Response that the posting of homes
as substandard constituted a seizure, and that seizures continued until drug testing and remediation
were conducted, "these simple facts alone warrant the Court entering summary judgment in
Plaintiff's favor, as it becomes immaterial whether there were other reasons for the seizures of the
homes."  Thomas and Gabaldon Reply at 3.  Thomas and Gabaldon also maintain that, absent
exigent circumstances, seizure of the homes was unreasonable.  See Thomas and Gabaldon Reply
at 4.  They contend that the Defendants fail to show that there is a "scientific or legal basis for
deciding that any [drug or drug related contamination] poses an immediate health risk to occupants
of a home," Thomas and Gabaldon Reply at 6, and that the Defendants therefore fail to meet their
burden to show that "mere presence of drugs or drug paraphernalia creates an objectively reasonable
circumstance justifying the immediate and total seizure of [Plaintiffs'] homes," id. at 5.  Thomas and
Gabaldon argue that the Defendants also fail to show that any of the other code violations were
imminently life threatening so as to create an exigency.  See Thomas and Gabaldon Reply at 5.
Finally, the Plaintiffs contend that the affidavits offered by the Defendants to demonstrate the code
violations that were the basis of the evictions "do not detail the violations or explain how the

-33-

violations presented immediate risks to the occupants of the homes," and are "conclusory." Thomas and Gabaldon Reply at 7.

At the hearing, the Plaintiffs' counsel, Joseph Kennedy, argued the three Plaintiffs' motions for summary judgment together, stating that the "thrust of our motions for summary judgment is a Fourth Amendment claim," Tr. at 14:14, and "the interrelationship of the Fourth Amendment and the Fourteenth Amendment and how they play a part in a case like this," Tr. at 14:19 (Kennedy). Mr. Kennedy argued that the facts show that the City of Albuquerque and the inspectors had a policy of immediately seizing homes without an order and without exigency. See Tr. at 14:22-25 (Kennedy). He contended that the Defendants bear the burden of showing an exigency, see Tr. at 15:9-11 (Kennedy), and that because the Defendants failed to do so, summary judgment would be proper, see Tr. at 15:18-19 (Kennedy).

Mr. Kennedy allowed that seizure of the homes followed shortly by an automatic hearing on the seizure would be constitutional, see Tr. at 16:1-10 (Court, Kennedy), but maintained that the Notice and Order under the current Ordinance does not provide for such a hearing, see Tr. at 16:16-18 (Kennedy). Instead, he argued that the Ordinance provides only for an appeal during which a hearing is held. See Tr. at 16:16-18 (Kennedy). The "practical difference," Tr. at 17:17 (Court), between an automatic hearing and a hearing on appeal is the burden on the homeowner to file an appeal. See Tr. at 17:22-25 (Kennedy). Mr. Kennedy stated further that the Plaintiffs challenge the adequacy of the notice of the right to appeal in the Notice and Order. See Tr. at 18:3-5 (Kennedy).

Upon questioning by the Court, Mr. Kennedy stated that the motion for summary judgment rests on two prongs: first, that the ordinance does not provide for automatic review of a seizure of a home, and second, that the statute is overly broad in its definition of substandard housing. See Tr.

at 19:6-13 (Court, Kennedy).  He  argued that the statute is "facially" flawed, because it neither protects the public nor the rights of the homeowners or residents in the homes.  Tr. at 19:14-20:11 (Kennedy).  Mr. Kennedy explained that the rights of residents and homeowners are violated, because their homes are seized purportedly because of substandard living conditions, but the City's protection of the residents ends upon the filing of an appeal, whereupon residents are supposed to be allowed back into the house previously deemed substandard.  See Tr. at 19:21-20:11 (Kennedy).

The Court requested that Mr. Kennedy point out exactly which language in the ordinance 36-2004, § 14-3-4-1 was allegedly overly broad.  See Tr. at 22:1-5 (Court).  The Defendants directed the Court's attention to Document 32-1, page 9 of 11.  See Tr. at 22:11 (Levy).  Mr. Kennedy read the ordinance aloud, and the Court questioned which elements of the statute were at issue.  See Tr. at 22:19-24:10 (Court, Kennedy).  Mr. Kennedy maintained that the Plaintiffs accepted the use of the words "life," "limb," "health," and "safety," but found inclusion of the words "property" and "welfare" overly broad.  Tr. at 23:5-10 (Court, Kennedy).  He also contended that the statute should include a requirement that any danger to life, limb, health, or safety be imminent.[29]  See Tr. at 23:11-17 (Kennedy).

The Court next questioned the relevance of the City's ordinances to the problem of methamphetamine-manufacturing laboratories.  Tr. at 24:1-6 (Court).  Mr. Kennedy stated that the City had passed an ordinance addressing the issue of methamphetamine labs and that such an ordinance was within the police power of the City, but that the methamphetamine lab ordinance was not a part of this case.  See Tr. at 24:7-18 (Kennedy, Court).  Mr. Kennedy alleged

---

[29] Later in the hearing, the Plaintiffs reconsidered this position and agreed that addition of an imminence requirement would make the ordinance constitutional without removal of the words "property" and "welfare."

that, at one time, the inspectors were declaring residences substandard based on evidence of drug

use, and not manufacturing, under the meth lab ordinance.  See Tr. at 24:19-23 (Kennedy).  He also

averred that, over time, the City of Albuquerque and inspectors began citing houses based on

evidence of drug use under the substandard building ordinance instead of the meth lab ordinance.

See Tr. at 24:24-25:3.  Mr. Kennedy reiterated his argument that the City of Albuquerque and

inspectors failed to show that the cited code violations created an immediate threat to life safety.

See Tr. at 25:10-20 (Kennedy).  In addition, he maintained that the City of Albuquerque failed to

show that there was a threat to the life or safety of others caused by drug use in the residences, see Tr.

at 26:5-8 (Kennedy): in each case all residents of the home were evicted when it was a single person

associated with the residence that used drugs, see Tr. at 26:7-25 (Kennedy, Court).  He argued that

the City of Albuquerque could address the dangers of drug use in a home through other measures.

See Tr. at 26:17-19 (Kennedy, Court).

   The Court questioned Mr. Kennedy on a situation in which there was no drug use, but a

"water heater and it looked like it was about to blow up."  Tr. at 28:18 (Court).  Mr. Kennedy

responded by stating that

> we don't see these cases . . . as fitting that situation primarily because the affidavits
> that the inspectors offered no detail and no information of -- of an immediate risk to
> life or limb or health, and they were essentially detailing code violations that,
> without -- with an unsubstantiated opinion that this stuff -- this was an immediate
> danger.

Tr. at 1:18-23 (Kennedy).  Mr. Kennedy also argued that, because drug use was the basis for some

of the code violations, "we have a situation where the -- the testing itself, the drug usage itself was

the -- the condition precedent, if you will, of the seizure, that the seizure would not be released in

any  manner until this drug testing was done . . . ."  Tr. at 3:4-7 (Kennedy).

   The Court asked Mr. Kennedy about the relevance of recent Supreme Court cases limiting

-36-

facial challenges to statutes.  <u>See</u> Tr. at 3:19-21 (Court).  The Plaintiffs responded by arguing that

the statute could be constitutional if it included a requirement that the danger to life, limb, safety,

health, property or welfare be imminent.  <u>See</u> Tr. at 5:18-25 (Court, Kennedy).  The Plaintiffs

reconsidered their earlier contention that the words "property" and "welfare" must be struck, and

agreed with the Court's understanding that "your real problem has not been with the words welfare

and property, it's with the lack of the word imminent."  Tr. at 5:18-21 (Court, Kennedy).  The Court

asked about the intersection between the Fourth Amendment and the Fifth Amendment due-process

claims.  <u>See</u> Tr. at 6:4-5 (Court).  Mr. Kennedy reiterated that there must be an "objectively

reasonable basis to believe that the occupants at home are at immediate threat for life or safety

reasons . . . ."  <u>Id.</u> at 6:22-24 (Kennedy).

      The Defendants' counsel, Kathryn Levy, Deputy City Attorney, objected to the Plaintiffs'

arguments in the hearing, stating that "many of the arguments that have been articulated here this

afternoon . . . go far beyond the corners of the Motions for Summary Judgment there were filed in

this case."  Tr. at 8:4-7 (Levy).  Ms. Levy asserted that the Plaintiffs' arguments regarding the

constitutionality of the ordinance were not part of the Motions for Summary Judgment and therefore

the Defendants did not address them in their Responses.  <u>See</u> Tr. at 10:16-23 (Levy).  She

maintained that the Defendants had responded to the "narrowly argued Motions" and not to the issue

of constitutionality, and that therefore it would be "premature" for the Court to rule on those issues

without an opportunity for the Defendants to submit a brief on those issues.  <u>See</u> Tr. at 13:5-14:2

(Levy).  She argued that summary judgment would be improper because the only issue raised by the

Motions was whether there was a factual dispute and the Defendants had adequately shown that

there is.  <u>See</u> Tr. at 11:8-11 (Levy).  Ms. Levy stated that, if the Court deemed the Plaintiffs'

argument as a challenge to the statutory scheme, the Defendants should be granted leave to

supplement the briefs.  See Tr. at 15:9-15 (Levy).  She maintained that, because a state statute reads "exactly the same way," the opportunity for a full briefing of the constitutionality issues was further warranted by the "far reaching ramifications" of a ruling on those issues.  See Tr. at 15:16-20 (Levy).

Mr. Kennedy countered the Defendants' argument by stating that the Defendants' narrow reading of the Motions "is just wrong."  Tr. at 17:22-18:1 (Kennedy).  He argued that the fact that the Defendants offered evidence that drug use was not the sole basis for the evictions is "inadequate," because the requirement for environmental testing is a seizure of the home.  Tr. at 17:8-16 (Kennedy).  He stated that "we've presented lack of order, lack of court order, and -- and the City, once the City admits to the seizure, which they admitted to, and a lack of court order, court oversight, it's up to the City to provide evidence of an emergency and exigency."  Tr. at 18:1-5 (Kennedy).  He argued further that, even viewing the Defendants' affidavits in the light most favorable to the Defendants, the Defendants have failed to show exigent circumstances justifying a seizure.  See Tr. at 18:5-8 (Kennedy).  Mr. Kennedy, in response to a question from the Court, agreed that the issue was "a straight up Fourth Amendment issue," Tr. at 21:5 (Kennedy), and that the question before the Court is "does the Fourth Amendment allow the City to immediately evict people and seize the house, . . . the seizure being you must get this house tested by environmental hygienist [sic] to have any access to this house at all?"  Tr. at 21:9-16 (Court, Kennedy).

The Court asked Ms. Levy if her objection would be resolved if the Plaintiffs narrowed the motion to this question and the Court offered an opportunity for the Defendants to file a supplemental brief on that issue.  See Tr. at 24:2-5 (Court).  Ms. Levy stated that this approach would satisfy the Defendants.  See Tr. at 24:6 (Levy).  The parties agreed that the Court would address only the Fourth Amendment issues raised by the Plaintiffs following submission of

-38-

supplemental briefing by the Defendants and of a surreply by the Plaintiffs, and that the Court will "assume the facts as the . . . City has set [them] forth in the Affidavits." Tr. at 25:4-12 (Court).

The Defendants filed a surreply on March 1, 2011.  <u>See</u> Surreply to Named Plaintiffs' Motions for Summary Judgment[36], [43] and [45], filed March 1, 2011 (Doc. 72)("Surreply"). They argued that they have submitted sufficient evidence regarding the presence of exigent circumstances to overcome a motion for summary judgment and that the Plaintiffs' contention that re-entry was barred was belied by the fact of the appeal process.  <u>See</u> Surreply at 2, 3.  The Plaintiffs responded on March 4, 2011.  <u>See</u> Plaintiffs' Response to Defendants' Surreply to Named Plaintiffs' Motions for Summary Judgment [36], [43] and [45], filed March 4, 2011 (Doc. 75)("Response to Surreply").   The Plaintiffs contended that Defendants' arguments regarding exigency are conclusions unsupported by objective factual bases on which a reasonable jury could find that an emergency existed to justify seizure of the homes.  <u>See</u> Response to Surreply at 4.  The Plaintiffs maintained that the evidence proffered by the Defendants only characterizes the violations as "life safety" issues rather than providing evidence that such violations could endanger the residents. Response to Surreply at 5.  The Plaintiffs argued that the Defendants' failure to provide evidence supporting the characterization of the code violations as a danger to life and safety constitutes a failure to meet their obligation to respond to a summary-judgment motion.  <u>See</u> Response to Surreply at 4.  They argued further that the Defendants' emphasis on the appeal process is misplaced, because the appeal process does not "un-seize" a residence.  Response to Surreply at 2. Finally, they argued that the appeal process itself demonstrates that no true exigency exists, because it allows residents back into a home even when previously it was deemed too dangerous to life and safety for the residents to stay there. <u>See</u> Response to Surreply at 2.

## **LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT**

Rule 56(c) states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record], together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.")(internal quotation marks omitted).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotes omitted).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere

allegations or denials of his [or her] pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.

See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United

States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary

judgment motion is made, the opposing party may not rest on the allegations contained in his

complaint, but must respond with specific facts showing the existence of a genuine factual issue to

be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory

opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer,

2008 WL 2309005, at *1 (citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross & Blue Shield of

Kan., Inc., 452 F.3d at 1199).  "In responding to a motion for summary judgment, 'a party cannot

rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment

in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL

2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

    Genuine factual issues must exist that "can be resolved only by a finder of fact because they

may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at

250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11

F.3d at 1539.  Rather, there must be sufficient evidence on which the fact-finder could reasonably

find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting

Schuylkill & Dauphin Improv. Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11

F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the

nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . .

or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty

Lobby, Inc., 477 U.S. at 249 (internal citations omitted).  Where a rational trier of fact, considering

-41-

the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.

See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party. See Hunt v. Cromartie, 526 U.S. 550-55. Third, the court cannot decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## RELEVANT LAW ON FOURTH AMENDMENT AND EXIGENT CIRCUMSTANCES

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment generally requires a warrant for there to be a valid search or seizure. The Supreme Court of the United States has previously stated that the home is entitled to the greatest Fourth-Amendment protection. See Kyllo v. United States, 533 U.S. 27, 31 (2001)("At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion."). "[P]olice officers need either a warrant or probable cause plus exigent circumstances, in order to make lawful entry into a home." Kirk v. Louisiana, 536 U.S. 635, 638 (2002). The Fourth Amendment's protections extend to searches or seizures pursuant to a municipal housing code. See Camara v. Municipal Court of San Francisco, 387 U.S. 523, 534 (1967)(holding that Fourth Amendment is applicable in administrative

searches for safety inspections).  See also Soldal v. Cook County, Ill., 506 U.S. 56, 70 (1992)("The

right against unreasonable seizures would be no less transgressed if the seizure of the house was

undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by

the police, or on a whim, for no reason at all.").  The Supreme Court recognized in Camara v.

Municipal Court of San Francisco that housing codes often serve important public interests and ruled

that "[t]he Fourth Amendment's requirement that all search warrants be supported by 'probable

cause' can be satisfied by demonstrating the reasonableness of the regulatory package that includes

compulsory inspections." Platteville Area Apartment Ass'n v. City of Platteville, 179 F.3d 574, 578

(7th Cir. 1999).

        "A 'seizure' of property occurs when there is some meaningful interference with an

individual's possessory interests in that property." United States v. Jacobsen, 466 U.S. 109, 114

(1984).  "The requirement of reasonableness that the Fourth Amendment imposes . . . entails the

striking of a balance between the benefits of an administrative search in implementing valid

governmental programs and its costs to the property and privacy interests of the persons whose

homes . . . are searched." Platteville Area Apartment Ass'n v. City of Platteville, 179 F.3d 574, 581

(7th Cir. 1999)(internal citations omitted). See Edmundson v. City of Tulsa, 152 F. App'x. 694, 698

(10th Cir. 2005)("In determining whether a government seizure violates the Fourth Amendment, the

seizure must be examined for its overall reasonableness.").

        The United States Court of Appeals for the Tenth Circuit has found "overall reasonableness"

that satisfies the Fourth Amendment in administrative seizures after and pursuant to an inspection

when the manner of the seizure is reasonable and procedural due-process requirements are met.  In

Santana v. City of Tulsa, 359 F.3d 1241(10th Cir. 2004), the Tenth Circuit held that, "as long as

procedural due process standards are met and no unreasonable municipal actions are shown, a

nuisance abatement action does not violate the Fourth Amendment." Santana v. City of Tulsa, 359 F.3d at 1246. See Edmundson v. City of Tulsa, 152 F. App'x 694, 698 (10th Cir. 2005). In Santana v City of Tulsa, the defendant was given advance notice of the nuisance abatement action and had time to remedy it before the City inspectors returned to remove the nuisance. Santana v. City of Tulsa, 359 F.3d at 1246. Similarly, in Edmundson v. City of Tulsa, the defendant was allowed "to keep and remove from the property . . . fifteen to twenty vehicles, and . . . another ten vehicles were left on the premises because they did not constitute a nuisance. [T]here was no violation of plaintiffs' Fourth Amendment rights." Edmundson v. City of Tulsa, 152 F. App'x. at 698.

The holding of Santana v. City of Tulsa relied on the discussion of the warrant requirement in administrative seizures in Freeman v. City of Dallas, 242 F.3d 642 (5th Cir. 2001). In Freeman v. City of Dallas, the City of Dallas ordered two apartment buildings demolished after finding that they were "urban nuisances" under the City's "Minimum Urban Rehabilitation Standards Code" ("Code"). Freeman v. City of Dallas, 242 F.3d at 646. After receiving the notice that the buildings violated the City of Dallas' Code, the plaintiffs challenged the notice through the procedures set forth in the Code but lost after review by the Urban Rehabilitation Standards Board ("URSB"). Freeman v. City of Dallas, 242 F.3d at 646-47. When the plaintiffs failed to demolish the building, the City of Dallas contracted to have it demolished and billed the plaintiffs. See Freeman v. City of Dallas, 242 F.3d at 647. The plaintiffs maintained that the demolition of the buildings violated their Fourth Amendment protection against unreasonable seizures because the City of Dallas failed to obtain a warrant for the demolition. See Freeman v. City of Dallas, 242 F.3d at 647. The United States Court of Appeals for the Fifth Circuit found that the lack of such a warrant was not a violation of the Fourth Amendment, because the "ultimate test of reasonableness" was met:

The ultimate test of reasonableness is fulfilled in this case by the City's adherence to its ordinances and procedures as a prelude to ordering the landowners to abate their nuisance structures. The Supreme Court originally extended an administrative warrant requirement to civil investigations because "the basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against *arbitrary* invasions by governmental officials." Camara, 387 U.S. at 528 (emphasis added). . . . The City's . . . municipal habitation code . . . is sufficiently hedged about by published standards, quasi-judicial administrative proceedings, and flexible remedies that it is not *arbitrary.* In the context of reviewing civil administrative and regulatory enforcement of laws enacted pursuant to the traditional police power, Fourth Amendment reasonableness means non-arbitrariness.

Freeman v. City of Dallas, 242 F.3d at 654 (internal citations omitted). The Fifth Circuit distinguished Camara v. Municipal Court of San Francisco and its progeny on two grounds. First, the Camara v. Municipal Court of San Francisco plaintiff sought to avoid inspection of his apartment without a warrant. In Freeman v. City of Dallas, the plaintiffs sought to avoid only demolition of the property, and not the inspection that gave rise to the URSB's order to demolish. See Freeman v. City of Dallas, 242 F.3d at 651. Second, the Fifth Circuit found that the regulatory structure in which the Freeman v. City of Dallas inspectors operated was not arbitrary, unlike the "unbridled discretion" with which the Camara v. Municipal Court of San Francisco inspectors operated. Freeman v. City of Dallas, 242 F.3d at 651.

Although "searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), exigent circumstances may, at times, justify a search or seizure without a warrant, see United States v. Najar, 451 F.3d 710, 717-18 (10th Cir. 2006). To lawfully enter a home, police officers need either a warrant or some exception to the warrant requirement. One important exception to the warrant requirement is the presence of exigent circumstances, such as the presence of evanescent evidence or an emergency requiring the officer's aid. See Kirk v. Louisiana, 536 U.S. 635, 638 (2002)(holding that, to enter a home, "police officers need either a warrant or probable cause plus exigent circumstances, in order to make lawful entry

into a home"); <u>Manzanares v. Higdon,</u> 575 F.3d 1135, 1142-43 (10th Cir. 2009)("[E]ven when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within a home, police may not enter without a warrant absent exigent circumstances.")(citing <u>Groh v. Ramirez</u>, 540 U.S. 551, 559 (2004)) (internal quotes omitted). <u>See also</u> <u>United States v. Martinez</u>, 686 F. Supp. 2d 1161, 1181 (D.N.M. 2009)(Browning, J.).

In summary, the Fourth Amendment prohibition against unreasonable seizures is satisfied when (i) there is a warrant issued; (ii) there are circumstances justifying a warrantless entry, such as exigent circumstances; or (iii) the seizure is an administrative seizure pursuant to findings of an inspection that is not arbitrary, because it occurs within the bounds set by an ordinance or code that specifies the standards, methods, and processes of the seizure, including pre-deprivation procedures.

### A.   REQUIREMENTS FOR EXIGENT CIRCUMSTANCES.

In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause. <u>See</u> <u>United States v. Najar</u>, 451 F.3d 710, 718 (10th Cir. 2006). In such emergency-aid situations, the Tenth Circuit employs a two-pronged test -- adopted after <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (2006) -- to determine whether emergency circumstances justify a warrantless entry into a home, which examines: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is [sic] reasonable." <u>United States v. Najar</u>, 451 F.3d at 717-18. A court must also remember that officers cannot create their own exigent circumstances to justify a warrantless entry. <u>See</u> <u>United States v. Flowers</u>, 336 F.3d 1222, 1230 (10th Cir. 2003). Exceptions to the warrant requirement of the Fourth Amendment, including the exception of exigencies, should be "well delineated," and "jealously and carefully drawn." <u>United States v. Aquino</u>, 836 F.2d 1268,

1271 (10th Cir. 1988).

  **B.**  **EXIGENT CIRCUMSTANCES ARE JUDGED ON AN OBJECTIVE STANDARD AND THE GOVERNMENT BEARS THE BURDEN OF PROVING EXIGENCY.**

The Court uses an objective standard to determine the presence of exigent circumstances: the circumstances of the seizure must be assessed as they would by a "prudent, cautious, and trained officers." Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1072 (10th Cir. 2010).  See Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006)("The officer's subjective motivation is irrelevant.").  In addition, there must be a factual basis to support a claim of exigent circumstances. See Cortez v. McCauley, 478 F.3d 1108, 1124 (10th Cir. 2007).  Finally, the State must demonstrate exigency.  See United States v. Anderson, 154 F.3d 1225, 1234 (10th Cir. 1998)("The Government has the burden of proving exigency."); Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1072 (10th Cir. 2010)("Officers bear the burden of establishing that the threats [by the defendant] posed exigent circumstances justifying the warrantless entry.")(citing United States v. Reeves, 524 F.3d 1161, 1170 (10th Cir.2008).

## ANALYSIS

   To survive a motion for summary judgment, the Defendants must come forth with evidence to show that there was a warrant for the seizure, that there is a genuine issue of material fact regarding whether the seizure of the Plaintiffs' homes met both prongs of the Tenth Circuit test for exigent circumstances and therefore warrantless seizure was justified, or that seizure of the Plaintiffs' homes after a warranted inspection was within the bounds of the ordinance and pursuant to reasonable pre-deprivation processes.  The code violations for which the Plaintiffs were cited and ordered to vacate fall into two categories: drug-related and non-drug-related.  The Defendants have failed to provide evidence that the presence of drugs or drug paraphernalia posed an immediate

threat to the life or safety of the occupants of the seized homes that would create an exigent circumstance.  The Court will grant the Plaintiffs' Motion for Summary Judgment for the drug related citations.  The Court also will grant Plaintiff's Motion for Summary Judgment for the non-drug-related violations.

The Court notes first that there are several facts in the record which the parties did not highlight in the briefing or at the hearing, and which the Court discovered when it began to prepare its opinion and order.[30]  The Court has previously addressed whether to consider evidence in therecord on which the parties do not rely in the briefing.  See Trujillo v. Board of Educ. of

---

[30] Evidence in the record indicates that warrants were issued for the Lovato and Gabaldon homes.  See Motion for Class Certification ¶ 39, at 9 ("After a search of Plaintiff Lovato's home based upon a warrant, members of the Nuisance Abatement Unit ordered Plaintiff to leave the home and seized the property through a nuisance abatement "Notice and Order" and a public posting on the property of "substandard building.").  In his deposition, Moya testified that he had an administrative warrant:

> A. . . . At that point, what I did is just looking, based on what I saw on the outside, I decided to get a warrant. And I don't remember what the code violations were that warranted that. I did get a warrant, and then we served the warrant, and I don't remember the date or anything.
>
> Q. It was an administrative warrant, I guess?
>
> A. Correct.
>
> Q. And you served the warrant, and they did an inspection of his home; is that fair?
>
> A. Yes.

Moya Depo. at 11-12:16-1.  Administrative warrants differ from judicial warrants in that the probable cause requirement in administrative searches "must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." Camara v. Mun. Court of City & County of San Francisco, 387 U.S. 523, 538 (1967). The standards are not based on "specific knowledge of the condition of the particular dwelling." Camara v. Mun. Court of City & County of San Francisco, 387 U.S. at 538.

Albuquerque Public Schools, 470 F. Supp. 2d 1270, 1276 (D.N.M. 2005).  After reviewing the case law from this and other circuits, this Court ultimately relied on a case from the Tenth Circuit, in which the Tenth Circuit noted that, while it may, in its "discretion[,] . . . go beyond the referenced portions of these materials, [the Court] is not required to do so."  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir.1998) (citation omitted).  In so holding, the Tenth Circuit cautioned that the courts "have a limited and neutral role in the adversarial process, and [they should be] wary of becoming advocates who comb through the record . . . and make a party's case for it."  Adler v. Wal-Mart Stores, Inc., 144 F.3d at 672.  In this case, the Court will tread carefully in its review of the evidence it found in the record to which the parties did not direct its attention.

The Plaintiffs' argument has two prongs.  One prong of the argument is that the drug-related code citations were not threatening to the life or safety of the occupants, and that eviction was unreasonable because there were no exigent circumstances.  The Plaintiffs further argue that, given that the drug-related citations were not exigent circumstances, the testing and remediation that the Defendants ordered for such citations was an unconstitutional seizure, because they were forced to leave their homes until they completed environmental remediation.  The Plaintiffs further contend that the evidence of drug use alone must establish exigent circumstances, because even if the non-drug-related violations were immediately life threatening, the testing and remediation required by the Notice and Order precluded entry to the home to fix them and therefore that requirement served as an unreasonable "condition precedent" to the Plaintiffs' compliance with the housing code.  The second prong is that, even if the Court were to consider the non-drug-related code violations, those violations were not threatening to the life or safety of occupants, and therefore were insufficient to establish exigent circumstances justifying eviction.

# I.   EXIGENT CIRCUMSTANCES WERE REQUIRED FOR THE SEIZURES, BECAUSE THERE WERE NO PRE-DEPRIVATION PROCEEDINGS.

Evidence in the record suggests that warrants were issued for Lovato's and Gabaldon's homes.[31] The Plaintiffs do not address the presence of the warrants in their briefs. Perhaps more important, the Defendants do not argue in their briefs, nor did they argue in the hearing, that the presence of warrants makes the seizures reasonable under the Fourth Amendment, and obviates the need for exigent circumstances as justification for warrantless seizure of the homes. In addition, the Defendants' affidavits make no reference to warrants. Furthermore, the evidence in the record which the Court discovered about the warrants is very limited, and it is unclear whether judicial or administrative warrants were issued, how the warrants were obtained, when they were obtained, and whether the warrants permitted the inspectors to inspect, or what else, if anything, the warrants allowed the Defendants to do. If the warrants are judicial warrants, the Defendants have made no effort to show probable cause supported the warrant or their ability to seize the homes, as the Fourth Amendment requires. See Camara v. Mun. Court of City & County of San Francisco, 387 U.S. at

---

[31] See Motion for Class Certification ¶ 39, at 9 ("After a search of Plaintiff Lovato's home based upon a warrant, members of the Nuisance Abatement Team ordered Plaintiff to leave the home and seized the property through a nuisance abatement "Notice and Order" and a public posting on the property of "substandard building."). In Moya's deposition, he stated he had an administrative warrant:

> A. . . . At that point, what I did is just looking, based on what I saw on the outside, I decided to get a warrant. And I don't remember what the code violations were that warranted that. I did get a warrant, and then we served the warrant, and I don't remember the date or anything.

> Q. It was an administrative warrant, I guess?

> A. Correct.

> Q. And you served the warrant, and they did an inspection of his home; is that fair?

> A. Yes.

Moya Depo at 11:16-12:1.

-50-

534 ("In cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness.). If the warrants were administrative warrants, the Defendants have not shown there were pre-deprivation hearing processes. See also Thomas' and Gabaldon's Motion ¶ 19, at 5; Thomas Response ¶ 19, at 4; Lovato Notice and Order at 3; Lowery Notice and Order at 7; Thomas Notice and Order at 4. See Thomas and Gabaldon Response at 7-8; Lovato Response at 5-6; Lowery Response at 3-4; Surreply at 2-4. There is some evidence that the police secured some warrants, called the inspectors, who then secured their own administrative warrants. In any case, the parties do not appear to want the Court to consider the warrants at all. The parties agreed at the September 14, 2010 hearing that the issue before the Court was whether there was a genuine issue of whether exigent circumstances provided an exception to the warrant requirement. The Court need not speculate whether the warrants were invalid or did not cover the seizure of the Plaintiffs' homes, for the parties apparently have concluded, assumed, or want the Court to assume the warrants do not solve the constitutional problem. The Court, therefore, does not decide whether there were valid warrants to support the seizure of the Plaintiffs' homes.

Under Santana v. City of Tulsa, a seizure of property after a valid search is reasonable even in the absence of a separate warrant for the seizure when the seizure is conducted pursuant to an established scheme and accompanied by pre-deprivation processes in accordance with that scheme.[32]

--------

[32] The holdings of Santana v. City of Tulsa and of Freeman v. City of Dallas relied on the fact that the actions of the City were within the bounds of an ordinance or code that proscribed the inspectors' discretion in the conduct of the search and subsequent seizure. See Freeman v. City of Dallas, 242 F.3d at 654 ("In the context of reviewing civil administrative and regulatory enforcement of laws enacted pursuant to the traditional police power, Fourth Amendment reasonableness means non-arbitrariness."). In this case, the evidence suggests that the non-drug-related violations were consistent with the Substandard Housing Ordinance, whereas the drug-related citations were not, because the Ordinance does not address drug use. The Court does not reach the question whether the non-drug-related violations were consistent with the Substandard Housing Ordinance, however, because there is no evidence that the Ordinance provides for a pre-deprivation process as in Santana v. City of Tulsa.

Santana v. City of Tulsa, 359 F.3d at 1245.  Here, each Plaintiff was required to vacate the residence immediately upon the issuance of the Notice and Order.  See Thomas' and Gabaldon's Motion ¶ 19, at 5; Thomas Response ¶ 19, at 4; Lovato Notice and Order at 3; Lowery Notice and Order at 7; Thomas Notice and Order at 4.  In each case, the inspection of the property and issuance of the Order occurred on the same day.  See Thomas' and Gabaldon's Motion ¶ 19, at 5; Thomas Response ¶ 19, at 4; Lovato Notice and Order at 3; Lowery Notice and Order at 7; Thomas Notice and Order at 4.  Unlike the plaintiffs in Santana v. City of Tulsa, Edmundson v. City of Tulsa, and Freeman v. City of Dallas, the Plaintiffs here were offered no opportunity to remedy the code violations or challenge the findings of the inspectors before the property was seized.  See Thomas' and Gabaldon's Motion ¶ 19, at 5; Thomas Response ¶ 19, at 4; Lovato Notice and Order at 3; Lowery Notice and Order at 7; Thomas Notice and Order at 4.  The Defendants argue that the provisions of the appeal process make the seizure reasonable and rely on the holding of Camuglia v. City of Albuquerque, 448 F. 3d 1214, 1220 (10th Cir. 2006).  In that case, a restaurant owner challenged seizure of the restaurant on grounds that his procedural due process grounds had been violated.  The plaintiff agreed that the City of Albuquerque ordinance allowing such seizure was constitutional, but argued that the city inspector had erred in seizing the property.  The Court held that a postdeprivation hearing was sufficient to avoid violation of the Plaintiff's due process rights.

The Camuglia v. City of Albuquerque holding does not apply to the issue presently before the Court for two reasons.  First, the plaintiff there sought relief only on grounds of violation of due process, and not on the Fourth Amendment right to be free from unreasonable searches and seizures.  Second, that case dealt with regulation of a restaurant and not a home.  In New York v. Burger, the Supreme Court of the United States recognized that business owners have an expectation of privacy that "exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes."  New York v. Burger, 482 U.S. 691, 700 (1987)(citations omitted).  Homes, however, are

not like businesses: "An expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home."  Id.

Plaintiffs argue that the evidence of drug use alone must establish exigent circumstances, because even if the non-drug-related violations were immediately life or safety threatening, the testing and remediation required by the Notice and Order precluded entry to the home to fix them and therefore that requirement served as an unreasonable "condition precedent" to the Plaintiffs compliance with the housing code.  Because the Substandard Housing Ordinance does not allow for seizure of a home based on the presence of drugs or drug paraphernalia – and consequently there is no pre-deprivation procedure associated with such seizure -- absent exigent circumstances a home cannot be seized.  Here, the Plaintiffs were prevented from entering their homes to remedy the nondrug-related violations by the order to test and remediate methamphetamine contamination. Because the testing and remediation requirements were a seizure, see United States v. Jacobsen, 466 U.S. at 114 ("A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."), exigency is required.

Because the nature and validity of the warrants is unclear, and because the parties agreed to narrow the issue before the Court only to the issue of exigency, the Court need not and does not decide whether the seizure would be justified under Santana v. City of Tulsa.  The appropriate question, therefore, is whether the Defendants have shown that there is a genuine issue of material fact whether there were exigent circumstances that would justify the seizures.

## II.     THERE IS INSUFFICIENT EVIDENCE IN THE RECORD TO CREATE A GENUINE ISSUE OF MATERIAL FACT WHETHER THE VIOLATIONS CREATED AN OBJECTIVELY REASONABLE BASIS FOR THE INSPECTORS' BELIEF THAT THERE WAS AN IMMEDIATE NEED TO PROTECT THE LIVES OR SAFETY OF THEMSELVES OR OTHERS.

The Defendants have not established a material question of fact whether the presence of

-53-

The Defendants have not established a material question of fact whether the presence of drugs or drug use in the home was immediately life threatening as required to establish exigent circumstances under the first prong of the Tenth Circuit's test for exigent circumstances. See United States v. Najar, 451 F.3d at 717-18.

### A. THERE IS INSUFFICIENT EVIDENCE TO CREATE A GENUINE ISSUE OF MATERIAL FACT WHETHER DRUG USE OR THE PRESENCE OF DRUGS IN THE HOME PRESENTED AN IMMEDIATE DANGER TO THE LIVES OR SAFETY OF OCCUPANTS.

The Defendants, having failed to adduced evidence indicating that the presence of drugs or drug use in the home presents an immediate danger to the life and safety of occupants, have not met their burden to show a genuine question existed whether exigent circumstances existed. The Defendants present no scientific evidence to establish that drug use creates an immediate danger necessary to create exigency. The Tenth Circuit and Supreme Court have held that an exigent circumstance requires an "emergency," or "immediate" or "imminent" threat to life or safety. West v. Keef, 479 F.3d at 759 ("The Supreme Court has made clear . . . that police may enter a home without a warrant where they have . . . belief that an occupant is . . . imminently threatened . . . .")(emphasis added); United States v. Najar, 451 F.3d at 718.

A number of cases have found that the presence of a meth lab creates an immediate danger to public safety and therefore an exigent circumstance.[33] These cases demonstrate, however, that

---

[33] The Tenth Circuit found that:

Threats to public safety are widely accepted as one of the exigent circumstances exceptions to the Fourth Amendment's warrant requirement. See . . . United States v. Walsh, 299 F.3d 729, 734 (8th Cir. 2002)(danger associated with suspected methamphetamine lab sanctioned warrantless search by police officers); . . . United States v. Wilson, 865 F.2d 215, 216-17 (9th Cir. 1989)(officer's fear methamphetamine lab would explode justified warrantless entry into home); cf. United States v. Spinelli, 848 F.2d 26, 29-30 (2nd Cir. 1988)(officer's concern

the danger of a methamphetamine lab lies in the threat of explosion as a result of the manufacturing process, and not in the presence of methamphetamine itself.  For example, in United States v. Rhiger, the Court of Appeals for the Tenth Circuit held that a methamphetamine lab created an immediate threat because there was a possibility of a significant explosion resulting from the combination of the chemicals and heat used in methamphetamine production.  See United States. v. Rhiger, 315 F.3d at 1289 ("[T]he heat generated from methamphetamine production 'can be very intense [and] can cause fires' and . . . vapors from the manufacture of methamphetamine 'are very, very flammable . . . [and] in large quantities can produce a large explosion, causing a danger for the surrounding public.'")(internal citations omitted).  Furthermore, the Tenth Circuit in United States v. Rhiger found that particularized objective evidence of the presence of a meth lab supported the officers' determination that there was an immediate danger to public safety: "[T]he officers' knowledge that iodine, phosphorus, ice and cotton balls had been purchased by defendants, coupled with the strong odor of methamphetamine cooking, justified the officers' belief that there was a danger to the public amounting to exigent circumstances."  United States v. Rhiger, 315 F.3d at 1289.  In United States v. Jackson, 199 F. Supp. 2d 1081, 1090 (D. Kan. 2002), the United States District Court for the District of Kansas declined to find exigent circumstances justifying entry into a home when the officers failed to provide evidence that there was reason "to believe that there was an immediate need to protect the lives of others.  The sole relevant testimony was that anhydrous ammonia could have some negative long term health effects upon a person's lungs or eyes . . . .  No

---

regarding volatile nature of methamphetamine justified failure to comply with knock-and-announce statute).

United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003).

testimony about any danger of explosion, the volatile nature of methamphetamine, or other immediate need to evacuate the premises was offered." United States v. Jackson, 199 F. Supp. 2d at 1090. These cases demonstrate that (i) "negative long term health effects" do not qualify as an immediate threat justifying seizure of a home, and (ii) specific objective evidence of the immediacy of the threat is necessary to demonstrate an exigency exception to the Fourth Amendment.

Here, none of the Plaintiffs' homes were seized under the Drug Lab Ordinance, and neither party argued that there was evidence of drug manufacturing in the Plaintiffs' homes. However, the Notices and Orders for Lovato, Lowery, and Thomas contain language that is ambiguous whether there was a suspicion of drug manufacturing. The Lowery Notice stated: "I HAVE POSTED THIS PROPERTY SUBSTANDARD DUE TO POSSIBLE CONTAMINATION ASSOCIATED WITH THE USE AND OR [sic] SALES OF A CONTROLLED SUBSTANCE. THIS PROPERTY WILL NEED TO BE TESTED FOR CONTAMINANTS ASSOCIATED WITH THE MANUFACTURING, USE AND OR [sic] DISTRIBUTION OF A CONTROLLED SUBSTANCE, HEROINE [sic]." Lowery Notice and Order at 1. The Notice and Order issued to Thomas was the same, except for the insertion of "methamphetamine" instead of "heroine." See Thomas Notice and Order at 1. The Notice and Order issued to Lovato differed only slightly, reading: "THIS DWELLING UNIT WAS ALSO POSTED AS SUBSTANDARD DUE TO THE POSSIBLE CONTAMINATION ASSOCIATED WITH THE USE AND/OR SALES OF A CONTROLLED SUBSTANCE. THIS UNIT MUST BE TESTED FOR CONTAMINATES ASSOCIATED WITH THE MANUFACTURING AND/OR DISTRIBUTION OF METHAMPHETAMINE AND COCAINE."[34] Lovato Notice and Order at 1. The Notice and Order issued to Gabaldon was not

---

[34] Wall testified that there was no manufacturing of drugs in the house: "Q. Was there any methamphetamine manufacturing going on in this house? A. I don't believe so. I don't think they

submitted, but the parties agree that no evidence of methamphetamine manufacturing was found.
See Moya Depo. at 12:17-23; Thomas' and Gabaldon's Motion ¶¶ 27, 28, at 6 (setting forth this
fact); Thomas Response ¶¶ 27, 28, at 5 (admitting this fact).  In any case, the Inspectors had at their
disposal an ordinance specifically designed to address residences in which controlled substances
were manufactured, but did not use it in these instances, instead citing the Plaintiffs under the
Substandard Housing ordinance.  The Court concludes, because none of the Plaintiffs were
suspected of manufacturing methamphetamine or other drugs in their homes,[35] that therefore the
dangers associated with manufacturing were not present in this case.

       In addition, there is no evidence presented that indicates that methamphetamine itself or its
residue is explosive or immediately damaging to health.  Rather, the evidence presented indicates
that the inspectors believed that the risks of methamphetamine in the home to be long-term health
effects.  Wall testified that she believed methamphetamine contamination to have long-term health
effects:

       Q:  So what we're talking about then is the belief in your mind, as a code inspector,
       that the contamination in this house presents a long-term danger or risk to people
       living in that house and breathing in that air on a daily basis, is that fair?

       A: Yes.  To young children crawling on the floor, yes.

Wall Depo. 27:2-8.  Crandall testified that "long exposure causes problems for persons" and that
exposure can cause "long-term" problems for babies.  Crandall Depo. at 41-42:21-25.  Long-term

------

found a lab, if that's what you mean."  Wall Depo. 21:22-25.

       [35] The Plaintiffs contend in their arguments that there was no finding of drug manufacturing
in any of the Plaintiffs' homes, but with the exception of Gabaldon, do not include this fact in the
statement of facts.  The Defendants also do not address this question specifically.  The Court has
done the best it can on the record before it.  "It is not the job of this court to search the record . . .
for evidence . . . ."  Adams v. Dyer, 223 F. App'x 757, 762 (10th Cir. 2007).

health effects do not constitute exigent circumstances.  See United States v. Jackson, 199 F. Supp. 2d at 1090.  In addition, the Defendants adduce no factual basis to support either immediate danger or long-term health effects of methamphetamine contamination, indicating that the inspectors' belief in the danger is speculation.  The Tenth Circuit has previously found no exigent circumstances when a possible threat was based on no more than speculation.  See United States. v. Bute, 43 F.3d 531, 539 (10th Cir.1994)(holding that speculating that a burglary may have taken place because a commercial building had an open garage door at night was not enough to "reasonably and objectively create[ ] the impression of an immediate threat to person or property as to justify a warrantless search of the premises.").  See also Kerns v. Bd. of Com'rs of Bernalillo County, No. CIV 07-0771 JB/ACT, 2009 WL 3672877, at *9 (D.N.M., 2009)(Browning, J.)(denying summary judgement for officers when there was a genuine issue of material fact whether exigent circumstances were present when there was a report of a gunshot in the area, no one answered the door, music was playing inside, and there was a broken window on the side of the house, stating "as the Kerns live directly on the golf course, a reasonable fact finder might conclude that [the officers] may have overlooked an obvious, rational explanation in favor of speculating that an intruder was in the Kerns' home.").

In addition to the Defendants' speculation about the dangers of methamphetamine contamination, the evidence suggests that the inspectors did not treat the threat as imminent.  First, Wall testified that at no point during the inspection of the Lovato house did she put on protective clothing or gear, and that she was not concerned for her own safety while conducting the inspection. See Wall Depo. at 26:2-23.  Second, the inspectors' affidavits address the presence of drugs or drug use in the homes only to state that such evidence was not the sole reason for the Notice and Order, or to state that the inspector was "concerned."  For instance, in his affidavit regarding the home of

Gabaldon, Moya states: "I was concerned with information regarding drug usage and the presence of drug paraphernalia in the residence and required testing for contamination."  Moya Aff. ¶ 6, at 1.  Crandall makes a similar statement regarding his inspection of Thomas' and Lowery's homes: "I was concerned with information regarding drug usage in the residence and required testing for contamination.  It was not the primary reason the home was redtagged."  Crandall Aff. ¶ 6, at 1. Wall's affidavit includes a slightly different statement: "I was concerned with information regarding drug usage in the residence and required testing for contamination.  It was not the primary reason the home was redtagged.  It created a serious sanitation issue under the building code."  Wall Aff. ¶ 6, at 1.  Wall also states: "It was the totality of the code violations which caused the residence to be out of compliance with applicable codes and ordinances."  Wall Aff. ¶ 7, at 1.  Nothing else in the affidavit, however, indicates that Wall believed that drugs or drug use in the home was a threat to life or safety.  Because the mere presence of drugs does not present an immediate threat of harm, the presence of drugs in a home does not rise to the level required for an exigent circumstances exception to the prohibition against seizure of property in the Fourth Amendment without a warrant.

Moreover, use of the Substandard Housing Ordinance to cite residents for methamphetamine contamination belies the implication that methamphetamine contamination poses an immediate danger to persons in the house, because the ordinance provides for an appeal process whereupon the order to vacate is stayed pending conclusion of the appeal.  See Ord. 34-1986 § 14-3-5-4(D)("Enforcement of any notice and order of the Mayor issued under this code shall be stayed during the pendency of an appeal therefrom which is properly and timely filed.").  This provision means that residents ordered to vacate a home may return to live in the home once an appeal is filed with the Mayor's office.  These facts indicate that the perceived danger of the home is not such that the Defendants required residents to stay away from the dwelling.

Additionally, although the City ordinances themselves are not dispositive whether the Plaintiffs' homes were reasonably seized under the Fourth Amendment, relevant findings by the City of Albuquerque could have provided some objective evidence of the government interest that the ordinance serves.   Cf. City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 426 (2002)(addressing free speech implications of an ordinance prohibiting adult entertainment establishments within 1000 feet of a school, religious institution, or park, stating: "The municipality's evidence must fairly support its rationale for its ordinance.").  Here, however, the Substandard Building Ordinance does not include findings by the City of Albuquerque that drug use in a home poses an immediate health or safety threat.  See Ord. 34-1986 §§ 14-3-4-1 and 14-3-1-2 ("The purpose of this code is to provide minimum standards to safeguard life or limb, health, property and public welfare by regulating and controlling the occupancy level and maintenance of all residential buildings and structures within this jurisdiction.").   Similarly, the Cleanup of Clandestine Drug Laboratory Sites Ordinance, which provides for the seizure of homes in which evidence of drug manufacturing is found, states only that drug manufacturing is a "serious health threat."   Ord. 36-2004 § 11-1-1-40.   That ordinance addresses only "property on which methamphetamine, ecstasy, LSD or any other controlled substance is being manufactured or on which there is an attempt to manufacture, or where a person is arrested for having on any property any chemicals or equipment used in manufacturing methamphetamine, ecstasy, LSD or any other controlled substance," and does not address drug use.  Ord. 36-2004 § 11-1-1-40 (emphasis added). Neither ordinance provides any finding that drug use presents an immediate risk of death or serious harm that would justify seizure of the homes.

The Court concludes that the Defendants have failed to show there is a genuine issue of material fact whether an objective observer would believe that evidence of drug use or drug

paraphernalia in the home posed an imminent threat to the residents justifying warrantless seizure of the home.

> **B.    THERE IS INSUFFICIENT EVIDENCE TO CREATE A GENUINE ISSUE OF MATERIAL FACT WHETHER THE NON-DRUG-RELATED VIOLATIONS PRESENTED AN IMMEDIATE DANGER TO THE LIVES OR SAFETY OF OCCUPANTS.**

The non-drug related code violations differ for Gabaldon, Lovato, Lowery, and Thomas -- ranging from inadequate window cranks and missing door knobs to exposed wiring and lack of functional plumbing.  An individualized assessment of these violations is necessary to determine whether a genuine issue exists regarding whether those violations create an exigency justifying seizure.  The specific code violations therefore bear repeating.

> **1.    Defendants do not Adduce Sufficient Evidence to Raise a Genuine Issue of Material Fact whether the Code Violations for which Plaintiff Danny Gabaldon was Cited Presented an Immediate Danger to the Lives or Safety of Occupants.**

No party submitted the Notice and Order issued to Gabaldon.  The parties agreed that the Notice and Order included both drug-related and non-drug-related code violations.[36]  Moya testified that the non-drug related code violations were related to the electrical and plumbing systems.  Moya

---

[36] No party submitted the Notice and Order to the Court.  The Plaintiffs assert that "the factual basis" for the eviction was the smell in the house and the admission that a drug user had lived on the property.  Moya Depo. at 12:4-6, 12:8-14, and 14:22-25; Thomas' and Gabaldon's Motion ¶ 23, at 5.  The Plaintiffs also assert that Moya cited the property for "electrical violations and plumbing issues." Thomas' and Gabaldon's Motion ¶ 25, at 5.  The Defendants dispute the assertion that the smell and drug use was the "factual basis," and direct the Court to the Moya Aff. ¶ 7, at 1 ("I did not base my decision to have the property vacated because a 'drug user' had lived on the property . . . ."), and the Moya Depo. at 13:1-14 ("There was [sic] some electrical code violations that I recall.").  The parties therefore appear to agree that the order to vacate included citations for both drug-related and non-drug related issues.

Depo. at 13:2-24.[37]  The parties also agree that the electrical code violation identified by Moya could

have been remedied by removing the wires.  Moya Depo. at 13:2-24.  Moya characterized this

violation and unspecified plumbing code violations as "serious" and "immediate[ly] threat[ening]

to the life safety of the occupants."  Moya Aff. ¶ 4, at 1.  Moya provides no factual allegations in

support of his conclusory assertion.  A party cannot "avoid summary judgment by repeating

conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins.

Co. v. Omer, 2008 WL 2309005, at *1 (citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue

Shield of Kan., Inc., 452 F.3d at 1199)  The Court finds conclusory allegations of unspecified,

easily remedied electrical code violations are insufficient to create a genuine question whether an

_____

[37]  In his deposition, Moya stated:

    Q: Okay.  Were any of the code violations life threatening, as far as you were
    concerned, that you recall?

    A: There was some electrical code violations that I recall. Because what he was – I
    don't know exactly why he was doing this, but he was running like extension cords
    in through the attic and then drilling holes in the ceiling and bringing those wires
    back down. It wasn't Romex wire, which is approved electrical wire.  It was more
    like extension type of wire, and he just had this wire running to several different
    rooms. And I'm not sure why he was doing that.  And there was some plumbing
    issues, yeah.

    Q: Okay.  Your recollection is the wire didn't have any covering, any rubber
    covering?

    A: It did.  It's like an extension cord wire, but it wasn't the approved Romex wire,
    whatever you call it, 12-1.  It wasn't the gauge that it needed to be to be running that
    length and to run it in through the attic and down in through the walls.

    Q: So that's a situation that could be remedied by simply removing the wires, I
    guess?

    A: Correct.

Moya Depo. at 13:2-24.

objective observer would have found these code violations an immediate danger to the lives and safety of residents justifying seizure.

2.      **Defendants do not Adduce Sufficient Evidence to Raise a Genuine Issue of Material Fact whether the Code Violations for which Plaintiff Judy Lovato was Cited Presented an Immediate Danger to the Lives or Safety of Occupants.**

Lovato was cited for a number of code violations.  The Notice and Order issued to her states the following requirements: (i) replace all missing or inoperative window cranks, the door knob on the front security door, and a knob on the stove; (ii) replace all damaged molding, door jambs and striker plates; and (iii) "thoroughly clean" the home because "the entire dwelling as found to be unsanitary."  Lovato Notice and Order at 2.  In addition, under the heading "Section 14-3-4-3(D) Structural hazards include members of walls, partitions or other vertical supports that split, lean, list or buckle," the Notice included the following note and order: "A POST FOR THE ATTACHED COVERED PATIO IS HANGING OVER THE CONCRETE.  HAVE THE COVERED PATIO INSPECTED AND REPAIRED BY A LICENSED CONTRACTOR OR HAVE THE COVER PERMANENTLY REMOVED."  Lovato Notice and Order at 2.  Lovato was also required to repair all holes in the walls and ceilings, including replacing insulation, installing sheet rock, "taping, texturing and painting."  Id. at 2.  All appliances, interior furniture and trash, as well as "miscellaneous items" on the back patio were ordered removed.  Id. at 2.  An outdoor shed was ordered removed: "THE REAR DETACHED STORAGE SHED IS LEANING AND IN OVERALL POOR CONDITION.  THE DOORS MUST ALSO BE LOCKED FOR SECURITY PURPOSES. DUE TO THE BAD CONDITION AND FOR THE SAFETY OF THE OCCUPANTS OF THIS DWELLING, HAVE THE SHED PERMANENTLY REMOVED."  Id. at 2.  Electrical code violations included the following: (i) damaged or missing electrical receptacle and/or switch covers;

-63-

(ii) broken or missing interior and exterior light globes and lenses; and (iii) exposed wiring on the rear patio light.  See Lovato Notice and Order at 2.  The Notice stated that "[t]he lack of [switch] covers leaves wiring exposed that if touched could cause great bodily harm."  Id. at 2.  Finally, the Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  Id. at 3.

The Defendants provide no objective evidence that missing door knobs or leaning outdoor sheds could threaten the life or safety of occupants in the Lovato home.  The lack of a switch cover could "if touched, cause great bodily harm," but there is no indication whether touching the wiring is likely, or whether the switch could be operated without touching the wires.  If not touched, there appears to be no danger, and there is no indication here that touching was imminent.  The Defendants instead refer to the affidavit of the inspector, who stated: "My inspection revealed life safety issues, which condition endangered the life, health, safety and welfare of the occupants of the residence or the public.  These issues included barred windows in the bedrooms which did not have quick release latches."  Wall Aff. ¶ 4, at 1.  There is no evidence adduced to suggest that the danger posed to the residents or to "the public" by the violations at the Lovato home rise to the level of immediacy and urgency required for exigent circumstances defined by cases in which there is evidence that someone has been or is about to be shot, see United States v. Uscanga-Ramirez, 475 F.3d 1024, 1029 (8th Cir. 2007), a victim is injured and bleeding, see United States v. Gillenwaters, 890 F.2d 679, 683 (4th Cir. 1989), the police observe a violent fight, see Brigham City, Utah v. Stuart, 547 U.S. 398, 406 (2006), or there is a risk of explosion, see United States. v. Rhiger, 315 F.3d at 1289.  Exigent circumstances create an exception to the fundamental protections of the Fourth Amendment: "emergencies" created by missing door knobs or leaning outdoor sheds cannot be a reason to forego one of the most closely held rights in our society.  Lacking factual assertions

to support the conclusory statements that these violations posed an imminent threat to life or safety for which there was no time to give notice of a hearing or to secure a warrant, the Court therefore finds the evidence insufficient to create a genuine issue of material fact whether the seizure of Lovato's home was justified.

### 3.     Defendants do not Adduce Sufficient Evidence to Raise a Genuine Issue of Material Fact whether the Code Violations for which Plaintiff Kevin Lowery was Cited Presented an Immediate Danger to the Lives or Safety of Occupants.

Inspectors cited K. Lowery for electrical and plumbing violations as well as for general disrepair of his home.  The Notice and Order required that Lowery restore electrical, water and natural gas to the residence and stated that "the home cannot be occupied" without these services. Lowery Notice and Order at 5-6.  The electrical system was found to have had "numerous modifications to the system that have not been performed by an electrician," and K. Lowery was ordered to have the system inspected by a licensed electrician.  See Id. at 5.  The electrical code violations were described in the City Inspector's affidavit as follows:

> Upon arrival, I saw electrical wires connected to car batteries which were providing electrical service to the dwelling.  I also saw that electrical wires were connected to Public Service Company pedestal.  The connections were not only illegal but above ground and caused immediate safety issues to both occupants of the dwelling and members of the public. The residence had no gas service in [sic] running water.  Kevin Lowery told me occupants of the house were drinking from the hot tub which was in the rear yard of the house.  In addition there was evidence of an electrical fire at the hot tub (I was advised the Albuquerque Fire Department had been to the residence responding to a fire).  This lack of utilities and illegal hook-up of electrical services to PNM and the car batteries created serious electrical and plumbing code violations which presented an immediate threat to the life safety of the occupants of the dwelling and which conditions endangered the life, limb, health, property, safety or welfare of those occupants or the public.

Crandall Aff. ¶ 4, at 1.

In addition, Lowery was required to replace missing light switch and electrical receptacle plate covers, light fixtures, and globe covers because, "there is exposed wiring where the fixtures

have been removed." Lowery Notice and Order at 5. Finally, Lowery was ordered to replace or install smoke detectors in the bedrooms and in areas near the bedrooms, replace or recharge defective fire extinguishers, and remove "all outdoor storage and litter" and "inoperative vehicles" from the premises. Lowery Notice and Order at 6-7. Like Lovato, Lowery was warned to remove any animals on the property for the duration of his absence from the home. See Lowery Notice and Order at 7.

For the most part, the code violations for which K. Lowery was cited fall into the same category as those for which Lovato was cited: general disrepair for which the Defendants provide no factual evidence to show that such disrepair is imminently threatening to life or safety. Contrary to Crandall's assertion, failure to maintain electrical, gas, or water service does not present an immediate danger to residents; otherwise, residents would be required to evacuate their homes whenever there is a power failure. The Defendants adduce no factual, objective support for the assertion that the "lack of utilities . . . created serious electrical and plumbing code violations which presented an immediate threat to the life safety of the occupants." Crandall Aff. ¶ 4, at 1. A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (citing Fed. R. Civ. P. 56(e); see Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1199). In addition to the lack of utilities, Lowery was cited for "illegal hook-up of electrical services to PNM and car batteries." Crandall Aff. ¶ 4, at 1. The hook-up to the Public Service Company of New Mexico (PNM) was characterized as "above ground and caused immediate safety issues to both occupants of the dwelling and members of the public." Id. The Defendants argue correctly that the Court should not "substitute its judgment for that of the inspectors" by second-guessing their assessment of violations as dangerous to life or safety. See Surreply at 3. The Court's role is not to weigh the

evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Here, however, the question of whether a code violation creates an exigency justifying seizure of the home necessarily includes whether the seizure is tailored to the interest served. See Illinois v. McArthur, 531 U.S. at 333. The Plaintiffs maintain that the danger created by the illegal hook-up to PNM and car batteries could have been eliminated by removal of the hook-up, see Lowery's Motion at 11, and the Defendants maintain that the "repairs . . . required a licensed electrician and plumber," Crandall Aff. ¶ 7, at 2. The Defendants offer no evidence that Lowery, who presumably rigged this hook-up, could not easily remove it, eliminating the danger, or that the danger posed by the illegal hook-up was high enough to prohibit living in the home until an electrician was hired. The Court therefore finds that conclusory allegations of unspecified, easily remedied electrical code violations are insufficient to create a genuine question whether an objective observer would have found these code violations an immediate danger to the lives and safety of residents justifying seizure.

4.      **Defendants do not Adduce Sufficient Evidence to Raise a Genuine Issue of Material Fact whether the Code Violations for which Plaintiff Barbara Thomas was Cited Presented an Immediate Danger to the Lives or Safety of Occupants**.

The Notice and Order required Thomas to remedy four violations not related to the presence of methamphetamine. See Thomas Notice and Order at 3. Specifically, the Notice and Order required Thomas to (i) replace or repair inoperative smoke detectors "in each sleeping room . . . [and] outside each . . . sleeping area in the [same] vicinity"; (ii) replace or recharge fire extinguishers approved by the fire marshall; (iii) "remove all outdoor storage, and litter from the premises"; and (iv) remove all inoperative vehicles from the property. Thomas Notice and Order at 3. In addition, the Notice and Order warns that the Albuquerque Animal Services Department

-67-

may remove any animals on the property while the owner is barred from entry.  See id. at 4.

The Defendants fail to provide any factual support for the contention that the "garage which was clearly used and occupied as a living area did not provide the appropriate living conditions required by the Ordinance and/or building code for occupancy by the residents.  These conditions endangered the life, health, safety and welfare of the occupants or the public."  Crandall Aff. ¶ 4, at 1.  They argue that the "Plaintiffs' statement that the affidavits of the Defendant inspectors are conclusory is equally without foundation as the affidavits must be read in conjunction with the detailed notices and orders that Plaintiffs themselves provided to the Court."  Surreply at 3.  Here, however, the statements in the affidavit regarding the danger posed by the violations are not supported by the Notice and Order, which requires only installation of smoke alarms and of fire extinguishers, and removal of garbage and of inoperative vehicles.  The Defendants adduced no factual evidence supporting the contention that these violations threatened Thomas' life or safety.  The Court finds, therefore, that the Defendants have not shown there is a genuine issue of material fact whether an objective observer would have found these code violations an exigent circumstance justifying seizure without a warrant.

The Court concludes that the record is insufficient to show there is a genuine issue of material fact whether the non-drug-related violations for which the Plaintiffs were cited would give rise to a belief that they posed an imminent threat sufficient to justify a warrantless seizure of their homes.

## III.   THERE IS INSUFFICIENT EVIDENCE TO DEMONSTRATE A GENUINE ISSUE OF MATERIAL FACT THAT THE SEIZURE WAS REASONABLE IN SCOPE AND MANNER.

The second prong of the Tenth Circuit test for exigent circumstances is whether "the manner and scope of the search is [sic] reasonable."  United States v. Najar, 451 F.3d at 717-18.  In United

States v. Najar, the Court held that search of the defendant's home was reasonable, because the police "confined the search to only those places inside the home where an emergency would reasonably be associated." United States v. Najar, 451 F.3d at 721. In that case, the Tenth Circuit found that, once officers had a reasonable belief that there was a victim in the residence, their search was reasonable, because they searched only places where a victim could be. In Illinois v. McArthur, 531 U.S. 326 (2001), the Supreme Court held that a seizure of the defendant by preventing him from entering his house was reasonable, because the seizure continued only as long as necessary to obtain a warrant. See Illinois v. McArthur, 531 U.S. at 333.

In this case, the Notices and Orders prohibited entry into any part of the building, even when evidence of possible contamination was found only in certain rooms. See Moya Depo. at 14:11-13; Thomas' and Gabaldon's Motion ¶ 44, at 8; Thomas Response ¶ 44, at 6; Lovato Motion ¶ 11, at 3. Thus, the area of the seizure based on possible drug contamination was not limited to specific areas giving rise to a suspicion of contamination. Similarly, the duration of the seizure was not limited in a manner consistent with the ordinance's putative objectives. The Plaintiffs were prevented from entering their homes immediately upon a finding that the building was substandard. See Thomas' and Gabaldon's Motion ¶ 19, at 5; Thomas Response ¶ 19, at 4; Lovato Notice and Order at 3; Lowery Notice and Order at 7; Thomas Notice and Order at 4. The length of time that they would be prohibited entry depended on whether and how quickly they filed an appeal, or hired a firm to complete the testing and remediation. In the absence of either of these actions, the Plaintiffs would be barred from entry indefinitely. The holding of Illinois v. McArthur rested on an assessment of the length of the seizure *vis a vis* the police objectives: the seizure ceased as soon as the objective of obtaining a warrant was achieved. Here, there is a disconnect between the putative objective of the order to vacate -- to protect inhabitants from the threat of methamphetamine

contamination -- and the provision of the ordinance allowing re-entry upon appeal, indicating that the length of the seizure is not "jealously and carefully drawn" in accord with the objective. United States v. Aquino, 836 F.2d at 1271.

The Court concludes that the Defendants have not demonstrated that there is a genuine issue of material fact whether an objective observer would find that the seizure of the entire home for an indefinite period was sufficiently tailored in scope and duration to protect the interests of the residents under the Fourth Amendment.

In conclusion, the Defendants have failed to provide evidence that the presence of drugs or drug paraphernalia posed an immediate threat to the life or safety of the occupants of the seized homes that would create an exigent circumstance. The Court will grant the Plaintiffs' Motion for Summary Judgment for the drug-related citations. Finally, although the non-drug related code violations fall within the scope of the Substandard Housing Ordinance, there was no evidence of a pre-deprivation process, and the Court therefore finds that there is no issue raised that will survive the motion for summary judgment. The Court will also grant Plaintiff's Motion for Summary Judgment for the non-drug-related violations.

**IT IS ORDERED** that Plaintiffs Thomas' and Gabaldon's Motion for Summary Judgment, filed July 13, 2010, Plaintiff Lovato's Motion for Summary Judgment, filed July 30, 2010, and Plaintiff Lowery's Motion for Summary Judgment, filed August 6, 2010 are granted in part. The motions included motions for summary judgment on Counts IV (unreasonable seizure of the Plaintiffs' property), V and VI (deprivation of property without procedural due-process), and VII and VIII (deprivation of property without substantive due process). The parties agreed at the September 14, 2010 hearing, however, that the Plaintiffs' motion for summary judgment would be

narrowed to only the issue whether an objective observer would believe that the violations for which the Plaintiffs were cited posed an immediate threat to the lives or safety of the occupants, of the public or of the officers such that an exception to the Fourth Amendment prohibition against warrantless searches and seizures was justified. The Court has held on that issue the neither the drug code violations or the non-drug based code violations establish exigent circumstances. The motion for summary judgment is granted only with respect to this issue.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

     *Attorneys for the Defendants*