## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KEVIN LOWERY, on his behalf and
on behalf of similarly situated persons,

       Plaintiff,

JUDY LOVATO, DANNY GABALDON,
BARBARA THOMAS, each on his/her behalf
and on behalf of similarly situated persons,

       Plaintiffs-in-Intervention,

vs.                               No. CIV 09-0457 JB/WDS

CITY OF ALBUQUERQUE, MARTIN CHAVEZ,
in his individual capacity as mayor of the City of
Albuquerque; RAY SCHULTZ, in his individual
capacity chief of police of the City of Albuquerque
Police Department; JOHN OLMSTEAD; MARK
CRANDALL; and JOHN DOE POLICE OFFICERS,

       Defendants,

MICHELLE WALL, LARRY MOYA,

       Defendants-in-Intervention.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Class Certification,

filed June 4, 2010 (Doc. 32)("Motion for Class Certification").  The Court held a hearing on

September 14, 2010.  The primary issue is whether the Court should certify a class of all individuals

or corporations whose property was seized without court order, or who were deprived of their

property for suspected drug use and subsequent to the City of Albuquerque's Criminal Nuisance

Abatement Team designating their property as substandard from three years before Plaintiff Kevin

Lowery filed his Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery

of Damages Resulting from a Deprivation of Constitutional Rights, filed May 8, 2009 (Doc. 1-1)("Complaint"), until the policy ceases, for Counts IV through X of the Complaint. The Defendants agree, without admitting liability, that the class satisfies the requirements of rule 23(a), 23(b)(2) and 23(b)(3), with the reservation that they may challenge the class in the future. The Court grants the Motion for Class Certification.

## FACTUAL BACKGROUND

The Court has previously reviewed the facts of this case in its Memorandum Opinion and Order, filed March 31, 2011 (Doc. 79), which granted summary judgment on the issue whether exigent circumstances existed to seize the Plaintiffs' homes. The Court adopts those facts for the purposes of this order. The Court does not revisit the factual disputes addressed in its summary judgment opinion.

### 1.    City Ordinances.

In 2004, Defendant City of Albuquerque, New Mexico, passed the Clean Up of Laboratory Sites Ordinance, Ord. 36-2004 (hereinafter "Drug Lab Ordinance"). The purpose of the ordinance is to require remediation of clandestine drug laboratory sites "to assure the health, safety and welfare of the community." Ord. 36-2004 § 11-1-1-42. See Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment ¶ 1, at 2, filed July 13, 2010 (Doc. 36)("Thomas' and Gabaldon's Motion"); Defendants' Response to Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment ¶ 1, at 1, filed August 29, 2010 (Doc. 52)("Thomas and Gabaldon Response")(admitting this fact). Clandestine drug laboratories are defined in the ordinance as "property on which [a controlled substance] is being manufactured or on which there is an attempt to manufacture, or where a person is arrested for having on any property any chemicals

or equipment used in manufacturing [a controlled substance]." Ord. 36-2004 § 11-1-1-42.  See Thomas' and Gabaldon's Motion ¶ 2, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 2, at 2 (admitting this fact).  The Substandard Building ordinance states that any building or portion of a building where there exists an inadequate sanitation condition "to the extent that [the condition] endangers the life, limb, health, property, safety or welfare of the public or occupants thereof shall be deemed and declared a SUBSTANDARD BUILDING." Ord. 34-1985 § 14-3-4-1. See Thomas' and Gabaldon's Motion ¶ 5, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 5, at 2 (admitting this fact).  Substandard housing means that there is an immediate risk of harm to the resident.  See Deposition of Mark Crandall at 25:1-25 (taken April 14, 2010), filed August 29, 2010 (Doc. 52-4).  Designation of a house as substandard through "posting" or "red tagging" requires same-day eviction of all residents. Ord. § 14-3-5-3(D); Crandall Depo. at 29:18-24; Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).  Residents and homeowners re-entering a property posted as substandard without a permit is a misdemeanor offense.  See Ord. § 14-3-5-3 (D); Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).

When a property is deemed substandard because of drug contamination, occupants and homeowners are barred from entering the property until homeowners pay for drug contaminant testing and remediation, which can cost thousands of dollars.  See Thomas' and Gabaldon's Motion ¶ 12, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 12, at 3 (admitting this fact). Residents and homeowners have an automatic right to reenter their homes upon an appeal.  See Ord. 34-1986 § 14-3-5-4(D); Thomas' and Gabaldon's Motion ¶ 13, at 3 (setting forth this fact); Thomas

and Gabaldon Response ¶ 13, at 3 (admitting this fact).

**2.      Albuquerque Police Department's Criminal Nuisance Abatement Team Practices.**

City Inspector Joseph Martinez wrote the initial draft of the Drug Lab Ordinance.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 3 (citing Deposition of Joseph Martinez at 64:12-16 (taken March 23, 2010), filed June 3, 2010 (Doc. 32-3)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Martinez included language about possible contamination from drug use based on his belief that drug use could lead to property contamination.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 3 (citing Martinez Depo. at 94:2-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Martinez' belief was not founded on scientific evidence.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 4 (citing Martinez Depo. at 94:9-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Martinez enforced the draft ordinance he had written and not the ordinance that the City of Albuquerque put into law.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:11-18)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Martinez did not read the final version of the Drug Lab Ordinance that the City of Albuquerque passed until about a year after it had been in effect.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:1-6)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Members of the Nuisance Abatement Team enforced Martinez' draft and not the ordinance that the City of Albuquerque gave legal effect.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:19-25)); Thomas and Gabaldon Response

¶ 3, at 2 (not controverting this fact).

Some members of the Nuisance Abatement Team evicted residents and homeowners from their home based on the belief of drug use in the home.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 6, at 4 (citing Wall Depo. at 33:4-7; Crandall Depo. at 41:21-42:17;  Moya Depo.  at  16:23-17:5));  Thomas  and  Gabaldon  Response  ¶  3,  at  2  (not controverting this fact).  Possible contamination because of drug use in a home was, in some cases, the sole basis for "red tagging" a home.  Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 7, at 4 (citing Crandall Depo. at 40:22-25)).  Some members of the Nuisance Abatement Team posted houses where there was evidence that drug use had occurred, even if the drug use was a onetime occurrence.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 7, at 4 (citing Moya Depo. at 16:1-12; id. at 19:1-4)).

Members of the Nuisance Abatement Team knew that the Drug Lab Ordinance applied only to drug labs and expressed concerns that the Drug Lab Ordinance did not apply to drug use.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:3-12; Moya Depo. at 4:10-22, 5:1-23, 6:21-24)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  When a member of the Nuisance Abatement Team expressed concern that the Drug Lab Ordinance did not extend to evictions based on drug use, he was told that the Substandard Building Ordinance could be used to deem a house substandard based on drug use.  See Thomas' and Gabaldon's Motion ¶¶ 3, 4, at 2 (setting forth this fact)(citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:21-32: 20; Moya Depo. at 6:2-6)); Thomas and Gabaldon Response ¶ 4, at 3 (not controverting this fact).  Members of the Nuisance Abatement Team were told that, if they found drug paraphernalia, they should post those homes because there

might be contamination.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Moya Depo. at 16:8-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Inspectors have used the Drug Lab Ordinance to evict suspected drug users from their homes.  See Motion for Class Certification ¶ 11, at 5 (citing Crandall Depo. at 24:6-23; Wall Depo. 33:4-7); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). On at least one occasion, one inspector did not wear protective clothing or gear when conducting a search of a property.

### 3.     Plaintiff Danny Gabaldon.

At all times relevant, Gabaldon was the owner and resident of 11101 Mahlon Ave N.E. in Albuquerque.  See Affidavit of Danny Gabaldon ¶ 3, at 1 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-2); Thomas' and Gabaldon's Motion ¶¶ 15, 17, at 4, 5 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 15, 17, at 4 (admitting this fact).  On September 9, 2008, the Criminal Nuisance Abatement Team searched Gabaldon's home.  See Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  The inspectors did not see evidence that methamphetamine had been "cooked" in the house or that there was a methamphetamine laboratory operating in the house.  Moya Depo. at 12:17-23. See Thomas' and Gabaldon's Motion ¶¶ 27, 28, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 27, 28, at 5 (admitting this fact).  Moya noted that the house smelled of methamphetamine.  See Moya Depo. at 12:8-15.  Gabaldon told Moya that his wife, who was in jail at the time, struggled with methamphetamine addiction.  See Moya Depo. at 12:4-6; Thomas' and Gabaldon's Motion ¶ 21, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 21, at 4 (admitting this fact).  After a search of Gabaldon's home, members of the Nuisance Abatement

Team ordered Gabaldon to leave his home, and seized the property through a nuisance abatement "Notice and Order."  Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact).  See Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  They also posted on the property a notice that the house was a "substandard building."  Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact).  See Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  The Notice given to Gabaldon and the sign on the property stated that entry into the home was a criminal violation of trespass.  See Thomas' and Gabaldon's Motion ¶ 19, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 19, at 4 (admitting this fact).

The order to vacate the property cited electrical and plumbing violations in addition to suspected methamphetamine contamination. See Affidavit of Larry Moya ¶ 7, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-1).  The Notice and Order required Gabaldon to retain "an industrial or environmental hygienist firm" to test the property for "contamination."  Thomas' and Gabaldon's Motion ¶ 22, at 5 (setting forth this fact).  See Gabaldon Aff. ¶ 11, at 2 (stating that testing was required); Moya Aff. ¶ 6, at 1 (stating that testing was required).  The environmental testing company Gabaldon later hired found that one room of the house was contaminated.  See Gabaldon Aff. ¶ 12, at 2 (stating the finding of the testing company); Thomas' and Gabaldon's Motion ¶ 31, at 6 (setting forth that the testing company found one room contaminated); Thomas and Gabaldon Response ¶ 31, at 5 (admitting this fact).  The environmental testing company quoted Gabaldon a remediation cost of between $18,000.00 and $20,000.00 for removal, replacement of the carpets, and cleaning of the entire house.  See Gabaldon Aff. ¶¶ 13, 14, at 2; Thomas' and Gabaldon's Motion ¶¶ 32, 33, at 6.  Gabaldon did think that he had the money to pay for the cleaning. See Thomas' and Gabaldon's Motion ¶ 34, at 6.  Removal of the electrical cords Gabaldon

had installed could have fixed the electrical code violations.  <u>See</u> Moya Depo. at 13:2-24.  The house

went into foreclosure and was sold when Gabaldon did not pay the mortgage.  <u>See</u> Thomas' and

Gabaldon's Motion ¶¶ 35, 36, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 35,

36, at 5 (not controverting this fact).

      **4.**    <u>**Plaintiff Judy Lovato.**</u>

      At all times relevant, Lovato is a resident of 4701 Burton Ave SE, Albuquerque.  <u>See</u> Lovato

Motion ¶¶ 2, 4, at 2 (setting forth these facts); Defendants' Response to Plaintiff Lovato's Motion

and Memorandum in Support of Summary Judgment ¶¶ 2, 4, at 3, filed August 29, 2010 (Doc.

53)("Lovato Response")(admitting these facts).  The Nuisance Abatement Team searched Lovato's

house on February 10, 2009 and deemed it substandard.  <u>See</u> Lovato's Motion ¶¶ 3 and 5, at 2

(setting forth these facts); Lovato Response ¶¶ 3, 5, at 3 (admitting these facts).   The Nuisance

Abatement Team posted on the property a public notice of this finding that same day, including a

notice that entry into the home was a criminal violation.  <u>See</u> Lovato's Motion ¶¶ 5, 7, at 2 (setting

forth these facts); Lovato Response ¶¶ 5, 7, at 3 (admitting these facts).  The Nuisance Abatement

Team ordered Lovato to leave the home under threat of arrest.  <u>See</u> Lovato's Motion ¶ 6, at 2 (setting

forth the fact of the order to vacate); Lovato Response ¶ 6, at 3 (not controverting the fact of the

order to vacate).  At the time of the inspection, the residents of the house included Lovato's daughter

(who was five months pregnant), two granddaughters, two grandsons, and three great-grandchildren.

<u>See</u> Affidavit of Judy Lovato ¶ 16, at 3 (executed July 22, 2010), filed July 30, 2010 (Doc. 43-2);

Lovato Motion ¶ 15, at 3 (setting forth this fact); Lovato Response ¶ 15, at 4 (not controverting this

fact).

      Wall found some drug paraphernalia in a converted garage room.  <u>See</u> Lovato Aff. ¶ 11, at

2.  The Notice and Order was based on "life safety issues" as well as possible contamination that controlled substances caused.  See Lovato Notice and Order at 1-2 (executed February 12, 2009), filed July 30, 2010 (Doc. 43-1).  Specifically, the Notice and Order issued to Lovato states the following requirements: (i) replace all missing or inoperative window cranks, the door knob on the front security door, and a knob on the stove; (ii) replace all damaged molding, door jambs and striker plates; and (iii) "thoroughly clean" the home because "the entire dwelling was found to be unsanitary."  Id. at 2.  In addition, under the heading "Section 14-3-4-3(D) Structural hazards include members of walls, partitions or other vertical supports that split, lean, list or buckle," the Notice included the following note and order: "A POST FOR THE ATTACHED COVERED PATIO IS HANGING OVER THE CONCRETE.   HAVE THE COVERED PATIO INSPECTED AND REPAIRED BY A LICENSED CONTRACTOR OR HAVE THE COVER PERMANENTLY REMOVED."  Lovato Notice and Order at 2.  Lovato was also required to repair all holes in the walls and ceilings, including replacing insulation, installing sheet rock, "taping, texturing and painting."  Id. at 2.  All appliances, interior furniture, and trash, as well as "miscellaneous items" on the back patio, were ordered removed.  Id. at 2.  An outdoor shed was ordered removed: "THE REAR DETACHED STORAGE SHED IS LEANING AND IN OVERALL POOR CONDITION.  THE DOORS MUST ALSO BE LOCKED FOR SECURITY PURPOSES. DUE TO THE BAD CONDITION AND FOR THE SAFETY OF THE OCCUPANTS OF THIS DWELLING, HAVE THE SHED PERMANENTLY REMOVED."  Id. at 2.  The inspectors found electrical code violations, including the following: (i) damaged or missing electrical receptacle and/or switch covers; (ii) broken or missing interior and exterior light globes and lenses; and (iii) exposed wiring on the rear patio light.  See id. at 2.  The Notice and Order stated that

"[t]he lack of [switch] covers leaves wiring exposed that if touched could cause great bodily harm." Id. at 2.  Finally, the Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  See id. at 3.

     **5.**    **Plaintiff K. Lowery.**

At all times relevant, K. Lowery was the owner of the residence at 8250 Northridge N.E. in Albuquerque.  See Affidavit of John Lowery ¶ 3, at 1 (executed August 6, 2010), filed August 6, 2010 (Doc. 45-1); Lowery's Motion ¶ 2, at 2 (setting forth this fact); Defendants' Response to Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment ¶ 2, at 2, filed August 27, 2010 (Doc. 51)("Lowery Response")(admitting this fact).  On March 20, 2009, members of the Nuisance Abatement Team, including Crandall, arrived at K. Lowery's home.  See Lowery's Motion ¶ 3, at 2 (setting forth this fact); Lowery Response ¶ 3, at 2 (admitting this fact).  After a search of the home, Crandall ordered K. Lowery and his tenants to leave the home.  See Lowery's Motion ¶ 4, at 2 (setting forth this fact); Lowery Response ¶ 4, at 2 (admitting this fact).  The inspector placed a poster declaring the property to be "substandard" on the property.  Lowery's Motion ¶ 5, at 2 (setting forth this fact); Lowery Response ¶ 5, at 2 (admitting this fact).  The poster stated that entry into the home was a criminal violation of trespass.  See Lowery's Motion ¶ 7, at 2 (setting forth this fact); Lowery Response ¶ 7, at 2 (admitting this fact).  Crandall also issued a Notice and Order for K. Lowery to leave his home immediately under threat of arrest.  See Lowery's Motion ¶ 6, at 2 (setting forth this fact); Lowery Response ¶ 6, at 2 (admitting this fact).  The Notice and Order cites "life safety" issues, as well as "possible contamination associated with the use and or sales of a controlled substance."  Notice and Order at 1 (executed March 10, 2009), filed August

6, 2010 (Doc. 45-1)("Lowery Notice and Order").  The Lowery Notice and Order required K. Lowery to "retain the industrial or environmental hygienist firm and the drug laboratory site remediation firm within thirty (30) days." Lowery Notice and Order at 2-3.  The Lowery Notice and Order required K. Lowery to restore electrical, water and natural gas to the residence and, stated that "the home cannot be occupied" without these services.  Lowery Notice and Order at 5-6.  The electrical system was found to have had "numerous modifications to the system that have not been performed by an electrician," and K. Lowery was ordered to have the system inspected by a licensed electrician. Lowery Notice and Order at 5.  In addition, he was required to replace missing light switch and electrical receptacle plate covers, light fixtures, and globe covers, because "there is exposed wiring where the fixtures have been removed." Lowery Notice and Order at 5.  Finally, K. Lowery was ordered to replace or to install smoke detectors in the bedrooms and in areas near the bedrooms, to replace or to recharge defective fire extinguishers, and to remove "all outdoor storage and litter" and "inoperative vehicles" from the premises.  Lowery Notice and Order at 6-7.  K. Lowery was warned to remove any animals on the property for the duration of his absence from the home.  See id. at 7.

K. Lowery was barred from his home until he arranged for environmental testing and decontamination, if necessary, and repaired the electrical, plumbing, and other code violations.  See Lowery Notice and Order at 2.  The basis of the allegation of contamination was the presence in the home of a spoon believed to be used for drug use.  Lowery Aff. ¶ 11, at 2.  On the same day, Crandall ordered that K. Lowery's home be boarded with plywood.  See Lowery Aff. ¶ 13, at 2; Lowery's Motion ¶ 13, at 3 (setting forth this fact); Lowery Response ¶ 13, at 3 (admitting this fact).

Nine days after receiving the Notice and Order, K. Lowery filed a written appeal of the order

with the Mayor's office.  <u>See</u> Lowery Aff. ¶ 12, at 2; Lowery's Motion ¶ 12, at 3 (setting forth this

fact); Lowery Response ¶ 12, at 3 (admitting this fact).  Despite the appeal, the plywood was not

removed from the house.  <u>See</u> Lowery Aff. ¶¶ 14, 16, at 3; Lowery's Motion ¶¶ 14, 16, at 3 (setting

forth this fact); Lowery Response ¶ 14, at 3 (not controverting this fact).  As a result of these actions,

Lowery was homeless and lost the means of his livelihood.  <u>See</u> Lowery Aff. ¶ 15, at 3; Lowery's

Motion ¶ 15, at 3 (setting forth this fact); Lowery Response ¶ 15, at 3 (not controverting this fact).

       **6.**     **<u>Plaintiff Barbara Thomas</u>.**

      In February 2009, Thomas was a resident at 3000 Florida N.E. in Albuquerque.  <u>See</u>

Thomas' and Gabaldon's Motion ¶ 37, at 7 (setting forth this fact); Thomas and Gabaldon Response

¶ 37, at 5 (admitting that Thomas is a resident of Albuquerque and not controverting that she was

a resident at that address).  D.N.M. LR-Civ. 56.1(b).  Thomas' adult son lived on the property in the

garage.  <u>See</u> Thomas' and Gabaldon's Motion ¶¶ 38, 43, at 7; Thomas and Gabaldon Response ¶¶

38, 43, at 5-6.  On February 26, 2009, the Nuisance Abatement Team notified Thomas that the house

was "substandard," that she must leave the house immediately under threat of arrest, and that entry

into the home would be criminal trespass.  <u>See</u> Notice and Order (executed February 26, 2009), filed

July 13, 2010 (Doc. 36-4)("Thomas Notice and Order"); Thomas' and Gabaldon's Motion ¶¶ 38,

39, 41, 42, at 7 (setting forth these facts); Thomas and Gabaldon Response ¶¶ 39, 41, 42, at 6

(admitting these facts); <u>id.</u> ¶ 38, at 5 (admitting that Thomas was ordered to leave her home after the

house was found to be substandard).  A member of the Nuisance Abatement Team conducting the

inspection advised Thomas that she and her family could seek help from a shelter.  <u>See</u> Affidavit of

Barbara Thomas ¶ 5, at 2 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-5); Thomas' and

Gabaldon's Motion ¶ 52, at 8.  A public notice indicating the property was found to be substandard

was posted on the property.  See Thomas' and Gabaldon's Motion ¶ 40, at 7 (setting forth this fact);

Thomas and Gabaldon Response ¶ 40, at 6(admitting this fact).

The Notice and Order to vacate was based at least in part on non-drug-related code

violations.  See Affidavit of Mark Crandall ¶ 4, at 1 (executed August 27, 2010), filed August 29,

2010 (Doc. 52-2)(stating that "the garage . . . was clearly used and occupied as a living area [and]

did not provide the appropriate living conditions required per Ordinance and/or building code for

occupancy by the residents."); Thomas' and Gabaldon's Motion ¶ 46, at 8 (setting forth this fact and

describing the violations as "minor"); Thomas and Gabaldon Response ¶ 46, at 6 (disputing that the

violations were "minor" but not controverting that the code violations were part of the basis for the

order).  The Notice and Order required Thomas to remedy four violations not related to the presence

of methamphetamine.  See Thomas Notice and Order at 3.  Specifically, the Notice and Order

required Thomas to: (i) replace or repair inoperative smoke detectors "in each sleeping room . . .

[and] outside each . . . sleeping area in the [same] vicinity"; (ii) replace with or recharge fire

extinguishers approved by the fire marshall; (iii) "remove all outdoor storage, and litter from the

premises"; and (iv) remove all inoperative vehicles from the property.  Thomas Notice and Order

at 3.  In addition, the Notice and Order warned that the Albuquerque Animal Services Department

may remove any animals on the property while the owner is barred from entry.  See Thomas Notice

and Order at 4.  The electrical code violation identified by Crandall was on the exterior of the home.

See Crandall Depo. at 94:23.

The Notice and Order was also based at least in part on the finding of "paraphernalia in

association with methamphetamines," and "possible contamination associated with the use and or

sales of controlled substances."  Thomas Notice and Order at 2.  See Crandall Aff. ¶ 6, at 1.  The

paraphernalia was found in the garage that Thomas' son occupied.  See Thomas' and Gabaldon's Motion ¶ 44, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 44, at 6 (denying this fact, but failing to adduce contrary evidence).  The Order prohibited Thomas from re-entering her home until environmental testing and, if necessary, decontamination had been completed.  See Thomas Notice and Order at 2 ("DO NOT BEGIN REPAIRS UNTIL TESTING HAS BEEN COMPLETED.  IF CONTAMINATES ARE FOUND, DO NOT BEGIN REPAIRS UNTIL ALL AREAS WHICH TESTED POSITIVE FOR CONTAMINATES HAVE BEEN REMEDIATED."); Thomas' and Gabaldon's Motion ¶ 48, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 48, at 6 (admitting this fact).  Thomas was told that testing and remediation would cost thousands of dollars.  See Thomas Aff. ¶¶ 4, at 2; Thomas' and Gabaldon's Motion ¶ 49, at 8.

## PROCEDURAL BACKGROUND

On April 7, 2009, K. Lowery, on his behalf and on behalf of similarly situated persons, filed a Complaint in the Second Judicial District of New Mexico.  The Defendants removed the matter on May 8, 2009.  See Notice of Removal, filed May 8, 2009 (Doc. 1).  The Notice of Removal asserts that the Court has jurisdiction over K. Lowery's federal law claims under 28 U.S.C. § 1331 and that removal was permitted under 28 U.S.C. §1441.  See Notice of Removal ¶ 2, at 1.

The Complaint contains ten counts.  See Complaint at 4-14.  Count I alleges Defendants John Doe Police Officers deprived K. Lowery of his Fourth-Amendment rights, because they seized his person without probable cause.  See Complaint at 4.  Count II states that the Nuisance Abatement Team inspector and John Doe Police Officers violated K. Lowery's Fourth-Amendment rights when they entered into the curtilage of his home.  See Complaint at 5.  Count III alleges that the entry and search of the home by police and city inspectors was unreasonable, and therefore a deprivation of

-14-

K. Lowery's Fourth-Amendment rights.  See Complaint at 5.  Count IV alleges that the Defendants violated Lowery's Fourth-Amendment rights through unreasonable seizure of his home.  See Complaint at 6.  In Count V, Lowery contends that the Defendants seized his property without procedural due process in violation of the Fourteenth Amendment.  Count V is an alternative to Count IV, alleging that the Defendants afforded him inadequate pre-deprivation procedure.  See Complaint at 6.  Count VI alleges a procedural due-process violation based on the Defendants' failure to release K. Lowery's property to him upon his filing a notice of appeal.  See Complaint at 7.  Count VII is a Fourteenth-Amendment claim related to requiring environmental testing without sufficient factual basis.  See Complaint at 8.  Count VIII is a Fourteenth-Amendment claim related to overall use of the Nuisance Abatement Team to deprive property owners of property rights and a request to declare the Substandard Building Ordinance unconstitutional.  See Complaint at 9. Count IX alleges that the ordinance violates the New Mexico State Constitution and asserts tort claims on behalf of K. Lowery against the Defendants, including torts of false imprisonment for his detention, and trespass for entry into his curtilage and home and seizure of his home.  See Complaint at 12.  Count X alleges that the Defendants have a custom, practice, or policy of intentionally violating civil or constitutional rights.  See Complaint at 12.  Count X also seeks to represent all individuals or corporations whose property was seized or deprived of them by the City of Albuquerque's Nuisance Abatement Team or through its enforcement of the housing code from three years of the filing of this Complaint until the alleged policy ceases, and seeks certification of Counts IV through X.  See Complaint at 12.

On August 11, 2009, Gabaldon, Lovato, and Thomas filed a Complaint in Intervention.  See Complaint in Intervention, filed August 11, 2009 (Doc. 11).  On August 10, 2010, the Plaintiffs filed

an Amended Complaint.  See Amended Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights, filed August 10, 2010 (Doc. 48, at 6-16)("Amended Complaint").  The Amended Complaint modified the Complaint to (i) incorporate the Plaintiffs-in-Intervention Gabaldon, Lovato and Thomas into Counts IV, V, VII, VIII, IX, and X, see Amended Complaint at 6-16; (ii) add Lovato to Count VI, see Amended Complaint at 9; and (iii) add facts specific to the Gabaldon, Lovato, and Thomas, see Amended Complaint at 2-6.

On June 4, 2010, the Plaintiffs moved for class certification.  In a hearing on September 14, 2010,[1] the parties agreed that the requirements of Rule 23(a), (b)(2), and (b)(3) were satisfied.  See Fed. R. Civ. P. 23.    See Transcript of Hearing at 4:11-12 (taken September 14, 2010)(Kennedy)("Tr.").[2]  The Defendants reserved the right to challenge the class at any time.  See Tr. at 7:11-21 (Court, Levy).  The parties agreed that the Defendants did not admit that there was an unconstitutional policy and that there was no admission of liability of any kind.  See Tr. at 6:15-21 (Levy).  The Court orally granted the motion for class certification at the hearing, see Tr. at 9:2-13 (Court), and entered a written order approving class action notice and trial setting on December 14, 2010, see Order Approving Class Action Notice and Trial Setting, filed December 14, 2010 (Doc. 67).

## LAW REGARDING CLASS ACTIONS

Rule 23 provides the requirements for certifying a class under the federal rules.  All classes

---

[1] The hearing on September 14, 2010 included argument on the class certification and summary-judgment motions.

[2] The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

must satisfy the prerequisites under rule 23(a).  Additionally, a class must satisfy one of the three sets of requirements under rule 23(b).  The plaintiff bears the burden of showing that the requirements are met.  See Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988)("A party seeking to certify a class is required to show . . . that all the requirements of [Rule 23(a)] are clearly met."). See also Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir. 2004)("Although the party seeking to certify a class bears the burden of proving that all the requirements of Rule 23 are met, the district court must engage in its own 'rigorous analysis' of whether 'the prerequisites of Rule 23(a) have been satisfied.'" (quoting Gen. Tel. Co. of the S.W. v. Falcon, 457 U.S. 147, 161 (1982), and citing Reed v. Bowen, 849 F.2d at 1309).  The Court must accept a plaintiff's substantive allegations as true, but it "need not blindly rely on conclusory allegations which parrot Rule 23," and "may consider the legal and factual issues presented by plaintiff's complaints."  Shook v. El Paso County, 386 F.3d at 968 (citing J.B. v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999); Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974)).  See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1234 (11th Cir. 2000)("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Anderson v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982).  See Vallario v. Vandehey, 554 F.3d 1259, 1267 (10th Cir. 2009)("We, of course, adhere to the principle that class certification does not depend on the merits of a suit.").

-17-

1.    **Class Prerequisites**.

All classes must satisfy the prerequisites under rule 23(a):

(a) **Prerequisites**. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

a.    **Numerosity**.

Rule 23(a)(1) requires that the class membership be sufficiently large to warrant a class action because the alternative of joinder is impracticable.  Some courts have held that numerosity may be presumed at a certain number; the United States Court of Appeals for the Tenth Circuit, however, "has never adopted such a presumption." Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  The Tenth Circuit has stated that there is "no set formula" to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion. Rex v. Owens, 585 F.2d 432, 436 (10th Cir. 1978). Cf. Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d 620, 624 (5th Cir. 1999)(finding that proposed class consisting of "100 to 150 members . . . is within the range that generally satisfies the numerosity requirement").  In determining whether a proposed class meets the numerosity requirement, "the exact number of potential members need not be shown," and a court "may make 'common sense assumptions' to support a finding that joinder would be impracticable." Neiberger v. Hawkins, 208 F.R.D. 301, 313

(D. Colo. 2002)(citation omitted).  See Bittinger v. Tecumseh Prods. Co., 123 F.3d 877, 884 n.1 (6th

Cir. 1997)(noting that rule 23(a)(1) is not a "'strict numerical test'"; holding, however, that, where

class comprises over 1,100 persons, suggestion that joinder is not impractical is "frivolous")(citation

omitted); Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993)("[T]he difficulty in joining as few

as 40 class members should raise a presumption that joinder is impracticable." (citing 1 Herbert B.

Newberg, Newberg on Class Actions § 3.05, at 141-42 (2d ed. 1985))).  "Satisfaction of the

numerosity requirement does not require that joinder is impossible, but only that plaintiff will suffer

a strong litigational hardship or inconvenience if joinder is required." Cook v. Rockwell Int'l Corp.,

151 F.R.D. 378, 384 (D. Colo. 1993).  See Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir.

1993)("Impracticable does not mean impossible.").

**b.    Commonality.**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed.

R. Civ. P. 23(a)(2).  Even "factual differences in the claims of the individual class members should

not result in a denial of class certification where common questions of law exist." In re Intelcom

Group Sec. Litig., 169 F.R.D. 142, 148 (D. Colo. 1996). See Adamson v. Bowen, 855 F.2d 668, 676

(10th Cir. 1988)("That the claims of individual class members may differ factually should not

preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.");

Lopez v. City of Santa Fe, 206 F.R.D. 285, 289 (D.N.M. 2002)(Vázquez, J.)("Commonality requires

only a single issue common to the class, and the fact that 'the claims of individual class members

may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the

application of a common policy.'")(citations omitted).

In Harrington v. City of Albuquerque, 222 F.R.D. 505, 511 (D.N.M. 2004)(Hansen, J.), each

-19-

plaintiffs' claim was based upon the actions of the defendants in collecting the fees from the plaintiffs, and not upon plaintiffs acts. The district court found that each class member's claim was therefore common to the entire class. "[T]he Plaintiffs allege[d] that the entire class was subjected to the same unconstitutional practices, which is sufficient to meet the commonality requirement." Id. at 510.

### c.    Typicality.

Rule 23(a)(3) requires that the named representative's claims be typical of the class' claims. See Fed R. Civ. P. 23(a)(3). The typicality requirement ensures that absent class members are adequately represented by evaluating whether the named plaintiff's interests are sufficiently aligned with the class' interest. See Baby Neal ex rel. Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994); Nicodemus v. Union Pac. Corp., 204 F.R.D. 479, 490 (D. Wyo. 2001). The Supreme Court of the United States has noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tele. Co. of the Southwest v. Falcon, 457 U.S. at 157 n.13. "Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." DG v. Devaughn, 594 F.3d 1188, 1198 (10th Cir. 2010)(citing Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988)). "[L]ike commonality, typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." DG v. Devaughn, 594 F.3d at 1199. Factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). See Penn v. San Juan Hosp., Inc., 528 F.2d 1181, 1189 (10th Cir. 1975)("It is to be recognized that

there may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members are based on the same legal or remedial theory."). Accordingly, differences in the amount of damages will not defeat typicality. See Harrington v. City of Albuquerque, 222 F.R.D. at 511. "The United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact." Gianzero v. Wal-Mart Stores Inc., No. 09-cv-00656-REB-BNB, 2010 WL 1258071, at *3 (D. Colo. Mar. 29, 2010)(citing Milonas v. Williams, 691 F.2d 931, 938 (10th Cir. 1982)("In determining whether the typicality and commonality requirements have been fulfilled, either common questions of law or fact presented by the class will be deemed sufficient."), cert. denied, 460 U.S. 1069 (1983); Adamson v. Bowen, 855 F.2d at 676 ("[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." (citations omitted)).

        **d.**      **Adequacy.**

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement protects the due-process interests of unnamed class members, who are bound by any judgment in the action. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the

most important of the criteria for class certification set forth in Rule 23(a) . . . ." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002). In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.

The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)). Courts have found that intraclass conflicts "may negate adequacy under Rule 23(a)(4)." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intraclass conflicts). See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574,

579 (W.D. Va. 1999)(holding that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition." 7A C. Wright, A. Miller & M. Kane, <u>Fed. Prac. & Proc.</u> § 1768, at 389-93 (3d ed. 2005). "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with class members, not every potential disagreement between a class representative and the class members will stand in the way of a class suit." 1 A. Conte & H. Newberg, <u>Newberg on Class Actions</u> § 3:26, at 433-34 (4th ed. 2002).

### 2. **Class Types**.

Once the court finds that the threshold requirements have been met, "it must then examine whether the class falls within at least one of three categories of suits set forth in Rule 23(b)." <u>Adamson v. Bowen</u>, 855 F.2d at 675. <u>See</u> <u>DG v. Devaughn</u>, 594 F.3d at 1199 ("In addition to satisfying Rule 23(a)'s requirements, the class must also meet the requirements of one of the types of classes described in subsection (b) of Rule 23."). Rule 23(b) provides that a class action is appropriate if the threshold requirements are satisfied, and the case falls into one or more of three categories:

(b) **Types of Class Actions**. A class action may be maintained if Rule 23(a) is satisfied and if:

(1) prosecuting separate actions by or against individual class members would create a risk of:

>(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

>(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

>(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

>(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

>(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

>(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b). "Only one of rule 23(b)'s subdivisions must be satisfied to meet the class-action requirements." Gonzales v. City of Albuquerque, No. CIV 09-0520 JB/RLP, 2010 WL 4053947, at *11 (D.N.M. Aug. 21, 2010)(citing Carpenter v. Boeing, Co., 456 F.3d 1183, 1187 (10th Cir. 2006)(stating that the district court must determine whether a suit "falls within one of the categories of actions maintainable as class actions")).

To satisfy rule 23(b)(3), the court must find "that the questions of law or fact common to the

members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) instructs that the court should consider: (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the difficulties likely to be encountered in the management of a class action.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The predominance criterion of rule 23(b)(3) is "far more demanding" than rule 23(a)(2)'s commonality requirement.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997); Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir. 2004)("Although we do not rest our decision upon Rule 23(a), cases that interpret that the commonality requirement of Rule 23(a) illustrate the instant Plaintiffs' inability to satisfy Rule 23(b)(3)'s 'far more demanding' requirement that common issues predominate.").  In Monreal v. Potter, the Tenth Circuit found: "The myriad discriminatory acts that Plaintiffs allege (e.g., failure to promote, failure to train, unequal pay, disrespectful treatment, etc.) each require independent legal analysis, and similarly challenge the predominance requirement of Rule 23(b)(3) if not also the commonality requirement of Rule 23(a)."  367 F.3d at 1237.

**3.    Class Order.**

Rule 23(c) provides the requirements for a court order certifying a class:

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1) Certification Order.**

(A) Time to Issue.  At an early practicable time after a person sues or

is sued as a class representative, the court must determine by order
whether to certify the action as a class action.

(B) Defining the Class; Appointing Class Counsel.  An order that
certifies a class action must define the class and the class claims,
issues, or defenses, and must appoint class counsel under Rule 23(g).

(C) Altering or Amending the Order.  An order that grants or denies
class certification may be altered or amended before final judgment.

Fed. R. Civ. P. 23(c).  The United States Court of Appeals for the Third Circuit addressed the

requirements of rule 23(c)(1)(B) after the 2003 amendments to the Federal Rules of Civil Procedure,

holding that "Rule 23(c)(1)(B) requires district courts to include in class certification orders a clear

and complete summary of those claims, issues, or defenses subject to class treatment."  Wachtel v.

Guardian Life Ins. Co. of America, 453 F.3d 179, 184 (3d Cir. 2006).  The Third Circuit "noted that

most district court opinions fell short of this standard."  Nafar v. Hollywood Tanning Sys., Inc.,

339 F. App'x 216, 219 (3d Cir. 2009).

[T]he proper substantive inquiry for an appellate tribunal reviewing a certification
order for Rule 23(c)(1)(B) compliance is whether the precise parameters defining the
class and a complete list of the claims, issues, or defenses to be treated on a class
basis are readily discernible from the text either of the certification order itself or of
an incorporated memorandum opinion.

Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d at 185.

## ANALYSIS

The Plaintiffs ask the Court to certify a class of all individuals or corporations whose

property was seized without court order, or who were deprived of their property for suspected drug

use and subsequent to the City of Albuquerque's Criminal Nuisance Abatement Team designating

their property as substandard from three years before Lowery filed his Complaint, until the policy

ceases for Counts IV through X of the Complaint.  See Tr. at 4:11-12.  The Defendants reserved the

right to challenge the class at any time.  See Tr. at 7:11-21 (Court, Levy).  The parties agreed that the Defendants did not admit that there was an unconstitutional policy and that there was no admission of liability of any kind.  See Tr. at 6:15-21 (Levy).  Because the Court agrees that the class satisfies the requirements of rule 23(a), 23(b)(2) and 23(b)(3), the Court certifies the class.

## I.   THE CLASS IS SO NUMEROUS THAT JOINDER OF ALL MEMBERS IS IMPRACTICABLE.

The Court finds that there are several hundred class members, making them so numerous that joinder would be impracticable.  Several hundred tenants and homeowners have had their homes seized because of suspected drug use on the property in the three years before Lowery filed his Complaint.  Crandall, one of five City inspectors, has posted approximately eighty homes as substandard based on drug use over the past five years.  See Crandall Depo. at 98:2-10.  One Albuquerque environmental hygiene company, CERL, Inc., has tested fifty-nine homes for possible drug contamination, and twenty-seven of those homes were tested based on evidence of cocaine or heroine use.  See Motion for Class Certification ¶ 17, at 6.  Another environmental hygiene company, RLB CIH, LLC., has tested 136 homes for possible drug contamination, and fifty-four of those homes were tested based on evidence of cocaine, heroine, or marijuana use.  See Motion for Class Certification ¶ 17, at 6.  The number of class members satisfies the numerosity requirement. See Fed. R. Civ. P. 23(a)(1); Mullen v. Treasure Chest Casino, L.L.C., 186 F.3d at 624 (finding that proposed class consisting of "100 to 150 members -- is within the range that generally satisfies the numerosity requirement"); Bittinger v. Tecumseh Prods. Co., 123 F.3d at 884 n.1 (rejecting as "frivolous" the "content[ion] that the plaintiffs failed to address the issue of whether joinder of all [1,100] members of the class [wa]s impracticable"); Robidoux v. Celani, 987 F.2d at 936 ("[T]he difficulty in joining as few as 40 class members should raise a presumption that joinder is

impracticable." (citing 1 H. Newberg, supra § 3.05, at 141-42)); Harrington v. City of Albuquerque, 222 F.R.D. at 509 (certifying a class of 300 members); Yazzie v. Ray Vicker's Special Cars, Inc., 180 F.R.D. 411, 415 (D.N.M. 1998)(Vázquez, J.)(certifying a class of approximately 210 persons who pawned their vehicles with an auto pawn business in Farmington, New Mexico); Olenhouse v. Commodity Credit Corp., 136 F.R.D. 672, 679 (D. Kan. 1991)(holding that joinder is shown to be impracticable where the class to be represented consisted of at least 50 members). In light of the large number of class members, this action satisfies Rule 23(a)(1).[3]

## II.   THERE ARE QUESTIONS OF LAW AND FACT COMMON TO THE CLASS.

The commonality requirement is also satisfied. See Fed. R. Civ. P. 23(a)(2). "[F]actual differences in the claims of the individual class members should not result in a denial of class certification where common questions of law exist." In re Intelcom Group Sec. Litig., 169 F.R.D. at 148. "That the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy." Adamson v. Bowen, 855 F.2d at 676. "Commonality requires only a single issue common to the class, and the fact that 'the claims of individual class members may differ factually should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a common policy.'" Lopez v. City of Santa Fe, 206 F.R.D. at 289 (citations omitted). "The commonality requirement has been applied permissively in securities fraud litigation." In re Initial Pub. Offering Sec. Litig., 227 F.R.D.

---

[3] Pursuant to the Court's Order Approving Class Action Notice and Trial Setting, the parties sent the Class Action Notice, filed November 5, 2010 (Doc. 65-1), to 217 potential class members. See Plaintiffs' Report Back to the Court on Class Notice, at 1-2, filed March 30, 2011 (Doc. 78). Eighty-eight notices were returned undelivered. The Plaintiffs received responses from thirty-three class members. The Plaintiffs also approximate that ninety-six class members have received notice and not responded. Thus, approximately 132 class members have been notified. See Plaintiffs' Report Back to the Court on Class Notice, at 2.

at 87.  "Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement."  5 J. Moore, D. Coquillette, G. Joseph, G. Vairo, J. Solovy & S. Schreiber, <u>supra</u> ¶ 23.23[4][b], at 23-77.  "Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met."  <u>In re Oxford Health Plans, Inc. Sec. Litig.</u>, 191 F.R.D. at 374.  <u>Accord</u> <u>Initial Pub. Offering</u>, 227 F.R.D. at 87 ("In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.").

"[T]he Plaintiffs allege that the entire class was subjected to the same unconstitutional practices, which is sufficient to meet the commonality requirement."  <u>Harrington v. City of Albuquerque</u>, 222 F.R.D. at 510.  Each of the named Plaintiffs' claims are based upon the Defendants' allegedly unlawful actions in depriving the Plaintiffs of their property in violation of their constitutional rights.  The Nuisance Abatement Team's allegedly unconstitutional policy and practice forms the basis for the Plaintiffs' claims.  They contend that the Nuisance Abatement Team's policy is to immediately seize homes, without court order, where illicit drugs are used or believed to be used.  Because the entire proposed class is subjected to the same allegedly unconstitutional practices, there are questions of law and fact common to the class.  The Court thus finds "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

## III.   <u>THE PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLASS.</u>

The Court finds that the Plaintiffs' claims satisfy Rule 23(a)(3)'s requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement ensures that absent class members are

adequately represented by evaluating whether the class representative's interests are sufficiently aligned with the class's interest.  See Baby Neal for & by Kanter v. Casey, 43 F.3d at 57; Nicodemus v. Union Pac. Corp., 204 F.R.D. at 490.  The essential characteristics of the class representative's claims must be the same or similar as the class' claims, but they need not be identical.  The Tenth Circuit has affirmed that factual differences among some of the class members will "not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory."  Adamson v. Bowen, 855 F.2d at 676.  See Penn v. San Juan Hosp., Inc., 528 F.2d at 1189 ("It is to be recognized that there may be varying fact situations among individual members of the class and this is all right so long as the claims of the plaintiffs and the other class members are based on the same legal or remedial theory.").  "So long as there is a nexus between the class representatives' claims or defenses and the common questions of fact or law which unite the class, the typicality requirement is satisfied."  Neiberger v. Hawkins, 208 F.R.D. at 315.  See Milonas v. Williams, 691 F.2d at 938 ("[E]very member of the class need not be in a situation identical to that of the named plaintiff.").

The Plaintiffs' claims have a close nexus with those of the proposed class; both the Plaintiffs and the proposed class challenge the Defendants' immediate seizure of homes without judicial warrant upon discovering drug use.  Moreover, the Court has found that there are questions of law or fact common to the class, and the "[t]he United States Court of Appeals for the Tenth Circuit has said that the typicality requirement is satisfied if there are common questions of law or fact."  Gianzero v. Wal-Mart Stores Inc., 2010 WL 1258071, at *3 (citing Milonas v. Williams, 691 F.2d at 938; Adamson v. Bowen, 855 F.2d at 676).  The Court thus finds that the Plaintiffs' claims or defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

## IV.     THE PLAINTIFFS AND THEIR COUNSEL WILL FAIRLY AND ADEQUATELY PROTECT THE INTERESTS OF THE CLASS.

The Plaintiffs and their counsel will adequately represent the class.  See Fed. R. Civ. P. 23(a)(4)("[T]he representative parties will fairly and adequately protect the interests of the class."). The Court will therefore appoint K. Lowery as the class representative and the Kennedy Law Firm as class counsel.  See Fed. R. Civ. P. 23(c)(1)(B)("An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel . . . .").  To protect the due-process interests of unnamed class members -- who are bound by any judgment in the action -- rule 23(a)(4) requires that the named representative provide fair and adequate protection for the class' interests.  See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. at 379 n.5 (characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F. Supp. 2d at 1277 ("Due process requires that the Court 'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings.").   "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ." Miller ex rel. S.M. v. Bd. of Educ., 455 F. Supp. 2d at 1294.  See Cobb v. Avon Prods., Inc., 71 F.R.D. at 654 ("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . .").  The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether the named plaintiffs and their counsel have any conflicts with other class members; and (ii) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1187-88.  In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis.

-31-

See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.   "Any doubt regarding adequacy of representation should be resolved in favor of . . . upholding the class."   Schwartz v. Celestial Seasonings, Inc., 178 F.R.D. at 552; accord Neiberger v. Hawkins, 208 F.R.D. at 316.

The Plaintiffs have common interests with the proposed class.   Their claims are typical of those of the proposed class, and as such, they will directly benefit from a favorable resolution of the claims of the proposed class.   The typicality of the Plaintiffs' claims and the community of interest presented by the common questions of law and fact support finding that they will adequately represent the proposed class.   Moreover, the Plaintiffs have vigorously prosecuted the interests of the proposed class through their chosen counsel and their work with them in this case.   The Plaintiffs have also engaged qualified, experienced, and capable attorneys for this type of litigation.   Their counsel have many years experience in class action litigation and are well equipped to prosecute the action vigorously on behalf of the class.   See also Lopez v. City of Santa Fe, 206 F.R.D. at 289-90 (stating that the experience and competence of the attorney representing the class may inform the court's analysis).   There is no evidence that the Plaintiffs have any conflicts with other class members.   The Court finds that the Plaintiffs and their chosen counsel will vigorously prosecute the action on behalf of the class.

## V.     THE CLASS SATISFIES RULE 23(B)(2) AND (3)'S REQUIREMENTS.

The Plaintiffs seek class certification under rule 23(b)(2) and (b)(3).   The Plaintiffs seek to enjoin the City of Albuquerque from seizing houses under the Drug Lab Ordinance and Substandard Housing Ordinance to deprive Albuquerque tenants and landlords of their property based on evidence of drug use.   The Court finds the requested "injunctive relief . . . is appropriate respecting the class as a whole."   Fed. R. Civ. P. 23(b)(2).   The Plaintiffs also seek compensatory damages for

the depravation of their homes.  The Court finds that their claims present "questions of law or fact

common to class members [that] predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy."  Fed. R. Civ. P. 23(b)(3).

A.     **RULE 23(B)(2)'S REQUIREMENTS ARE SATISFIED.**

Class certification under rule 23(b)(2) requires that "the party opposing the class has acted

or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

23(b)(2).  See Harrington v. City of Albuquerque, 222 F.R.D. 505, 516 (D.N.M. 2004)(Hansen, J.).

> Rule 23(b)(2) "imposes two independent, but related requirements" upon
> those seeking class certification.  [Shook v. Board of County Commissioners, 543
> F.3d 597, 604 (10th Cir. 2008)].  First, plaintiffs must demonstrate defendants'
> actions or inactions are "based on grounds generally applicable to all class
> members."  Id. Second, plaintiffs must also establish the injunctive relief they have
> requested is "appropriate for *the class as a whole*."  Id. (emphasis in original).
> Together these requirements demand "cohesiveness among class members with
> respect to their injuries . . . ."  Id.

> This cohesiveness, in turn, has two elements.  First, plaintiffs must illustrate
> the class is "sufficiently cohesive that any classwide injunctive relief" satisfies Rule
> 65(d)'s requirement that every injunction "'state its terms specifically; and describe
> in reasonable detail . . . the act or acts restrained or required.'"  Id. (quoting Fed. R.
> Civ. P. 65(d)).  Second, cohesiveness also requires that class members' injuries are
> "sufficiently similar" that they can be remedied in a single injunction without
> differentiating between class members.  Id. Rule 23(b)(2)'s bottom line, therefore,
> demands at the class certification stage plaintiffs describe in reasonably particular
> detail the injunctive relief they seek "such that the district court can at least
> 'conceive of an injunction that would satisfy [Rule 65(d)'s] requirements,' as well
> as the requirements of Rule 23(b)(2)."  Id. at 605 (quoting Monreal v. Potter, 367
> F.3d 1224, 1236 (10th Cir. 2004)).

D.G. v. DeVaughn, 594 F.3d 1188, 1199-1200 (10th Cir. 2010).

In D.G. v. Devaugn, the plaintiffs sought to certify "a class of all children who are or will

be in the legal custody of the [Oklahoma Department of Human Services] due to a report or suspicion of abuse or neglect or who are or will be adjudicated deprived due to abuse or neglect." 594 F.3d at 1192.  The plaintiffs alleged that agency-wide policies exposed all class members to an impermissible risk of harm, violating their Fifth, Ninth, and Fourteenth Amendment rights. See 594 F.3d at 1192.  The plaintiffs sought injunctive relief setting limits on caseworker caseloads and mandating that caseworkers conduct minimum monitoring visits.  See 594 F.3d at 1200.  The Tenth Circuit held that the requested injunctions would remedy the defendants' conduct based on grounds generally applicable to the class and that the injuries alleged were "sufficiently similar that they [could] be addressed in a single injunction that need not differentiate between class members."  594 F.3d at 1201 (citing Shook v. Board of County Commissioners, 543 F.3d at 604).  The Tenth Circuit stated "[t]hat a class possibly or even likely includes persons unharmed by a defendant's conduct should not preclude certification."  594 F.3d at 1201.

Here, the Plaintiffs allege that the Defendants have an unconstitutional policy and practice of using the Drug Lab Ordinance and Substandard Housing Ordinance to deprive Albuquerque tenants and landlords of their property based on evidence of drug use.  The Plaintiffs request an injunction prohibiting members of the Nuisance Abatement Team from evicting tenants and landlords from their property on this basis until such time as a city ordinance or other legal authority grants them that enforcement power.  The requested injunction would remedy the Defendants' conduct on grounds generally applicable to the class, and the seizure of property suffered by class members is sufficiently similar to be remedied in a single class action.  The Court thus concludes that certification of the class under rule 23(b)(2) is appropriate.

**B.    RULE 23(B)(3)'S REQUIREMENTS ARE SATISFIED.**

Class certification under rule 23(b)(3) requires "class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded." Amchem Prods. v. Windsor, 521 U.S. at 614-15.  Under this subsection of rule 23, the Court must find that: (i) the questions of law or fact common to class members predominate over any questions affecting only individual members; and (ii) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  See Fed. R. Civ. P. 23(b)(3).  The Court finds that both of these requirements are satisfied here.

**1.    Common Questions of Law and Fact Predominate.**

"[T]he predominance analysis tests whether the class is a 'sufficiently cohesive' unit[;] all factual or legal issues that are common to the class inform the analysis." In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006)(citations omitted). See Amchem Prods. v. Windsor, 521 U.S. at 621 ("Subdivisions (a) and (b) focus court attention on whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives."). "In turn, an issue is common to the class when it is susceptible to generalized, class-wide proof." In re Nassau County Strip Search Cases, 461 F.3d at 227-28 ("That the class-wide proof comes in the form of a simple concession rather than contested evidence certainly shortens the time that the court must spend adjudicating the issue, but it does nothing to alter the fundamental cohesion of the proposed class, which is the central concern of the predominance requirement."); 7 Newberg, supra, §22:55, at 248-49 ("In most cases, common issues of liability are deemed to predominate even when reliance and damages issues must be individually proved.").

"The commonality requirement is satisfied if there is a single factual or legal question

common to the entire class.  The predominance requirement is met if this common question is at the heart of the litigation." Powers v. Hamilton County Pub. Defender Comm'n, 501 F.3d 592, 619 (6th Cir. 2007).  In Powers v. Hamilton County Public Defender Commisson, the representative class member alleged that the Public Defender engaged in an ongoing and regular practice of failing to seek indigency hearings for criminal defendants facing incarceration for nonpayment of fines.  See 501 F.3d at 619.  The United States Court of Appeals for the Sixth Circuit held: "The dispositive facts and law are the same as to each class member.  This is sufficient to satisfy both the commonality and predominance requirements."  501 F.3d at 619.

Similarly, in In re Nassau County Strip Search Cases, the plaintiff sought certification of a class consisting of "all persons arrested for misdemeanors or non-criminal offenses in Nassau County who thereafter were strip-searched at the NCCC pursuant to defendants' blanket policy, practice and custom which required that all arrestees be strip searched upon admission to the facility."  In re Nassau County Strip Search Cases, 461 F.3d at 223.  The United States Court of Appeals for the Second Circuit found that the class definition implicated two broad common liability issues: "whether the blanket policy existed and whether defendants are liable for its implementation." 461 F.3d at 229.

Here, the Plaintiffs allege that the Defendants have an ongoing policy and practice of ejecting people from their homes when they find evidence of drug use anywhere on the property.  Similar to the plaintiffs in In re Nassau County Strip Search Cases, the Plaintiffs will have to establish that this blanket policy exists and that Defendants are liable for its implementation.  Similar to the due-process violations alleged in Powers v. Hamilton County Public Defender Commisson, the dispositive facts and law are the same in this case as to each class member.  Each class member's

-36-

claims are based upon the same theories of liability and will require the same proof. The Court thus concludes that common claims of fact and law predominate.

The primary differences among the class members' claims, if any, will be the amount of damages. When the amount of damages must be established individually, that "necessity alone cannot preclude class certification." Aguirre v. Bustos, 89 F.R.D. 645, 649 (D.N.M. 1981)(citing Gold Strike Stamp Co. v. Christensen, 436 F.2d 791 (10th Cir. 1970)).

> The District Court should bear in mind that "[t]here are a number of management tools available to a district court to address any individualized damages issues," such as bifurcation, the use of a magistrate or special master, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability.

In re Nassau County Strip Search Cases, 461 F.3d at 231 (citations omitted). Here, class members are aggrieved by the same allegedly unconstitutional policy and practice of the City of Albuquerque's Nuisance Abatement Team, and there is a commonality between the unconstitutional deprivation of property and the harm. Thus, the Plaintiffs' common facts and claims predominate both as to liability and general damages. The same jury that determines liability may be able to determine damages, if any. "Failing some practical solution allowing full resolution of all class damage claims in a single case, the court could enter a judgment of liability, leaving class members to pursue damage claims in separate law suits." Tardiff v. Knox County, 365 F.3d 1, 7 (1st Cir. 2004). The Court thus finds that, for many of the same reasons that the class satisfies the commonality requirement, rule 23(b)(3)'s predominance standard is satisfied, as the common questions predominate over any perceived or potential individual issues. See Amchem Prods. v. Windsor, 521 U.S. at 625. Accordingly, the Court finds that common questions, at least at this stage of proceedings, predominate over any individual questions.

**2.      A Class Action Is Superior to Other Methods for Resolving this Dispute.**

A rule 23(b)(3) class must be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "A class action is 'superior' to other available methods when there is a need to remedy a common legal grievance and where a class action serves to achieve economies of time, effort and expense."  Yazzie v. Ray Special Cars, Inc., 180 F.R.D. at 417.  Rule 23(b) identifies four factors that are relevant to determining when a class action is the superior method of adjudication.  See Fed. R. Civ. P. 23(b)(3).  The first factor to consider is "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  In Harrington v. City of Albuquerque, the Court found that, because no other individual suits had been filed by members of the class, "the class members have little, if any, interest in controlling the prosecution of this suit separately from the class."  222 F.R.D. at 517 (citing Gaspar v. Linvatec Corp., 167 F.R.D. 51, 60 (N.D. Ill. 1996); Walco Invs. v. Thenen, 168 F.R.D. 315, 337 (S.D. Fla. 1996); In re Revco Sec. Litig., 142 F.R.D. 659, 669 (N.D. Ohio 1992); Riordan v. Smith Barney, 113 F.R.D. 60, 66 (N.D. Ill. 1986)).  Similarly, no other class members have filed individual suits challenging the constitutionality of the deprivation of property by the Nuisance Abatement Team based on evidence of drug use on the property.  The Court thus concludes that class members appear to have little interest in controlling prosecution of his or her suit separately from the class.

The second factor is "the extent and nature of any litigation concerning the controversy already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  In Harrington v. City of Albuquerque, only one lawsuit had been filed challenging the fees that the union collected.  See 222 F.R.D. at 518.  The district court concluded that "the extent of the litigation commenced by members

-38-

of the class indicates that a class action is superior to separate suits." 222 F.R.D. at 518.  Here, no other lawsuit has been filed challenging the unlawful policy and practice of the City's Nuisance Abatement Team ejecting people from their homes for suspected drug use and minor, easily remedied code violations.  The Court thus concludes that the extent of litigation demonstrates that a class action is superior to separate suits.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C).  Just as all of the claims in Harrington v. City of Albuquerque originated in Albuquerque, all of the claims of the putative class are based on the City of Albuquerque's Nuisance Abatement Teams' enforcement of city ordinances.  The Court thus concludes that "the litigation of these claims will take place in this forum; venue is not appropriate in any other." Harrington v. City of Albuquerque, 222 F.R.D. at 518 (citing  28 U.S.C. § 1391(b)).

The fourth factor is "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  Manageability " encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit."  Eisen v. Carlisle & Jacquelin, 417 U.S. at 164.  Similar to the approximately 300 non-union city employees that constituted the class in Harrington v. City of Albuquerque, the putative class

> is finite and the identities of each class member are known to the Defendants, if not to the Plaintiffs, making management of the suit far simpler.  Providing them with the mandatory notice required by Fed. R. Civ. P. 23(c)(2)(B) will not create significant difficulty. The entire class is located in the Albuquerque area, making communication with the class far simpler than in most cases.
>
> Moreover, each Plaintiffs' claims are so similar that certifying this suit as a class action will present little, if any, difficulty that will not be presented by a series of individual suits filed by class members.

-39-

222 F.R.D. at 518 (citations omitted).  The Court thus concludes that a class action is the superior method of adjudicating this controversy.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Class Certification, filed June 4, 2010 (Doc. 32), is granted; (ii) the Court certifies a class of all individuals or corporations whose property was seized without court order, or who were deprived of their property for suspected drug use and subsequent to the City of Albuquerque's Criminal Nuisance Abatement Team designating their property as substandard from three years before Plaintiff Kevin Lowery filed his Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights, filed May 8, 2009 (Doc. 1-1)("Complaint"), until the policy ceases for Counts IV through X of the Complaint; (iii) the Court certifies Plaintiffs Kevin Lowery, Judy Lovato, Danny Gabaldon, and Barbara Thomas as the class representatives; (iv) the Court appoints the Kennedy Law Firm as class counsel; and (v) the Court defines the class claims as Counts IV through X of Lowery's Complaint.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

    *Attorneys for the Defendants*