## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KEVIN LOWERY, on his behalf and
on behalf of similarly situated persons,

        Plaintiff,

JUDY LOVATO, DANNY GABALDON,
BARBARA THOMAS, each on his/her behalf
and on behalf of similarly situated persons,

        Plaintiffs-in-Intervention,

vs.                                    No. CIV 09-0457 JB/WDS

CITY OF ALBUQUERQUE, MARTIN CHAVEZ,
in his individual capacity as mayor of the City of
Albuquerque; RAY SCHULTZ, in his individual
capacity chief of police of the City of Albuquerque
Police Department; JOHN OLMSTEAD; MARK
CRANDALL; and JOHN DOE POLICE OFFICERS,

        Defendants,

MICHELLE WALL, LARRY MOYA,

        Defendants-in-Intervention.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, filed May 5, 2011 (Doc. 90)("Motion for Preliminary Approval"); and (ii) the Plaintiffs' Unopposed Motion for Leave to File Second Complaint in Intervention, filed August 24, 2011 (Doc. 93)("Motion to Intervene"). The primary issues are: (i) whether the Court should approve the proposed class action settlement; and (ii) whether the Court should grant Plaintiffs Barry Schooley, Christine Garner, Joel Marks, Sherry Meurer, Ana Lima, Darlene Chavez, and Ronald Tapia, Tammy Gallegos, and their minor child, T.T. (collectively the

"Prospective Intervenors") leave to file a Second Complaint in Intervention.  The Court will deny the Motion for Preliminary Approval and the Motion to Intervene.  The Court rejects the proposed settlement, because it has concerns about the fairness of the settlement and, now, about the adequacy of the class representatives.  The Court denies the Motion to Intervene, because permitting intervention could cause undue delay or prejudice to the prosecution of the class claims.  Additionally, the Court will reaffirm its order with respect to Plaintiff Kevin Lowery.

## FACTUAL BACKGROUND

The Court has previously reviewed the facts of this case in its Memorandum Opinion and Order, filed March 31, 2011 (Doc. 79)("March 31, 2011 MOO"), which granted summary judgment on the issue whether exigent circumstances existed to seize Plaintiffs Danny Gabaldon, Judy Lovato, Barbara Thomas and K. Lowery's homes, and in its Memorandum Opinion and Order, filed April 13, 2011 (Doc. 83)("April 13, 2011 MOO"), which certified the class action.  The Court adopts those facts for the purposes of this memorandum opinion and order.

### 1.    City Ordinances.

In 2004, Defendant City of Albuquerque, New Mexico, passed the Clean Up of Laboratory Sites Ordinance, Ord. 36-2004 (hereinafter "Ord. 36-2004").  The purpose of the ordinance is to require remediation of clandestine drug laboratory sites "to assure the health, safety and welfare of the community."  Ord. 36-2004 § 11-1-1-42.  See Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment ¶ 1, at 2, filed July 13, 2010 (Doc. 36)("Thomas' and Gabaldon's Motion"); Defendants' Response to Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment ¶ 1, at 1, filed August 29, 2010 (Doc. 52)("Thomas and Gabaldon Response")(admitting this fact).  Clandestine drug laboratories are defined in the ordinance as "property on which [a controlled substance] is being manufactured or on which there

is an attempt to manufacture, or where a person is arrested for having on any property any chemicals or equipment used in manufacturing [a controlled substance]."  Ord. 36-2004 § 11-1-1-42.  <u>See</u> Thomas' and Gabaldon's Motion ¶ 2, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 2, at 2 (admitting this fact).  The Substandard Building Ordinance, Ord. 34-1985 (hereinafter "Ord. 34-1985") states that any building or portion of a building where there exists an inadequate sanitation condition "to the extent that [the condition] endangers the life, limb, health, property, safety or welfare of the public or occupants thereof shall be deemed and declared a SUBSTANDARD BUILDING."  Ord. 34-1985 § 14-3-4-1.  <u>See</u> Thomas' and Gabaldon's Motion ¶ 5, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 5, at 2 (admitting this fact). Substandard housing means that there is an immediate risk of harm to the resident.  <u>See</u> Deposition of Mark Crandall at 25:1-25 (taken April 14, 2010), filed August 29, 2010 (Doc. 52-4).  Designation of a house as substandard through "posting" or "red tagging" requires same-day eviction of all residents.  Ord. 34-1985 § 14-3-5-3(D); Crandall Depo. at 29:18-24; Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).  Residents and homeowners who re-enter a property posted as substandard without a permit commit a misdemeanor offense.  <u>See</u> Ord. § 14-3-5-3(D); Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).

When a property is deemed substandard because of drug contamination, occupants, and homeowners are barred from entering the property until the homeowners pay for drug contaminant testing and remediation, which can cost thousands of dollars.  <u>See</u> Thomas' and Gabaldon's Motion ¶ 12, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 12, at 3 (admitting this fact). Residents and homeowners have an automatic right to reenter their homes upon an appeal.  <u>See</u> Ord. 34-1986 § 14-3-5-4(D); Thomas' and Gabaldon's Motion ¶ 13, at 3 (setting forth this fact); Thomas

and Gabaldon Response ¶ 13, at 3 (admitting this fact).

> **2.** **Albuquerque Police Department's Criminal Nuisance Abatement Team Practices.**

City Inspector Joseph Martinez wrote the initial draft of the Drug Lab Ordinance. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Plaintiffs' Motion for Class Certification ¶ 4, at 3, filed June 4, 2010 (Doc. 32)("Motion for Class Certification")(citing Deposition of Joseph Martinez at 64:12-16 (taken March 23, 2010), filed June 3, 2010 (Doc. 32-3)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Martinez included language about possible contamination from drug use based on his belief that drug use could lead to property contamination. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 3 (citing Martinez Depo. at 94:2-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Martinez' belief was not founded on scientific evidence. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 4 (citing Martinez Depo. at 94:9-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Martinez enforced the draft ordinance he had written and not the ordinance that the City of Albuquerque put into law. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:11-18)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Martinez did not read the final version of the Drug Lab Ordinance that the City of Albuquerque passed until about a year after it had been in effect. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:1-6)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Members of the Nuisance Abatement Team enforced Martinez' draft and not the ordinance that the City of Albuquerque gave legal effect. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for

Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:19-25)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Some members of the Nuisance Abatement Team evicted residents and homeowners from their home based on the belief that drug use was occurring in the home. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 6, at 4 (citing Wall Depo. at 33:4-7; Crandall Depo. at 41:21-42:17; Moya Depo. at 16:23-17:5)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Possible contamination because of drug use in a home was, in some cases, the sole basis for "red tagging" a home. Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 7, at 4 (citing Crandall Depo. at 40:22-25)). Some members of the Nuisance Abatement Team posted houses where there was evidence that drug use had occurred, even if the drug use was a onetime occurrence. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 7, at 4 (citing Moya Depo. at 16:1-12; id. at 19:1-4)).

Members of the Nuisance Abatement Team knew that the Drug Lab Ordinance applied only to drug laboratories and expressed concerns that the Drug Lab Ordinance did not apply to drug use. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:3-12; Moya Depo. at 4:10-22, 5:1-23, 6:21-24)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). When a member of the Nuisance Abatement Team expressed concern that the Drug Lab Ordinance did not extend to evictions based on drug use, he was told that the Substandard Building Ordinance could be used to deem a house substandard based on drug use. See Thomas' and Gabaldon's Motion ¶¶ 3, 4, at 2 (setting forth this fact)(citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:21-32: 20; Moya Depo. at 6:2-6)); Thomas and Gabaldon Response ¶ 4, at 3 (not controverting this fact). Members of the Nuisance Abatement

Team were told that, if they found drug paraphernalia, they should post notices on those homes because there might be contamination. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Moya Depo. at 16:8-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Inspectors have used the Drug Lab Ordinance to evict suspected drug users from their homes. See Motion for Class Certification ¶ 11, at 5 (citing Crandall Depo. at 24:6-23; Wall Depo. 33:4-7); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). On at least one occasion, one inspector did not wear protective clothing or gear when conducting a search of a property.

    **3.**    **Gabaldon.**

At all times relevant, Gabaldon was the owner and resident of 11101 Mahlon Ave N.E. in Albuquerque. See Affidavit of Danny Gabaldon ¶ 3, at 1 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-2); Thomas' and Gabaldon's Motion ¶¶ 15, 17, at 4, 5 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 15, 17, at 4 (admitting this fact). On September 9, 2008, the Nuisance Abatement Team searched Gabaldon's home. See Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact). The inspectors did not see evidence that methamphetamine had been "cooked" in the house or that there was a methamphetamine laboratory operating in the house. Moya Depo. at 12:17-23. See Thomas' and Gabaldon's Motion ¶¶ 27, 28, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 27, 28, at 5 (admitting this fact). Moya noted that the house smelled of methamphetamine. See Moya Depo. at 12:8-15. Gabaldon told Moya that his wife, who was in jail at the time, struggled with methamphetamine addiction. See Moya Depo. at 12:4-6; Thomas' and Gabaldon's Motion ¶ 21, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 21, at 4 (admitting this fact). After a search of Gabaldon's home, members of the Nuisance Abatement Team ordered Gabaldon

to leave his home, and seized the property through a nuisance abatement "Notice and Order." Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact).  See Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  They also posted on the property a notice that the house was a "substandard building."  Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact). See Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact).  The Notice given to Gabaldon and the sign on the property stated that entry into the home was a criminal violation of trespass.  See Thomas' and Gabaldon's Motion ¶ 19, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 19, at 4 (admitting this fact).

The order to vacate the property cited electrical and plumbing violations in addition to suspected methamphetamine contamination. See Affidavit of Larry Moya ¶ 7, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-1).  The Notice and Order required Gabaldon to retain "an industrial or environmental hygienist firm" to test the property for "contamination."  Thomas' and Gabaldon's Motion ¶ 22, at 5 (setting forth this fact).  See Gabaldon Aff. ¶ 11, at 2 (stating that testing was required); Moya Aff. ¶ 6, at 1 (stating that testing was required).  The environmental testing company Gabaldon later hired found that one room of the house was contaminated.  See Gabaldon Aff. ¶ 12, at 2 (stating the finding of the testing company); Thomas' and Gabaldon's Motion ¶ 31, at 6 (setting forth that the testing company found one room contaminated); Thomas and Gabaldon Response ¶ 31, at 5 (admitting this fact).  The environmental testing company quoted Gabaldon a remediation cost of between $18,000.00 and $20,000.00 for removal, replacement of the carpets, and cleaning of the entire house.  See Gabaldon Aff. ¶¶ 13, 14, at 2; Thomas' and Gabaldon's Motion ¶¶ 32, 33, at 6.  Gabaldon did not think that he had the money to pay for the cleaning.  See Thomas' and Gabaldon's Motion ¶ 34, at 6.  Removal of the electrical cords that Gabaldon had installed could have fixed the electrical code violations.  See Moya Depo. at 13:2-24.

The house went into foreclosure and was sold when Gabaldon did not pay the mortgage.  See Thomas' and Gabaldon's Motion ¶¶ 35, 36, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 35, 36, at 5 (not controverting this fact).

    **4.**    **Lovato.**

At all times relevant, Lovato was a resident of 4701 Burton Ave SE, Albuquerque.  See Lovato Motion ¶¶ 2, 4, at 2 (setting forth these facts); Defendants' Response to Plaintiff Lovato's Motion and Memorandum in Support of Summary Judgment ¶¶ 2, 4, at 3, filed August 29, 2010 (Doc. 53)("Lovato Response")(admitting these facts).  The Nuisance Abatement Team searched Lovato's house on February 10, 2009 and deemed it substandard.  See Lovato's Motion ¶¶ 3 and 5, at 2 (setting forth these facts); Lovato Response ¶¶ 3, 5, at 3 (admitting these facts).  The Nuisance Abatement Team posted on the property a public notice of this finding that same day, including a notice that entry into the home was a criminal violation.  See Lovato's Motion ¶¶ 5, 7, at 2 (setting forth these facts); Lovato Response ¶¶ 5, 7, at 3 (admitting these facts).  The Nuisance Abatement Team ordered Lovato to leave the home under threat of arrest.  See Lovato's Motion ¶ 6, at 2 (setting forth this fact); Lovato Response ¶ 6, at 3 (not controverting this fact).  At the time of the inspection, the residents of the house included Lovato's daughter (who was five months pregnant), two granddaughters, two grandsons, and three great-grandchildren.  See Affidavit of Judy Lovato ¶ 16, at 3 (executed July 22, 2010), filed July 30, 2010 (Doc. 43-2); Lovato Motion ¶ 15, at 3 (setting forth this fact); Lovato Response ¶ 15, at 4 (not controverting this fact).

Defendant-in-Intervention Michelle Wall found some drug paraphernalia in a converted garage room.  See Lovato Aff. ¶ 11, at 2.  The Notice and Order was based on "life safety issues" as well as possible contamination from controlled substances.  Lovato Notice and Order at 1-2 (executed February 12, 2009), filed July 30, 2010 (Doc. 43-1).  Specifically, the Notice and Order

issued to Lovato states the following requirements: (i) replace all missing or inoperative window cranks, the door knob on the front security door, and a knob on the stove; (ii) replace all damaged molding, door jambs and striker plates; and (iii) "thoroughly clean" the home, because "the entire dwelling was found to be unsanitary." Lovato Notice and Order at 2. In addition, under the heading "Section 14-3-4-3(D) Structural hazards include members of walls, partitions or other vertical supports that split, lean, list or buckle," the Notice included the following note and order: "A POST FOR THE ATTACHED COVERED PATIO IS HANGING OVER THE CONCRETE. HAVE THE COVERED PATIO INSPECTED AND REPAIRED BY A LICENSED CONTRACTOR OR HAVE THE COVER PERMANENTLY REMOVED." Lovato Notice and Order at 2. Lovato was also required to repair all holes in the walls and ceilings, including replacing insulation, installing sheet rock, "taping, texturing and painting." Lovato Notice and Order at 2. All appliances, interior furniture, and trash, as well as "miscellaneous items" on the back patio, were ordered removed. Notice and Order at 2. An outdoor shed was ordered removed: "THE REAR DETACHED STORAGE SHED IS LEANING AND IN OVERALL POOR CONDITION. THE DOORS MUST ALSO BE LOCKED FOR SECURITY PURPOSES. DUE TO THE BAD CONDITION AND FOR THE SAFETY OF THE OCCUPANTS OF THIS DWELLING, HAVE THE SHED PERMANENTLY REMOVED." Notice and Order at 2. The inspectors found electrical code violations, including the following: (i) damaged or missing electrical receptacle and/or switch covers; (ii) broken or missing interior and exterior light globes and lenses; and (iii) exposed wiring on the rear patio light. See Notice and Order at 2. The Notice and Order stated that "[t]he lack of [switch] covers leaves wiring exposed that if touched could cause great bodily harm." Notice and Order at 2. Finally, the Notice and Order warned that the Albuquerque

-9-

Animal Services Department may remove any animals on the property while the owner is barred from entry.  See Notice and Order at 3.

   **5.    K. Lowery.**

   At all times relevant, K. Lowery was the owner of the residence at 8250 Northridge N.E., Albuquerque, New Mexico.  See Affidavit of John Lowery ¶ 3, at 1 (executed August 6, 2010), filed August 6, 2010 (Doc. 45-1); Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment ¶ 2, at 2, filed August 6, 2010 (Doc. 45)("K. Lowery's SJ Motion") (setting forth this fact); Defendants' Response to Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment ¶ 2, at 2, filed August 27, 2010 (Doc. 51)("K. Lowery SJ Response")(admitting this fact).  On March 20, 2009, members of the Nuisance Abatement Team, including Crandall, arrived at K. Lowery's home.  See K. Lowery's SJ Motion ¶ 3, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 3, at 2 (admitting this fact).  After a search of the home, Crandall ordered K. Lowery and his tenants to leave the home.  See K. Lowery's SJ Motion ¶ 4, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 4, at 2 (admitting this fact).  The inspector placed a poster declaring the property to be "substandard" on the property.  K. Lowery's SJ Motion ¶ 5, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 5, at 2 (admitting this fact).  The poster stated that entry into the home was a criminal violation of trespass.  See K. Lowery's SJ Motion ¶ 7, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 7, at 2 (admitting this fact).  Crandall also issued a Notice and Order for K. Lowery to leave his home immediately under threat of arrest.  See K. Lowery's SJ Motion ¶ 6, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 6, at 2 (admitting this fact).  The Notice and Order cites "life safety" issues, as well as "possible contamination associated with the use and or sales of a controlled substance."  Notice and Order at 1 (executed March 10, 2009), filed August 6, 2010 (Doc. 45-1)("K. Lowery Notice and Order").  The K. Lowery Notice and Order required K.

Lowery to "retain the industrial or environmental hygienist firm and the drug laboratory site remediation firm within thirty (30) days." K. Lowery Notice and Order at 2-3. The K. Lowery Notice and Order required K. Lowery to restore electrical, water, and natural gas to the residence, and stated that "the home cannot be occupied" without these services. K. Lowery Notice and Order at 5-6. The electrical system was found to have had "numerous modifications to the system that have not been performed by an electrician," and K. Lowery was ordered to have the system inspected by a licensed electrician. K. Lowery Notice and Order at 5. In addition, he was required to replace missing light switch and electrical receptacle plate covers, light fixtures, and globe covers, because "there is exposed wiring where the fixtures have been removed." K. Lowery Notice and Order at 5. Finally, K. Lowery was ordered to replace or to install smoke detectors in the bedrooms and in areas near the bedrooms, to replace or to recharge defective fire extinguishers, and to remove "all outdoor storage and litter" and "inoperative vehicles" from the premises. K. Lowery Notice and Order at 6-7. K. Lowery was warned to remove any animals on the property for the duration of his absence from the home. See K. Lowery Notice and Order at 7.

K. Lowery was barred from his home until he arranged for environmental testing and decontamination, if necessary, and repaired the electrical, plumbing, and other code violations. See K. Lowery Notice and Order at 2. The basis of the allegation of contamination was the presence in the home of a spoon believed to be used for drug use. See J. Lowery Aff. ¶ 11, at 2. On the same day, Crandall ordered that K. Lowery's home be boarded with plywood. See J. Lowery Aff. ¶ 13, at 2; K. Lowery's SJ Motion ¶ 13, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 13, at 3 (admitting this fact). Nine days after receiving the Notice and Order, K. Lowery filed a written appeal of the order with the Mayor's office. See J. Lowery Aff. ¶ 12, at 2; K. Lowery's SJ Motion ¶ 12, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 12, at 3 (admitting this fact). Despite

the appeal, the plywood was not removed from the house.  See J. Lowery Aff. ¶¶ 14, 16, at 3; K. Lowery's SJ Motion ¶¶ 14, 16, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 14, at 3 (not controverting this fact).  As a result of these actions, K. Lowery was homeless and lost the means of his livelihood.  See J. Lowery Aff. ¶ 15, at 3; K. Lowery's SJ Motion ¶ 15, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 15, at 3 (not controverting this fact).

6.    **Thomas.**

In February 2009, Thomas was a resident at 3000 Florida N.E., Albuquerque, New Mexico. See Thomas' and Gabaldon's Motion ¶ 37, at 7 (setting forth this fact); Thomas and Gabaldon Response ¶ 37, at 5 (admitting that Thomas is a resident of Albuquerque and not controverting that she was a resident at that address); D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Thomas' adult son lived on the property in the garage.  See Thomas' and Gabaldon's Motion ¶¶ 38, 43, at 7; Thomas and Gabaldon Response ¶¶ 38, 43, at 5-6.  On February 26, 2009, the Nuisance Abatement Team notified Thomas that the house was "substandard," that she must leave the house immediately under threat of arrest, and that entry into the home would be criminal trespass.  Notice and Order (executed February 26, 2009), filed July 13, 2010 (Doc. 36-4)("Thomas Notice and Order").  See Thomas' and Gabaldon's Motion ¶¶ 38-39, 41-42, at 7 (setting forth these facts); Thomas and Gabaldon Response ¶¶ 39, 41-42, at 6 (admitting these facts); Thomas and Gabaldon Response ¶ 38, at 5 (admitting that Thomas was ordered to leave her home after the house was found to be substandard).  A member of the Nuisance Abatement Team conducting the inspection advised Thomas that she and her family could seek help from a shelter.  See Affidavit of Barbara Thomas ¶ 5, at 2 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-5); Thomas' and Gabaldon's Motion ¶ 52, at 8.  A public notice indicating that the property was found to be substandard was posted on the property.  See Thomas'

-12-

and Gabaldon's Motion ¶ 40, at 7 (setting forth this fact); Thomas and Gabaldon Response ¶ 40, at 6 (admitting this fact).

The Thomas Notice and Order to vacate was based at least in part on non-drug-related code violations.  <u>See</u> Affidavit of Mark Crandall ¶ 4, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-2)(stating that "the garage . . . was clearly used and occupied as a living area [and] did not provide the appropriate living conditions required per Ordinance and/or building code for occupancy by the residents"); Thomas' and Gabaldon's Motion ¶ 46, at 8 (setting forth this fact and describing the violations as "minor"); Thomas and Gabaldon Response ¶ 46, at 6 (disputing that the violations were "minor," but not controverting that the code violations were part of the basis for the order).  The Thomas Notice and Order required Thomas to remedy four violations not related to the presence of methamphetamine.  <u>See</u> Thomas Notice and Order at 3.  Specifically, the Thomas Notice and Order required her to: (i) replace or repair inoperative smoke detectors "in each sleeping room . . . [and] outside each . . . sleeping area in the [same] vicinity"; (ii) replace with or recharge fire extinguishers approved by the fire marshal; (iii) "remove all outdoor storage, and litter from the premises"; and (iv) remove all inoperative vehicles from the property.  Thomas Notice and Order at 3.  In addition, the Thomas Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  <u>See</u> Thomas Notice and Order at 4.  The electrical code violation identified by Defendant Mark Crandall was on the home's exterior.  <u>See</u> Crandall Depo. at 94:23.

The Thomas Notice and Order was also based at least in part on the finding of "paraphernalia in association with methamphetamines," and "possible contamination associated with the use and or sales of controlled substances."  Thomas Notice and Order at 2.  <u>See</u> Crandall Aff. ¶ 6, at 1.  The paraphernalia was found in the garage that Thomas' son occupied.  <u>See</u> Thomas' and Gabaldon's

Motion ¶ 44, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 44, at 6 (denying this fact, but failing to adduce contrary evidence). The Thomas Notice and Order prohibited Thomas from re-entering her home until environmental testing and, if necessary, decontamination had been completed. See Thomas Notice and Order at 2 ("DO NOT BEGIN REPAIRS UNTIL TESTING HAS BEEN COMPLETED. IF CONTAMINATES ARE FOUND, DO NOT BEGIN REPAIRS UNTIL ALL AREAS WHICH TESTED POSITIVE FOR CONTAMINATES HAVE BEEN REMEDIATED."); Thomas and Gabaldon's Motion ¶ 48, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 48, at 6 (admitting this fact). Thomas was told that testing and remediation would cost thousands of dollars. See Thomas Aff. ¶ 4, at 2; Thomas' and Gabaldon's Motion ¶ 49, at 8.

## PROCEDURAL BACKGROUND

On April 7, 2009, K. Lowery, on his behalf and on behalf of similarly situated persons, filed the Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights in the Second Judicial District of New Mexico. See Doc 1-1 (dated April 7, 2009), filed May 8, 2009 ("Complaint"). Defendants City of Albuquerque, Martin Chavez, Ray Schultz, John Olmstead, Crandall, and John Doe Police Officers removed the matter on May 8, 2009 (collectively the "Defendants"). See Notice of Removal, filed May 8, 2009 (Doc. 1). The Notice of Removal asserts that the Court has jurisdiction over K. Lowery's federal law claims under 28 U.S.C. § 1331 and that removal is permitted under 28 U.S.C. § 1441. See Notice of Removal ¶ 2, at 1.

The Complaint contains ten counts. See Complaint at 4-14. Count I alleges John Doe Police Officers deprived K. Lowery of his Fourth-Amendment rights, because they seized his person without probable cause. See Complaint at 4. Count II states that the Nuisance Abatement Team

inspector and John Doe Police Officers violated K. Lowery's Fourth-Amendment rights when they entered into the curtilage of his home.  <u>See</u> Complaint at 5.  Count III alleges that the entry and search of the home by police and city inspectors was unreasonable, and therefore a deprivation of K. Lowery's Fourth-Amendment rights.  <u>See</u> Complaint at 5.  Count IV alleges that the Defendants violated K. Lowery's Fourth-Amendment rights through unreasonable seizure of his home.  <u>See</u> Complaint at 6.  In Count V, K. Lowery contends that Crandall and John Doe Police Officers seized his property without procedural due process in violation of the Fourteenth Amendment. <u>See</u> Complaint at 6.  Count V is an alternative to Count IV, alleging that Crandall and John Doe Police Officers afforded him inadequate pre-deprivation procedure.  <u>See</u> Complaint at 6-7.  Count VI alleges a procedural due-process violation based on the Defendants' failure to release K. Lowery's property to him upon his filing a notice of appeal.  <u>See</u> Complaint at 7.  Count VII is a Fourteenth-Amendment claim related to requiring environmental testing without sufficient factual basis.  <u>See</u> Complaint at 8.  Count VIII is a Fourteenth-Amendment claim related to overall use of the Nuisance Abatement Team to deprive property owners of property rights and a request to declare the Substandard Building Ordinance unconstitutional.  <u>See</u> Complaint at 9.  Count IX alleges that the ordinance violates the New Mexico State Constitution and asserts tort claims on behalf of K. Lowery against the Defendants, including torts of false imprisonment for his detention and trespass for entry into his curtilage and home and seizure of his home.  <u>See</u> Complaint at 12.  Count X alleges that the Defendants have a custom, practice, or policy of intentionally violating civil or constitutional rights.  <u>See</u> Complaint at 12.  Count X also seeks to represent all individuals or corporations whose property the City of Albuquerque's Nuisance Abatement Team, either directly or through its enforcement of the housing code, seized or deprived of the benefit of use, from three years of the filing of this Complaint until the alleged policy ceases, and seeks certification of a class

for Counts IV through X.  See Complaint ¶ 82, at 12.

On August 11, 2009, Gabaldon, Lovato, and Thomas filed a Complaint in Intervention.  See Complaint in Intervention, filed August 11, 2009 (Doc. 11).  On August 10, 2010, K. Lowery, Lovato, Gabaldon, and Thomas, on behalf of themselves and the class, filed an Amended Complaint. See Amended Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights, filed August 10, 2010 (Doc. 48, at 6-16)("Amended Complaint").  The Amended Complaint modified the Complaint to (i) incorporate Gabaldon, Lovato and Thomas into Counts IV, V, VII, VIII, IX, and X, see Amended Complaint at 6-16; (ii) add Lovato to Count VI, see Amended Complaint at 9; and (iii) add facts specific to the Gabaldon, Lovato, and Thomas, see Amended Complaint at 2-6.

On June 4, 2010, K. Lowery, Lovato, Gabaldon, and Thomas moved for class certification. In a hearing on September 14, 2010, the parties agreed that the requirements of Rule 23(a), (b)(2), and (b)(3) were satisfied.  See Fed. R. Civ. P. 23.  See Transcript of Hearing at 4:11-12 (taken September 14, 2010)(Kennedy)("Sept. 14, 2010 Tr.").[1]  The Defendants reserved the right to challenge the class at any time.  See Sept. 14, 2010 Tr. at 7:11-21 (Court, Levy).  The parties agreed that the Defendants did not admit that there was an unconstitutional policy and that there was no admission of liability of any kind.  See Sept. 14, 2010 Tr. at 6:15-21 (Levy).  The Court orally granted the motion for class certification at the hearing, see Sept. 14, 2010 Tr. at 9:2-13 (Court), and entered a written order approving a class action notice and setting a trial for December 14, 2010, see Order Approving Class Action Notice and Trial Setting, filed December 14, 2010 (Doc. 67).  The

---

[1]  The Court's citations to the transcripts of the September 14, 2010 and November 29, 2011 hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Court then entered its April 13, 2011 MOO and granted the Motion for Class Certification. See Doc. 83, at 1-2. The Court certified a class of all individuals or corporations whose property was seized without court order, or who were deprived of their property for suspected drug use and subsequent to the City of Albuquerque's Criminal Nuisance Abatement Team designating their property as substandard from three years before Lowery filed his Complaint, until the policy ceases. See April 13, 2011 MOO at 26-27. The Court also: (i) designated K. Lowery, Lovato, Gabaldon, and Thomas as the class representatives; and (ii) appointed the Kennedy Law Firm as class counsel. See April 13, 2011 MOO at 40.

On April 21, 2011, K. Lowery, Lovato, Gabaldon, and Thomas filed the Plaintiffs' Unopposed Motion for Relief of Kevin Lowery's Duty as Class Representative and to Sever Claim. See Doc. 87 ("K. Lowery Motion"). K. Lowery, Lovato, Gabaldon, and Thomas asserted that K. Lowery did not wish to participate in a proposed settlement and that he wanted to exercise his right to "opt out" of the class action. K. Lowery Motion at 6. K. Lowery, Lovato, Gabaldon, and Thomas represented that K. Lowery wishes to proceed to trial and that he was walking away from the settlement offer. See K. Lowery Motion at 7. The Court granted in part and denied in part the K. Lowery Motion. See Order Granting Plaintiffs' Unopposed Motion for Relief of Kevin Lowery's Duty as Class Representative and to Sever Claim at 1, filed May 4, 2011 (Doc. 89)("K. Lowery Order"). In its K. Lowery Order, the Court agreed that K. Lowery should no longer serve as a class representative, but stated:

> The Court is not convinced, however, that Mr. Lowery should be able to opt-out at this late stage or that his claims should be severed. The Court has made rulings as to Mr. Lowery; he should not, after that ruling, be able to opt-out of the case. He remains part of the class. The Court always anticipated that there would be or might be individual issues and claims as to some or all class members. The parties may enter a partial settlement as to some parties and allow other claims to proceed.

-17-

K. Lowery Order at 2.

On May 5, 2011, K. Lowery, Lovato, Gabaldon, and Thomas filed their Motion for Preliminary Approval. See Doc. 90. K. Lowery, Lovato, Gabaldon, and Thomas assert that, through the mailing of the notice of the class action, class counsel, Joseph P. Kennedy of the Kennedy Law Firm, has had contact with thirty-five to forty class members. See Motion for Preliminary Approval at 2. They assert that the class' economic damages approximate $200,000.00. See Motion for Preliminary Approval at 2. Mr. Kennedy also represents that there were "a number of class members identified who are presumed to have received notice, but did not respond to the notice." Motion for Preliminary Approval at 2. K. Lowery, Lovato, Gabaldon, and Thomas inform the Court that the class notice told class members that they did not have to act to preserve their rights and gave class members an opportunity to "opt out," but did not set a deadline for the right to "opt out." Motion for Preliminary Approval at 2. K. Lowery, Lovato, Gabaldon, and Thomas assert that class members who owned and were living in their homes "alleged distinct additional damages from class members whose homes were tested but who were not displaced." Motion for Preliminary Approval at 3. They further assert that each of the class representatives, K. Lowery, Lovato, Gabaldon, and Thomas, was displaced from his or her home. See Motion for Preliminary Approval at 3. The Plaintiffs represent that there are currently seven class members who have opted out, because they contend they have suffered damages beyond the economic costs of testing and remediation, and who intend to file separate lawsuits. See Motion for Preliminary Approval at 3.

K. Lowery, Lovato, Gabaldon, and Thomas state that the proposed monetary settlement is a total of $495,000.00. See Motion for Preliminary Approval at 3. The Kennedy Law Firm proposes a fee of $165,000.00 plus gross receipts tax of $11,550.00 and reimbursement for costs in the amount of $15,173.09. See Motion for Preliminary Approval at 3. K. Lowery, Lovato,

Gabaldon, and Thomas state that the named plaintiffs remaining in the class-- Lovato, Gabaldon, and Thomas -- will receive $30,000.00 and that a class fund of $213,276.91 will be created for class members to make economic claims.  <u>See</u> Motion for Preliminary Approval at 3.  K. Lowery, Lovato, Gabaldon, and Thomas assert that, after an "opt out" period, the money in the class fund will be distributed on a pro rata basis based on proven economic losses.  <u>See</u> Motion for Preliminary Approval at 4.  K. Lowery, Lovato, Gabaldon, and Thomas represent that any disputes will be submitted to the Honorable W. Daniel Schneider, United States Magistrate Judge, and that any remaining funds will be returned to the City of Albuquerque.  <u>See</u> Motion for Preliminary Approval at 4.  K. Lowery, Lovato, Gabaldon, and Thomas also assert that, as part of the settlement, the City of Albuquerque has agreed to review: (i) policies and procedures related to pre-deprivation hearings when there is no imminent threat to safety; (ii) policies and procedures related to the citation of persons for code violations for contamination from drug use without a supporting ordinance; and (iii) whether the phrases "immediate danger" and "imminent danger" should be more clearly defined in the context of code violations.  Motion for Preliminary Approval at 4.  The Plaintiffs assert that the proposed settlement is fair and reasonable to the class.  <u>See</u> Motion for Preliminary Approval at 4.

K. Lowery, Lovato, Gabaldon, and Thomas argue that in this action, class counsel was confronted with "the difficulty of proving class wide damages" and that, while "the victory for the Class Representatives on their individual claims was significant," the "translation of that victory to class wide relief would have relied upon a certain level of circumstantial evidence."  Motion for Preliminary Approval at 7.  K. Lowery, Lovato, Gabaldon, and Thomas assert that, if no additional claims are received, the class should receive complete relief.  <u>See</u> Motion for Preliminary Approval at 7.  Furthermore, K. Lowery, Lovato, Gabaldon, and Thomas assert that the class representatives

did not receive a premium for their positions, but that the settlement is within the range of settlement any plaintiff would likely receive on his or her own.  See Motion for Preliminary Approval at 7. K. Lowery, Lovato, Gabaldon, and Thomas contend that the class representatives are receiving a set sum for damages, while class members are participating in a settlement fund on a pro rata basis, because they have suffered differing levels of damages.  See Motion for Preliminary Approval at 9.  They assert that class actions are often certified with the acknowledgment that class members may have suffered differing levels of damages.  See Motion for Preliminary Approval at 9.  They argue that the class consists of two overlapping subclasses: (i) some class members suffered only economic harm; and (ii) some class members suffered both economic harm and displacement from their homes.  See Motion for Preliminary Approval at 9.   Additionally, K. Lowery, Lovato, Gabaldon, and Thomas assert that the proposed settlement was negotiated with the acknowledgment that class members may opt out and that the treatment of the class representatives can only be justified if all similarly situated plaintiffs are treated equally or are given the opportunity to "opt out."  Motion for Preliminary Approval at 10.  They concede that a number of claimants will not receive adequate compensation through the class fund, such that an "opt out" opportunity is necessary to ensure that the proposed settlement is fair and reasonable.  Motion for Preliminary Approval at 10.  K. Lowery, Lovato, Gabaldon, and Thomas assert that the proposed settlement balances all class members' interests and permits those who wish to settle to end their portion of the litigation without being subjected to the desires of other class members who may desire greater compensation.  See Motion for Preliminary Approval at 11.

With respect to the requested attorneys' fees, class counsel request approval of thirty-three percent of the class fund as their attorneys' fees.  See Motion for Preliminary Approval at 11.  Class counsel assert that they have expended significant time on briefing and discovery.  See Motion for

Preliminary Approval at 11.  Class counsel, furthermore, argues that they have achieved significant

success for the class.  <u>See</u> Motion for Preliminary Approval at 11.

On August 24, 2011, class members Barry Schooley, Christine Garner, Joel Marks, Sherry

Meurer, Ana Lima, Darlene Chavez, and Ronald Tapia, Tammy Gallegos, and their minor child,

T.T. (collectively the "Prospective Intervenors") filed their Motion to Intervene.  <u>See</u> Doc. 93.  The

Prospective Intervenors assert that they are class members who do not wish to proceed with the

proposed class action settlement.  <u>See</u> Motion to Intervene ¶ 4, at 2.  They argue that whether "this

action proceeds to settlement, whether the court rejects the settlement and decertifies the class, the

proposed second set of intervenors retain a right to proceed with their own claims."  Motion to

Intervene ¶ 5, at 2.  The Prospective Intervenors contend that the City of Albuquerque's "core

policy" of which the Proposed Intervenors complain is the same core policy that is at issue in the

class action.  Motion to Intervene ¶ 6, at 2.  Accordingly, the Prospective Intervenors assert that their

claims, and the class' claims, share common questions of law and fact.  <u>See</u> Motion to Intervene ¶ 6,

at 2 (citing Fed. R. Civ. P. 24(b)(1)(B)).

On November 29, 2011, the Court held a hearing.  The Court first took up the Motion for

Preliminary  Approval  and  expressed  concerns  about  the  proposed  class  action  settlement.

<u>See</u> Transcript of Hearing at 4:8-12 (November 29, 2011)(Court)("Nov. 29, 2011 Tr.").  The Court

stated that, because there was no date for opt outs, all class members could opt out.  <u>See</u> Nov. 29,

2011 Tr. at 4:12-14 (Court).  The Court further explained its concerns with the class representatives

-- Lovato, Gabaldon, and Thomas  -- receiving a fixed $30,000.00 payment, while the rest of the

class has to compete for a limited amount of funds.  <u>See</u> Nov. 29, 2011 Tr. at 4:14-16 (Court).  The

Court recognized that K. Lowery, Lovato, Gabaldon, and Thomas do not believe that these payments

represent a premium for the class representatives' positions, but explained that they are at least

getting a priority position because they receive a set sum and that other class members must divide the remaining pool.  <u>See</u> Nov. 29, 2011 Tr. at 4:16-23 (Court).  With respect to the Prospective Intervenors, the Court suggested that: (i) the parties should first determine who will be part of the class; (ii) the Court should set some dates for opting out; (iii) the parties should notify class members that K. Lowery will no longer be a class representative because he wishes to opt out; and (iv) if class members do not want to be part of this class action, they need to file their own lawsuit.  <u>See</u> Nov. 29, 2011 Tr. at 5:3-12 (Court).  The Court indicated that it was inclined to deny the pending motions, have the parties re-send a notice on K. Lowery, set a deadline for opt-outs, and set a date for trial, because the settlement does not look workable.  <u>See</u> Nov. 29, 2011 Tr. at 5:21-15 (Court).

K. Lowery, Lovato, Gabaldon, and Thomas  asserted that in negotiating the settlement they kept in mind that there are two distinct harms which individuals experienced.  <u>See</u> Nov. 29, 2011 Tr. at 6:4-8 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas argued that there are two groups of class members: (i) class members who owned property that they rented to tenants who were evicted, and then the owners had to pay remediation costs; and (ii) class members who lived in the house and were evicted.  <u>See</u> Nov. 29, 2011 Tr. at 6:9-16 (Kennedy).  They asserted that the settlement is structured so that class members who were evicted from their homes receive a set sum, and that other class members are not being treated differently, because those class members retain the opportunity to opt out.  <u>See</u> Nov. 29, 2011 Tr. at 6:17-24 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas  argued that the settlement is not putting the class representatives in a better position, because every class member has the opportunity to opt out and seek mental or emotional damages.  <u>See</u> Nov. 29, 2011 Tr. at 7:2-7 (Kennedy).

The Court asked whether this inequality in treatment was something that should be cured.

See Nov. 29, 2011 Tr. at 7:8 (Court).  The Court stated that the class was in a fluid state at the moment, and asked whether the Court should send out a notice saying that K. Lowery no longer wished to be a class representative and setting an opt-out date to freeze the class.  See Nov. 29, 2011 Tr. at 7:9-12 (Court).  The Court suggested that, if an opt-out date was set, it would enable the parties to reasonably determine how many class members wished to belong to the class.  See Nov. 29, 2011 Tr. at 7:12-15 (Court).  The Court stated that, otherwise, it is difficult for the remaining class members to know how much compensation to expect for their claims.  See Nov. 29, 2011 Tr. at 7:14-17 (Court).  The Court suggested that, once the parties and the Court knew how many people have not opted out of the class, the parties could send out another notice on the settlement letting class members know exactly how much compensation they would likely receive.  See Nov. 29, 2011 Tr. at 7:21-25 (Court).  The Court commented that the only class members who know how much compensation they will receive are the class representatives -- Lovato, Gabaldon, and Thomas. See Nov. 29, 2011 Tr. at 7:25-8:2 (Court).  The Court stated that knowing the exact compensation that they are guaranteed under the settlement agreement puts the class representatives in a favored position vis-a-vis the rest of the class.  See Nov. 29, 2011 Tr. at 8:4-5 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas asked whether the Court was suggesting that they notify the class that K. Lowery was not going to be a class representative any longer.  See Nov. 29, 2011 Tr. at 8:10-13 (Kennedy).  The Court agreed that such a notice should be sent to class members and stated that the notice should include the date by which class members need to opt out.  See Nov. 29, 2011 Tr. at 8:17-20 (Court).

K. Lowery, Lovato, Gabaldon, and Thomas suggested that, for efficiency reasons, the Court should permit the Prospective Intervenors and other opt-out class members to intervene in this case, because they will involve a common core of facts related to the City of Albuquerque's policy.

See Nov. 29, 2011 Tr. at 9:7-10 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas asserted that the Prospective Intervenors would be under the same case number, and like K. Lowery, would proceed outside of the class.  See Nov. 29, 2011 Tr. at 9:13-15 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas argued that the Prospective Intervenors should proceed under the same case number as K. Lowery, because all the class members, including those that choose to opt-out, should be able to take advantage of the discovery and law which has already been developed in this case. See Nov. 29, 2011 Tr. at 9:16-20 (Kennedy).  The Court then asked why, if the only issue was damages, the class members would have to opt out of the class to litigate the damages claim. See Nov. 29, 2011 Tr. at 9:21-25 (Court).  The Court asked whether it should gather all the class members, impanel a jury, allow those people who wish to settle to take settlement offers from the city, and the rest of the claims would proceed to trial on damages.  See Nov. 29, 2011 Tr. at 10:11-15 (Court). The City of Albuquerque asserted that the case could not proceed to a trial on damages, because, with the exception of K. Lowery, there has not been a liability determination on the class claims and that the Prospective Intervenors would still need to prove their individual claims. See Nov. 29, 2011 Tr. at 11:4-10 (Levy).  The City of Albuquerque admitted that, given the way the Court has analyzed the case, the City of Albuquerque may be liable, but that the case has not yet reached that point in the proceedings.  See Nov. 29, 2011 Tr. at 11:11-14 (Levy).  The City of Albuquerque contended that, if class members opt out of the settlement agreement, they do not get the benefit of a resolution of the liability question.  See Nov. 29, 2011 Tr. at 11:14-15 (Levy).

The Court stated that it did not see any benefit to using this case as a vehicle to bring in intervenors who have not yet established liability.  See Nov. 29, 2011 Tr. at 11:16-18 (Court).  The Court suggested that the Prospective Intervenors should file their own claims, which may end up before the Court or consolidated, so that the Court can deal separately with the class action and

resolve the class issues.  See Nov. 29, 2011 Tr. at 11:22-12:2 (Court).  The Court also asked the

parties to clarify K. Lowery's status, because it believed that the K. Lowery Order relieved him of

his class representative status, but left him in the class.  See Nov. 29, 2011 Tr. at 12:5-8 (Court).

K. Lowery, Lovato, Gabaldon, and Thomas asserted that K. Lowery was opting out of the class

completely.  See Nov. 29, 2011 Tr. at 12:9-10 (Kennedy).  The City of Albuquerque added that K.

Lowery's claim was severed from the class.  See Nov. 29, 2011 Tr. at 12:11-13 (Levy).  The Court

stated that it may have to deal with K. Lowery separately because of its previous holdings, but that

it did not want to compound the problems it may face with K. Lowery by allowing the Prospective

Intervenors to prosecute their individual claims in the class case.  See Nov. 29, 2011 Tr. at 12:19-25

(Court).  K. Lowery, Lovato, Gabaldon, and Thomas asked, whether under the framework the Court

was suggesting, the parties would send a new notice to the class which would provide an opt-out

date, proceed with the class action for those who stay in the case, and permit separate litigation for

those who wish to opt out.  See Nov. 29, 2011 Tr. at 13:1-5 (Kennedy).  The Court agreed, and

stated it would have to deal with K. Lowery in this case, but that it would deny the motion to

intervene.  See Nov. 29, 2011 Tr. at 13:8-12 (Court).  The Court also stated that the Prospective

Intervenors' individual cases might be grouped for discovery purposes anyways.  See Nov. 29, 2011

Tr. at 13:14-19 (Court).

K. Lowery, Lovato, Gabaldon, and Thomas argued that they have suffered damages distinct

from the rest of the class, so any proposed settlement will need to recognize those differences.

See Nov. 29, 2011 Tr. at 13:20-25 (Kennedy).  Because of those differences, K. Lowery, Lovato,

Gabaldon, and Thomas suggested that decertification of the class may be necessary and that,

assuming the Court would approve it, individual class members could proceed with their claims.

See Nov. 29, 2011 Tr. at 14:1-6 (Kennedy).  The Kennedy Law Firm asserted that it was having

difficulty negotiating a fair class settlement when there were different interests at stake.  See Nov. 29, 2011 Tr. at 14:6-12 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas argued that, rather than proceed with the class, they may need to individually negotiate with the City of Albuquerque or present individual claims to a jury.  See Nov. 29, 2011 Tr. at 14:13-15 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas reiterated that they could not envision a class-wide settlement that did not recognize the distinction between pure economic damages claims and those class members who were evicted from their homes.  See Nov. 29, 2011 Tr. at 14:16-23 (Kennedy).  The Court then asked what the City of Albuquerque thought about decertifying the class.  See Nov. 29, 2011 Tr. at 14:24-25 (Court).  The City of Albuquerque responded that, based on the Court's concerns and the number of members who want to opt out of the settlement, it is concerned whether there is a true class with sufficient commonality of interests.  See Nov. 29, 2011 Tr. at 15:1-6 (Levy).  The City of Albuquerque argued that the number of intervenors suggests that there are conflicts about the amount of claims and that someone staying in the class may get far less than those who file individual lawsuits.  See Nov. 29, 2011 Tr. at 15:6-10 (Levy).  The Court then asked whether, before deciding to decertify, the parties should: (i) notify the class that K. Lowery will no longer be a class representative; (ii) inform the class that K. Lowery is going to be treated differently, but that the Court will not allow any further intervenors in the case; and (iii) set a date for opting out of the class.  See Nov. 29, 2011 Tr. at  15:11-15 (Court).  The Court stated that this process would enable all parties and class members to get a sense of how many people remain in the class.  See Nov. 29, 2011 Tr. at 15:15-19 (Court).  The Court noted that, if the parties had already made the determination that the class representatives are not representative of the class, it should decertify the class and address the class members' claims individually.  See Nov. 29, 2011 Tr. at 15:20-16:2 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas asserted that their preference was to decertify and deal with the

claims on an individual basis.  See Nov. 29, 2011 Tr. at 16:3-5 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas represented that they are unsure how many people are in the class, because many of the class notices that have been sent out were returned or the class members gave no response to the notice.  See Nov. 29, 2011 Tr. at 16:7-12 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas argued that, having discussed several class members' claims, they believe that the claims are more individualized and that it was difficult to try to negotiate for the class.  See Nov. 29, 2011 Tr. at 16:13-20 (Kennedy).  Class counsel asserted that they were inclined to deal with individual clients rather than deal with class members.  See Nov. 29, 2011 Tr. at 16:20-22 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas represented that, based on the mailings, there are approximately 200 to 300 individuals who could be class members, but that only 40 class members had responded to the mailings.  See Nov. 29, 2011 Tr. at 16:23-17:1 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas asserted that class members have likely not responded to the notice, because the notice told recipients that they did not need to act to protect their rights. See Nov. 29, 2011 Tr. at 17:2-5 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas argued that they wish to send out a new class notice, informing class members that the class is decertified and that, if class members wish to protect their rights, they should contact the Kennedy Law Firm or another law firm.  See Nov. 29, 2011 Tr. at 17:9-13 (Kennedy).

The Court asked whether class members would face statute of limitations issues if the Court decertified the class.  See Nov. 29, 2011 Tr. at 17:14-16 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas responded that the statute of limitations is tolled while the class action is pending, but that it begins to run again when the class is decertified.  See Nov. 29, 2011 Tr. at 17:17-20 (Kennedy). K. Lowery, Lovato, Gabaldon, and Thomas stated that they could inform class members of any statute of limitations issues.  See Nov. 29, 2011 Tr. at 17:20-24 (Kennedy).  The Court stated that

it had been dealing with similar issues in other cases, and that the K. Lowery's, Lovato's, Gabaldon's, and Thomas' summary of the law sounded accurate. See Nov. 29, 2011 Tr. at 18:4-10 (Court). The Court then asked where the claims were in terms of the statute of limitations. See Nov. 29, 2011 Tr. at 18:11-12 (Court). K. Lowery, Lovato, Gabaldon, and Thomas replied that, if there were no class action, the statute of limitations on some of the claims would have run. See Nov. 29, 2011 Tr. at 18:13-15 (Kennedy). The Court then asked what the reason for the decertification would be and whether the Court would be decertifying the class because the class representatives were not representative of the class. See Nov. 29, 2011 Tr. at 18:16-20 (Court). K. Lowery, Lovato, Gabaldon, and Thomas responded that the class representatives are representative as far as liability, but that they were not representative of the class as far as damages were concerned. See Nov. 29, 2011 Tr. at 18:21-24 (Kennedy). K. Lowery, Lovato, Gabaldon, and Thomas asserted that class actions have been certified despite differences in damages, but that K. Lowery, Lovato, Gabaldon, and Thomas were concerned about taking those differences into account in any settlement. See Nov. 29, 2011 Tr. at 19:1-6 (Kennedy). Class counsel stated that, from their prospective, they did not see any other way to approach negotiating a proposed settlement on behalf of the class and that it would be difficult to come up with a different settlement that would be more fair to the full class. See Nov. 29, 2011 Tr. at 19:6-10 (Kennedy). Class counsel represented that they would rather be responsible to individual clients, rather than the to class as a whole. See Nov. 29, 2011 Tr. at 19:11-13 (Kennedy). Class counsel argued that they did not see a way to satisfy the competing interests in the class and receive approval from the Court. See Nov. 29, 2011 Tr. at 19:14-19 (Kennedy). K. Lowery, Lovato, Gabaldon, and Thomas stated that it was the Court's apparent rejection of the proposed settlement that led them to suggest decertification. See Nov. 29, 2011 Tr. at 19:25-20:2 (Kennedy). The Court suggested it would be more comfortable approving decertification of the

-28-

class if it knew that the City of Albuquerque was not going to raise statute of limitations issues against class members when they pursued individual suits. <u>See</u> Nov. 29, 2011 Tr. at 20:3-7 (Court). The City of Albuquerque stated that it was not in a position to waive any argument at the hearing. <u>See</u> Nov. 29, 2011 Tr. at 20:8-9 (Levy).

K. Lowery, Lovato, Gabaldon, and Thomas then returned to the issue of the proposed settlement and stated that: (i) the class members will receive notice that the case has settled; (ii) they will have some idea of the compensation they can expect from the settlement, between fifty and one-hundred percent of their economic losses; and (iii) then the class members will have the opportunity to opt-out. <u>See</u> Nov. 29, 2011 Tr. at 20:14-22 (Kennedy). K. Lowery, Lovato, Gabaldon, and Thomas asserted that they believed the notice and settlement would fulfill their duty to give class members the best opportunity to approximate what they can expect to receive from the settlement and give them the opportunity to opt out if they believe the settlement is not a good offer. <u>See</u> Nov. 29, 2011 Tr. at 20:23-21:3 (Kennedy). K. Lowery, Lovato, Gabaldon, and Thomas then reiterated their request that the Court approve the settlement agreement, because it gives the class members the best opportunity to make an educated approximation whether they wish to opt out of the class settlement. <u>See</u> Nov. 29, 2011 Tr. at 21:4-7 (Kennedy). The City of Albuquerque asserted that it believes that a deadline for opting out makes the most sense for all the parties and that leaving lingering issues of who belongs in the class would impede efforts to resolve the class claims. <u>See</u> Nov. 29, 2011 Tr. at 21:25-22:4 (Levy). K. Lowery, Lovato, Gabaldon, and Thomas stated that the proposed settlement is fair to all parties. <u>See</u> Nov. 29, 2011 Tr. at 22:9-11 (Kennedy). They asserted that they would be willing to send out an updated class notice and set a firm opt-out date, but K. Lowery, Lovato, Gabaldon, and Thomas stated that they feared that, after taking those steps, the parties would have to return to Court to address the fairness concerns. <u>See</u> Nov. 29, 2011 Tr.

at 22:11-20 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas stated that, if the Court rejects the proposed settlement, they would ask for decertification.  See Nov. 29, 2011 Tr. at 22:21-23 (Kennedy).

On the Motion to Intervene, the Prospective Intervenors argued that, for reasons of judicial efficiency, they should be permitted to intervene in this case.  See Nov. 29, 2011 Tr. at  23:2-4 (Kennedy).  The Prospective Intervenors noted that the Court has already done a substantial amount of work in analyzing the legal issues that the Prospective Intervenors would present.  See Nov. 29, 2011 Tr. at 23:4-6 (Kennedy).  The Prospective Intervenors also argued that allowing class members who opt out to intervene fulfills the goal of judicial economy and remedies the statute of limitations issues that may arise if they were forced to file individual lawsuits.  See Nov. 29, 2011 Tr. at 23:13-17 (Kennedy).  The Court asked whether the Prospective Intervenors were currently part of the class as unnamed class members.  See Nov. 29, 2011 Tr. at 23:20-23 (Court).  The Prospective Intervenors responded that they are currently class members and that, if the Court approves their intervention, they will be opting out of the class to proceed individually.  See Nov. 29, 2011 Tr. at 23:24-24:2 (Kennedy).  They asserted that the Motion to Intervene is an act of opting out.  See Nov. 29, 2011 Tr. at 24:2-3 (Kennedy).  The Prospective Intervenors asserted that they were rejecting the proposed settlement for the class and that they wish to proceed individually.  See Nov. 29, 2011 Tr. at 24:4-12 (Kennedy).

The Court then stated that it was inclined to not approve the settlement at the present time.  See Nov. 29, 2011 Tr. at 25:23-26:1 (Court).  The Court stated that the parties should send out a notice: (i) informing the class that K. Lowery will no longer be a class representative; and (ii) setting an opt-out deadline.  See Nov. 29, 2011 Tr. at 26:2-3 (Court).  The Court commented that it was inclined to deny the Motion to Intervene, and that, if the parties wanted to move to decertify, the

Court would address that motion.  <u>See</u> Nov. 29, 2011 Tr. at 26:4-6 (Court).  The Court asked whether it should set K. Lowery's trial date, because the Court will have to deal with him separately and get his claims resolved.  <u>See</u> Nov. 29, 2011 Tr. at 26:15-18 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas asserted that there may be a situation where all of K. Lowery's, Lovato's, Gabaldon's, and Thomas' claims would be tried together for damages, because, if there is no settlement, all of the current class representatives are in the same position as K. Lowery.  <u>See</u> Nov. 29, 2011 Tr. at 26:19-24 (Kennedy).  K. Lowery, Lovato, Gabaldon, and Thomas asserted that, because it is unclear whether their claims would be tried together, it might be premature to set a trial date.  <u>See</u> Nov. 29, 2011 Tr. at 26:25-27:4 (Kennedy).  The Court asked whether the it should attempt to amend the K. Lowery Order so that K. Lowery remains a class representative and whether the only notice sent out should be the opt-out date.  <u>See</u> Nov. 29, 2011 Tr. at 27:5-9 (Court).  The Court stated that the parties would then know how many individuals want to litigate as a class. <u>See</u> Nov. 29, 2011 Tr. at 27:9-12 (Court).  The Court noted that there does not seem to be a reason to treat K. Lowery differently from any other class representative or class member.  <u>See</u> Nov. 29, 2011 Tr. at 27:12-14 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas agreed that, if the Court rejects the proposed settlement, then K. Lowery is in the same spot as the other class representatives and there is no reason to treat him differently.  <u>See</u> Nov. 29, 2011 Tr. at 27:15-19 (Kennedy).  The Court asked whether there would be any opposition to the Court vacating the K. Lowery Order, if the Court rejects the proposed settlement.  <u>See</u> Nov. 29, 2011 Tr. at 27:20-24 (Court).  The Court stated that it would likely vacate the K. Lowery Order and then tell the parties to prepare a notice informing the class of the opt-out date.  <u>See</u> Nov. 29, 2011 Tr. at 27:24-28:1 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas represented that they would not object to that proposal.  <u>See</u> Nov. 29, 2011 Tr. at 28:3-4 (Kennedy).  The City of Albuquerque also represented that it would not object

to that proposal.  See Nov. 29, 2011 Tr. at 28:6-8 (Court, Levy).  The Court noted that its ruling would let the parties then make an informed decision as to how to proceed with decertification and with the Prospective Intervenors.  See Nov. 29, 2011 Tr. at 28:9-11 (Court).  The Court stated that it would work hard to protect the Prospective Intervenors' rights, but that, if they decide they do not wish to be part of the class action, they can opt out and file another action.  See Nov. 29, 2011 Tr. at 28:15-23 (Court).

The Court stated that, if the class were decertified and the parties chose to brief the statute of limitations issue, they might want to look at Genesee County Employees' Retirement System v. Thornburg Mortgage Securities Trust 2006-3, No. 09-0300, 2011 WL 5840482 (D.N.M. Nov. 12, 2011)(Browning, J.).  See Nov. 29, 2011 Tr. at 28:25-29:12 (Court, Levy).  The Court stated that, as far as it is concerned, the class members are likely protected, but that issue is enough of an open question that it may be better to keep the Prospective Intervenors in the class action.  See Nov. 29, 2011 Tr. at 29:15-22 (Court).  The Court noted that the parties have a vehicle to work within in the current class action and that, if the Court addresses the K. Lowery situation, a class action is workable.  See Nov. 29, 2011 Tr. at 30:10-13 (Court).  The Court suggested that, if the parties need to renegotiate the settlement agreement, that modification would be fine and that the Court would work with the parties.  See Nov. 29, 2011 Tr. at 30:13-20 (Court).  The Court noted that its sense was that, if there was a trial on damages on one claim, the parties might be able to settle the rest. See Nov. 29, 2011 Tr. at 30:21-31:4 (Court).  The Court also stated that the parties would need to wait for Court's memorandum opinion and order on the Motion for Preliminary Approval and Motion to Intervene before mailing the class notice.  See Nov. 29, 2011 Tr. at 31:9-13 (Court, Kennedy).

## LAW REGARDING APPROVAL OF CLASS-ACTION SETTLEMENTS

A district court considering a proposed class-action settlement must determine whether the proposed settlement is fair, reasonable, and adequate.  See In re Integra Realty Res., Inc., 354 F.3d 1246, 1266 (10th Cir. 2004).  The United States Court of Appeals for the Tenth Circuit, in Jones v. Nuclear Pharmacy, Inc., 741 F.2d 322 (10th Cir. 1984) established a four-factor test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes: (i) whether the proposed settlement was fairly and honestly negotiated; (ii) whether serious questions of law and fact exist placing the ultimate outcome of the litigation in doubt; (iii) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (iv) the judgment of the parties that the settlement is fair and reasonable.  See 741 F.2d at 324.  In Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180 (10th Cir. 2002), the Tenth Circuit addressed objections to a class-action settlement, which the district court had approved. See 314 F.3d at 1187.  The objectors argued that the class representatives and class counsel failed to adequately represent the class members and/or suffered conflicts of interest.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  The objectors also challenged the approval of the settlement as fair and reasonable.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188. The Tenth Circuit found that the adequacy requirement of rule 23(a)(4) of the Federal Rules of Civil Procedure was satisfied, because each subgroup had its own class representative during settlement negotiations.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  With respect to the fairness and reasonableness of the settlement, the Tenth Circuit found that the district court did not abuse its discretion in determining that the settlement, "from which an extremely small percentage of class members opted out, was fair, reasonable, and adequate."  Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1189.

In Robles v. Brake Masters Systems, Inc., No. 10-0135, 2011 U.S. Dist. LEXIS 14432 (D.N.M. Jan. 31, 2011)(Browning, J.), the Court granted in part and denied in part the parties joint motion for approval of a class action settlement. See 2011 U.S. Dist. LEXIS at *1. The Court denied the distribution of an incentive award to the class representative. See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS at *26. The Court held that the class representative was not entitled to an incentive award because he did not put forth more effort or incur more risk than any other plaintiff. See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS at *26. The Court found that, other than the incentive award, the class-action settlement was fair and approved the settlement agreement. See Robles v. Brake Masters Sys. Inc., 2011 U.S. Dist. LEXIS at *51.

## LAW REGARDING CLASS REPRESENTATIVES

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement protects the due-process interests of unnamed class members, who are bound by any judgment in the action. See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 379 n.5 (1996)(characterizing adequacy of representation as a constitutional requirement); Lile v. Simmons, 143 F.Supp.2d 1267, 1277 (D. Kan. 2001)("Due process requires that the Court 'stringently' apply the competent representation requirement because class members are bound by the judgment (unless they opt out), even though they may not actually be aware of the proceedings."). "The requirement of fair and adequate representation is perhaps the most important of the criteria for class certification set forth in Rule 23(a) . . . ." Miller ex rel. S.M. v. Bd. of Educ., 455 F.Supp.2d 1286, 1294 (D.N.M. 2006)(Armijo, J.). See Cobb v. Avon Prods., Inc., 71 F.R.D. 652, 654 (W.D. Pa. 1976)("Adequacy of the representative is of monumental importance since representation demands undiluted loyalty to the class interests . . . ."). The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (i) whether

the named plaintiffs and their counsel have any conflicts with other class members; and (ii) whether the named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at1187-88. In considering this second question, the experience and competence of the attorney representing the class may inform the court's analysis. See Lopez v. City of Santa Fe, 206 F.R.D. at 289-90.

The Supreme Court of the United States "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. 395, 403 (1977)(quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216 (1974)). Courts have found that intra-class conflicts "may negate adequacy under Rule 23(a)(4)." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 315 n.28 (5th Cir. 2007)(holding that the district court erred in certifying a class without evaluating intra-class conflicts). See Pickett v. Iowa Beef Processors, 209 F.3d 1276, 1280 (11th Cir. 2000)(finding that representation was inadequate where the class included those "who claim harm from the very acts from which other class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir. 1998)(holding that the current franchisees who had an interest in the continued viability of the franchiser had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Alston v. Va. High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999)(holding that a class of all high school female athletes could not be certified -- even if the alleged conduct of the defendant school system was discriminatory -- when some female athletes did not share the same goals or interests as the named female plaintiffs, because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

In Gonzales v. City of Albuquerque, No. 09-0520, 2010 WL 4053947 (D.N.M. Aug. 21,

2010)(Browning, J.), the Court found that rule 23(a)(4) of the Federal Rules of Civil Procedure was not satisfied because there was a conflict of interest between the former employees and current employees in the proposed class.  See 2010 WL 4053947, at *14.  The Court noted that the nine named plaintiffs in the class action were all former employees.  See Gonzales v. City of Albuquerque, 2010 WL 4053947, at *15.  The Court also noted that the current and former employees sought different remedies, because the former employees sought reinstatement and backpay, while the current employees did not seek either.  See Gonzales v. City of Albuquerque, 2010 WL 4053947, at *15.  The Court found that the interests of the named plaintiffs were likely opposed to the interests of many of the current employees in the class.  See Gonzales v. City of Albuquerque, 2010 WL 4053947, at *15.  Accordingly, the Court found that the class failed to satisfy rule 23(a)(4).  See Gonzales v. City of Albuquerque, 2010 WL 4053947, at *170.

On the other hand, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.  Beyond that straightforward proposition, defining the level of antagonism or conflict that should preclude class certification is a more difficult proposition."  7A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 1768, at 389-93 (3d ed. 2005).  "Though a plaintiff cannot be an adequate representative if he or she has a conflict of interest with class members, not every potential disagreement between a class representative and the class members will stand in the way of a class suit."  1 A. Conte & H. Newberg, Newberg on Class Actions § 3:26, at 433-34 (4th ed. 2002).

## LAW REGARDING MOTIONS TO INTERVENE

Rule 24 provides for intervention of right or permissive intervention on timely motion:

**(a)**     **Intervention of Right.** On timely motion, the court must permit anyone to intervene who:

-36-

> **(1)** is given an unconditional right to intervene by a federal statute; or
>
> **(2)** claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.
>
> **(b)** **Permissive Intervention.**
>
> > **(1)** *In General*. On timely motion, the court may permit anyone to intervene who:
> >
> > > **(A)** is given a conditional right to intervene by a federal statute; or
> > >
> > > **(B)** has a claim or defense that shares with the main action a common question of law or fact.
> >
> > **(2)** *By a Government Officer or Agency*. On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:
> >
> > > **(A)** a statute or executive order administered by the officer or agency; or
> > >
> > > **(B)** any regulation, order, requirement, or agreement issued or made under the statute or executive order.
> >
> > **(3)** *Delay or Prejudice*. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24(a) and (b) (emphasis original). The movant bears the burden of establishing its right to intervene. See United States v. Tex. E. Transmission Corp., 923 F.2d 410, 414 (5th Cir. 1991).

"The timeliness of a motion to intervene is assessed in light of all the circumstances, including the length of time since the applicant knew of his interest in the case, prejudice to the existing parties, prejudice to the applicant, and the existence of any unusual circumstances." Utah

Ass'n of Counties v. Clinton, 255 F.3d 1246, 1250 (10th Cir. 2007).  "Unusual circumstances" refers to those circumstances that would excuse the untimely filing of a motion to intervene.  See In re SEC, 296 F.App'x 637, 640 (10th Cir. 2008)(unpublished).

In the absence of an unconditional, federal statutory right to intervene, a movant must satisfy the following three criteria to qualify for intervention of right: (i) the movant must have an interest in the subject matter of the litigation; (ii) the movant's interest will be impaired or impeded if movant is not allowed to intervene; and (iii) the existing parties to the litigation will not adequately represent the movant's interest.  See Fed. R. Civ. P. 24(a)(2).  "To satisfy [the impairment] element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied.  This burden is minimal."  WildEarth Guardians v. U.S. Forest Service, 573, F.3d 992, 995 (10th Cir. 2009)("If an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.").  "Although the intervenor cannot rely on an interest that is wholly remote and speculative, the intervention may be based on an interest that is contingent upon the outcome of the litigation."  San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1203 (10th Cir. 2007).

"To permissively intervene, a party need not have a direct personal or pecuniary interest in the subject of the litigation."  San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1207 (10th Cir. 2007)(en banc).  Permissive intervention lies in the court's sound discretion, and the appellate court will not disturb the district court's exercise of that discretion absent clear abuse.   See United Nuclear Corp. v. Cranford Ins. Co., 905 F. 2d 1424, 1427 (10th Cir. 1990).  The court is required to consider whether intervention will cause undue delay or prejudice when considering whether to grant permissive intervention.  See F. R. Civ. P. 24(b)(3).  See DeJulius v. New England Health Care Emp.s Pension Fund, 429 F.3d 935, 943 (10th Cir. 2005)(noting that district courts required to

consider undue prejudice or delay in deciding whether to grant permissive intervention); Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. 236, 259 (D.N.M. 2008)(Browning, J.).  While not a required part of the test for permissive intervention, a court's finding that existing parties adequately protect prospective intervenors' interests will support a denial of permissive intervention. See City of Stilwell, Okla. v. Ozarks Rural Elec. Co-op. Corp., 79 F.3d 1038, 1043 (10th Cir. 1996). In American Association of People with Disabilities v. Herrera, the Court found that allowing individuals to intervene in the case would be inappropriate because the defendant was adequately representing any interests the prospective intervenors might have and allowing their intervention would cause delays.  See 257 F.R.D. at 259.  The Court also found that fairness required that the Court deny the motion to intervene, because the potential number of intervenors was so great, and, if the Court let one voter or legislator intervene, it would need to let other, similarly situated persons intervene.  See Am. Ass'n of People with Disabilities v. Herrera, 257 F.R.D. at 259-60.  In Lane v. Page, 250 F.R.D. 634 (D.N.M.)(Browning, J.), the Court held that it did not need to decide the motion to intervene in the class action that a class member filed, because the Court would have to decide the issues that the prospective intervenor raised in the normal course of the case.  See 250 F.R.D. at 642 ("Regardless whether Martin is a party to this litigation or not, the Court will have to decide whether the notice Lane published complies with the PSLRA's requirements, whether Lane is the most adequate plaintiff to lead this litigation, and whether his choice of Lerach to represent him is appropriate.").

## ANALYSIS

The Court rejects the proposed class settlement, because it is not fair, reasonable, and adequate.  The Court has several concerns about the disparity in compensation between the class representatives and the rest of the class, as well as the priority position that Lovato, Gabaldon, and

Thomas receive.  The Court is also concerned about the adequacy of the representation of the class because no class representative has the same damages as the average class member, and the proposed settlement appears to unjustifiably favor the class representatives.  The Court will also, in its discretion, deny the Motion to Intervene.  Because the Court has rejected the proposed settlement, the Prospective Intervenors may wish to remain part of the class.  Additionally, even if the Court were not rejecting the proposed settlement, the Court would not permit the Prospective Intervenors to intervene, because to do so could unduly delay the prosecution or settlement of the class claims and may prejudice the class.  The Court also reaffirms that, under its K. Lowery Order, K. Lowery is still a member of the class, although no longer a class representative.

I.     **BECAUSE THE PROPOSED SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE, THE COURT WILL DENY THE MOTION FOR PRELIMINARY APPROVAL.**

K. Lowery, Lovato, Gabaldon, and Thomas ask that the Court preliminarily approve the proposed settlement.  See Motion for Preliminary Approval at 1.  They assert that the proposed settlement is fair and reasonable to the class.  See Motion for Preliminary Approval at 4.  The proposed settlement provides for: (i) a total settlement of $495,000.00; (ii) attorneys' fees, costs, and gross receipts taxes of $191,723.09; (iii) $30,000.00 for the three named plaintiffs, who are also the remaining class representatives -- Lovato, Gabaldon, and Thomas; (iv) a $213,276.91 class fund to compensate the remaining class members; and (v) review of City of Albuquerque policies and procedures for these incidents.  See Motion for Preliminary Approval at 3-4.  K. Lowery, Lovato, Gabaldon, and Thomas argue that the remaining class representatives will receive a lump sum payment in recognition of their distinct damages and that the proposed settlement preserves the opt out rights of those members with potentially more significant damages.  See Motion for Preliminary Approval at 4.  K. Lowery, Lovato, Gabaldon, and Thomas contend that, if no additional claims are

received, the class members should receive complete relief.  <u>See</u> Motion for Preliminary Approval

at 7.  K. Lowery, Lovato, Gabaldon, and Thomas further assert that the proposed settlement for the

class representatives -- Lovato, Gabaldon, and Thomas -- does not represent a premium for their

positions, but is within the range of settlement any one of those Plaintiffs would likely receive on

his/her own.  <u>See</u> Motion for Preliminary Approval at 7.

      At the preliminary approval stage, the Court makes a preliminary evaluation of the fairness

of the proposed settlement and determines whether it has any reason to not notify class members of

the proposed settlement.  <u>See</u> <u>Gautreaux v. Pierce</u>, 690 F.2d 616, 621 n.3 (7th Cir. 1982); <u>In re</u>

<u>Motor Fuel Temperatures Sales Practice Litig.</u>, No. 07-1840, 2011 WL 4431090, at *5 (D. Kan.

Sept. 22, 2011)(Vratil, J.).  The Court will ordinarily grant preliminary approval where the proposed

settlement "'appears to be the product of serious, informed, non-collusive negotiations, has no

obvious-deficiencies, does not improperly grant preferential treatment to class representatives or

segments of the class and falls within the range of possible approval.'"  <u>In re Motor Fuel</u>

<u>Temperatures Sales Practices Litig.</u>, 2011 WL 4431090, at *5 (quoting <u>Am. Med. Ass'n v. United</u>

<u>Healthcare Corp.</u>, No. 00-2800, 2009 WL 1437819, at * 3 (S.D.N.Y. May 19, 2009)).  Because the

Court has several concerns about the fairness and adequacy of the proposed settlement, the Court

will deny the Motion for Preliminary Approval.  The Court is concerned about the fairness of the

proposed settlement because: (i) Lovato, Gabaldon, and Thomas receive a lump sum award, while

the rest of the class gets a pro rata portion of the class fund; and (ii) class members will not know

how much money they are likely to get under the settlement, because the number of total class

members is unclear.  The Court is also concerned about the adequacy of the class representatives

in obtaining the proposed settlement, because all the class representatives had "distinct damages,"

which entitled them to greater relief, and no class representative had the pure economic damages

representative of the majority of the class.

With respect to fairness, the Court is concerned with the protection of class members whose rights may not have been given adequate consideration during settlement negotiations.  See Childs v. Unified Life Ins. Co., No. 10-23, 2011 WL 6016486, at * (N.D. Okla. Dec. 2, 2011)(Clearly, J.); Wilkerson v. Martin Marietta Corp., 171 F.R.D. 273, 283 (D. Colo. 1997)(Daniel, J.).  See also 7B C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1797.1, at 78-79 ("The main judicial concern is that the rights of the passive class members not be jeopardized by the possible settlement.").  Another factor to consider is the extent to which the proposed settlement "treats particular segments of the class differently from others not only in terms of the type of relief, but more specifically in terms of the arguably significant disparity in the value of that relief."  In re Sprint Corp. ERISA Litig., 443 F.Supp.2d 1249, 1256 (D. Kan 2006)(Lungstrum, J.)(citing Manual for Complex Litigation (Fourth), § 21.62, at 317 (2004)).  Here, there is a significant difference between the amount that Lovato, Gabaldon, and Thomas are likely to recover, $30,000.00, and the amount that the average class member is likely to recover.  If only the class members that have responded to the class notice participate in the settlement -- approximately forty individuals, see Nov. 29, 2011 Tr. at 16:23-17:1 (Kennedy), then the average class member would receive approximately $5,331.92.  If, however, class counsel correctly estimated the class size at 200 to 300 members, see Nov. 29, 2011 Tr. at 16:23-17:1 (Kennedy), and 200 class members choose to participate in the settlement, then the average class member would receive only $1,066.38.  K. Lowery, Lovato, Gabaldon, and Thomas represent that there is a distinct difference in damages between the class representatives and the average class member, because Lovato, Gabaldon, and Thomas  were evicted from their homes.  See Motion for Preliminary Approval at 9 ("Some class members suffered only economic harm.  Some class members suffered both economic harm and

displacement from their homes."). Although K. Lowery, Lovato, Gabaldon, and Thomas rely on the class representatives' distinct damages, they do not explain why the gap between Lovato, Gabaldon, and Thomas and the rest of the class is so large. The difference between the relief for the class representatives and the rest of the class, may ultimately be justifiable, but K. Lowery, Lovato, Gabaldon, and Thomas have not yet established that such a difference is warranted. "[A] settlement agreement in which the size of the recovery for the class representatives [is] unduly large in relation to that of the unnamed class representatives" will not meet the requirements for approval of a class action. 7B C. Wright, A. Miller, & M. Kane Federal Practice and Procedure § 1797.1, at 105 (citing Staton v. Boeing Co., 327 F.3d 938 (9th Cir. 2003); Holmes v. Cont'l Can Co., 706 F.2d 1144 (11th Cir. 1983); Franks v. Kroger Co., 649 F.2d 1216 (6th Cir. 1981)).

Beyond the disparity in value, that the class representatives are guaranteed a set amount under the proposed settlement, while other class members receive a pro rata share dependant on how many people opt out, is also troubling. See Motion for Preliminary Approval at 3-4. Structuring the proposed settlement in this manner ensures that Lovato, Gabaldon, and Thomas receive compensation for one-hundred percent of their injuries, but members of the class at large could receive as little as fifty percent of their economic losses. See Nov. 29, 2011 Tr. at 20:14-22 (Kennedy). Because the proposed settlement allocates a greater award and priority position for the class representatives, the Court believes that the proposed settlement "treats particular segments of the class differently from others not only in terms of the type of relief, but more specifically in terms of the arguably significant disparity in the value of that relief." In re Sprint Corp. ERISA Litig., 443 F.Supp.2d at 1256.

Furthermore, the proposed settlement does not draw a distinction between class members who were evicted and those who were not; rather, it compensates the three remaining class

representatives separately from the rest of the class. This flaw is particularly troubling given that class counsel has only spoken with forty of the approximately 200 to 300 potential class members. See Nov. 29, 2011 Tr. at 16:23-17:1 (Kennedy). Other class members who may have been evicted from their homes would not be able to receive the same lump sum that Lovato, Gabaldon, and Thomas would receive under the proposed settlement. K. Lowery, Lovato, Gabaldon, and Thomas appear to envision that class members who are similarly situated to the class representatives will opt out to protect their interests, because they would not be protected under the proposed settlement. See Motion for Preliminary Approval ("Indeed, the treatment of named Plaintiffs can only be justified if all similarly situated plaintiffs are treated equally or are given the opportunity to 'opt out.'"). Court approval of class-action settlements serves to protect the interests of the class' passive members, see 7B C. Wright, A. Miller, & M. Kane Federal Practice and Procedure § 1797.1, at 78-79, and here, the parties do not appear to have taken into account the interests of other class members who may have suffered damages similar to Lovato, Gabaldon, and Thomas at all. Additionally, the Court has concerns about the fairness and reasonableness of the proposed settlement, because ten class members have indicated that they wish to opt out of the class rather than proceed under the current settlement. See K. Lowery Motion at 1; Motion to Intervene at 1. K. Lowery, Schooley, Garner, Marks, Meurer, Lima, Chavez, Tapia, Gallegos, and Tapia and Gallegos' minor child, T.T., have all indicated that they wish to opt out of the settlement and proceed to trial. See Lowery Motion at 1; Motion to Intervene at 1. K. Lowery, Lovato, Gabaldon, and Thomas asserted that these class members "opted out because the financial settlement for the class was considered insufficient to compensate them for their damages and they wish to proceed to trial." Motion for Preliminary Approval at 10. At the hearing, class counsel represented that approximately forty class members responded to the class notice mailing. See Nov. 29, 2011 Tr.

at 16:23-17:1 (Kennedy).  This sampling means that, of the class members who are aware of the proposed settlement, approximately twenty-five percent are opting out.  It concerns the Court that such a large percentage of the known class, the only portion of the class which is currently aware of the proposed settlement, wants to opt out of the settlement.

With respect to the adequacy of the representation in achieving the proposed settlement, the Court also has some concerns.  Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Supreme Court "has repeatedly held [that] a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  E. Tex. Motor Freight Sys. Inc. v. Rodriguez, 431 U.S. at 403 (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. at 216).  K. Lowery, Lovato, Gabaldon, and Thomas assert that Lovato, Gabaldon, and Thomas have damages distinct  from the rest of the class.  See Motion for Preliminary Approval at 4.  Lovato, Gabaldon, and Thomas are the class representatives and are required to represent the interests of class members similar to themselves as well as class members who do not have these distinct damages.  Given the allocation of the settlement money, the Court is concerned that Lovato, Gabaldon, and Thomas did not adequately represent the interests of the rest of the class.  In AmChem Products, Inc. v. Windsor, 521 U.S. 591 (1997), the Supreme Court found that, where members of a settlement class have divergent interests and receive diverse benefits under a settlement, the structure of the settlement must assure fair and adequate representation for the groups affected.  See 521 U.S. at 627.  Here, the class representatives all have damages "distinct" from the rest of the class.  With no class representative representing the average class member, the Court is concerned that the class' interests may have been subverted to obtain a larger settlement for Lovato, Gabaldon, and Thomas.  In re Motor Fuel Temperature Sales Practices Litig., 271 F.R.D. 263 (D. Kan. 2010)(Vratil, J.), the United

States District Court for the District of Kansas held that, to find that the settlement was fair, the parties would need to restructure the settlement to ensure adequate representation of the entire class. See 271 F.R.D. at 285. The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, stated that she could not find that the proposed settlement was fairly and honestly negotiated for one subset of the class, because there were no class representatives from that group. See In re Motor Fuel Temperature Sales Practices Litig., 271 F.R.D. at 288. The Court has similar concerns here. Because Lovato's, Gabaldon's, and Thomas' damages are "distinct," they may not have been able to achieve the best settlement possible for class members who were not subject to eviction from their homes. The Court cannot say that the proposed settlement "does not improperly grant preferential treatment to class representatives or segments of the class." Am. Med. Ass'n v. United Healthcare Corp., 2009 WL 1437819, at * 3.

"It is the responsibility of the proponents of the settlement to provide sufficient evidence to support a conclusion that the settlement is fair." Gottlieb v. Wiles, 11 F.3d 1004, 1015 (10th Cir. 1993). The Court cannot soundly conclude that the proposed settlement is fair, reasonable, and adequate, because: (i) Lovato, Gabaldon, and Thomas will receive significantly more compensation than the rest of the class; (ii) Lovato, Gabaldon, and Thomas will receive a set amount of compensation, while the rest of the class will receive of a pro rata share of the class fund; (iii) class members with damages similar to Lovato, Gabaldon, and Thomas would not be adequately compensated under the proposed settlement; (iv) class members will not be able to anticipate the amount of compensation they will receive for the settlement of their claims, because the total class participating in the settlement could range from forty to three-hundred members; and (v) the class representatives were exclusively from the group of class members with "distinct" damages. Accordingly, the Court will deny the Motion for Preliminary Approval.

## II.     __THE COURT WILL DENY THE MOTION TO INTERVENE__.

In the Motion to Intervene, the Prospective Intervenors move to intervene in the class action pursuant to rules 20 and 24(b).  <u>See</u> Motion to Intervene at 1.  The Prospective Intervenors assert that they do not wish to proceed with the proposed class action settlement.  <u>See</u> Motion to Intervene ¶ 4, at 2.  The Prospective Intervenors assert that their claims and the class' claims share common questions of law and fact as rule 24(b)(1)(B) requires.  <u>See</u> Motion to Intervene ¶ 6, at 2.

The Prospective Intervenors assert that the Court should grant the Motion to Intervene under rule 24(b), which allows permissive intervention.  <u>See</u> Motion to Intervene at 1.  The decision "to allow or deny permissive intervention lies within the sound discretion of the district court."  <u>Am. Ass'n of People with Disabilities v. Herrera</u>, 257 F.R.D. at 259 (citing <u>United Nuclear Corp. v. Cranford Ins. Co.</u>, 905 F.2d at 1427).  In <u>DeJulius v. New England Health Care Employees Pension Fund</u>, the Tenth Circuit addressed circumstances similar to those before the Court.  There, the prospective intervenors moved to intervene to raise two objections to the class settlement.  <u>See</u> <u>DeJulius v. New England Health Care Emp.s Pension Fund</u>, 429 F.3d at 942.  The Tenth Circuit held that, because the prospective intervenors did not challenge the adequacy of the named class representatives, intervention as of right was unavailable to them.  <u>See</u>  <u>DeJulius v. New England Health Care Emp.s Pension Fund</u>, 429 F.3d at 942.  The Tenth Circuit noted that, in deciding to permit intervention, a district court should examine whether the intervention will unduly delay or prejudice the adjudication of the rights of existing litigants.  <u>See</u> <u>DeJulius v. New England Health Care Emp.s Pension Fund</u>, 429 F.3d at 943.  The Tenth Circuit affirmed the district court's denial of the motion, because the district court's "conclusion that the notice procedures in this case were adequate . . . [could] be read as a conclusion that the intervention Appellants sought would cause undue dely to the final disposition of the class settlement."  <u>DeJulius v. New England Health Care</u>

Emp.s Pension Fund, 429 F.3d at 943.  In American Association of People with Disabilities v. Herrera, the Court found that fairness required that the Court deny the motion to intervene, because the potential number of intervenors was so great, and, if the Court let one voter or legislator intervene, it would need to let other, similarly situated persons intervene.  See 257 F.R.D. at 259-60. The Court will deny the Motion to Intervene.

The Prospective Intervenors represent that they wish to opt out of the proposed settlement and intervene in the class case, because they believe that the proposed settlement is not in their financial interests.  See Motion to Intervene ¶ 4, at 2 ("The proposed second set of intervenors herein are the Class Members who do not wish to proceed with the proposed class action settlement."); Motion for Preliminary Approval at 10 ("The parties opted out because the financial settlement proposed for the class was considered insufficient to compensate them for their damages and they wish to proceed to trial.").  After the Court's rejection of the proposed settlement, however, the Prospective Intervenors may wish to reconsider their motion and attempt to obtain compensation through the class action vehicle.  If the Prospective Intervenors still wish to proceed to trial, then the class action is not the appropriate vehicle in which to pursue their individual claims.  Permitting the Prospective Intervenors to join the class action to pursue their individual claims would inevitably prejudice the class members and unduly delay resolution of the class claims.  Rather than facing a class acting cohesively and moving on the same schedule, the City of Albuquerque would be faced with multiple claims within the same case and an unknown level of exposure.  The individual claims and the class claims would be moving on parallel tracks, as the class appears ready to settle, and could not be cohesively resolved within the same court proceedings.  Additionally, allowing the Prospective Intervenors to join this case may give the City of Albuquerque and the Named Plaintiffs an incentive to delay negotiation of a class settlement to see how the individual cases progress, to

the detriment of the class.  Class Counsel recognized that possibility in its K. Lowery Motion, where it argued that a "trial of the individual claims of Kevin Lowery poses the risk that the result in Lowery will be used by either party to rescind or modify any settlement agreement and may place the class in a less advantageous negotiation position."  K. Lowery Motion at 4.  Furthermore, there may be issues, such as tolling of the statute of limitations, that would arise in the course of prosecuting the Prospective Intervenors' claims which would slow the progress of the class claims.  See  Nov. 29, 2011 Tr. at 20:8-9 (Levy).  Accordingly, if the Court were to exercise its discretion to permit intervention, the class would be prejudiced and face undue delay in the settlement of their claims.  See DeJulius v. New England Health Care Emp.s Pension Fund, 429 F.3d at 943.

Moreover, the Court finds, as in American Association of People with Disabilities v. Herrera, that fairness requires that the Court deny the Motion to Intervene.  In American Association of People with Disabilities v. Herrera, the Court addressed whether it should permit various state politicians or the Republican Party of New Mexico to intervene as defendants in a lawsuits.  See 257 F.R.D. at 240.  The Court held that fairness required that the Court deny the motions to intervene, because, if "it lets one voter, or one legislator who voted for the bill, intervene, it may need to let others similarly situated intervene," and at some point the Court must cut off the intervention of such persons to make a decision.  Similarly, in this case, there are ten people who wish to intervene in the class action to pursue their individual claims, because they do not like the proposed settlement; if the Court permits the Prospective Intervenors to join the case, the Court would, in fairness, have to permit any other class member who opt out of a proposed settlement and wish to proceed to trial the same opportunity to join this case.  Ten out of a class of approximately 200 to 300 members is already a significant number and would make managing this case difficult, and if more class members choose to pursue this course of action, the case could become unmanageable.  See Hiser

v. Franklin, 94 F.3d 1287, 1292 (9th Cir. 1996)("If every member of the class were compelled to intervene to protect his individual claims, serious questions would be raised as to the adequacy of the class representatives, and the class action would become unmanageable.").

The Court declines to exercise its discretion to permit the Prospective Intervenors to intervene in this case for the purposes of pursuing their individual claims, because: (i) the Court has rejected the proposed settlement which led the Prospective Intervenors to opt out of the class; (ii) permitting intervention creates a substantial risk of undue delay and prejudice for class members pursuing the class action; and (iii) if the Court permits class members who opt out of the class to intervene in this case, it could become unmanageable.   Accordingly, the Court will deny the Prospective Intervenors' Motion to Intervene.

### III.   THE COURT'S K. LOWERY ORDER DID NOT SEVER K. LOWERY'S CLAIMS FROM THE CLASS, AND THE COURT WILL NOT PERMIT K. LOWERY TO PURSUE HIS INDIVIDUAL CLAIMS WITHIN THE CLASS.

At the hearing, the Court also asked the parties to clarify K. Lowery's status, because it believed that the K. Lowery Order relieved him of his class representative status, but left him in the class. See Nov. 29, 2011 Tr. at 12:5-8 (Court). K. Lowery, Lovato, Gabaldon, and Thomas asserted that Lowery was opting out of the class completely.  See Nov. 29, 2011 Tr. at 12:9-10 (Kennedy). The City of Albuquerque added that K. Lowery's claim was severed from the class.  See Nov. 29, 2011 Tr. at 12:11-13 (Levy).  The Court asked whether there would be any opposition to the Court vacating the K. Lowery Order, if the Court rejects the proposed settlement.  See Nov. 29, 2011 Tr. at 27:20-24 (Court).  The Court stated that it would likely vacate the K. Lowery Order and then tell the parties to prepare a notice informing the class of the opt-out date.  See Nov. 29, 2011 Tr. at 27:24-28:1 (Court).  K. Lowery, Lovato, Gabaldon, and Thomas represented that they would not object to that proposal. See Nov. 29, 2011 Tr. at 28:3-4 (Kennedy).  The City of Albuquerque also

represented that it would not object to that proposal.  <u>See</u> Nov. 29, 2011 Tr. at 28:6-8 (Court, Levy).

In its K. Lowery Order, the Court relieved K. Lowery of his position as class representative, but denied K. Lowery's request that the Court sever his claim.  <u>See</u> K. Lowery Order at 2.  The Court found that K. Lowery was not an appropriate class representative.  <u>See</u> K. Lowery Order at 2.  Accordingly, K. Lowery is no longer a class representative, but his claim remains part of the class action.  The K. Lowery Order also ordered that the parties send a notice to class members to inform the class that K. Lowery is no longer a class representative.  <u>See</u> K. Lowery Order at 2.  The parties do not appear to have provided the class with such notice.

In the K. Lowery Motion, K. Lowery represented that he has suffered a physical injury, which renders him unable to carry on any duties to the class, and that he currently lives out-of-state in Tennessee.  <u>See</u> K. Lowery Motion ¶ 5, at 2.  K. Lowery also asserted that he had claims and suffered damages unique to him.  <u>See</u> K. Lowery Motion ¶ 6, at 2.  For the reasons stated in the K. Lowery Order granting the K. Lowery Motion, the Court continues to believe that K. Lowery is not an appropriate class representative; it will not order K. Lowery to remain a class representative when K. Lowery represents that he is not capable of carrying out such duties and does not wish to remain in that position.

The Court has now rejected the proposed class settlement, which K. Lowery asserted was the reason he wished to opt out of the class.  <u>See</u> K. Lowery Motion at 6 ("Kevin Lowery does not wish to participate in the proposed settlement.  Kevin Lowery is simply exercising his right to 'opt out' of the class action.").  The Court will order that the parties send out an opt-out notice to the members of the class so that they may decide whether they wish to pursue remedies as a class or whether they would be better off pursuing their own case.  K. Lowery, Lovato, Gabaldon, and Thomas may decide that the best course of action is to decertify the class.  K. Lowery may still wish

to opt out of the class and pursue compensation on his individual claims. As the Court discussed with respect to the Prospective Intervenors, however, the Court will not permit individuals who choose to opt out of the class to pursue their individual claims within this case.  The purpose of the class action device is to save "the resources of both the courts and the parties."  Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 155 (1982).  Permitting intervention in this case so that former class members can pursue their individual claims would undercut the efficiency of the class vehicle and prejudice class members.  Accordingly, those class members who wish to opt out of the class should file separate suits and not attempt to intervene in the class.

If individual members decide to opt out of the case and file separate lawsuits, they can move to consolidate the cases, perhaps even with this class action and before Judge Browning, at least for certain purposes.  Some coordination may gain the efficiencies that the parties are seeking with their present maneuvering.[2]  There does not, however, appear to be anything to be gained by the class here and the class action litigation is too far along to slow its progress by allowing a host of individual claims to also proceed within the case.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, filed May 5, 2011 (Doc. 90), is denied; and (ii) the Plaintiffs' Unopposed Motion for Leave to File Second Complaint in Intervention, filed August 24, 2011 (Doc. 93), is denied.  The parties must send out a class notice that Plaintiff Kevin Lowery will no longer be a class representative and setting an opt-out deadline for the class.

---

[2]Furthermore, the Court notes that any class members who choose to opt out of the class and pursue their own lawsuit may be able to use the Court's rulings in this case as non-mutual offensive collateral estoppel.  See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 332-33 (1979) (holding that a plaintiff may use the holding of a previous suit against the defendant, to which the plaintiff was not a party, as offensive collateral estoppel where the defendant had a "full and fair" opportunity to litigate that question).

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

      _Attorneys for the Plaintiff_

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

      _Attorneys for the Defendants_