## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KEVIN LOWERY, on his behalf and
on behalf of similarly situated persons,

        Plaintiff,

JUDY LOVATO, DANNY GABALDON,
BARBARA THOMAS, each on his/her behalf
and on behalf of similarly situated persons,

        Plaintiffs-in-Intervention,

vs.                                                            No. CIV 09-0457 JB/WDS

CITY OF ALBUQUERQUE, MARTIN CHAVEZ,
in his individual capacity as mayor of the City of
Albuquerque; RAY SCHULTZ, in his individual
capacity as chief of police of the City of Albuquerque
Police Department; JOHN OLSTEAD; and MARK
CRANDALL, and JOHN DOE POLICE OFFICERS,

        Defendants,

MICHELLE WALL, LARRY MOYA,

        Defendants-in-Intervention.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Plaintiffs' Motion In Limine to Exclude

Evidence of Other Housing Code Violations, filed February 14, 2012 (Doc. 101)("Violation

Motion"); (ii) the Plaintiffs' Motion in Limine No. II to Exclude Evidence of Alleged Drug Use by

Class Members, filed February 16, 2012 (Doc. 102)("Drug Motion"); and (iii) the Plaintiff's Motion

in Limine No. III to Exclude Evidence of Alleged Drug "Contamination," filed February 23, 2012

(Doc. 103)("Contamination Motion").  The Court held a hearing on April 2, 2012.  The primary

issues are: (i) whether the Court should exclude evidence of housing code violations unrelated to

the Plaintiffs' drug contamination violations; (ii) whether the Court should exclude evidence of the Plaintiffs', tenants', or other persons' alleged drug use; and (iii) whether the Court should exclude evidence of all environmental testing results of the Plaintiffs' homes. The Court will deny the Violation Motion, because evidence of other housing code violations is relevant. The Court will grant in part and deny in part the Drug Motion, based on the concessions that the Defendants made at the hearing -- that they would only seek to introduce such evidence with respect to persons seeking emotional distress damages. The Court will also grant in part and deny in part the Contamination Motion, because the Court believes that the environmental testing evidence is admissible for some non-hearsay purposes. The Court will not, however, permit the Defendants to offer the testing results as evidence that there was a health risk to the Plaintiffs, unless the Defendants establish the scientific validity of that theory.

## FACTUAL BACKGROUND

The Court has previously reviewed the facts of this case in its Memorandum Opinion and Order, filed March 31, 2011 (Doc. 79)("March 31, 2011 MOO"), which granted summary judgment on the issue whether exigent circumstances existed to seize Plaintiffs Danny Gabaldon's, Judy Lovato's, Barbara Thomas' and Kevin Lowery's homes, and in its Memorandum Opinion and Order, filed April 13, 2011 (Doc. 83)("April 13, 2011 MOO"), which certified the class action. The Court adopts those facts for the purposes of this memorandum opinion and order.

1.      **City Ordinances.**

In 2004, Defendant City of Albuquerque, New Mexico, passed the Clean Up of Laboratory Sites Ordinance, Ord. 36-2004 (hereinafter "Ord. 36-2004"). The purpose of the ordinance is to require remediation of clandestine drug laboratory sites "to assure the health, safety and welfare of the community." Ord. 36-2004 § 11-1-1-42. See Plaintiffs Thomas and Gabaldon's Motion and

Memorandum in Support of Summary Judgment ¶ 1, at 2, filed July 13, 2010 (Doc. 36)("Thomas' and Gabaldon's Motion"); Defendants' Response to Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment ¶ 1, at 1, filed August 29, 2010 (Doc. 52)("Thomas and Gabaldon Response")(admitting this fact).  The ordinance defines clandestine drug laboratories as "property on which [a controlled substance] is being manufactured or on which there is an attempt to manufacture, or where a person is arrested for having on any property any chemicals or equipment used in manufacturing [a controlled substance]."  Ord. 36-2004 § 11-1-1-42.  See Thomas' and Gabaldon's Motion ¶ 2, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 2, at 2 (admitting this fact).  The Substandard Building Ordinance, Ord. 34-1985 (hereinafter "Ord. 34-1985"), states that any building or portion of a building where there exists an inadequate sanitation condition "to the extent that [the condition] endangers the life, limb, health, property, safety or welfare of the public or occupants thereof shall be deemed and declared a SUBSTANDARD BUILDING."  Ord. 34-1985 § 14-3-4-1.  See Thomas' and Gabaldon's Motion ¶ 5, at 2 (setting forth this fact); Thomas and Gabaldon Response ¶ 5, at 2 (admitting this fact).  Substandard housing means that there is an immediate risk of harm to the resident.  See Deposition of Mark Crandall at 25:1-25 (taken April 14, 2010), filed August 29, 2010 (Doc. 52-4).  Designation of a house as substandard through "posting" or "red tagging" requires same-day eviction of all residents.  Ord. 34-1985 § 14-3-5-3(D); Crandall Depo. at 29:18-24; Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).  Residents and homeowners who re-enter a property posted as substandard without a permit commit a misdemeanor offense.  See Ord. § 14-3-5-3(D); Thomas' and Gabaldon's Motion ¶ 6, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 6, at 3 (admitting this fact).

When a property is deemed substandard because of drug contamination, occupants and

homeowners are barred from entering the property until the homeowners pay for drug contaminant testing and remediation, which can cost thousands of dollars. <u>See</u> Thomas' and Gabaldon's Motion ¶ 12, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 12, at 3 (admitting this fact). Residents and homeowners have an automatic right to reenter their homes upon an appeal. <u>See</u> Ord. 34-1986 § 14-3-5-4(D); Thomas' and Gabaldon's Motion ¶ 13, at 3 (setting forth this fact); Thomas and Gabaldon Response ¶ 13, at 3 (admitting this fact).

**2. <u>Albuquerque Police Department's Criminal Nuisance Abatement Team Practices.</u>**

City Inspector Joseph Martinez wrote the initial draft of the Drug Lab Ordinance. <u>See</u> Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Plaintiffs' Motion for Class Certification ¶ 4, at 3, filed June 4, 2010 (Doc. 32)("Motion for Class Certification")(citing Deposition of Joseph Martinez at 64:12-16 (taken March 23, 2010), filed June 3, 2010 (Doc. 32-3)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Martinez included language about possible contamination from drug use based on his belief that drug use could lead to property contamination. <u>See</u> Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 3 (citing Martinez Depo. at 94:2-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Martinez' belief was not founded on scientific evidence. <u>See</u> Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 4, at 4 (citing Martinez Depo. at 94:9-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Martinez enforced the draft ordinance he had written and not the ordinance that the City of Albuquerque put into law. <u>See</u> Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:11-18)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Martinez did not read the final version of the Drug Lab Ordinance

that the City of Albuquerque passed until about a year after it had been in effect.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:1-6)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Members of the Nuisance Abatement Team enforced Martinez' draft and not the ordinance that the City of Albuquerque gave legal effect.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 5, at 4 (citing Martinez Depo. at 69:19-25)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).

Some members of the Nuisance Abatement Team evicted residents and homeowners from their home based on the belief that drug use was occurring in the home.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 6, at 4 (citing Wall Depo. at 33:4-7; Crandall Depo. at 41:21-42:17; Moya Depo. at 16:23-17:5)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  Possible contamination because of drug use in a home was, in some cases, the sole basis for "red tagging" a home.  Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 7, at 4 (citing Crandall Depo. at 40:22-25)).  Some members of the Nuisance Abatement Team posted houses where there was evidence that drug use had occurred, even if the drug use was a one time occurrence.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 7, at 4 (citing Moya Depo. at 16:1-12; id. at 19:1-4)).

Members of the Nuisance Abatement Team knew that the Drug Lab Ordinance applied only to drug laboratories and expressed concerns that the Drug Lab Ordinance did not apply to drug use.  See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:3-12; Moya Depo. at 4:10-22, 5:1-23, 6:21-24)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact).  When a member of the Nuisance Abatement Team expressed

concern that the Drug Lab Ordinance did not extend to evictions based on drug use, he was told that the Substandard Building Ordinance could be used to deem a house substandard based on drug use. See Thomas' and Gabaldon's Motion ¶¶ 3, 4, at 2 (setting forth this fact)(citing Motion for Class Certification ¶ 8, at 4 (citing Wall Depo. at 31:21-32: 20; Moya Depo. at 6:2-6)); Thomas and Gabaldon Response ¶ 4, at 3 (not controverting this fact). Members of the Nuisance Abatement Team were told that, if they found drug paraphernalia, they should post notices on those homes, because there might be contamination. See Thomas' and Gabaldon's Motion ¶ 3, at 2 (citing Motion for Class Certification ¶ 8, at 4 (citing Moya Depo. at 16:8-13)); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). Inspectors have used the Drug Lab Ordinance to evict suspected drug users from their homes. See Motion for Class Certification ¶ 11, at 5 (citing Crandall Depo. at 24:6-23; Wall Depo. 33:4-7); Thomas and Gabaldon Response ¶ 3, at 2 (not controverting this fact). On at least one occasion, an inspector did not wear protective clothing or gear when conducting a search of a property.

### 3.   Gabaldon.

At all times relevant, Gabaldon was the owner and resident of 11101 Mahlon Ave N.E. in Albuquerque. See Affidavit of Danny Gabaldon ¶ 3, at 1 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-2); Thomas' and Gabaldon's Motion ¶¶ 15, 17, at 4, 5 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 15, 17, at 4 (admitting this fact). On September 9, 2008, the Nuisance Abatement Team searched Gabaldon's home. See Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact). The inspectors did not see evidence that methamphetamine had been "cooked" in the house or that there was a methamphetamine laboratory operating in the house. Moya Depo. at 12:17-23. Thomas' and Gabaldon's Motion ¶¶ 27-28, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 27-28,

at 5 (admitting this fact). Moya noted that the house smelled of methamphetamine. <u>See</u> Moya Depo. at 12:8-15. Gabaldon told Moya that his wife, who was in jail at the time, struggled with methamphetamine addiction. <u>See</u> Moya Depo. at 12:4-6; Thomas' and Gabaldon's Motion ¶ 21, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 21, at 4 (admitting this fact). After a search of Gabaldon's home, members of the Nuisance Abatement Team ordered Gabaldon to leave his home, and seized the property through a nuisance abatement "Notice and Order." Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact). <u>See</u> Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact). They also posted on the property a notice that the house was a "substandard building." Thomas' and Gabaldon's Motion ¶ 18, at 5 (setting forth this fact). <u>See</u> Thomas and Gabaldon Response ¶ 18, at 4 (admitting this fact). The Notice given to Gabaldon and the sign on the property stated that entry into the home was a criminal violation of trespass. <u>See</u> Thomas' and Gabaldon's Motion ¶ 19, at 5 (setting forth this fact); Thomas and Gabaldon Response ¶ 19, at 4 (admitting this fact).

The order to vacate the property cited electrical and plumbing violations in addition to suspected methamphetamine contamination. <u>See</u> Affidavit of Larry Moya ¶ 7, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-1). The Notice and Order required Gabaldon to retain "an industrial or environmental hygienist firm" to test the property for "contamination." Thomas' and Gabaldon's Motion ¶ 22, at 5 (setting forth this fact). <u>See</u> Gabaldon Aff. ¶ 11, at 2 (stating that testing was required); Moya Aff. ¶ 6, at 1 (stating that testing was required). The environmental testing company which Gabaldon later hired found that one room of the house was contaminated. <u>See</u> Gabaldon Aff. ¶ 12, at 2 (stating the finding of the testing company); Thomas' and Gabaldon's Motion ¶ 31, at 6 (setting forth that the testing company found one room contaminated); Thomas and Gabaldon Response ¶ 31, at 5 (admitting this fact). The environmental testing company quoted

Gabaldon a remediation cost of between $18,000.00 and $20,000.00 for removal, replacement of the carpets, and cleaning of the entire house.  See Gabaldon Aff. ¶¶ 13-14, at 2; Thomas' and Gabaldon's Motion ¶¶ 32-33, at 6.  Gabaldon did not think that he had the money to pay for the cleaning.  See Thomas' and Gabaldon's Motion ¶ 34, at 6.  Removal of the electrical cords that Gabaldon had installed could have fixed the electrical code violations.  See Moya Depo. at 13:2-24.  The house went into foreclosure and was sold when Gabaldon did not pay the mortgage.  See Thomas' and Gabaldon's Motion ¶¶ 35-36, at 6 (setting forth this fact); Thomas and Gabaldon Response ¶¶ 35-36, at 5 (not controverting this fact).

**4.    Lovato.**

At all times relevant, Lovato was a resident of 4701 Burton Ave SE, Albuquerque.  See Lovato Motion ¶¶ 2, 4, at 2 (setting forth these facts); Defendants' Response to Plaintiff Lovato's Motion and Memorandum in Support of Summary Judgment ¶¶ 2, 4, at 3, filed August 29, 2010 (Doc. 53)("Lovato Response")(admitting these facts).  The Nuisance Abatement Team searched Lovato's house on February 10, 2009 and deemed it substandard.  See Lovato's Motion ¶¶ 3, 5, at 2 (setting forth these facts); Lovato Response ¶¶ 3, 5, at 3 (admitting these facts).  The Nuisance Abatement Team posted on the property a public notice of this finding that same day, including a notice that entry into the home was a criminal violation.  See Lovato's Motion ¶¶ 5, 7, at 2 (setting forth these facts); Lovato Response ¶¶ 5, 7, at 3 (admitting these facts).  The Nuisance Abatement Team ordered Lovato to leave the home under threat of arrest.  See Lovato's Motion ¶ 6, at 2 (setting forth this fact); Lovato Response ¶ 6, at 3 (not controverting this fact).  At the time of the inspection, the residents of the house included Lovato's daughter (who was five months pregnant), two granddaughters, two grandsons, and three great-grandchildren.  See Affidavit of Judy Lovato ¶ 16, at 3 (executed July 22, 2010), filed July 30, 2010 (Doc. 43-2); Lovato Motion ¶ 15, at 3 (setting

forth this fact); Lovato Response ¶ 15, at 4 (not controverting this fact).

Defendant-in-Intervention Michelle Wall found some drug paraphernalia in a converted garage room. See Lovato Aff. ¶ 11, at 2. The Notice and Order was based on "life safety issues" as well as possible contamination from controlled substances. Lovato Notice and Order at 1-2 (executed February 12, 2009), filed July 30, 2010 (Doc. 43-1). Specifically, the Notice and Order issued to Lovato states the following requirements: (i) replace all missing or inoperative window cranks, the door knob on the front security door, and a knob on the stove; (ii) replace all damaged molding, door jambs and striker plates; and (iii) "thoroughly clean" the home, because "the entire dwelling was found to be unsanitary." Lovato Notice and Order at 2. In addition, under the heading "Section 14-3-4-3(D) Structural hazards include members of walls, partitions or other vertical supports that split, lean, list or buckle," the Notice included the following note and order: "A POST FOR THE ATTACHED COVERED PATIO IS HANGING OVER THE CONCRETE. HAVE THE COVERED PATIO INSPECTED AND REPAIRED BY A LICENSED CONTRACTOR OR HAVE THE COVER PERMANENTLY REMOVED." Lovato Notice and Order at 2. Lovato was also required to repair all holes in the walls and ceilings, including replacing insulation, installing sheet rock, "taping, texturing and painting." Lovato Notice and Order at 2. All appliances, interior furniture, and trash, as well as "miscellaneous items" on the back patio, were ordered removed. Notice and Order at 2. An outdoor shed was ordered removed: "THE REAR DETACHED STORAGE SHED IS LEANING AND IN OVERALL POOR CONDITION. THE DOORS MUST ALSO BE LOCKED FOR SECURITY PURPOSES. DUE TO THE BAD CONDITION AND FOR THE SAFETY OF THE OCCUPANTS OF THIS DWELLING, HAVE THE SHED PERMANENTLY REMOVED." Notice and Order at 2. The inspectors

found electrical code violations, including the following: (i) damaged or missing electrical receptacle and/or switch covers; (ii) broken or missing interior and exterior light globes and lenses; and (iii) exposed wiring on the rear patio light.  See Notice and Order at 2.  The Notice and Order stated that "[t]he lack of [switch] covers leaves wiring exposed that if touched could cause great bodily harm."  Notice and Order at 2.  Finally, the Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  See Notice and Order at 3.

     **5.**     <u>**K. Lowery.**</u>

     At all times relevant, K. Lowery was the owner of the residence at 8250 Northridge N.E., Albuquerque.  See Affidavit of John Lowery ¶ 3, at 1 (executed August 6, 2010), filed August 6, 2010 (Doc. 45-1); Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment ¶ 2, at 2, filed August 6, 2010 (Doc. 45)("K. Lowery's SJ Motion")(setting forth this fact); Defendants' Response to Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment ¶ 2, at 2, filed August 27, 2010 (Doc. 51)("K. Lowery SJ Response")(admitting this fact). On March 20, 2009, members of the Nuisance Abatement Team, including Defendant Mark Crandall, arrived at K. Lowery's home.  See K. Lowery's SJ Motion ¶ 3, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 3, at 2 (admitting this fact).  After a search of the home, Crandall ordered K. Lowery and his tenants to leave the home.  See K. Lowery's SJ Motion ¶ 4, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 4, at 2 (admitting this fact).  The inspector placed a poster declaring the property to be "substandard" on the property.  K. Lowery's SJ Motion ¶ 5, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 5, at 2 (admitting this fact).  The poster stated that entry into the home was a criminal violation of trespass.  See K. Lowery's SJ Motion ¶ 7, at 2 (setting forth this

fact); K. Lowery SJ Response ¶ 7, at 2 (admitting this fact).  Crandall also issued a Notice and Order

for K. Lowery to leave his home immediately under threat of arrest.  See K. Lowery's SJ Motion

¶ 6, at 2 (setting forth this fact); K. Lowery SJ Response ¶ 6, at 2 (admitting this fact).  The Notice

and Order cites "life safety" issues, as well as "possible contamination associated with the use and

or sales of a controlled substance."  Notice and Order at 1 (executed March 10, 2009), filed August

6, 2010 (Doc. 45-1)("K. Lowery Notice and Order").  The K. Lowery Notice and Order required K.

Lowery to "retain the industrial or environmental hygienist firm and the drug laboratory site

remediation firm within thirty (30) days."  K. Lowery Notice and Order at 2-3.  The K. Lowery

Notice and Order required K. Lowery to restore electrical, water, and natural gas to the residence,

and stated that "the home cannot be occupied" without these services.  K. Lowery Notice and Order

at 5-6.  The electrical system was found to have had "numerous modifications to the system that

have not been performed by an electrician" and K. Lowery was ordered to have a licensed

electrician inspect the system.  K. Lowery Notice and Order at 5.  In addition, he was required to

replace missing light switch and electrical receptacle plate covers, light fixtures, and globe covers,

because "there is exposed wiring where the fixtures have been removed."  K. Lowery Notice and

Order at 5.  Finally, K. Lowery was ordered to replace or to install smoke detectors in the bedrooms

and in areas near the bedrooms, to replace or to recharge defective fire extinguishers, and to remove

"all outdoor storage and litter" and "inoperative vehicles" from the premises.  K. Lowery Notice and

Order at 6-7.  K. Lowery was warned to remove any animals on the property for the duration of his

absence from the home.  See K. Lowery Notice and Order at 7.

K. Lowery was barred from his home until he arranged for environmental testing and

decontamination, if necessary, and repaired the electrical, plumbing, and other code violations.  See

K. Lowery Notice and Order at 2.  The basis of the allegation of contamination was the presence in

the home of a spoon believed to be used for drug use.  See J. Lowery Aff. ¶ 11, at 2.  On the same

day, Crandall ordered that K. Lowery's home be boarded with plywood.  See J. Lowery Aff. ¶ 13,

at 2; K. Lowery's SJ Motion ¶ 13, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 13, at 3

(admitting this fact).  Nine days after receiving the Notice and Order, K. Lowery filed a written

appeal of the order with the Mayor's office.  See J. Lowery Aff. ¶ 12, at 2; K. Lowery's SJ Motion

¶ 12, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 12, at 3 (admitting this fact).  Despite

the appeal, the plywood was not removed from the house.  See J. Lowery Aff. ¶¶ 14, 16, at 3; K.

Lowery's SJ Motion ¶¶ 14, 16, at 3 (setting forth this fact); K. Lowery SJ Response ¶ 14, at 3 (not

controverting this fact).  As a result of these actions, K. Lowery was homeless and lost the means

of his livelihood.  See J. Lowery Aff. ¶ 15, at 3; K. Lowery's SJ Motion ¶ 15, at 3 (setting forth this

fact); K. Lowery SJ Response ¶ 15, at 3 (not controverting this fact).

> **6.    Thomas.**

In February 2009, Thomas was a resident at 3000 Florida N.E., Albuquerque.  See Thomas'

and Gabaldon's Motion ¶ 37, at 7 (setting forth this fact); Thomas and Gabaldon Response ¶ 37, at

5 (admitting that Thomas is a resident of Albuquerque and not controverting that she was a resident

at that address); D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be

deemed undisputed unless specifically controverted.").  Thomas' adult son lived on the property in

the garage.  See Thomas' and Gabaldon's Motion ¶¶ 38, 43, at 7; Thomas and Gabaldon Response

¶¶ 38, 43, at 5-6.  On February 26, 2009, the Nuisance Abatement Team notified Thomas that the

house was "substandard," that she must leave the house immediately under threat of arrest, and that

entry into the home would be criminal trespass.  Notice and Order (executed February 26, 2009),

filed July 13, 2010 (Doc. 36-4)("Thomas Notice and Order").  See Thomas' and Gabaldon's Motion

¶¶ 38-39, 41-42, at 7 (setting forth these facts); Thomas and Gabaldon Response ¶¶ 39, 41-42, at 6

(admitting these facts); Thomas and Gabaldon Response ¶ 38, at 5 (admitting that Thomas was ordered to leave her home after the house was found to be substandard).  A member of the Nuisance Abatement Team conducting the inspection advised Thomas that she and her family could seek help from a shelter.  See Affidavit of Barbara Thomas ¶ 5, at 2 (executed July 8, 2010), filed July 13, 2010 (Doc. 36-5); Thomas' and Gabaldon's Motion ¶ 52, at 8.  A public notice indicating that the property was found to be substandard was posted on the property.  See Thomas' and Gabaldon's Motion ¶ 40, at 7 (setting forth this fact); Thomas and Gabaldon Response ¶ 40, at 6 (admitting this fact).

The Thomas Notice and Order to vacate was based at least in part on non-drug-related code violations.  See Affidavit of Mark Crandall ¶ 4, at 1 (executed August 27, 2010), filed August 29, 2010 (Doc. 52-2)(stating that "the garage . . . was clearly used and occupied as a living area [and] did not provide the appropriate living conditions required per Ordinance and/or building code for occupancy by the residents"); Thomas' and Gabaldon's Motion ¶ 46, at 8 (setting forth this fact and describing the violations as "minor"); Thomas and Gabaldon Response ¶ 46, at 6 (disputing that the violations were "minor," but not controverting that the code violations were part of the basis for the order).  The Thomas Notice and Order required Thomas to remedy four violations not related to the presence of methamphetamine.  See Thomas Notice and Order at 3.  Specifically, the Thomas Notice and Order required her to: (i) replace or repair inoperative smoke detectors "in each sleeping room . . . [and] outside each . . . sleeping area in the [same] vicinity"; (ii) replace with or recharge fire extinguishers that the fire marshal approves; (iii) "remove all outdoor storage, and litter from the premises"; and (iv) remove all inoperative vehicles from the property.  Thomas Notice and Order at 3.  In addition, the Thomas Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  See

Thomas Notice and Order at 4.  The electrical code violation identified by Crandall was on the home's exterior.  See Crandall Depo. at 94:23.

The Thomas Notice and Order was also based at least in part on the finding of "paraphernalia in association with methamphetamines," and "possible contamination associated with the use and or sales of controlled substances."  Thomas Notice and Order at 2.  See Crandall Aff. ¶ 6, at 1.  The paraphernalia was found in the garage that Thomas' son occupied.  See Thomas' and Gabaldon's Motion ¶ 44, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 44, at 6 (denying this fact, but failing to adduce contrary evidence).  The Thomas Notice and Order prohibited Thomas from re-entering her home until environmental testing and, if necessary, decontamination had been completed.  See Thomas Notice and Order at 2 ("DO NOT BEGIN REPAIRS UNTIL TESTING HAS BEEN COMPLETED.  IF CONTAMINATES ARE FOUND, DO NOT BEGIN REPAIRS UNTIL ALL AREAS WHICH TESTED POSITIVE FOR CONTAMINATES HAVE BEEN REMEDIATED."); Thomas and Gabaldon's Motion ¶ 48, at 8 (setting forth this fact); Thomas and Gabaldon Response ¶ 48, at 6 (admitting this fact).  Thomas was told that testing and remediation would cost thousands of dollars.  See Thomas Aff. ¶ 4, at 2; Thomas' and Gabaldon's Motion ¶ 49, at 8.

## PROCEDURAL BACKGROUND

On April 7, 2009, K. Lowery, on his behalf and on behalf of similarly situated persons, filed the Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights in the Second Judicial District of New Mexico.  See Doc 1-1 (dated April 7, 2009), filed May 8, 2009 ("Complaint").  Defendants City of Albuquerque, Martin Chavez, Ray Schultz, John Olmstead, Crandall, and John Doe Police Officers removed the matter on May 8, 2009.  See Notice of Removal, filed May 8, 2009 (Doc. 1).  The

Notice of Removal asserts that the Court has jurisdiction over K. Lowery's federal law claims under 28 U.S.C. § 1331 and that removal is permitted under 28 U.S.C. § 1441. <u>See</u> Notice of Removal ¶ 2, at 1.

The Complaint contains ten counts. <u>See</u> Complaint at 4-14. Count I alleges John Doe Police Officers deprived K. Lowery of his Fourth-Amendment rights, because they seized his person without probable cause. <u>See</u> Complaint ¶ 22, at 4. Count II states that the Nuisance Abatement Team inspector and John Doe Police Officers violated K. Lowery's Fourth-Amendment rights when they entered into the curtilage of his home. <u>See</u> Complaint ¶27, at 5. Count III alleges that the police and city inspectors entry and search of the home was unreasonable, and therefore a deprivation of K. Lowery's Fourth-Amendment rights. <u>See</u> Complaint ¶ 32, at 5. Count IV alleges that the Defendants violated K. Lowery's Fourth-Amendment rights through unreasonable seizure of his home. <u>See</u> Complaint ¶ 38, at 6. In Count V, K. Lowery contends that Crandall and John Doe Police Officers seized his property without procedural due process in violation of the Fourteenth Amendment. <u>See</u> Complaint ¶ 44, at 6. Count V is an alternative to Count IV, alleging that Crandall and John Doe Police Officers afforded him inadequate pre-deprivation procedure. <u>See</u> Complaint at 6-7. Count VI alleges a procedural due-process violation based on the Defendants' failure to release K. Lowery's property to him upon his filing a notice of appeal. <u>See</u> Complaint ¶ 51, at 7. Count VII is a Fourteenth-Amendment claim related to requiring environmental testing without sufficient factual basis. <u>See</u> Complaint ¶ 55, at 8. Count VIII is a Fourteenth-Amendment claim related to overall use of the Nuisance Abatement Team to deprive property owners of property rights and a request to declare the Substandard Building Ordinance unconstitutional. <u>See</u> Complaint ¶ 74, at 11. Count IX alleges that the ordinance violates the New Mexico State Constitution and asserts tort claims on behalf of K. Lowery against the Defendants, including torts of false

imprisonment for his detention and trespass for entry into his curtilage and home, and seizure of his home.  See Complaint ¶ 77, at 12.  Count X alleges that the Defendants have a custom, practice, or policy of intentionally violating civil or constitutional rights.  See Complaint ¶ 79, at 12.  Count X also seeks to represent all individuals or corporations whose property the City of Albuquerque's Nuisance Abatement Team, either directly or through its enforcement of the housing code, seized or deprived of the benefit of use, from three years of the filing of this Complaint until the alleged policy ceases, and seeks certification of a class for Counts IV through X.  See Complaint ¶ 82, at 12.

On August 11, 2009, Gabaldon, Lovato, and Thomas filed a Complaint in Intervention.  See Complaint in Intervention, filed August 11, 2009 (Doc. 11).  On August 10, 2010, K. Lowery, Lovato, Gabaldon, and Thomas, on behalf of themselves and the class, filed an Amended Complaint. See Amended Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights, filed August 10, 2010 (Doc. 48, at 6-16)("Amended Complaint").  The Amended Complaint modified the Complaint to (i) incorporate Gabaldon, Lovato and Thomas into Counts IV, V, VII, VIII, IX, and X, see Amended Complaint at 6-16; (ii) add Lovato to Count VI, see Amended Complaint at 9; and (iii) add facts specific to Gabaldon, Lovato, and Thomas, see Amended Complaint at 2-6.

On June 4, 2010, K. Lowery, Lovato, Gabaldon, and Thomas moved for class certification. In a hearing on September 14, 2010, the parties agreed that the requirements of Rule 23(a), (b)(2), and (b)(3) were satisfied.  See Fed. R. Civ. P. 23.  See Transcript of Hearing at 4:11-12 (taken September 14, 2010)(Kennedy)("Sept. 14, 2010 Tr.").[1]  The Defendants reserved the right to

---

[1]  The Court's citations to the transcripts of the September 14, 2010 and April 2, 2012 hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain

challenge the class at any time.  See Sept. 14, 2010 Tr. at 7:11-21 (Court, Levy).  The parties agreed that the Defendants did not admit that there was an unconstitutional policy and that there was no admission of liability.  See Sept. 14, 2010 Tr. at 6:15-21 (Levy).  The Court orally granted the motion for class certification at the hearing, see Sept. 14, 2010 Tr. at 9:2-13 (Court), and entered a written order approving a class action notice and setting a trial for April 18, 2011, see Order Approving Class Action Notice and Trial Setting, filed December 14, 2010 (Doc. 67).  On March 31, 2011, the Court entered its March 31, 2011 MOO and, focusing on the issue "whether an objective observer would believe that the violations for which the Plaintiffs were cited posed an immediate threat to the lives or safety of the occupants," found that "the Defendants failed to provide evidence that the presence of drugs or drug paraphernalia posed an immediate threat to the life or safety of the occupants of the seized homes that would create an exigent circumstance." March 31, 211 MOO at 70-71.  The Court then entered its April 13, 2011 MOO granting the Motion for Class Certification and explaining why the proposed class satisfied the rule 23 requirements. See Doc. 83, at 1-2.  The Court certified a class of all individuals or corporations whose property was seized without court order, or who were deprived of their property for suspected drug use and subsequent to the City of Albuquerque's Criminal Nuisance Abatement Team designating their property as substandard from three years before Lowery filed his Complaint, until the policy ceases. See April 13, 2011 MOO at 26-27.  The Court also: (i) designated K. Lowery, Lovato, Gabaldon, and Thomas as the class representatives; and (ii) appointed the Kennedy Law Firm as class counsel. See April 13, 2011 MOO at 40.

On January 24, 2012, the Court rejected a proposed settlement because of fairness concerns,

---

slightly different page and/or line numbers.

see Memorandum Opinion and Order at 2, filed January 24, 2012 (Doc. 96)("Jan. 24, 2012 MOO"), and the parties began to prepare for trial.  On February 14, 2012, the Plaintiffs filed the Violation Motion.  The Plaintiffs ask that the Court exclude "all evidence of cited, housing code violations unrelated to Defendants' allegations of drug contamination," because such evidence "is irrelevant and will serve no other purpose than to confuse the jury on the theory of liability and on Plaintiff's [sic] damages."  Violation Motion at 1.  The Plaintiffs assert that, while the Defendants cited them for "a litany of minor housing code violations," their homes were "seized permanently due to the allegations of the drug contamination."  Violation Motion at 2.  They argue that the minor, non-drug related violations are irrelevant, because the Plaintiffs were unable to address or remedy them, while the Defendants blocked their access to their property, until the property was "de-contaminated."  Violation Motion at 2.  The Plaintiffs contend that evidence of other housing violations is not relevant to liability, because their damages "stem from the wrongful, continued seizure of their homes through Defendants' unlawful policy of requiring Plaintiffs to spend thousands of dollars to 'de-contaminate' their homes."  Violation Motion at 3.  They further assert that their damages "stem from the arbitrary and capricious conduct by Defendants in acting in the absence of an authorizing statute to evict people from their home based on unsubstantiated fears of drug contamination, then seizing Plaintiffs homes and all the while providing no procedural protections."  Violation Motion at 3.  The Plaintiffs argue that the class damages consist of the economic and emotional hardships the implementation of these policies caused.  See Violation Motion at 3.  They assert that the damages will consist of environmental testing costs, remediation costs, lost rental income, and/or alternative housing expenses.  See Violation Motion at 3.  The Plaintiffs contend that they are not seeking compensation for remedying the minor, non-drug related housing code violations or challenging the propriety of such citations.  See Violation Motion at 3.  They further assert that the

housing code evidence is irrelevant, time-consuming, and will prove nothing in the case.  <u>See</u> Violation Motion at 3.  The Plaintiffs argue that the evidence of other code violation also risks unfair prejudice to many class members, because the Defendants may use "the evidence to paint a picture of the Plaintiffs' character as slovenly, irresponsible or negligent."  Violation Motion at 4.  They contend that the "only purpose in introducing the evidence would be to embarrass, humiliate and degrade the Plaintiffs."  Violation Motion at 4.

On March 29, 2012, the Defendants filed the Defendants' Response to Motion in Limine to Exclude Evidence of Other Housing Code Violations.  <u>See</u> Doc. 107 ("Violation Response").  The Defendants argue that the Violation Motion is "nothing more than an attempt to hamstring defendants from putting on a defense to both liability and damages claims."  Violation Response at 1.  They assert that liability has not been established and that the Plaintiffs still have a burden with respect to the Defendants' conduct.  <u>See</u> Violation Response at 1-2.  The Defendants contend that the evidence will show that these other housing code violations caused the properties to be deemed substandard and supported the Plaintiffs' displacement.  <u>See</u> Violation Response at 2.  They argue that the other violations are crucial to the Defendants' explanation of their conduct, and to defend against the charge that they were arbitrary and capricious.  <u>See</u> Violation Response at 2.  The Defendants assert that the Plaintiffs state that they are not challenging the appropriateness of these other violations and that the Plaintiffs do not want the jury to know that not <u>all</u> of the Defendants' conduct was arbitrary and capricious.  <u>See</u> Violation Response at 2.  They contend that there can be no prejudice in presenting the housing code violations to the jury if there is no dispute as to their validity.  <u>See</u> Violation Response at 2.  Additionally, the Defendants argue that, to prove their damages, the Plaintiffs will have to prove how their remediation costs were calculated and that they were connected to the drug-contamination policy, and not to any other violations.  <u>See</u> Violation

-19-

Response at 3.

On February 16, 2012, the Plaintiffs filed the Drug Motion.  See Doc. 102.  In the Drug Motion, the Plaintiffs ask that the Court exclude evidence of the Plaintiffs' alleged drug use, because the "personal habits of the Plaintiffs, Plaintiffs' tenants, or persons with whom Plaintiffs allowed to reside in their homes, is unrelated to issues of liability and damages to be determined at trial." Drug Motion at 1.  They argue that the Defendants' practices were not supported "by law and their policies not substantiated by science," and that they forced the Plaintiffs "to test and remediate their homes regardless of whether individuals had used drugs in the homes."  Drug Motion at 3.  Relying on the Court's March 31, 2011 MOO, the Plaintiffs assert that the Court has found that "the mere presence of drugs does not present an immediate threat of harm or serious harm."  Drug Motion at 3 (quoting March 31, 2011 MOO at 59).  They contend that, "[a]s alleged drug use was never a valid justification for Defendants' conduct towards the Plaintiffs, it should not be permitted at trial to attack Plaintiffs' character or the character of the tenants and occupants of their homes."  Drug Motion at 3.  They argue that admission of this evidence does not make it more or less probable that the Defendants wrongfully seized the Plaintiffs' homes.  See Drug Motion at 4.  The Plaintiffs assert that, because evidence of drug use is not relevant to the issues, the Defendants could use such evidence only for an "improper purpose."  Drug Motion at 4.  They further assert that drug-use evidence presents a particularly high risk of unfair prejudice and that "[e]vidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness's testimony."  Drug Motion at 5 (quoting United states v. Robinson, 956 F.2d 1388, 1397 (7th Cir. 1992)).  The Plaintiffs argue that, if this evidence possesses any relevance, the possibility of prejudice, confusion of the issues, and delay substantially outweighs the relevance.  See Drug Motion at 6.

On March 29, 2012, the Defendants filed the Defendants' Response to Motion in Limine No. II to Exclude Evidence of Alleged Drug Use by Class Members.  See Doc. 108 ("Drug Response"). The Defendants argue that the threshold criteria to be a member of the class is that there "had to be allegations or suspicions of drug use as the basis for displacement."  Drug Response at 1.  They assert that, if "there can be no evidence of drug use, the inspectors cannot even testify why they took the actions they did."  Drug Response at 1.  The Defendants contend that the scope of the Plaintiffs' Drug Motion is so broad "it would be impossible to craft an order stating what testimony came within the term 'drug use,'" because otherwise the Defendants will not be able to explain why they tested these properties.  Drug Response at 2.  They assert that the Drug Motion is overly broad and vague, and that the Plaintiffs should not "be allowed to testify as to only those facts which cast them in a favorable light, ignoring the negative issues which they would prefer not to share."  Drug Response at 2.

On February 23, 2012, the Plaintiffs filed the Contamination Motion.  See Doc. 103.  In the Contamination Motion, the Plaintiffs request that the Court "exclude all evidence of the results of environmental testing of Plaintiffs' homes."  Contamination Motion at 1.  They argue that the environmental-testing results are hearsay, lack a scientific foundation, are irrelevant, and will serve no purpose other than to confuse the jury.  See Contamination Motion at 1.  The Plaintiffs assert that the Court should exclude the environmental-testing results pursuant to rule 801(c) of the Federal Rules of Evidence.  See Contamination Motion at 3.  They contend that the percentage of false positives is unknown, and that the documents do not show who conducted the tests or testing procedure.  See Contamination Motion at 3.  The Plaintiffs argue that the test results are out-of-court statements made by multiple parties offered to assert, as truth, that the presence of drugs "contaminated" the Plaintiffs' homes.  Contamination Motion at 3.  They assert that the Court

should exclude these documents, because the declarants are unavailable and will be used to argue that the Plaintiffs' homes were "contaminated." Contamination Motion at 4. The Plaintiffs also contend that the Court should not permit the Defendants to question representatives from the environmental hygienist firms regarding these test results, because the testing company representatives do not have personal knowledge of the tests and results of Plaintiffs' homes. See Contamination Motion at 4-5.

The Plaintiffs also argue that the Court should exclude the testing results as they lack reliability and scientific foundation. See Contamination Motion at 5. They assert that the Defendants' "theory that various manners of smoking or ingesting drugs in a home causes 'contamination' of the home that is somehow immediately threatening to the health and safety [of] people living or in the home is not supported by expert testimony." Contamination Motion at 5. They contend that evidence purported to be scientific must "not only be relevant, but must also be reliable." Contamination Motion at 5 (citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)[2]). The Plaintiffs argue that the Defendants' witnesses

> should not be permitted to offer opinions or inferences related to the dangers of drug contamination as they did not rationally perceive any facts indicating Plaintiffs were in immediate danger due to alleged drug contamination, such testimony is irrelevant and would not be helpful to the jury in its determination, and finally, Defendants' lay witnesses do not possess the scientific, technical, or other specialized knowledge required by Rule 702, to offer opinions regarding the dangers of drug contamination.

Contamination Motion at 6. The Plaintiffs assert that the Defendants justified their wrongful conduct on the theory that drug use causes contamination of homes, but that the Defendants never presented any evidence, scientific or otherwise, laying a foundation for that theory and that the Court

---

[2]In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court of the United states held that the Federal Rules of Evidence assign to the trial judge the task of ensuring that scientific evidence is sufficiently reliable such that it will assist a trier of fact. See 509 U.S. at 592-94.

found the theory lacked scientific support.  See Contamination Motion at 7 (citing March 31, 2011

MOO at 58).  They contend that the Court should preclude the Defendants from eliciting testimony

on contamination, either through the direct examination of the Defendants' lay witnesses or through

cross-examination of the Plaintiffs' witnesses.  See Contamination Motion at 8.  The Plaintiffs argue

that no scientific community has accepted this contamination theory and that the Defendants, who

are not scientists, "made this theory up to justify their unconstitutional conduct."  Contamination

Motion at 8.

       The Plaintiffs further assert that the Court should exclude the testing-results evidence,

because it is not relevant to issues of liability or damages.  See Contamination Motion at 9.  The

Plaintiffs contend that the Defendants' immediate seizure of the Plaintiffs' homes based upon

"baseless, unscientific speculation constituted an unreasonable seizure," and that the Court found

that whether drug residue actually "contaminated" the Plaintiffs' homes is irrelevant, because such

"contamination" does not justify the immediate seizure of their homes.  Contamination Motion at

9.  They argue that, because the testing results could not justify the seizure of their homes, the

alleged levels of contamination are irrelevant to any triable issues and that the Court should exclude

the testing results.  See Contamination Motion at 9.  The Plaintiffs assert that their damages

> stem from the wrongful, continued seizure of their homes through Defendants'
> policy of requiring Plaintiffs' to pay for Environmental Companies to test their
> homes for the presence of drugs and then hire Remediation Companies to 'de-
> contaminate' the homes, and finally to hire the Testing Companies a second or third
> time to conduct a post remediation test.

Contamination Motion at 10. They argue that the testing-results evidence will not make it more or

less probable that the Plaintiffs were issued invoices, that they paid the invoices, or that they were

required to vacate the residences if they could not afford to pay for remediation.  See Contamination

Motion at 10.  The Plaintiffs further contend that the Court should exclude this evidence, because

it risks unfair prejudice to the class.  <u>See</u> Contamination Motion at 11.  They argue that "[f]anning

fears associated with the making of methamphetamine may prejudice the jury against Plaintiffs."

Contamination Motion at 12.

On March 29, 2012, the Defendants filed the Defendants' Response to Motion in Limine No.

III to Exclude Evidence of Alleged Drug "Contamination."  Doc. 109 ("Contamination Response").

The Defendants argue that, although the Plaintiffs seek to exclude "all evidence of the results of

environmental testing of Plaintiffs' homes," the Plaintiffs "fully intend to seek damages for testing

and remediation of their properties."  Contamination Response at 1.  The Defendants assert that,

because the Plaintiffs have the burden of proving their damages, the Plaintiffs must show that the

costs are reasonably related to their damages and what the basis for those costs were.  <u>See</u>

Contamination Response at 1.  The Defendants contend that, as part of their defense, the Defendants

are entitled to question witnesses regarding why they performed certain tests and for what the

Plaintiffs were billed.  <u>See</u> Contamination Response at 2.  Additionally, the Defendants argue that,

because the Plaintiffs seek punitive damages and "surely plan to question these opinions," the

Defendants must be permitted to express the basis on which those opinions were made.

Contamination Response at 2.

The Court held a hearing on April 2, 2012.  With respect to the Violation Motion, the

Plaintiffs argued that the City of Albuquerque inspectors' testimony will be that the City of

Albuquerque created a policy of evicting and citing citizens for contamination of their homes based

on drug use or possession.  <u>See</u> Transcript of Hearing at 29:3-9 (April 2, 2012)(Kennedy)("April,

2, 2012 Tr.").  The Plaintiffs asserted that some of the notices state that the owner may not do any

repairs until the home is tested and that the inspectors will testify that, because they were concerned

about drug contamination, they did not want the Plaintiffs inside.  <u>See</u> April, 2, 2012 Tr. at 29:12-20

(Kennedy).  The Plaintiffs contended that the other housing code violations were irrelevant, because the inspectors did not rely on those violations to evict the Plaintiffs.  See  April, 2, 2012 Tr. at 29:20-30:1 (Kennedy).  The Defendants responded that the inspectors will not testify that there was a stand alone policy, but that they were investigating a variety of code violations.  See April, 2, 2012 Tr. at 30:14-20 (Levy).  They asserted that they are entitled to tell the jury why and what they were investigating.  See April, 2, 2012 Tr. at 30:21-25 (Levy).  The Defendants further asserted that they are permitted to question whether the Plaintiffs' remediation costs were related to the contamination policy or these other housing code violations.  See April, 2, 2012 Tr. at 31:1-4 (Levy).  The Plaintiffs asserted that, if there were five housing code violations and one drug remediation in a given order, the housing code violation could not be addressed until the drug remediation was resolved, such that the housing code violation would not affect the remediation costs.  See April, 2, 2012 Tr. at 31:23-32:9 (Kennedy).  They argued that the condition precedent for the Plaintiffs to gain access to their property was the drug testing.  See April, 2, 2012 Tr. at 32:10-15 (Kennedy).  They contended that, although the Defendants may have had other reasons for issuing the order, the first thing that a homeowner had to do was remediate the drug issue.  See April, 2, 2012 Tr. at 32:15-19 (Kennedy).  The Defendants asserted that there were some cases where the Plaintiffs were allowed in their homes without remediation and that the housing code violations are important to give the jury a complete picture of the factors at play.  See April, 2, 2012 Tr. at 32:22-33:6 (Levy).

With respect to the Drug Motion, the Plaintiffs stated that this motion is directed towards the individuals who will testify as to their eviction and the Plaintiffs conceded that there is no way to exclude the mention of drugs completely from trial.  See April, 2, 2012 Tr. at 33:20-34:9 (Kennedy).  The Plaintiffs asserted that the Drug Motion is meant to preclude cross-examination of individual Plaintiffs with respect to whether they use illicit drugs, which the Plaintiffs believe are unfairly

prejudicial and irrelevant.  See April, 2, 2012 Tr. at 34:10-15 (Kennedy).  They argued that questions concerning drug use raise the false issue of comparative fault.  See April, 2, 2012 Tr. at 34:16-20 (Kennedy).  The Court then asked the Defendants whether there was a compromise and some way to limit how the Defendants would use this line of questioning.  See April, 2, 2012 Tr. at 34:23-35:2 (Court).  The Defendants conceded that, with the Plaintiffs' concession that they must show why the policy applied, they believe that it is unnecessary to ask any Plaintiff who seeks only economic damages about drug use.  See April, 2, 2012 Tr. at 35:3-7 (Levy).  The Defendants argued that, with respect to any Plaintiffs who seek emotional distress damages, they are entitled to ask about any other problems that might have caused the distress.  See April, 2, 2012 Tr. at 35:8-15 (Levy).  The Plaintiffs admitted that this issue might more prudently addressed on a case-by-case basis.  See April, 2, 2012 Tr. at 36:3-4 (Kennedy).  The Plaintiffs asserted, however, that an individual's drug use does not mean that they will not suffer emotional damages following an eviction.  See April, 2, 2012 Tr. at 36:5-18 (Kennedy).  The Court asked whether it should permit the Defendants to examine drug use on cross-examination with respect to emotional distress damages so that the jury may determine, if the alleged damages are sincere.  See April, 2, 2012 Tr. at 37:4-7 (Court).  The Plaintiffs responded that there may be some room for that questioning, but that if a person testifies that they were living under Interstate 40, drug use is not relevant.  See April, 2, 2012 Tr. at 37:8-15 (Kennedy).

Regarding the Contamination Motion, the Plaintiffs asserted that the purpose of the motion was to establish that the policy of measuring for drug contamination has no scientific support and that the Plaintiffs' expert witness will testify to that fact.  See April, 2, 2012 Tr. at 38:9-23 (Kennedy).  They argued that for the Defendants to rely on those results, which have no scientific meaning, is improper.  See April, 2, 2012 Tr. at 38:23-39:2 (Kennedy).  The Plaintiffs contended

that the numbers are hearsay, because the person who tested the materials collected will not be testifying, and that, even if the Defendants could authenticate the results, the numbers do not tell the jury anything about risk, contamination, or health effects.  See April, 2, 2012 Tr. at 39:2-8 (Kennedy).  They asserted that the Defendants will not have an expert to testify that these levels of drug contamination posed a health hazard.  See  April, 2, 2012 Tr. at 39:9-12 (Kennedy).  The Court asked if the Contamination Motion was a motion under Daubert v. Merrell Dow Pharmaceuticals, Inc. challenging some specific testimony that the Defendants will present.  See April, 2, 2012 Tr. at 39:16-18 (Court).  The Plaintiffs responded that the Defendants have not introduced any evidence to even get to a Daubert v. Merrell Dow Pharmaceuticals, Inc. hearing or motion.  See  April, 2, 2012 Tr. at 39:19-24 (Kennedy).  The Defendants asserted that what the Plaintiffs are saying is that their experts are going to prove that there is no scientific basis for the policy and that, at this point in the litigation, the Defendants and the Court should accept that fact as true.  See April, 2, 2012 Tr. at 40:1-4 (Levy).  The Defendants argued that the litigation has not yet reached the point where excluding this evidence might be appropriate.  See April, 2, 2012 Tr. at 40:5-14 (Levy).  The Defendants further asserted that the parties will need to discuss the testing results to establish damages for different individuals.  See April, 2, 2012 Tr. at 40:15-19 (Levy).  The Defendants contended that the Plaintiffs have markedly different damages and that the Plaintiffs will need to refer to the testing results to show why the damages related to remediation costs are reasonable.  See April, 2, 2012 Tr. at 40:19-22 (Levy).  They argued that the invoices that the Plaintiffs will introduce are necessarily based on the work performed and on the testing, and the Defendants are entitled to ask questions that force the witnesses to explain what work was done.  See April, 2, 2012 Tr. at 40:23-41:5 (Levy).  The Defendants asserted that the testing results are not prejudicial to the Plaintiffs, because the Plaintiffs are going to introduce evidence that it does not matter how high

these levels were -- there was no health risk.  <u>See</u> April, 2, 2012 Tr. at 41:6-9 (Levy).  They

contended that the jury has to hear, and agree with, the Plaintiffs' expert.  <u>See</u> April, 2, 2012 Tr. at

41:9-11 (Levy).

The Court then asked whether the purpose of introducing the testing results would be to

establish that there was enough contamination to find a housing code violation.  <u>See</u> April, 2, 2012

Tr. at 42:2-4 (Court).  The Defendants responded that the testing results would go to the issue

whether there was sufficient indicia of imminent danger.  <u>See</u> April, 2, 2012 Tr. at 42:5-6 (Levy).

They asserted that the Plaintiffs will put on evidence to say that there is no science to support the

testing, but that the jury has to hear that evidence.  <u>See</u> April, 2, 2012 Tr. at 42:6-10 (Levy).  The

Defendants also argued that the testing results went to the reasonableness of their actions and

whether punitive damages are appropriate.  <u>See</u> April, 2, 2012 Tr. at 42:10-18 (Levy).  The Court

stated that it appears that the Defendants' argument is that the Plaintiffs must prove that the tests

have no scientific validity, which the Defendants do not intend to oppose with their own expert, and

that it is improper to give, essentially, a directed verdict before the Plaintiffs have put on their proof.

<u>See</u> April, 2, 2012 Tr. at 42:19-43:1 (Court).  The Defendants agreed that the Court's summation

represented one part of their argument and stated that the other side is that the information is

relevant to damages.  <u>See</u> April, 2, 2012 Tr. at 43:1-2 (Levy).  The Plaintiffs analogized the drug

contamination policy to a policy stating that flour residue needed to be tested and argued that the

term "contamination" presupposes that there is an immediate threat.  April, 2, 2012 Tr. at 43:4-18

(Kennedy).  They argued that, because the Defendants will introduce no testimony that there is a

risk, there is no basis for the Defendants to testify that the levels were three or four times the

approved levels.  <u>See</u> April, 2, 2012 Tr. at 43:19-24 (Kennedy).  The Plaintiffs asserted that, to the

extent testimony that testing had to be performed multiple times because it did not meet with the

standards is relevant, such testimony could be elicited without referring to the testing results.  See April, 2, 2012 Tr. at 44:16-19 (Kennedy).  The Plaintiffs also argued that the Court has already determined that the Defendants have not linked the traceable amounts of drugs to any health risk. See April, 2, 2012 Tr. at 46:3-6 (Kennedy).

## LAW REGARDING RELEVANT EVIDENCE

The threshold issue in determining the admissibility of evidence is relevance.  As a baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless another law or rule excludes the evidence -- and any evidence that is not relevant is not admissible.  See Fed. R. Evid. 402.  The standard for relevance is very liberal.  See United States v. Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)).  The evidence need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only need to have "any tendency" to do so.  United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651; United States v. McVeigh, 153 F.3d at 1190.  Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence."  United States v. Jordan, 485 F.3d at 1218.

## LAW REGARDING RULE 403

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice. See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)). The United States Court of Appeals for the Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d 765, 787 (10th Cir. 2010).

The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's discretion, see United States v. Lugo, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's discretion to balance possible unfair prejudice against probative value is broad, see United States v. Bice-Bey, 701 F.2d 1086, 1089 (4th Cir. 1983); United States v. Masters, 622 F.2d 83, 87-88 (4th Cir. 1980). As the Supreme Court of the United States has noted:

> In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings . . . . This is particularly true with respect to Rule 403 since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant."

Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 384 (2008)(quoting 1 S. Childress & M. Davis, Federal Standards of Review § 4.02, at 4-16 (3d ed. 1999)). See United States v. Abel, 469 U.S. 45, 54 (1984)("Assessing the probative value of [proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules

401 and 403 . . . .”).

Evidence may be unfairly prejudicial if it would likely provoke an emotional response from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular matter. See United States v. Rodriguez, 192 F.2d 946, 951 (10th Cir. 1999). Evidence is not unfairly prejudicial merely because it damages a party's case. See United States v. Caraway, 543 F.3d 1290, 1301 (10th Cir. 2008); United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003); United States v. Martinez, 938 F.2d 1078, 1082 (10th Cir. 1991). Rather, “[t]o be unfairly prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'” United States v. Caraway, 453 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee note).

## ANALYSIS

The Court will deny the Violation Motion. The Court finds that evidence of other housing code violations are relevant and that potential for prejudice does not substantially outweigh the evidence's probative value. The Court will grant in part and deny in part the Drug Motion, based on the Defendants concession at the hearing, and on the Court's finding that evidence of drug use is relevant to emotional distress damages. The Court will also grant in part and deny in part the Contamination Motion, because the Court believes that the testing results are relevant for the non-hearsay purpose of explaining the Defendants' actions. The Court will not, however, permit the Defendants to offer the testing results as evidence that there was a health risk to the Plaintiffs, unless the Defendants establish the scientific validity of that theory.

I.     **THE COURT WILL DENY THE VIOLATION MOTION, BECAUSE EVIDENCE OF OTHER HOUSING VIOLATIONS IS RELEVANT AND THE POSSIBILITY OF PREJUDICE DOES NOT SUBSTANTIALLY OUTWEIGH ITS PROBATIVE VALUE.**

The Plaintiffs ask that the Court exclude "all evidence of cited, housing code violations unrelated to Defendants' allegations of drug contamination," because such evidence "is irrelevant and will serve no other purpose than to confuse the jury on the theory of liability and on Plaintiff's [sic] damages." Violation Motion at 1.  They argue that the minor, non-drug related violations are irrelevant, because the Plaintiffs were unable to address or remedy them while the Defendants blocked their access to their property, and until the property was "de-contaminated." Violation Motion at 2.  They contend that the "only purpose in introducing the evidence would be to embarrass, humiliate and degrade the Plaintiffs." Violation Motion at 4.  The Defendants argue that the Violation Motion is "nothing more than an attempt to hamstring defendants from putting on a defense to both liability and damages claims." Violation Response at 1.  They assert that liability has not been established and that the Plaintiffs still have a burden with respect to the Defendants' conduct.  <u>See</u> Violation Response at 1-2.  The Defendants contend that the evidence will show that these other housing code violations caused the properties to be deemed substandard and supported the Plaintiffs' displacement.  <u>See</u> Violation Response at 2.  Additionally, the Defendants argue that, to prove their damages, the Plaintiffs will have to prove how their remediation costs were calculated, and that they were connected to the drug-contamination policy and not to any other violations. <u>See</u> Violation Response at 3.

Evidence is relevant under rule 401 if it has "<u>any</u> tendency to make the existence of <u>any</u> fact that is of consequence" more or less probable.  Fed. R. Evid. 401 (emphasis added).  The bar for admission of evidence under rule 401 is "very low."  <u>United States v. McVeigh</u>, 153 F.3d 1166,

1190 (10th Cir. 1998). The argument may make some sense as to the named Plaintiffs for whom the Court has already entered partial summary judgment, see March 31, 2011 MOO at 1, but not as to the rest of the class. The Plaintiffs seek to exclude evidence of housing code violations unconnected to possible drug contamination. The Court finds that this evidence is relevant as to the rest of the class, because evidence of other housing code violations could tend to show that the Defendants had another basis for condemning or red-tagging the class members' property. Accordingly, evidence of other housing code violations could assist in defending against liability. The Court will not preclude the Defendants from establishing a defense and arguing that they are not liable, because these other housing code violations permitted them to enter the class members' property. Furthermore, such evidence is relevant as background information to explain the Defendants' actions in their entirety to the jury. See United States v. Condrin, 473 F.3d 1283, 1286 n. 2 (10th Cir. 2007). The Court has previously held that "general evidence" may be relevant where it "will shed light on the context in which the incident occurred." Mata v. City of Farmington, 798 F.Supp.2d 1215, 1236 (D.N.M. 2011)(Browning, J.). Additionally, the other housing code violations could have a tendency to show that some of the Plaintiffs' claimed damages were not related to drug remediation costs, but were incurred to address the other housing code violations. The Court finds that this evidence satisfies the "minimal" relevance standard provided under rule 401, even for those Plaintiffs for whom the Court has already entered partial summary judgment. United States v. Jordan, 485 F.3d at 1218.

The Plaintiffs also assert that the Court should exclude the other housing code violations at trial under rule 403, because the Defendants will use "the evidence to paint a picture of the Plaintiffs' character as slovenly, irresponsible or negligent." Violation Motion at 4. "Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative

value, which permits exclusion of relevant matter." United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991). The Court does not believe that the risk of prejudice from the introduction of these violations is great. The Plaintiffs will have the opportunity to explain why these citations were made and rebut any argument that they negligently maintained their homes. Furthermore, the far greater prejudice is to the Defendants, if the Court excluded this evidence. If the Court excludes the evidence, it will appear to the jury that the only policy the inspectors were enforcing was the drug contamination policy. Excluding this evidence would also prevent the Defendants from presenting to the jury the context in which these evictions took place. This evidence is not so prejudicial that it would "inflame the jury to make its merits verdict without regard to the other evidence." United States v. Meza, No. 09-3591, 2010 WL 2301582, at *4 (D.N.M. May 11, 2010)(Browning, J.). The Court finds that allowing the Defendants to introduce the other housing code violations will not be unduly confusing to jurors and will be substantially less confusing then presenting the jury with heavily redacted notices. As the Tenth Circuit has stated, "exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly." United States v. Smalls, 605 F.3d at 787. Accordingly, the Court will not exclude evidence of other housing code violations.

## II.     THE COURT WILL GRANT IN PART AND DENY IN PART THE DRUG MOTION, AND WILL PERMIT THE DEFENDANTS TO INQUIRE INTO THE DRUG USE ONLY OF THOSE WITNESSES ASKING FOR EMOTIONAL DISTRESS DAMAGES.

In the Drug Motion, the Plaintiffs ask that the Court exclude evidence of the Plaintiffs' alleged drug use, because the "personal habits of the Plaintiffs, Plaintiffs' tenants, or persons with whom Plaintiffs allowed to reside in their homes, is unrelated to issues of liability and damages to be determined at trial." Drug Motion at 1. They contend that, "[a]s alleged drug use was never a

valid justification for Defendants' conduct towards the Plaintiffs, it should not be permitted at trial to attack Plaintiffs' character or the character of the tenants and occupants of their homes." Drug Motion at 3. They further assert that drug-use evidence presents a particularly high risk of unfair prejudice and that "[e]vidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness's testimony." Drug Motion at 5 (quoting United States v. Robinson, 956 F.2d at 1397). The Defendants argue that the threshold criteria to be a member of the class was that there "had to be allegations or suspicions of drug use as the basis for displacement." Drug Response at 1. They assert that, if "there can be no evidence of drug use, the inspectors cannot even testify why they took the actions they did." Drug Response at 1. At the hearing, the Plaintiffs asserted that the Drug Motion is meant to preclude cross-examination of individual Plaintiffs with respect to whether they use illicit drugs, which the Plaintiffs believe are unfairly prejudicial and irrelevant. See April, 2, 2012 Tr. at 34:10-15 (Kennedy). They argued that questions concerning drug use raise the false issue of comparative fault. See April, 2, 2012 Tr. at 34:16-20 (Kennedy). The Defendants conceded that it is unnecessary to ask any Plaintiff who seeks only economic damages about drug use. See April, 2, 2012 Tr. at 35:3-7 (Levy). The Defendants argued that, with respect to any Plaintiffs who seek emotional distress damages, they are entitled to ask about any other problems that might have caused the distress. See April, 2, 2012 Tr. at 35:8-15 (Levy). The Plaintiffs admitted that this issue might be more prudently addressed on an individual basis. See April, 2, 2012 Tr. at 36:3-4 (Kennedy).

The Court will grant the Drug Motion with respect to those persons who are not seeking emotional distress or pain and suffering damages, consistent with the parties' discussions at the hearing. The Court will deny the Drug Motion with respect to any person who seeks emotional distress or pain and suffering damages. The Court has previously held that drug abuse is relevant

to a claim for damages where a plaintiff seeks  damages for emotional distress.  See Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313515, at *2 (D.N.M. July 31, 2005)(Browning, J.)("Because Chamberlin's uncharged misconduct, drug and alcohol use, and mental illness is relevant to rebut Chamberlin's claim of damages, the Court will allow Lehocky to introduce certain specific instances of Chamberlin's prior conduct as described in this opinion and order.").  Other courts have also held that past drug use is relevant to non-economic damages.  The United States District Court for the District of North Dakota has held that a plaintiff's "medical history, medical conditions, drug and alcohol abuse, psychological problems, and stressors in her life are relevant" to a claim for non-economic damages.  Magelky v. BNSF Ry. Co., No. 1:06-cv-025, 2008 WL 238451, at *11 (D.N.D. Jan. 28, 2008)("If Magelky decides to pursue a claim for non-economic damages at trial, that decision will likely 'open the door' to the admissibility of most of the 'garbage' evidence to which she now objects.").  Although the Court agrees that, generally, evidence of drug use is prejudicial, see Drug Motion at 5 (quoting United States v. Robinson, 956 F.2d at 1397), the Court finds it less likely to be prejudicial here, where the entire case resolves around drug paraphernalia and drug residue.  There is no way to completely remove the specter of drug use from the trial.  Furthermore, evidence of drug use is an important tool of cross-examination for persons seeking emotion or pain and suffering damages.  These damages depend on the Defendants' conduct on the Plaintiffs' mental state; it is, therefore, important for the jury to be aware of mind-altering substances that the Plaintiffs may be taking.  A person who is taking a drug like methamphetamine will perceive and react much differently to circumstances than a person not taking that drug.  Getting thrown out on the street may mean different things for someone who is high on methamphetamine, than it does for a drug-free individual.  Accordingly, the Court finds that evidence of drug use is relevant and that the risk of prejudice does not substantially outweigh its probative value.  The Court

will, however, monitor these questions and ensure that this line of inquiry does not cross the line to become unduly prejudicial.

## III.    THE COURT WILL GRANT IN PART AND DENY IN PART THE CONTAMINATION MOTION.

In the Contamination Motion, the Plaintiffs request that the Court "exclude all evidence of the results of environmental testing of Plaintiffs' homes." Contamination Motion at 1. The Plaintiffs argue that the test results are out-of-court statements made by multiple parties offered to assert, as truth, that the presence of drugs "contaminated" the Plaintiffs' homes. Contamination Motion at 3. They assert that the Court should exclude these documents, because the declarants are unavailable and because the Defendants will use this evidence to argue that the Plaintiffs' homes were "contaminated." Contamination Motion at 4. The Plaintiffs also argue that the Court should exclude the testing results as they lack reliability and scientific foundation. See Contamination Motion at 5. They assert that the Defendants' "theory that various manners of smoking or ingesting drugs in a home causes 'contamination' of the home that is somehow immediately threatening to the health and safety [of] people living or in the home is not supported by expert testimony." Contamination Motion at 5. The Plaintiffs argue that the Defendants' witnesses

> should not be permitted to offer opinions or inferences related to the dangers of drug contamination as they did not rationally perceive any facts indicating Plaintiffs were in immediate danger due to alleged drug contamination, such testimony is irrelevant and would not be helpful to the jury in its determination, and finally, Defendants' lay witnesses do not possess the scientific, technical, or other specialized knowledge required by Rule 702, to offer opinions regarding the dangers of drug contamination.

Contamination Motion at 6. They contend that the Court should preclude the Defendants from eliciting testimony on contamination, either through the direct examination of the Defendants' lay witnesses or through cross-examination of the Plaintiffs' witnesses. See Contamination Motion at 8. The Plaintiffs further assert that the Court should exclude the testing-results evidence, because

it is not relevant to issues of liability or damages.  See Contamination Motion at 9.  The Defendants argue that, although the Plaintiffs seek to exclude "all evidence of the results of environmental testing of Plaintiffs' homes," the Plaintiffs "fully intend to seek damages for testing and remediation of their properties."  Contamination Response at 1.  The Defendants contend that, as part of their defense, the Defendants are entitled to question witnesses regarding why they performed certain tests and for what the Plaintiffs were billed.  See Contamination Response at 2.

At the hearing, the Plaintiffs asserted that the purpose of the Contamination Motion was to establish that the policy of measuring for drug contamination has no scientific support and that the Plaintiffs' expert witness will testify to that fact.  See April, 2, 2012 Tr. at 38:9-23 (Kennedy).  They argued that, for the Defendants to rely on those results, which have no scientific meaning, is improper.  See April, 2, 2012 Tr. at 38:23-39:2 (Kennedy).  The Defendants argued that the litigation has not yet reached the point where excluding this evidence might be appropriate.  See April, 2, 2012 Tr. at 40:5-14 (Levy).  The Defendants further asserted that the parties will need to discuss the testing results to establish damages for different individuals.  See April, 2, 2012 Tr. at 40:15-19 (Levy).  The Defendants represented that the testing results would go to the issue whether there was sufficient indicia of imminent danger.  See April, 2, 2012 Tr. at 42:5-6 (Levy).  They asserted that the Plaintiffs will put on evidence to say that there is no science to support the testing, but that the jury has to hear that evidence.  See April, 2, 2012 Tr. at 42:6-10 (Levy).  The Defendants also argued that the testing results went to the reasonableness of their actions and whether punitive damages are appropriate.  See April, 2, 2012 Tr. at 42:10-18 (Levy).

The Court will not exclude evidence of the testing results for all purposes.  The Court will, however, limit the purposes for which it can be used, unless the Defendants establish that there is a scientific basis to support finding that the drug contamination posed a health risk.  First, the Court

-38-

finds that the testing results are relevant evidence to explain the work for which the Plaintiffs were invoiced and for which the Plaintiffs are seeking damages.  Furthermore, the testing results are necessary to explain why some individuals had to remediate more than once.  The Court concludes that the testing results tend to make the Plaintiffs' damages more or less probable, and also provide context for the Defendants' actions.  This ground is sufficient to satisfy rule 401's minimal relevancy requirements.  See United States v. Jordan, 485 F.3d at 1218.  Moreover, the Court does not see how the Plaintiffs can establish their damages without some reference to the testing results and what work was performed.  The invoices alone do not establish that the Defendants were responsible for the charges.  Additionally, by introducing the invoices, the Plaintiffs are opening the door to some explanation of for what services they were charged and why some testing had to be repeated.  See Tandberg v. Sholtis, 401 F.3d 1151, 1166 (10th Cir. 2005)("When a party opens the door to a topic, the admission of rebuttal evidence on that topic becomes permissible."); United States v. Jim, No. 10-2653, 2012 WL 592862, at *1 (D.N.M. Jan. 07, 2012)(Browning, J.)("Jim should be careful not to open the door to this evidence in his examinations."). The Plaintiffs also open the door to some questions, directed to their proposed expert witness, regarding whether the testing results present dangerous levels of drug residue.  The Defendants are entitled to cross-examine an expert witness regarding the basis for his or her opinion.  See Fed. R. Civ. P. 705.

The Defendants assert that the testing results are necessary to address damages and to show why the Defendants acted in the manner that they did.  Information acted upon is not hearsay.  Under rule 801(c), "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Out-of-court statements can be admitted as background for an investigation if they provide information that is necessary to explain subsequent actions.  See United States v. Cass, 127 F.3d

1218, 1223-24 (10th Cir. 1997). Furthermore, out-of-court statements are not hearsay if they are offered for a non-hearsay purpose. The Defendants may introduce the inspection reports containing the testing results, if they confine their use of those documents to the non-hearsay purpose of evaluating the effect of those reports on the Defendants -- to explain why the test results made the Defendants require remediation or to explain why that the test results led to the condemnation. See Crouch v. Pepperidge Farm, Inc., 424 F.App'x 456, 458 (6th Cir. 2011)(unpublished)("We therefore consider the document only for the non-hearsay purpose of evaluating its effect on Kroger and Pepperidge Farm."). The Defendants do not appear to be attempting to prove that the Plaintiffs homes were, in fact, "contaminated" with drugs, but that these tests were the basis for the Defendants subsequent actions and are critical to the Plaintiffs' damages. The Court will grant the Contamination Motion with respect to any attempt to introduce the testing results to prove the truth of the matter asserted and will limit the admissibility of the testing results to non-hearsay purposes. If the Defendants want to show that drug use or possession will contaminate or harm, they will need to make a showing under Daubert v. Merrell Dow Pharmaceuticals, which they have yet to do and yet to suggest they will try to do.

The Court will thus grant the Contamination Motion, without prejudice to the Defendants making a showing under Daubert v. Merrell Dow Pharmaceuticals, with respect to using the testing results to establish that the drug contamination was a danger or health risk, and will preclude testimony related to that purpose, unless the Defendants establish the scientific reliability of such evidence. Courts assess whether the reasoning or methodology underlying testimony is "scientifically valid" to determine the reliability of expert testimony. Truck Ins. Exch. v. Magnetek, Inc., 360 F.3d 1206, 1209 (10th Cir. 2004)(quoting Daubert v. Merrell Dow Pharm., 509 U.S. at 592-93). The danger of residual drug particles and the quantity necessary to present a health risk

is not within the realm of ordinary experience.  Accordingly, the Defendants will need to present

scientific evidence and expert testimony to attempt to establish that the quantity of drugs found in

the Plaintiffs' homes represents a health risk.  See Hollander v. Sandoz Pharm. Corp., 289 F.3d

1193, 1214 (10th Cir. 2002)("Here, the alleged effect of Parlodel is not within the realm of ordinary

experience: in order to assess the arguments regarding the alleged effects of the drug, the factfinder

would be required to assess . . . scientific evidence.  As a result, the Hollanders cannot prove their

claim without expert evidence.").  At the hearing, the Defendants did not suggest that they will be

calling an expert to address the scientific validity of the theory that drug residue poses a health risk

or that there was any scientific validity to that theory.  The Federal Rules of Evidence and Supreme

Court precedent require that, before the Defendants introduce such scientific evidence, the

Defendants must establish its scientific validity.  Accordingly, the Court will preclude any testimony

suggesting that the drug testing results demonstrate that there was an imminent health risk, unless

and until the Defendants establish the scientific validity of such evidence.

Because the testing results are an integral part of what this case is about, the Court does not

believe that it can or should exclude such evidence in their entirety.  The Court will, however, limit

its usage to the non-hearsay purposes of establishing why the Defendants acted as they did.  The

Court will also prohibit the Defendants from introducing evidence or testimony regarding the risk

posed by drug residue, until the Defendants establish the reliability of such a theory under Daubert

v. Merrell Dow Phamaceuticals, Inc.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion In Limine to Exclude Evidence of Other

Housing Code Violations, filed February 14, 2012 (Doc. 101), is denied; (ii) the Plaintiffs' Motion

in Limine No. II to Exclude Evidence of Alleged Drug Use by Class Members, filed February 16,

2012 (Doc. 102), is granted in part and denied in part; and (iii) the Plaintiff's Motion in Limine No.

III to Exclude Evidence of Alleged Drug "Contamination," filed February 23, 2012 (Doc. 103), is granted in part and denied in part. The Court will permit the Defendants to introduce evidence of class members' drug use only for those class members seeking emotional distress damages. The Court will also allow the introduction of the environmental testing results for the limited purposes of addressing damages and explaining their actions. The Court will not permit the Defendants to introduce the testing results to establish that the Plaintiffs' homes were "contaminated," such that there was a health risk to residents, unless and until the Defendants demonstrate the scientific reliability of that theory.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

    *Attorneys for the Defendants*

-42-