# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KEVIN LOWERY, on his behalf and
on behalf of similarly situated persons,

        Plaintiff,

JUDY LOVATO, DANNY GABALDON,
BARBARA THOMAS, each on his/her behalf
and on behalf of similarly situated persons,

        Plaintiffs-in-Intervention,

vs.                                                                No. CIV 09-0457 JB/WDS

CITY OF ALBUQUERQUE, MARTIN CHAVEZ,
in his individual capacity as mayor of the City of
Albuquerque; RAY SCHULTZ, in his individual
capacity chief of police of the City of Albuquerque
Police Department; JOHN OLMSTEAD; MARK
CRANDALL; and JOHN DOE POLICE OFFICERS,

        Defendants,

MICHELLE WALL, LARRY MOYA,

        Defendants-in-Intervention.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (ii) the Objections by Plaintiff Kevin Lowery to Class Settlement, filed Aug. 1, 2012 (Doc. 133)("Objections"); and (iii) Plaintiffs' Brief in Support of Class Action Settlement, filed Aug. 31, 2012 (Doc. 137)("Brief in Support"). The Court held a hearing on September 5, 2012. The primary issues are: (i) whether the Settlement Agreement, filed May 17, 2012 (Doc. 129-1)("Second Proposed Settlement"), is fair, reasonable and adequate; and (ii) whether an award of thirty-percent of the settlement fund in attorneys' fees is reasonable. The Court concludes that the Second Proposed Settlement is fair, reasonable, and

adequate, and thus overrules K. Lowery's objections and approves the Second Proposed Settlement.  The Court also concludes that thirty-percent of the settlement fund is a reasonable award, and thus grants the class counsel its requested attorneys' fees.

## FACTUAL BACKGROUND

The Court has previously reviewed the facts of this case in its Memorandum Opinion and Order, filed Mar. 31, 2011 (Doc. 79)("MSJ MOO"), which granted summary judgment on the issue whether exigent circumstances existed to seize Plaintiffs Danny Gabaldon's, Judy Lovato's, Barbara Thomas' and K. Lowery's homes, its Memorandum Opinion and Order, filed Apr. 13, 2011 (Doc. 83)("Certification MOO"), which certified the class action; and its Memorandum Opinion and Order, filed Jan. 24, 2012 (Doc. 96)("First Settlement MOO"), which rejected the parties' first proposed settlement.  The Court adopts those facts for the purposes of this memorandum opinion and order.

### 1.      City Ordinances.

In 2004, Defendant City of Albuquerque, New Mexico, passed the Clean Up of Laboratory Sites Ordinance, Ord. 36-2004 (hereinafter "Ord. 36-2004").  The purpose of the ordinance is to require remediation of clandestine drug laboratory sites "to assure the health, safety and welfare of the community."  Ord. 36-2004 § 11-1-1-42.  See First Settlement MOO at 2.  Clandestine drug laboratories are defined in the ordinance as "property on which [a controlled substance] is being manufactured or on which there is an attempt to manufacture, or where a person is arrested for having on any property any chemicals or equipment used in manufacturing [a controlled substance]."  Ord. 36-2004 § 11-1-1-42.  See First Settlement MOO at 2-3.  The Substandard Building Ordinance, Ord. 34-1985 (hereinafter "Ord. 34-1985") states that any building or portion

of a building where there exists an inadequate sanitation condition "to the extent that [the condition] endangers the life, limb, health, property, safety or welfare of the public or occupants thereof shall be deemed and declared a SUBSTANDARD BUILDING." Ord. 34-1985 § 14-3-4-1. See First Settlement MOO at 3. Substandard housing means that there is an immediate risk of harm to the resident. See First Settlement MOO at 3. Designation of a house as substandard through "posting" or "red tagging" requires same-day eviction of all residents. Ord. 34-1985 § 14-3-5-3(D); First Settlement MOO at 3. Residents and homeowners who re-enter a property posted as substandard without a permit commit a misdemeanor offense. See Ord. § 14-3-5-3(D); First Settlement MOO at 3.

When a property is deemed substandard because of drug contamination, occupants and homeowners are barred from entering the property until the homeowners pay for drug contaminant testing and remediation, which can cost thousands of dollars. See First Settlement MOO at 3-4; Ord. 34-1986 § 14-3-5-4(D).

## 2. Albuquerque Police Department's Criminal Nuisance Abatement Team Practices.

City Inspector Joseph Martinez wrote the initial draft of the Drug Lab Ordinance. See First Settlement MOO at 4. Martinez included language about possible contamination from drug use based on his belief that drug use could lead to property contamination. Martinez' belief was not founded on scientific evidence. See First Settlement MOO at 4.

Martinez enforced the draft ordinance he had written and not the ordinance that the City of Albuquerque put into law. Martinez did not read the final version of the Drug Lab Ordinance that the City of Albuquerque passed until about a year after it had been in effect. See First Settlement MOO at 4. Members of the Nuisance Abatement Team enforced the Martinez draft and not the

ordinance that the City of Albuquerque gave legal effect.  See First Settlement MOO at 4-5.

Some members of the Nuisance Abatement Team evicted residents and homeowners from their home based on the belief that drug use was occurring in the home.  See First Settlement MOO at 5.  Possible contamination because of drug use in a home was, in some cases, the sole basis for "red tagging" a home.  First Settlement MOO at 5.  Some members of the Nuisance Abatement Team posted houses where there was evidence that drug use had occurred, even if the drug use was a onetime occurrence.  See First Settlement MOO at 5.

Members of the Nuisance Abatement Team knew that the Drug Lab Ordinance applied only to drug laboratories and expressed concerns that the Drug Lab Ordinance did not apply to drug use.  When a member of the Nuisance Abatement Team expressed concern that the Drug Lab Ordinance did not extend to evictions based on drug use, he was told that the Substandard Building Ordinance could be used to deem a house substandard based on drug use.  See First Settlement MOO at 5.  Members of the Nuisance Abatement Team were told that, if they found drug paraphernalia, they should post notices on those homes, because there might be contamination. See First Settlement MOO at 5-6.  Inspectors used the Drug Lab Ordinance to evict suspected drug users from their homes.  See First Settlement MOO at 6.

**3.      Gabaldon.**

At all times relevant, Gabaldon was the owner and resident of 11101 Mahlon Ave N.E. in Albuquerque.  See First Settlement MOO at 6.  On September 9, 2008, the Nuisance Abatement Team searched Gabaldon's home.  The inspectors did not see evidence that methamphetamine had been "cooked" in the house or that there was a methamphetamine laboratory operating in the house.  First Settlement MOO at 6.  Defendant Larry Moya, an inspector with the City of

Albuquerque, noted that the house smelled of methamphetamine.  See First Settlement MOO at 6; Amended Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights ¶ 6, at 2, filed Aug. 10, 2010 (Doc. 48)("Amended Complaint").  Gabaldon told Moya that his wife, who was in jail at the time, struggled with methamphetamine addiction.  See First Settlement MOO at 6.  After a search of Gabaldon's home, members of the Nuisance Abatement Team ordered Gabaldon to leave his home, and seized the property through a nuisance abatement "Notice and Order."  First Settlement MOO at 6-7.  They also posted on the property a notice that the house was a "substandard building."  First Settlement MOO at 7.  The Notice given to Gabaldon and the sign on the property stated that entry into the home was a criminal violation of trespass.  See First Settlement MOO at 7.

The order to vacate the property cited electrical and plumbing violations in addition to suspected methamphetamine contamination.  The Notice and Order required Gabaldon to retain "an industrial or environmental hygienist firm" to test the property for "contamination."  First Settlement MOO at 7.  The environmental testing company Gabaldon later hired found that one room of the house was contaminated.  The environmental testing company quoted Gabaldon a remediation cost of between $18,000.00 and $20,000.00 for removal, replacement of the carpets, and cleaning of the entire house.  Gabaldon did not think that he had the money to pay for the cleaning.  Removal of the electrical cords that Gabaldon had installed could have fixed the electrical code violations.  See First Settlement MOO at 7.  The house went into foreclosure and was sold when Gabaldon did not pay the mortgage.  See First Settlement MOO at 8.

### 4.    **Lovato.**

At all times relevant, Lovato was a resident of 4701 Burton Ave S.E., Albuquerque.  The

Nuisance Abatement Team searched Lovato's house on February 10, 2009 and deemed it substandard.  The Nuisance Abatement Team posted on the property a public notice of this finding that same day, including a notice that entry into the home was a criminal violation.  The Nuisance Abatement Team ordered Lovato to leave the home under threat of arrest.  At the time of the inspection, the residents of the house included Lovato's daughter (who was five months pregnant), two granddaughters, two grandsons, and three great-grandchildren.

Defendant-in-Intervention Michelle Wall found some drug paraphernalia in a converted garage room.  The Notice and Order was based on "life safety issues," as well as on possible contamination from controlled substances.  Lovato Notice and Order at 1-2 (executed Feb. 12, 2009), filed July 30, 2010 (Doc. 43-1); First Settlement MOO at 8.  Specifically, the Notice and Order issued to Lovato states the following requirements: (i) replace all missing or inoperative window cranks, the door knob on the front security door, and a knob on the stove; (ii) replace all damaged molding, door jambs and striker plates; and (iii) "thoroughly clean" the home, because "the entire dwelling was found to be unsanitary."  Lovato Notice and Order at 2; First Settlement MOO at 8-9.  In addition, under the heading "Section 14-3-4-3(D) Structural hazards include members of walls, partitions or other vertical supports that split, lean, list or buckle," the Notice included the following note and order: "A POST FOR THE ATTACHED COVERED PATIO IS HANGING OVER THE CONCRETE.  HAVE THE COVERED PATIO INSPECTED AND REPAIRED BY A LICENSED CONTRACTOR OR HAVE THE COVER PERMANENTLY REMOVED."  Lovato Notice and Order at 2; First Settlement MOO at 9.  Lovato was also required to repair all holes in the walls and ceilings, including replacing insulation, installing sheet rock, "taping, texturing and painting."  Lovato Notice and Order at 2; First Settlement MOO at 9.

All appliances, interior furniture, and trash, as well as "miscellaneous items" on the back patio, were ordered removed.  Lovato Notice and Order at 2; First Settlement MOO at 9.  An outdoor shed was ordered removed: "THE REAR DETACHED STORAGE SHED IS LEANING AND IN OVERALL POOR CONDITION.  THE DOORS MUST ALSO BE LOCKED FOR SECURITY PURPOSES.   DUE TO THE BAD CONDITION AND FOR THE SAFETY OF THE OCCUPANTS OF THIS DWELLING, HAVE THE SHED PERMANENTLY REMOVED." Notice and Order at 2; First Settlement MOO at 9.  The inspectors found electrical code violations, including the following: (i) damaged or missing electrical receptacle and/or switch covers; (ii) broken or missing interior and exterior light globes and lenses; and (iii) exposed wiring on the rear patio light.  The Notice and Order stated that "[t]he lack of [switch] covers leaves wiring exposed that if touched could cause great bodily harm."  Notice and Order at 2; First Settlement MOO at 9. Finally, the Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  See Notice and Order at 3; First Settlement MOO at 10.

> **5.** **Thomas.**

In February 2009, Thomas was a resident at 3000 Florida N.E., Albuquerque.  Thomas' adult son lived on the property in the garage.  On February 26, 2009, the Nuisance Abatement Team notified Thomas that the house was "substandard," that she must leave the house immediately under threat of arrest, and that entry into the home would be criminal trespass.  Notice and Order (executed February 26, 2009), filed July 13, 2010 (Doc. 36-4)("Thomas Notice and Order"); First Settlement MOO at 12.  A member of the Nuisance Abatement Team conducting the inspection advised Thomas that she and her family could seek help from a shelter.  See First

Settlement MOO at 12.  A public notice indicating that the property was found to be substandard was posted on the property.  See First Settlement MOO at 12-13.

The Thomas Notice and Order to vacate was based at least in part on non-drug-related code violations.  See First Settlement MOO at 13.  The Thomas Notice and Order required Thomas to remedy four violations not related to the presence of methamphetamine.  See Thomas Notice and Order at 3; First Settlement MOO at 13.  Specifically, the Thomas Notice and Order required her to: (i) replace or repair inoperative smoke detectors "in each sleeping room . . . [and] outside each . . . sleeping area in the [same] vicinity"; (ii) replace with or recharge fire extinguishers approved by the fire marshal; (iii) "remove all outdoor storage, and litter from the premises"; and (iv) remove all inoperative vehicles from the property.  Thomas Notice and Order at 3; First Settlement MOO at 13.  In addition, the Thomas Notice and Order warned that the Albuquerque Animal Services Department may remove any animals on the property while the owner is barred from entry.  See Thomas Notice and Order at 4; First Settlement MOO at 13.  The electrical code violation identified by Defendant Mark Crandall, an inspector with the Nuisance Abatement Team, was on the home's exterior.  See First Settlement MOO at 13; Amended Complaint ¶ 11, at 3.

The Thomas Notice and Order was also based at least in part on the finding of "paraphernalia in association with methamphetamines," and "possible contamination associated with the use and or sales of controlled substances."  Thomas Notice and Order at 2; First Settlement MOO at 13.  The paraphernalia was found in the garage that Thomas' son occupied. See First Settlement MOO at 13-14.  The Thomas Notice and Order prohibited Thomas from re-entering her home until environmental testing and, if necessary, decontamination had been

completed.  See Thomas Notice and Order at 2 ("DO NOT BEGIN REPAIRS UNTIL TESTING

HAS BEEN COMPLETED.  IF CONTAMINATES ARE FOUND, DO NOT BEGIN REPAIRS

UNTIL ALL AREAS WHICH TESTED POSITIVE FOR CONTAMINATES HAVE BEEN

REMEDIATED."); First Settlement MOO at 14.  The Nuisance Abatement Team told Thomas

that testing and remediation would cost thousands of dollars.  See First Settlement MOO at 14.

        **6.      K. Lowery.**

        At all times relevant, K. Lowery was the owner of the residence at 8250 Northridge N.E.,

Albuquerque.  On March 20, 2009, members of the Nuisance Abatement Team, including

Crandall, arrived at K. Lowery's home.  After a search of the home, Crandall ordered K. Lowery

and his tenants to leave the home.  The inspector placed a poster declaring the property to be

"substandard" on the property.  First Settlement MOO at 10.  The poster stated that entry into the

home was a criminal violation of trespass.  Crandall also issued a Notice and Order for K. Lowery

to leave his home immediately under threat of arrest.  See First Settlement MOO at 10.  The Notice

and Order cited "life safety" issues, as well as "possible contamination associated with the use and

or sales of a controlled substance."  Notice and Order at 1 (executed March 10, 2009), filed Aug. 6,

2010 (Doc. 45-1)("K. Lowery Notice and Order"); First Settlement MOO at 10.  The K. Lowery

Notice and Order required K. Lowery to "retain the industrial or environmental hygienist firm and

the drug laboratory site remediation firm within thirty (30) days."  K. Lowery Notice and Order at

2-3; First Settlement MOO at 10-11.  The K. Lowery Notice and Order required K. Lowery to

restore electrical, water, and natural gas to the residence, and stated that "the home cannot be

occupied" without these services.  K. Lowery Notice and Order at 5-6; First Settlement MOO at

11.  The K. Lowery Notice and Order cited the electrical system for "numerous modifications to

the system that have not been performed by an electrician," and K. Lowery was ordered to have the system inspected by a licensed electrician.  K. Lowery Notice and Order at 5; First Settlement MOO at 11.  In addition, the Notice and Order required K. Lowery to replace missing light switch and electrical receptacle plate covers, light fixtures, and globe covers, because "there is exposed wiring where the fixtures have been removed."  K. Lowery Notice and Order at 5; First Settlement MOO at 11.  Finally, the Notice and Order ordered K. Lowery to replace or to install smoke detectors in the bedrooms and in areas near the bedrooms, to replace or to recharge defective fire extinguishers, and to remove "all outdoor storage and litter" and "inoperative vehicles" from the premises.  K. Lowery Notice and Order at 6-7; First Settlement MOO at 11.  The Notice and Order warned K. Lowery to remove any animals on the property for the duration of his absence from the home.  See K. Lowery Notice and Order at 7; First Settlement MOO at 11.

K. Lowery was barred from his home until he arranged for environmental testing and decontamination, if necessary, and repaired the electrical, plumbing, and other code violations. See K. Lowery Notice and Order at 2; First Settlement MOO at 11.  The basis of the allegation of contamination was the presence in the home of a spoon believed to be used for drug use.  On the same day, Crandall ordered that K. Lowery's home be boarded with plywood.  Nine days after receiving the Notice and Order, K. Lowery filed a written appeal of the order with the Mayor's office.  See First Settlement MOO at 11.  Despite the appeal, the plywood was not removed from the house.  See First Settlement MOO at 12.  As a result of these actions, K. Lowery was homeless and lost the means of his livelihood.  See First Settlement MOO at 12.

### 7.   K. Lowery's Retainer Agreement.

On April 8, 2009, K. Lowery signed a retainer agreement, titled "Retainer Agreement:

Civil Rights Case," with the Kennedy Firm.  See Objections at 3.  The retainer agreement expressly provides that the Kennedy Firm promises "to do their utmost on behalf of Client [Lowery] and to utilize all ethical and legal procedures to advance Client's interests in this matter." Objections at 3 (secondary quotations omitted).  The retainer agreement also provides that "Client Will Not Settle Without Attorneys' Consent: Attorney Will Not Settle Without Client's Consent." Objections at 3.  The Kennedy Firm further agreed: "Nor will the Attorneys compromise or settle the case without the consent of the Client."  Objections at 3.  The Kennedy Firm did not provide K. Lowery with the retainer agreement that explains the Kennedy Firm's obligations to the class as a whole in a class action litigation.  The retainer agreement that the Kennedy Firm entered into with K. Lowery is used in individual civil rights actions, not class action.  See Brief in Support at 10.

## PROCEDURAL BACKGROUND

This lawsuit has been ongoing for over three years.  The class has refined their allegations and become more defined over the course of the litigation.  The Court's rejection of the parties' first settlement agreement led to further litigation, but the ultimate outcome is a benefit for the class, as the Second Proposed Settlement provides a much greater award than the first settlement.

### 1.    K. Lowery's Class Action Complaint.

On April 7, 2009, K. Lowery, on his behalf and on behalf of similarly situated persons, filed the Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights in the Second Judicial District of New Mexico.  See Doc 1-1 (dated April 7, 2009), filed May 8, 2009 ("Complaint").  Defendants City of Albuquerque, Martin Chavez, Ray Schultz, John Olmstead, Crandall, and John Doe Police Officers (collectively the "Defendants") removed the matter on May 8, 2009.  Notice of Removal,

filed May 8, 2009 (Doc. 1).  The Notice of Removal asserts that the Court has jurisdiction over K.

Lowery's federal law claims under 28 U.S.C. § 1331 and that 28 U.S.C. § 1441 permitted removal.

See Notice of Removal ¶ 2, at 1.

     The Complaint contains ten counts.  See Complaint at 4-14.  Count I alleges John Doe

Police Officers deprived K. Lowery of his Fourth-Amendment rights, because they seized his

person without probable cause.  See Complaint at 4.  Count II states that the Nuisance Abatement

Team inspector and John Doe Police Officers violated K. Lowery's Fourth-Amendment rights

when they entered into the curtilage of his home.  See Complaint at 5.  Count III alleges that the

entry and search of the home by police and city inspectors was unreasonable, and therefore a

deprivation of K. Lowery's Fourth-Amendment rights.  See Complaint at 5.  Count IV alleges that

the Defendants violated K. Lowery's Fourth-Amendment rights through unreasonable seizure of

his home.  See Complaint at 6.  In Count V, K. Lowery contends that Crandall and John Doe Police

Officers seized his property without procedural due process in violation of the Fourteenth

Amendment.  See Complaint at 6.  Count V is an alternative to Count IV, alleging that Crandall

and John Doe Police Officers afforded him inadequate pre-deprivation procedure.  See Complaint

at 6-7.  Count VI alleges a procedural due-process violation based on the Defendants' failure to

release K. Lowery's property to him upon his filing a notice of appeal.  See Complaint at 7.  Count

VII is a Fourteenth-Amendment claim related to requiring environmental testing without sufficient

factual basis.  See Complaint at 8.  Count VIII is a Fourteenth-Amendment claim related to overall

use of the Nuisance Abatement Team to deprive property owners of property rights and a request

to declare the Substandard Building Ordinance unconstitutional.  See Complaint at 9.  Count IX

alleges that the ordinance violates the New Mexico State Constitution and asserts tort claims on

behalf of K. Lowery against the Defendants, including torts of false imprisonment for his detention and of trespass for entry into his curtilage and home and seizure of his home. See Complaint at 12. Count X alleges that the Defendants have a custom, practice, or policy of intentionally violating civil or constitutional rights. See Complaint at 12. Count X also seeks to represent all persons -- individuals or corporations -- whose property the Nuisance Abatement Team, either directly or through its enforcement of the housing code, seized or deprived of the benefit of use, from three years of the filing of this Complaint until the alleged policy ceases, and seeks certification of a class for Counts IV through X. See Complaint ¶ 82, at 12.

### 2. **The Amended Complaint and Class Certification.**

On August 11, 2009, Gabaldon, Lovato, and Thomas filed a Complaint in Intervention. See Complaint in Intervention, filed Aug. 11, 2009 (Doc. 11). On August 10, 2010, K. Lowery, Lovato, Gabaldon, and Thomas, on behalf of themselves and the class (collectively, "the Plaintiffs") filed the Amended Complaint. The Amended Complaint modified the Complaint to (i) incorporate Gabaldon, Lovato and Thomas into Counts IV, V, VII, VIII, IX, and X, see Amended Complaint at 6-16; (ii) add Lovato to Count VI, see Amended Complaint at 9; and (iii) add facts specific to the Gabaldon, Lovato, and Thomas, see Amended Complaint at 2-6.

On June 4, 2010, the Plaintiffs moved for class certification. In a hearing on September 14, 2010, the parties agreed that the requirements of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure are satisfied. See Fed. R. Civ. P. 23; Transcript of Hearing at 4:11-12 (taken September 14, 2010)(Kennedy)("Sept. 14, 2010 Tr.").[1] The Defendants reserved the right to

---

[1] The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

challenge the class at any time.  <u>See</u> Sept. 14, 2010 Tr. at 7:11-21 (Court, Levy).  The parties

agreed that the Defendants did not admit that there was an unconstitutional policy and that there

was no admission of liability of any kind.  <u>See</u> Sept. 14, 2010 Tr. at 6:15-21 (Levy).  The Court

orally granted the Plaintiffs' Motion for Class Certification, filed June 4, 2010 (Doc. 32), at the

hearing.  <u>See</u> Sept. 14, 2010 Tr. at 9:2-13 (Court).

　　　　　**3.**　　　　**<u>The Class Action Notice</u>.**

On December 14, 2010, the Court approved the Plaintiffs' Unopposed Motion for

Approval of Class Action Notice and Trial Setting, filed Nov. 5, 2010 (Doc. 65).  The Class Action

Notice, filed Nov, 5, 2010 (Doc. 65-1), informs the class of the nature of the lawsuit, the class

members' rights to participate in the lawsuit, consult with the Kennedy Firm or an attorney of their

choosing, opt out of the litigation, and commence and prosecute a civil litigation on their own

behalves.  <u>See</u> Class Action Notice at 3-4.  The Class Action Notice does not set a deadline for

opting out of the class action, but informs class members that, if they want to opt out, they should

mail a letter to the Kennedy Firm expressing that wish.  <u>See</u> Class Action Notice at 4-5.  The Class

Action Notice informs the class members that if they want to participate in the class action, they

should contact the Kennedy Firm regarding their claim, and that they will be notified of any

proposed settlement and their opportunity to object thereto.  <u>See</u> Class Action Notice at 5.

On March 30, 2011, the Plaintiffs reported to the Court the status of the Class Action

Notification.  <u>See</u> Plaintiffs' Report Back to the Court on Class Notice, filed Mar. 30, 2011 (Doc.

78).  The Plaintiffs informed the Court that the Class Action Notice was mailed to 217 potential

class members and that thirty-three class members contacted the Plaintiffs.  <u>See</u> Plaintiffs' Report

Back to the Court on Class Notice at 1-2.  The Plaintiffs stated that 102 Class Action Notices have

been returned as undeliverable, and the Plaintiffs stated that, after accounting for duplicate notices, eighty-eight potential class members did not receive the Class Action Notice.  See Plaintiffs' Report Back to the Court on Class Notice at 2.  The Plaintiffs estimate that, if the Class Action Notices that were not returned as undeliverable were delivered to class members, 132 class members were notified and a total of ninety-six class members did not contact the Kennedy Firm. See Plaintiffs' Report Back to the Court on Class Notice at 2.

Two class members chose to opt out.  Emily Penrod informed the Plaintiffs that she does "not wish to participate in the litigation/lawsuit/or class action."  Letter from Emily Penrod to Kennedy  Law  Firm  re:  Kevin  Lowery/similarly  situated  person/plaintiff/and Plaintiffs-in-intervention, dated Jan. 19, 2011, filed Mar. 30, 2011 (Doc. 78-1).  Mak Properties informed the Plaintiffs that "Mak Properties as agent to Milaris Properties located at 7615 Chico NE . . . wish to OPT OUT of the class action lawsuit."  Letter from Mak Properties LLC to Kennedy Law Firm, dated Mar. 17, 2011, filed Mar. 30, 2011 (Doc. 78-1).

## 4.    The Court Grants Summary Judgment for Plaintiffs Thomas, Gabaldon, Lovato and K. Lowery.

In July and August, 2010, the Plaintiffs moved for summary judgment on the issue whether exigent circumstances justified the Defendants' seizures of Thomas', Gabaldon's, Lovato's, and K. Lowery's homes.  The Defendants did not assert that they had a valid search warrant or administrative warrant to search and seize the homes, and the searches and seizures were not conducted "pursuant to an established scheme and accompanied by pre-deprivation processes in accordance with that scheme"; thus, the only issue regarding the legality of the searches and seizures was whether the exigent circumstances exception to the Fourth Amendment justified the Defendants' actions.  Memorandum Opinion and Order at 30 n.28, 51, filed Mar. 31, 2011 (Doc.

79)(explaining that Thomas's, Gabaldon's, Lovato's, and K. Lowery's motions for summary judgment rest on the common allegation that exigent circumstances did not justify the Defendants' seizures of these Plaintiffs' homes, because the Defendants do not provide evidence that search warrants supported the searches and seizures, or the searches and seizures were executed pursuant to an established scheme that provided pre-deprivation processes)("MSJ MOO"); Plaintiffs Thomas and Gabaldon's Motion and Memorandum in Support of Summary Judgment at 1, 12, filed July 13, 2010 (Doc. 36)(alleging that the Defendants' search and seizure of Thomas and Gabaldon's home was unlawful); Plaintiff Lovato's Motion and Memorandum in Support of Summary Judgment at 7, filed July 30, 2012 (Doc. 43)(same); Plaintiff Lowery's Motion and Memorandum in Support of Summary Judgment at 1, filed Aug. 6, 2010 (Doc. 45)(same).  The Court concluded that there is no genuine issue of material fact whether the drug use or the presence of drugs in the properties posed an immediate danger to the lives or safety of the occupants, and thus, the Defendants did not establish that the threat to the occupants' lives created an exigent circumstance justifying their search and seizure of the properties.  See MSJ MOO at 53-61.  The Court also concluded that the non-drug-related code violations for which the Defendants cited Thomas, Gabaldon, Lovato and K. Lowery were not violations that posed an immediate danger to the lives or safety of occupants of their homes.  See MSJ MOO at 61-68.  Lastly, the Court concluded that the Defendants' searches and seizures were not reasonably tailored in their scope and duration to protect the interests of the residents under the Fourth Amendment.  See MSJ MOO at 68-70.  The Court thus held, on the issue whether the exigent circumstances exception to the Fourth Amendment justified the Defendants' searches and seizures, that the Plaintiffs were entitled to judgment as a matter of law.  See MSJ MOO at 70-71.

### 5.      **The Class is Certified**.

On April 13, 2011, the Court certified the class for a class action.  <u>See</u> Certification MOO at 1-2.  The Court certified a class, under rules 23(a), (b)(2), and (b)(3), of all persons -- individuals or corporations -- whose property was seized without court order, or who were deprived of their property for suspected drug use pursuant to the Nuisance Abatement Team designating their property as substandard, for the period from three years before K. Lowery filed his Complaint until the policy ceases.  <u>See</u> Certification MOO at 26-27.  The Court also: (i) designated K. Lowery, Lovato, Gabaldon, and Thomas as the class representatives; and (ii) appointed the Kennedy Firm as Class Counsel.  <u>See</u> Certification MOO at 40.

### 6.      **K. Lowery Steps Down as a Class Representative**.

On April 21, 2011, the Plaintiffs filed the Plaintiffs' Unopposed Motion for Relief of Kevin Lowery's Duty as Class Representative and to Sever Claim.  <u>See</u> Doc. 87 ("K. Lowery Motion").  The Plaintiffs asserted that K. Lowery did not wish to participate in a proposed settlement and that he wanted to exercise his right to "opt out" of the class action.  K. Lowery Motion at 6.  The Plaintiffs represented that K. Lowery wishes to proceed to trial and that he was walking away from the settlement offer.  <u>See</u> K. Lowery Motion at 7.  The Court granted in part and denied in part the K. Lowery Motion.  <u>See</u> Order Granting Plaintiffs' Unopposed Motion for Relief of Kevin Lowery's Duty as Class Representative and to Sever Claim at 1, filed May 4, 2011 (Doc. 89)("K. Lowery Order").  In its K. Lowery Order, the Court agreed that K. Lowery should no longer serve as a class representative, but stated:

> The Court is not convinced, however, that Mr. Lowery should be able to opt-out at this late stage or that his claims should be severed.  The Court has made rulings as to Mr. Lowery; he should not, after that ruling, be able to opt-out of the case.  He remains part of the class.  The Court always anticipated that there would be or

might be individual issues and claims as to some or all class members.  The parties
may enter a partial settlement as to some parties and allow other claims to proceed.

K. Lowery Order at 2.

### 7. Plaintiffs' First Motion for Preliminary Approval of the First Proposed Settlement.

On May 5, 2011, the Plaintiffs filed their Motion for Preliminary Approval of Class Action
Settlement.  See Motion for Preliminary Approval of Class Action Settlement, filed May 5, 2011
(Doc. 90)("First Motion for Preliminary Approval").[2]  The Plaintiffs asserted that, through the
mailing of the Class Action Notice, the Plaintiffs have been in contact with thirty-five to forty class
members.  First Motion for Preliminary Approval at 2.  The Plaintiffs asserted that the class'
economic damages are approximate $200,000.00.  See First Motion for Preliminary Approval at 2.
The Plaintiffs stated that there were "a number of class members identified who are presumed to
have received notice, but did not respond to the notice."  First Motion for Preliminary Approval at
2.  The Plaintiffs informed the Court that the Class Action Notice told class members that they did
not have to act to preserve their rights and gave class members an opportunity to "opt out," but did
not set a deadline for the right to "opt out."  First Motion for Preliminary Approval at 2.  The
Plaintiffs asserted that class members who owned and were living in their homes "alleged distinct
additional damages from class members whose homes were tested but who were not displaced."
First Motion for Preliminary Approval at 3.  They further asserted that each of the original class
representatives, K. Lowery, Lovato, Gabaldon, and Thomas, was displaced from his or her home.

---

[2] K. Lowery, Lovato, Gabaldon, and Thomas, filed the First Motion for Preliminary
Approval with the Court, yet the Plaintiffs stated that, although K. Lowery's name is on the docket
for filing the First Motion for Preliminary Approval, K. Lowery "does not wish to accept the
settlement offered in this matter, and wishes to be relieved of any duty to the class."  First Motion
for Preliminary Approval at 2.

See First Motion for Preliminary Approval at 3.  The Plaintiffs represented that at the time seven class members have opted out, because they contend they have suffered damages beyond the economic costs of testing and remediation, and these class members state that they intend to file separate lawsuits.  See Motion for Preliminary Approval at 3.

The First Proposed Settlement provided: (i) a total settlement fund of $495,000.00; (ii) attorneys' fees, costs, and gross receipts taxes of $191,723.09; (iii) $30,000.00 for the three named plaintiffs -- the Class Representatives -- Thomas, Gabaldon, and Lovato; (iv) a $213,276.91 class fund to compensate the remaining class members; and (v) the City of Albuquerque's review of policies and procedures for incidents related to the actions alleged in the Amended Complaint.  See First Motion for Preliminary Approval at 3-4.

### 8.    The Motion to Intervene.

On August 24, 2011, class members Barry Schooley, Christine Garner, Joel Marks, Sherry Meurer, Ana Lima, Darlene Chavez, and Ronald Tapia, Tammy Gallegos, and their minor child, T.T. (collectively the "Prospective Intervenors") filed their Motion to Intervene.  Unopposed Motion for Leave to File Second Complaint in Intervention, filed Aug. 24, 2011 (Doc. 93)("Motion to Intervene").  The Prospective Intervenors asserted that they are class members who do not wish to proceed with the proposed class action settlement.  See Motion to Intervene ¶ 4, at 2.  They argued that whether "this action proceeds to settlement, whether the court rejects the settlement and decertifies the class, the proposed second set of intervenors retain a right to proceed with their own claims."  Motion to Intervene ¶ 5, at 2.  The Prospective Intervenors contended that the City of Albuquerque's "core policy" of which the Proposed Intervenors complain is the same core policy that is at issue in the class action.  Motion to Intervene ¶ 6, at 2.  Accordingly, the

Prospective Intervenors asserted that their claims, and the class' claims, share common questions of law and fact.  See Motion to Intervene ¶ 6, at 2 (citing Fed. R. Civ. P. 24(b)(1)(B)).

### 9.   The Court's Memorandum Opinion and Order on the First Motion for Preliminary Approval and the Motion to Intervene.

On January 24, 2012, the Court denied the First Motion for Preliminary Approval and the Motion to Intervene.  See First Settlement MOO.  The Court determined that the First Proposed Settlement was unfair and thus denied the First Motion for Preliminary Approval.  The Court was concerned about the disparity between the lump sum award to the class representatives and the pro rata distribution of the settlement fund to the remainder of the class.  See First Settlement MOO at 41.  The Court also noted that class members could not know their total award, because the total number of class members was unclear.  The Court was further concerned about the adequacy of the class representatives, because the class representatives asserted that they had "distinct damages," which entitled them to greater relief, and no class representative suffered the pure economic harm that the majority of class members experienced.  First Settlement MOO at 41-42.  In sum, the First Proposed Settlement did not treat all class members equally.  See First Settlement MOO at 42.  The Court noted that, although the class representatives may have suffered distinct and greater damages because they were all evicted from their homes, unlike the average class member, the parties did not explain how the class representatives' injuries were so much more severe that the class representatives deserved a thirty-times greater award.  See First Settlement MOO at 42-43 (finding that the class representatives' award of $30,000.00 is inexplicably disparate to the likely award of $1,000.00 for the average class member).  The Court was also concerned that the First Proposed Settlement did not "draw a distinction between class members who were evicted and those who were not . . . ."  First Settlement MOO at 43.  The First Proposed Settlement, thus, did

not take "into account the interests of other class members who may have suffered damages similar to Lovato, Gabaldon, and Thomas at all." First Settlement MOO at 44. The Court also believed that ten opt outs from the class -- K. Lowery and the Prospective Intervenors -- indicated that the First Proposed Settlement was not an adequate award for the class. See First Settlement MOO at 44-45. In sum, the Court determined that the First Proposed Settlement was not fair, because:

> (i) Lovato, Gabaldon, and Thomas will receive significantly more compensation than the rest of the class; (ii) Lovato, Gabaldon, and Thomas will receive a set amount of compensation, while the rest of the class will receive of a pro rata share of the class fund; (iii) class members with damages similar to Lovato, Gabaldon, and Thomas would not be adequately compensated under the proposed settlement; (iv) class members will not be able to anticipate the amount of compensation they will receive for the settlement of their claims, because the total class participating in the settlement could range from forty to three-hundred members; and (v) the class representatives were exclusively from the group of class members with "distinct" damages.

First Settlement MOO at 46.

Regarding the Motion to Intervene, the Court found that permitting "the Prospective Intervenors to join the class action to pursue their individual claims would inevitably prejudice the class members and unduly delay resolution of the class claims." First Settlement MOO at 48. Because the First Proposed Settlement motivated the Prospective Intervenor's desire to opt out and intervene individually, the Court found that, with its rejection of the First Proposed Settlement, the Prospective Intervenors may be able to obtain adequate compensation through the class action vehicle as class members. See First Settlement MOO at 47-48. The Court also found that, if it permitted the Prospective Intervenors and other class members to opt out and then intervene, the case could become "unmanageable." First Settlement MOO at 50. Accordingly, the Court denied the Motion to Intervene.

The Court also affirmed its K. Lowery Order. The Court explained that "K. Lowery is no

longer a class representative, but his claim remains part of the class action." First Settlement MOO at 51. The Court reaffirmed that its K. Lowery's claims are not severed from the class, and the Court held that it will not allow K. Lowery to pursue his individual claims within the class if he chooses to opt out. First Settlement MOO at 50-52 ("K. Lowery is no longer a class representative, but his claim remains part of the class action. . . . [T]he Court will not permit individuals who choose to opt out of the class to pursue their individual claims within this case."). The Court ordered the parties to send out a class notice informing the class that K. Lowery is no longer a class representative and setting an opt out deadline for the class. See First Settlement MOO at 52.

    10.    **The Second Class Action Notice.**

    On February 1, 2012, the Court approved, in part, the parties' Second Class Action Notice, filed Jan. 26, 2012 (Doc. 98-1). See Order Approving in Part Plaintiffs' Expedited Motion for Approval of Second Class Action Notice, filed Feb. 1, 2012 (Doc. 99)("Notice Order"). The Second Class Action Notice informed the class of the case's litigation history, including the February 17, 2012, trial setting, that the Court granted partial summary judgment for the Plaintiffs, and that K. Lowery is no longer a class representative. See Second Class Action Notice at 2-3. The Second Class Action Notice informed the class members of their rights to consult with Class Counsel or an attorney of their choice, opt out of the litigation, commence suit individually and on their own behalves, and do nothing and "allow the class members' lawyers to prosecute this action on your behalf." Second Class Action Notice at 4.

    The Second Class Action Notice submitted to the Court contained an opt out deadline of February 10, 2012. See Second Class Action Notice at 5. The Court rejected this opt out deadline, however, and ordered the parties to set an opt out period "not less than 30 days and no greater than

60 days" from the date the Class Action Notice is mailed.  Notice Order at 2.  The Court also ordered the parties to allow for opt outs to be timely if post-marked by the deadline rather than received by the deadline.  See Notice Order at 2.  Accordingly, the Second Class Action Notice mailed to class member provided an opt out deadline of March 30, 2012, and directed class members who wish to opt out to mail a letter to the Kennedy Firm expressing their request.  See Second Class Action Notice [mailed] at 5, filed Sep. 17, 2012 (Doc. 140).

On April 30, 2012, the Kennedy Firm reported to the Court regarding the results of the Second Class Action Notice.  See Class Counsel Report Back on Second Class Notice, filed Apr. 30, 2012 (Doc. 112).  The Kennedy Firm informed the Court that 257 Second Class Notices were mailed, and twenty-seven of those were returned.  The Kennedy Firm also informed the Court that three class members -- Vera Garcia, Barton Murphy, and Jim K. Chong -- choose to opt out of the class.  See Class Counsel Report Back on Second Class Notice at 1; Letter from Vera Garcia, filed Apr. 3, 2012 (Doc. 112-1); Letter from Barton Murphy to the Kennedy Law Firm, dated Feb. 21, 2012, filed Apr. 3, 2012 (Doc. 112-1); Letter from Jim K. Chong to Class Representative Lawyers, dated Mar. 16, 2012, filed Apr. 3, 2012 (Doc. 112-1).

## 11.   The Plaintiffs' Exhibit List.

The Court set this matter to go to trial on April 16, 2012.  See Minute Order filed Apr. 13, 2012 (Doc. 126).   On April 9, 2012, the Plaintiffs filed their exhibit list with the Court, and indicated that they intend to use a Nuisance Abatement Team's "[f]acsimile cover sheet," certain photographs of "Red Tag with skull card attached," various persons holding ace cards next to red tags and Nuisance Abatement Team officers, and excerpts from a Criminal Nuisance Abatement videotape.  Plaintiffs' Exhibit List ¶¶ 7, 23-33, at 1-3, filed Apr. 9, 2012 (Doc. 3).  The Defendants

objected to the Plaintiffs' use of this evidence, and argued that the facsimile coversheet, photographs and videotape excerpts had "no probative value," and would be used "solely to inflame the jury, and confuse them as to the underlying issues of the case."  See Defendants' Objections to Plaintiffs' Exhibit List, filed Apr. 11, 2012 (Doc. 121).  At the pretrial conference on April 11, 2012, the Plaintiffs informed the Court that they would use this evidence to demonstrate "what the unit was doing and how they accomplished their goals of what they were doing." Transcript of hearing (taken Apr. 11, 2012) at 5:2-5 (Kennedy)("Pretrial Conference").    The Plaintiffs stated that demonstrates that the Nuisance Abatement Team used, as an emblem, "the Ace of spades and a skull," which the Plaintiffs intended to demonstrate was "adopted from the story of American troops allegedly using this [in] Vietnam as a calling card on dead bodies." Pretrial Conference at 5:13-6:4 (Kennedy).  The Plaintiffs stated that the four photographs they sought to introduce as evidence were photographs of tenants from the properties the Nuisance Abatement Team searched "where they actually told the [tenants] to hold cards in front of the substandard signs."  Pretrial Conference at 6:20-7:6 (Kennedy, Court).  The Court informed the parties at the Pretrial Conference that it was inclined to admit these items of evidence, over the Defendants' objection.  See Pretrial Conference at 14:9-15:2 (Court).

**12.    Plaintiffs' Motion for Preliminary Approval of the Second Proposed Settlement.**

On May 17, 2012, the Plaintiffs filed the Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement.    See Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, filed May 17, 2012 (Doc. 129)("Second Motion for Preliminary Approval").  The Plaintiffs state that, after the Court rejected the First Proposed Settlement, the Kennedy Firm's goal was to "arrive at a figure that would fairly compensate all

class members and provide for a system or mechanism to give class members a simple way to proceed for compensation." Second Motion for Preliminary Approval at 5. The Second Proposed Settlement provides a total settlement fund of $1,700,000.00. The Kennedy Firm intends to request a fee of $510,000.00 -- thirty-percent of the settlement fund -- plus gross receipts tax of $35,700.00 and costs of $26,365.57 in attorneys' fees and costs. A class fund in the amount of $1,127,934.43 will be created for class members to seek reimbursement for economic loss and mental and emotional distress. Class members will be directed to fill out a "claim form" that asks each class member to provide "specific information on all 'out of pocket' expenses and loss of use and diminishment of value claims." Second Motion for Preliminary Approval at 6. The Second Proposed Settlement will provide for a Special Master to make the final determination of all class members' claims, specifically where a class member requests damages for mental and emotional distress, and pain and suffering. If claims exceed the class fund, the fund will be divided on a pro rata basis, to be "determined by the percentage of any individual claim to the total amount of reasonable compensation that Special Master determines." Second Motion for Preliminary Approval at 6. The parties select retired Judge William Lang, from the Second Judicial District Court, Bernalillo County, New Mexico, as Special Master. See Second Motion for Preliminary Approval at 6-7.

The Plaintiffs asserts that the Second Proposed Settlement resolves the "difficulty of providing class wide damages." Second Motion for Preliminary Approval at 9. The Plaintiffs note that a jury trial might have led to a diminished award for the class, given that the Nuisance Abatement Team was to "improve public health," and that class members had family members who used and/or possessed illegal drug members on the premises of some of the homes that were

red-tagged.  Second Motion for Preliminary Approval at 9.  The Kennedy Firm asserts that the

class representatives are not receiving a premium for their service, but rather, "the settlement is

within the range of settlement any plaintiff would be likely to receive on his/her own."  Second

Motion for Preliminary Approval at 9.  Regarding attorneys' fees, The Kennedy Firm asserts that a

"percentage of the common fund created is an approved method of awarding fees in class action

litigation."  Second Motion for Preliminary Approval at 11 (citing Brown v. Philips Petroleum,

838 F.2d 451, 454-55 (10th Cir. 1988)).

        **a.**      **The Second Proposed Settlement.**

The Settlement Agreement explains that the parties agree to accept a lump sum payment of

$1,700,000.00 from the City of Albuquerque, in exchange for a release of all claims "related to and

flowing from the class allegation that the City of Albuquerque had a policy of ordering testing and

remediation for any property it believed to have been contaminated with drug use or possession,

and of immediately evicting people from homes believed to be contaminated."  Second Proposed

Settlement at 2.  Attorneys' fees and costs, as approved by the Court, will be deducted from the

settlement fund.  See Second Proposed Settlement at 2.  The Special Master will receive

compensation from the settlement fund as well, at an hourly rate that the Court determines.  See

Second Proposed Settlement at 4-5.  The Second Proposed Settlement provides that the Special

Master "may communicate ex parte with counsel and the Court if necessary to facilitate a speedy

and just resolution."  Second Proposed Settlement at 5.  The Second Proposed Settlement requires

the Special Master to "receive testimony from each class member who requests to be heard on a

claim for damages resulting from mental and emotional distress."  Second Proposed Settlement at

5.  Regarding payment of class members' claims, the Special Master will determine the "legal

sufficiency," "reasonableness," and "proximate cause" of all clams for "loss of use, loss of property value, other out of pocket expenses, and mental and emotional distress." Second Proposed Settlement at 5. The Special Master will determine a reasonable compensation for all class members' claims. See Second Proposed Settlement at 5. The Second Proposed Settlement provides that, "[s]hould all class members receive full compensation as determined by the Special Master, any remaining funds in the class fund shall be returned to the City of Albuquerque." Second Proposed Settlement at 6.

### b.   The Class Action Notice of Proposed Settlement.

The Class Action Notice of Proposed Settlement informs class members of the Second Proposed Settlement. See Class Action Notice of Proposed Settlement, filed Sept. 7, 2012 (Doc. 139).[3] Specifically, the Class Action Notice of Proposed Settlement informs class members of the nature of the lawsuit, that trial was set and vacated because of the Second Proposed Settlement, the amount of the Second Proposed Settlement and the proposed methodology for determining the amount awarded to individual class members, and the City of Albuquerque's agreement to "cease and desist" the Nuisance Abatement Team's practices. Class Action Notice of Proposed Settlement at 2-5. The Class Action Notice of Proposed Settlement informs class members of their rights to consult with the Kennedy Firm or an attorney of their choosing regarding the lawsuit, participate in the Second Proposed Settlement by making a claim, and object to the Second Proposed Settlement. See Class Action Notice of Proposed Settlement at 5. The Class Action

---

[3] The Class Action Notice of Proposed Settlement contains two sets of page numbers: (i) those which the Plaintiffs included in the document -- located in the bottom-center of the page; and (ii) those which the Court attached when the Class Action Notice of Proposed Settlement was filed -- located in the upper-right-hand corner of the page. The Court's citations are to the page numbers attached when the Class Action Notice of Proposed Settlement was filed with the Court.

Notice of Proposed Settlement informs class members that they may appear at the fairness hearing and that they must file their objections by August 1, 2012. See Class Action Notice of Proposed Settlement at 5-6. There is no information regarding opting out of the Second Proposed Settlement in the Class Action Notice of Proposed Settlement.

Erin S. Pearson[4] informs the Court that the Class Action Notice of Proposed Settlement was mailed to all class members by June 15, 2012. See Affidavit of Erin S. Pearson, executed Sept. 6, 2012, filed Sept. 7, 2012 (Doc. 141). Katherine Stimpson informs the Court that she "assisted in reviewing Lowery claimant names and addresses that had been stored in spreadsheet format; . . . assisted in verifying mailing addresses through an online database for the Class-action Notice mailing," and personally mailed 182 of the Class Action Notice of Proposed Settlements on June 15, 2012. Affidavit of Katherine Stimpson ¶¶ 1-2, 4, at 1-2, executed Sept. 11, 2012, filed Sept. 11, 2012 (Doc. 142). Stimpson represents that the Kennedy Firm received back twenty-two Class Action Notice of Proposed Settlement as "undeliverable." Affidavit of Katherine Stimpson ¶ 6, at 2. Stimpson found "alternative addresses for the returned notices" and mailed Class Action Notice of Proposed Settlement to the alternative addresses on August 13, 2012. Affidavit of Katherine Stimpson ¶ 7, at 2. Stimpson states that, after the second round of notices was sent out,

---

[4] The Affidavit of Erin S. Pearson does not identify Pearson's employer, position, or inform the Court why Pearson participated in the Class Action Notice of Proposed Settlement's distribution. See Affidavit of Erin S. Pearson at 1-2. Neither does the Affidavit of Katherine Stimpson, filed Sept. 11, 2012 (Doc. 142), identify her employer, position, nor why she participated in the distribution process. See Affidavit of Katherine Stimpson at 1-2. The Court believes that Pearson and Stimpson are employed in some capacity by the Kennedy Firm. The Affidavit of Katherine Stimpson refers to the Kennedy Firm's receipt notices that were returned as "undeliverable," and the Kennedy Firm's attempt to reach class members whose addresses were undeliverable through a second mailing. Affidavit of Katherine Stimpson ¶¶ 6, 8. Pearson states that she provided address labels to Stimpson "so the mailing could be completed." Affidavit of Erin S. Pearson ¶ 5, at 2. Based upon these statements, the Court concludes that Stimpson and Pearson are employees of the Kennedy Firm.

five were returned to the Kennedy Firm again marked as "undeliverable."  Affidavit of Katherine Stimpson ¶ 8, at 2.

On June 4, 2012, the Court preliminarily approved the Second Proposed Settlement, except for its provision which allowed the Special Master to communicate ex parte with the Court and counsel.  See Order Approving Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement at 1-2, filed June 4, 2012 (Doc. 131).  The Court set the fairness hearing for September 5, 2012, at 9:00 a.m., and set August 1, 2012 as the deadline for class members to file their objections to the Second Proposed Settlement.  See Order Approving Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action at 1.

**c.      K. Lowery's Objections to the Second Proposed Settlement.**

On August 1, 2012, K. Lowery objected to the Second Proposed Settlement through his father and court-appointed guardian and conservator, John W. Lowery.  See Objections at 1.  J. Lowery informs the Court that, because K. Lowery was rendered homeless by the Nuisance Abatement Team's practices, K. Lowery was "forced to move back to Frankfort, Kentucky, in August, 2009 to live with Objector, his father."  Objections at 2.  J. Lowery also informs the Court that shortly after K. Lowery moved back to Frankfort, "he sustained a personal injury which rendered him comatose for over five weeks and has resulted in his being a virtual quadriplegic."  Objections at 3.  J. Lowery now cares for K. Lowery twenty-four hours a day; K. Lowery has no assets, which J. Lowery asserts is a result of the Nuisance Abatement Team's practices, and K. Lowery receives "minimal Social Security Disability and Medicaid assistance."  Objections at 3.

K. Lowery asserts that the Kennedy Firm filed the K. Lowery Motion without consulting with either J. Lowery or K. Lowery.  K. Lowery states that the Kennedy Firm did not make him

- 29 -

aware of the K. Lowery Motion or K. Lowery Order, and he did not learn of them until a later date and through independent efforts.  Objections at 4.

K. Lowery asserts that the Kennedy Firm's agreement to the Second Proposed Settlement violates his retainer agreement.  See Objections at 4.  K. Lowery states that his retainer agreement with the Kennedy Firm provides that the Kennedy Firm will not "compromise or settle the case without the Client's consent," yet, the Kennedy Firm agreed to the Second Proposed Settlement without contacting or consulting with J. Lowery or K. Lowery.  Objections at 4-5.  K. Lowery asserts that he objected to the First Proposed Settlement as awarding an amount "far too low," but the Kennedy Firm nonetheless agreed to the First Proposed Settlement.  Objections at 5.  K. Lowery contends that the Kennedy Firm filed the K. Lowery Motion J. Lowery after he objected to the First Proposed Settlement, because the Kennedy Firm "found himself in a conflicting situation," given that "his contractual and ethical obligations to Lowery . . . obligated him to devote his full time and efforts to advancing and protecting Lowery's interests," but the Kennedy Firm sought to further his own interests, and those of the other class representatives as well, which rendered the Kennedy Firm "incapable of adequately representing Lowery's interest."  Objections at 6.  K. Lowery asserts that the Kennedy Firm's statements that K. Lowery "'does not wish to accept the proposed settlement offered in the matter, and wishes to be relieved of any duty to the class,'" were "erroneous and unauthorized, at least insofar as Lowery's class status as class representative was concerned."  Objections at 7 (quoting K. Lowery Motion at 2).  K. Lowery argues that the Kennedy Firm's statement that K. Lowery "'suffered an unrelated physical injury which renders him [unable] to carry on any duties to the class'" was erroneous, because his injuries occurred nine months before the Kennedy Firm filed the K. Lowery Motion, and because the

Kennedy Firm's actual motivation for filing the K. Lowery Motion was to avoid a conflict between the Kennedy Firm's and K. Lowery's interests.  Objections at 7-8 (quoting K. Lowery Motion at 2).  K. Lowery argues that the "conflict of interest, and lack of candor with the Court, coupled with keeping knowledge of the whole affair from Lowery while purporting to file [the K. Lowery Motion] . . . renders the settlement improper, unreasonable and unfair."  Objections at 8.  K. Lowery contends that, because of the K. Lowery Motion and K. Lowery Order, he is "deprived . . . of any premium or fee to which the Special Master might believe him entitled" for having originating the lawsuit, and he is "not . . . permitted later to opt out of the case."  Objections at 8.

K. Lowery contends that the Second Proposed Settlement is "insufficient to compensate Lowery and other class members."  Objections at 9.  K. Lowery argues that the settlement funds available for compensating class members will likely be insufficient to "provide meaningful compensation to Lowery and other class members," after the Special Master and the Kennedy Firm are compensated.  Objections at 9.  K. Lowery asserts that he has suffered over $200,000.00 in damages from the Nuisance Abatement Team's practices.  K. Lowery asserts that the settlement fund will be insufficient to compensate him for his losses, and notes that, because of the K. Lowery Order, he cannot opt out of the Second Proposed Settlement.  See Objections at 10.

K. Lowery also asserts that the Second Proposed Settlement is unfair, because it provides that all remaining funds, in the circumstance that class members are fully compensated, will be returned to the City of Albuquerque.  See Objections at 10.  K. Lowery argues that "[j]ustice and fairness would dictate that the City should be required to pay at least the entire $1.7 million without recoupment," and the City of Albuquerque should not be allowed a "refund."  Objections at 10-11.  K. Lowery contends that any remaining settlement funds should be distributed on a pro

- 31 -

rata basis to the class members who receive distribution.  See Objections at 11.

K. Lowery also asserts that the Second Proposed Settlement should specify Special Master's hourly rate.  K. Lowery argues that, "[i]n order for the Court to properly gauge the reasonableness of the provision relating the Special Master's compensation, the Second Proposed Settlement should disclose his hourly rate and he should be asked to provide a reasonable estimate of the hours, or range of hours, that may be required of him."  Objections at 11.  K. Lowery argues that the City of Albuquerque should pay Special Master's fees, rather than the Court taking Special Master's compensation out of the settlement fund.  See Objections at 11-12.  K. Lowery asserts that the Court cannot determine if the Second Proposed Settlement is fair without knowing the number of class members, or at least the "best estimate of the number, of claimants who may be filing claims and the nature of their claims."  Objections at 12.  K. Lowery also argues that the Second Proposed Settlement is not fair unless Special Master conducts hearings on alleged damages for loss of use, loss of value, and other out-of-pocket expenses, in addition to the hearings on damages for mental and emotional distress that the Second Proposed Settlement allows.  See Objections at 12-13.  K. Lowery lastly suggests that the settlement fund should be broken into "separate dollar pools," for class members with "significant claims for mental and emotional distress, such as Lowery's . . . [with] substantial loss of income and loss in property value and home equity," and class members whose claims are less "significant."  Objections at 13.

       **d.**     **The Plaintiffs' Brief in Support of the Second Proposed Settlement.**

On August 31, 2012, the parties requested the Court's final approval of the Second Proposed Settlement.  The Plaintiffs state that they have "achieved the initial goal of stopping the City from implementing the policy further."  Brief in Support at 3.  The Plaintiffs state that the

"financial settlement achieved in this case will result in a palpable benefit to at least fifty people." Brief in Support at 3.  The Plaintiffs assert that the Second Proposed Settlement is a favorable end to the litigation.  See Brief in Support at 3.  The Plaintiffs state that, although there is "one identifiable group of people affected by the City's policy, the damages suffered by the group varied in nature and extent."  Brief in Support at 4.

The Plaintiffs inform the Court that 184 settlement notices were mailed to class members, twenty-three of which were returned as undeliverable.  The Kennedy Firm sent nine notices to class members at alternate addresses found through a search program and contacted fourteen class members telephonically.  Forty-seven class members have submitted claim forms.  The Kennedy Firm states that the total losses alleged by class members, at this point, are $2,275,006.14.  See Brief in Support at 4.  The Kennedy Firm states that it will "aid in the articulation of pain and suffering claims," but that Special Master will determine the amount of compensation to be awarded for that damage.  Brief in Support at 8.  The Plaintiffs state that using a special master "allows for a balancing of claims and treats all claims equally," and allows class members "an opportunity to participate in a recovery of all damages."  Brief in Support at 8.

The Plaintiffs assert that, although they have settled this case against K. Lowery's wishes, "any duty to Mr. Lowery cannot override class counsel's duty to the class as a whole."  Brief in Support at 01.  The Plaintiffs point out that, in Parker v. Anderson, 667 F.2d 1204 (5th Cir. 1982), the United State Court of Appeals for the Fifth Circuit found that a settlement was fair notwithstanding nine of the eleven named plaintiffs' objections thereto.  See Brief in Support at 10 (citing 667 F.2d at 1209).  The Plaintiffs argue that allowing "a class representative to have veto power would give undue leverage to one particular class member or to a group of class members."

Brief in Support at 10 (citing Lazy Oil Co. v. Witco Corp., 166 F.3d 581 (3d Cir. 1999); In re "Agent Orange" Prod. Liab. Litig., 800 F.2d 14, 18-19 (2d. Cir. 1986)).

The Kennedy Firm states that it "informed Kevin Lowery that the case was only economically viable as a class and that Kevin Lowery had certain duties to the class as a class representative, such as to evaluate a settlement proposal for the benefit of the absent class members." Brief in Support at 2. The Kennedy Firm admits that it "erred in using a retainer agreement that his firm uses in individual civil rights cases" with K. Lowery. Brief in Support at 10. The Kennedy Firm also admits that its retainer agreement with K. Lowery "contains a statement that the case would not be settled without the approval of Lowery." Brief in Support at 10-11. The Kennedy Firm asserts, however, that any error arising from its use of a retainer agreement, which states that the Kennedy Firm would not settle without K. Lowery's authority, does not render the Second Proposed Settlement unfair. See Brief in Support at 11. The Kennedy Firm asserts that its obligation is to the class as a whole, although its retainer agreement with K. Lowery did not outline its duties in the class action setting correctly. See Brief in Support at 18 (citing Maywalt v. Parker & Parsley Petroleum, Co., 155 F.R.D. 494, 496 (S.D.N.Y. 1994)). The Kennedy Firm states that the First Proposed Settlement was likely motivated by a "heightened sense of duty to the named representatives." Brief in Support at 11. The Kennedy Firm asserts, however, that its duty to individual clients in non-class action lawsuits "'cannot be imported wholesale into a class action setting.'" Brief in Support at 11 (quoting Parker v. Anderson, 667 F.2d at 1209). The Kennedy Firm asserts that the class, as a whole, is satisfied with its representation, even though K. Lowery is disappointed with his representation. See Brief in Support at 12.

- 34 -

Regarding the Second Proposed Settlement's fairness, the Plaintiffs first assert that the Second Proposed Settlement was fairly and honestly reached through arms-length, non-collusive negotiations.  See Brief in Support at 13.  The Plaintiffs state that their main struggle in negotiating a fair settlement was determining how to award special damages -- for class members' losses arising from testing and remediation -- and class members' damages for mental and emotional distress.  The Plaintiffs assert that, rather than requiring class members to bring claims for mental and emotional damages separately from the settlement, as the First Proposed Settlement required, the Second Proposed Settlement "would compensate all class members fairly and treat class claims equally while speeding the process toward payment of claims."  Brief in Support at 14.  The Plaintiffs state that both parties departed from their original positions and compromised in reaching the Second Proposed Settlement.  See Brief in Support at 14.

The Plaintiffs also assert that the outcome of this litigation was in question.  The Plaintiffs state that they were "particularly concerned about whether liability could be determined on a class wide basis as a matter of law," and whether they could sufficiently establish that the Nuisance Abatement Team's practices proximately caused their injuries.  Brief in Support at 15.  The Plaintiffs state that they were concerned whether a jury would be amenable to their suit, given the popularity of the Nuisance Abatement Team and that many class members had family members who were known drug users in their home.  The Plaintiffs assert that a "lawsuit against a local government ultimately presents [] a sympathetic defendant," because the community "literally relies upon the services local governments provide to its citizens."  Brief in Support at 15.  The Plaintiffs assert that the class members' were unlikely to receive compensation for their cumulative claims had the case gone to trial.  See Brief in Support at 15.  The Plaintiffs assert that

their "property damage claims are difficult to articulate and prove and were uncertain," further jeopardizing their possibility of future relief at trial.  Brief in Support at 16.  The Plaintiffs state that it would "be difficult to prove significant loss of property," given that the Nuisance Abatement Team's practices coincided with a period of dramatic declines in real estate value.  Brief in Support at 16.  The Plaintiffs also assert that a jury verdict on their mental and emotional damages would be highly unpredictable, because the Plaintiffs' damages are "in the nature of embarrassment, humiliation, anxiety, discomfort and sleeplessness," and further,  recovery of emotional distress for loss or damage to property is difficult.  Brief in Support at 17.

The Plaintiffs assert that the value of an immediate recovery is great for the class, given that most of the class members are retired and use their rental income to fund their livelihood.  The Plaintiffs state that most class members would be relieved for the litigation to end.  See Brief in Support at 17.  The Kennedy Firm and the Defendants' counsel, who have "tried the majority of police cases in this district in the past ten years," approve of the Second Proposed Settlement. Brief in Support at 18.

Regarding K. Lowery's objections to the settlement fund's insufficiency, the Plaintiffs point out that K. Lowery could have re-inhabited his home as of March 17, 2009, when he appealed his eviction.  See Brief in Support at 16 (citing Notice and Order, re: 8250 Northridge NE Albuquerque, NM 87111, filed Aug. 31, 2012 (Doc. 137-4)).  The Plaintiffs point out that the City of Albuquerque also stipulated that K. Lowery could re-inhabit his home on April 24, 2009.  See Brief in Support at 16 (citing Stipulated Order to Stay City of Albuquerque "Notice and Order," filed Aug. 31, 2012 (Doc. 137-5)).  The Plaintiffs argue, therefore, that K. Lowery could have significantly mitigated the damages he now alleges.  See Brief in Support at 16.  The Plaintiffs

- 36 -

asserts that K. Lowery's objection to the size of the settlement fund and to the possibility of the City of Albuquerque receiving excess funds are "inconsistent," because if the City of Albuquerque receives the remaining funds, then the class members would have received full compensation, but on the other hand, if the class members do not receive full compensation, the City of Albuquerque will not receive a refund.  See Brief in Support at 18.  Lastly, the Plaintiffs assert that the Defendants are "unwilling to eliminate a re-capture provision."  Brief in Support at 20.

The Kennedy Firm states that it believed that K. Lowery would recover from his injury in 2009 and re-assume his responsibility as a class representative.  The Kennedy Firm asserts that it had no intent to hide any aspect of K. Lowery's condition from the Defendants or the Court.  The Kennedy Firm asserts that it was "authorized and directed to remove Kevin's claim from the class." Brief in Support at 19.  The Kennedy Firm also asserts that it received "no advantage . . . by removing Kevin from any obligation as class representative."  Brief in Support at 19.  The Kennedy Firm further asserts that K. Lowery may bring its claims to the Special Master, and seek reimbursement for its property loss and argue that his eviction caused his accident in 2009.  See Brief in Support at 20.  Regarding K. Lowery's alleged damages, the Kennedy Firm asserts that K. Lowery may recover for only the lost rental value he suffered before he was allowed to re-inhabit his home.  The Kennedy Firm asserts that K. Lowery "abandoned his property despite the fact he had every right to inhabit the property."  Brief in Support at 20.  The Plaintiffs also state that the Court may set a proper hourly rate for the Special Master.  See Brief in Support at 20-21.  The Plaintiffs assert that there is no basis to shift the cost of the Special Master to the Defendants.  Regarding K. Lowery's contention that the Special Master should conduct hearings on all alleged losses, the Plaintiffs assert that the Special Master may do so, but that many claims may not require

an evidentiary hearing.  Regarding K. Lowery's suggestion that the class members' claims be divided by their value, the Plaintiffs assert that the "goal of the settlement agreement was to treat the claims equally."  Brief in Support at 21.  Lastly, the Plaintiffs assert that more significant claims will be separated out naturally by the settlement process, as "they will be awarded greater compensation."  Brief in Support at 21.  The Plaintiffs argue, thus, that accepting the Second Proposed Settlement accomplishes the goals of the lawsuit because the class will receive fair compensation.  See Brief in Support at 20.

Regarding the request for attorneys' fees, the Kennedy Firm asserts that a percentage of the common fund is an appropriate method for compensating his services.  See Brief in Support at 21. The Kennedy Firm asserts that the percentage of the common fund is a preferable award method to a lodestar award, because it incentivizes efficiency and aligns the attorneys' interests with their clients' interests.  See Brief in Support at 22 (citing In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 845 (3d Cir. 1995)).  The Kennedy Firm asserts that Mr. Kennedy has already devoted over 500 hours to this litigation, and it will devote at least 100 additional hours during the settlement administration, and that associates and paralegals at the firm have similarly expended over 500 hours thus far and will likely spend 100 additional hours on this case.  The Kennedy Firm states that its work "included numerous meeting with class members, gathering and organizing damage proof, creation of excel spreadsheet and staff time for telephone calls."  Brief in Support at 23.  The Kennedy Firm states that it used its staff to respond to class members' needs, gather mailing information, mail notices, and search for addresses.  See Brief in Support at 23-24. The Kennedy Firm states that the firm spent two months in trial preparation "and has necessarily delayed payment on other contingency matters in counsel's office."  Brief in Support at 24.  The

Kennedy Firm argues that the market conditions support its requested award, because customary contingent fee arrangements range from thirty-three percent to forty-five percent. <u>See</u> Brief in Support at 24. The Kennedy Firm asserts that the novelty and difficulty of this case support its requested award, because "[l]ess experienced counsel may have approached the issue herein as primarily an issue of a deprivation of fourteenth amendment due process rights," rather than focusing on the Fourth Amendment violations, as the Kennedy Firm did, which are determined by a less stringent reasonableness standard. Brief in Support at 24. The Kennedy Firm notes that its clientele were not "ideal," as many members of the class are "accused of using drugs or having a loved one or tenant use drugs." Brief in Support at 24. The Kennedy Firm asserts that its "experience and . . . willingness to jump full force into a controversy over drug contamination and how the government reacts to alleged drug contamination should weigh in favor of the thirty percent fee." Brief in Support at 24. The Kennedy Firm lastly argues that an award of less than thirty percent could dissuade attorneys from taking on similar suits in the future, given the risks and work entailed with this litigation. <u>See</u> Brief in Support at 24-25.

### e.     <u>The September 5, 2012 Fairness Hearing</u>.

The Court held a fairness hearing on September 5, 2012. <u>See</u> Transcript of Hearing (taken Sept. 5, 2012)("Tr."). The Plaintiffs stated that their main concern in negotiating the Second Proposed Settlement was that class-wide damages be adequately addressed. <u>See</u> Tr. at 2:17-3:1 (Kennedy). The Plaintiffs stated that the class has a "very coherent theory of class wide damages on the remediation and the testing ordered by the City on the properties," but that the more difficult burden was proving "individualized claims of damages." Tr. at 3:2-8 (Kennedy).

The Court inquired whether the settlement fund would pay for the Kennedy Firm's fees

and costs first, and then pay for class members' claims for physical remediation and environmental testing they suffered on their properties.  See Tr. at 3:14-20 (Court).  The Plaintiffs stated that the settlement fund would be administered after the Special Master determines, based upon the class' total damages, whether the settlement fund is sufficient to fully compensate each class member, or must be divided on a pro rata basis.  See Tr. at 4:1-5 (Kennedy).  The Plaintiffs clarified that all of the class members' claims, whether for emotional distress, loss of use, or physical remediation and environmental testing, would be initially assessed, and then the Special Master would determine how the settlement fund would be administered.  See Tr. at 5:6-10 (Court, Kennedy).

The Court inquired why the parties decided not to compensate class members for their remediation and environmental testing claims first, before the claims for emotional and mental damages, and the Plaintiffs responded that they wanted to treat both the "hard cost damages and emotional distress damages" equally.  Tr. at 6:7-14 (Court, Kennedy).  The Plaintiffs stated that the Second Proposed Settlement does not preclude a claimant from seeking compensation for any particular type of damage, although class members would have to provide sufficient evidence of proximate cause and the monetary harm they suffered.  See Tr. at 6:18-7:4 (Court, Kennedy).  The Plaintiffs affirmed that class members may appeal a decision by the Special Master to the Court. See Tr. at 7:9-13 (Kennedy, Court).  The Plaintiffs informed the Court that they estimate the class' total losses to be close to $2,200,000.00, and thus class members are likely to recover approximately fifty-percent of their losses through the $1,700,000.00 settlement fund.  See Tr. at 8:3-9:1 (Kennedy, Court).  The Plaintiffs stated that $2,200,000.00 is, in their opinion, the maximum amount of damages the class could have suffered, but that number may be inflated depending on how damages are accounted.  See Tr. at 9:2-16 (Court, Kennedy).  The Plaintiffs

stated that it is likely that the class will recover more than fifty-percent of their damages.  See Tr. at 9:17-22 (Court, Kennedy).  The Plaintiffs stated that the total estimated amount of remediation damages is approximately $339,000.00.  See Tr. at 9:23-10:3 (Court, Kennedy).  The Plaintiffs affirmed that the Special Master could choose to pay claims for remediation and environmental testing damages before administering settlement funds for class members' emotional and distress damages.  See Tr. at 10:4-20 (Court, Kennedy).

The Plaintiffs informed the Court that class members would complete an application, detailing all of their alleged damages, and the Kennedy Firm and the class members would then meet to determine which of the alleged damages are legally compensable.  See Tr. at 11:2-19 (Kennedy, Court).  The Plaintiffs stated that they would likely provide the Special Master with a methodology for measuring class members' remediation and environmental testing damages.  See Tr. at 11:2-5 (Kennedy).  The Plaintiffs explained that some damages may require an evidentiary hearing, such as for the class members that allege that the Nuisance Abatement Team's practices resulted in a diminishment of their property value.  See Tr. at 11:19-24 (Kennedy).  The Plaintiffs stated that claims for mental and emotional distress would likely require an evidentiary hearing as well, and the Plaintiffs stated that they are planning for the Special Master to have an evidentiary hearing on those damages.  See Tr. at 11:24-12:4 (Kennedy).  In regard to K. Lowery's objection that all class members should be able to bring evidence of their claims to the Special Master, the Plaintiffs stated that class members will "[a]bsolutely" have the opportunity to present evidence to the Special Master.  Tr. at 12:5-9 (Court, Kennedy).  The Plaintiffs stated that they set up the process with the Special Master to avoid any possibility of certain class members receiving a disproportionate award compared to others.  See Tr. at 12:15-13:12 (Kennedy).  The Plaintiffs

informed the Court that the Special Master's final determination of each class members' total award will be available for the entire class to review before any class member is paid, so that individual class members may appeal the Special Master's decision to the Court if they believe it is unfair.  See Tr. at 13:13-14:6 (Court, Kennedy).

The Plaintiffs stated that class members may obtain separate counsel if they desire, a provision which the Plaintiffs believe will diminish any potential conflict of interest between the Kennedy Firm and the class members.  See Tr. at 14:7-22 (Court, Kennedy).  The Plaintiffs stated that class members who want the Kennedy Firm to represent them will provide a written acknowledgement of the Kennedy Firm's role in the Second Proposed Settlement.  See Tr. at 14:23-15:6 (Kennedy).  The Plaintiffs stated that the written acknowledgement will not include a waiver of conflicts, although the acknowledgment would include language informing the class members of an attorneys' role when representing multiple clients.  See Tr. at 15:7-14 (Court, Kennedy).  The Plaintiffs stated that they will inform class members that there are three options for representation: (i) the Kennedy Firm; (ii) self-representation; and (iii) other counsel.  See Tr. at 15:15-21 (Court, Kennedy).

Joseph P. Kennedy informed the Court that his position, and that of the Plaintiffs, is that K. Lowery's objections should be handled separately from the Second Proposed Settlement, because K. Lowery's objections relate to his attorney-client relationship with the Kennedy Firm.  See Tr. at 16:2-10 (Court, Kennedy).  The Court asked Mr. Kennedy how he intends to handle K. Lowery's objections, and Mr. Kennedy stated that it attempted earlier to resolve K. Lowery's objections by severing K. Lowery's claim from the class action, but Mr. Kennedy noted that the Court rejected that option.  See Tr. at 16:11-23 (Court, Kennedy).  Mr. Kennedy stated that it is "reluctant to offer

- 42 -

any other ideas or any other suggestions as far as how to resolve Mr. Lowery's individual concerns
. . . [regarding] the class agreement." Tr. at 17:3-6 (Kennedy). The Court inquired why K. Lowery
cannot opt out of the Second Proposed Settlement, and Mr. Kennedy stated that there is "nothing
from our perspective that would keep him from doing that." Tr. at 17:12-18 (Court, Kennedy).
Mr. Kennedy stated that it would prefer if K. Lowery could opt out of the Second Proposed
Settlement, and he suggested that the Plaintiffs may be able to negotiate with the Defendants to set
aside a portion of the settlement fund to cover class members' claims who opt out. See Tr. at
17:18-20 (Kennedy). The Plaintiffs stated that they believe the Defendants have a different
viewpoint regarding K. Lowery's objections, but also stated that, if K. Lowery is able to opt out of
the Second Proposed Settlement, this move may resolve his objections and allow the class to
remain intact. See Tr. at 17:20-24 (Kennedy). The Court inquired why the Defendants would not
want K. Lowery to opt out, given that the Defendants already agreed to the Second Proposed
Settlement. See Tr. at 17:25-18:5 (Court). The Plaintiffs responded that they do not know why the
Defendants might not want K. Lowery to opt out. See Tr. at 18:6-7 (Kennedy). The Plaintiffs
stated that their concern with K. Lowery opting out is that they want to avoid any appearance of
"turning our back on the settlement agreement with the City in any way." Tr. at 18:7-10
(Kennedy).

The Court inquired whether the Kennedy Firm would pursue an individual claim on K.
Lowery's behalf against the Defendants if K. Lowery opted out of the Second Proposed
Settlement. See Tr. at 18:21-24 (Court). Mr. Kennedy stated that it would have to "sit down and
have a long talk about that and whether we would or not," but admitted that "[t]heoretically we
could." Tr. at 18:25-19:4 (Court, Kennedy). Mr. Kennedy stated that if K. Lowery opted out,

although the Kennedy firm might decide not to continue representing him because of difficulties in their relationship, K. Lowery could proceed with his claims in a manner that avoided all of the aspects of the Second Proposed Settlement that he does not like.  See Tr. at 19:5-13 (Court, Kennedy).  Regarding K. Lowery's objection to the size of the settlement fund being too small, Mr. Kennedy stated that opting out is the correct method for addressing that objection.  See Tr. at 19:14-22 (Court, Kennedy).

The Defendants informed the Court that they have no disagreement with the Second Proposed Settlement or with how the Plaintiffs explained that the settlement process would proceed.  See Tr. at 20:6-11 (Court, Levy).  The Defendants informed the Court that the City of Albuquerque has agreed to be present at the Special Master's hearing so that the Special Master has the benefit of the City of Albuquerque's documentation and testimony regarding individual class members' claims.  See Tr. at 20:11-18 (Levy).  The Defendants stated that the City of Albuquerque will provide an adversarial role in the Special Master's hearings so as to ensure that class members' awards are fair and that the Special Master has a full analysis of the case.  See Tr. at 20:19-21:9 (Court, Levy).

Regarding K. Lowery's objections, the Defendants informed the Court that "the settlement in this case included the fact that Mr. Lowery was, in fact, a class member."  Tr. at 21:10-13 (Levy).  The Court inquired whether the deadline for K. Lowery to opt out had passed, and the Defendants informed the Court that the deadline had passed and that, rather than opting out, K. Lowery chose to file objections to the Second Proposed Settlement.  See Tr. at 21:17-22:5 (Court, Levy).  The Plaintiffs stated, however, that the K. Lowery Order stated that K. Lowery's deadline for opting out had passed at that point, but the Court noted that after the Court rejected the First

Proposed Settlement, the opt-out deadline may have changed.  See Tr. at 22:7-22 (Kennedy, Court).

The Defendants informed the Court that part of their rationale for accepting the Second Proposed Settlement was the inclusion of K. Lowery's claim as part of the class' claims, because the Defendants could be liable for greater damages on K. Lowery's claim.  See Tr. at 23:16-24:5 (Levy).  The Defendants stated that they believe the opt-out period is over, and that they negotiated the Second Proposed Settlement specifically with the inclusion of K. Lowery's claim because they understood, from the K. Lowery Order, that K. Lowery could not sever his claim.  See Tr. at 24:6-11 (Levy).

The Court stated that it understood that the Class Action Notice of Proposed Settlement informed class members they could opt out but did not set a specific opt-out date.  See Tr. at 24:12-16 (Court).  The Court requested that the parties file a copy of the notice that was sent to class members.  See Tr. at 24:21-25 (Court).  Mr. Kennedy stated that he believes that the parties decided to not include an opt-out deadline in the Class Action Notice of Proposed Settlement.  See Tr. at 25:3-11 (Kennedy, Court).  The Court stated that perhaps, procedurally, the class could be frozen after the first opt-out deadline; thus, if class members had not already opted out, they could not now.  See Tr. at 25:23-26:6 (Court).  The Court noted that, if that were true, then K. Lowery's objections could affect the Second Proposed Settlement.  See Tr. at 26:4-6 (Court).

The Defendants stated that they have "extreme concerns about Mr. Lowery's ability to opt out at this point in light of the Court's prior order."  Tr. at 26:7-12 (Levy).  The Defendants contended that they are entitled to the benefit of the K. Lowery Order's ruling that K. Lowery could not opt out of the class.  See Tr. at 26:14-21 (Levy, Court).  The Court noted that the Second

- 45 -

Class Action Notice, filed Jan. 26, 2012 (Doc. 98-1), was sent to class members before the parties' trial setting on February 17, 2012.  See Tr. at 1-8 (Levy, Court)(citing Second Class Action Notice at 2).  The Plaintiffs stated that the Second Class Action Notice notified the class of the class certification.  See Tr. at 27:9-12 (Kennedy).  The Court noted that the Second Class Action Notice informed class members of the February 17, 2012, trial date, that K. Lowery was no longer a class representative, and provided an opt-out deadline.  See Tr. at 27:16-25 (Court).  The Court informed the parties that they should file with the Court a copy of the Second Class Action Notice that was mailed to class members.  See Tr. at 27:25-28:2 (Court).  The Court noted that the K. Lowery Order did not allow K. Lowery to opt out of the class action, because of the late stage of the litigation and that the Court had already made rulings with respect to K. Lowery's claims.  See Tr. at 28:12-29:2 (Court)(citing K. Lowery Order at 2).  The Court stated that the issue it must resolve is whether a class member can opt out of the settlement after the opt-out deadline from the class action has passed, when the previous opt-out deadline was set before the parties were supposed to go to trial.  See Tr. at 29:3-13 (Court).

The Defendants asserted that the amount of the Second Proposed Settlement was significantly increased from the First Proposed Settlement in part because it would include "all possible claims and it certainly included Mr. Lowery."  Tr. at 29:14-20 (Levy).  The Defendants asserted that, if K. Lowery did not want to settle, he could have opted out of the First Proposed Settlement, which he did not do.  See Tr. at 30:1-4 (Court, Levy).  The Defendants emphasized "that at this point when [we] urged the Court to approve the settlement for the class it does include Mr. Lowery's claim and that will be subject to determin[ation] by the Special Master," and that if K. Lowery's claim is not included in the Second Proposed Settlement, the Defendants should be

"entitled to revisit this issue."  Tr. at 30:6-11 (Levy).  The Defendants stated that they believe the Second Proposed Settlement will provide "a full voice to anyone that wants to come forward."  Tr. at 30:19-20 (Levy).

J. Lowery then addressed the Court regarding K. Lowery's Objections.  See Tr. at 31:1-6 (Court, Lowery).  J. Lowery stated that he finds himself in a "fiduciary relationship to" his son, given K. Lowery's injuries and the breakdown of his attorney-client relationship with the Kennedy Firm.  See Tr. at 31:7-15 (Lowery).  The Court inquired how much of K. Lowery's objection to the Second Proposed Settlement was based upon the inability of guaranteeing a specific amount for each class member.  See Tr. at 32:7-23 (Court).  J. Lowery stated that the lump sum payment makes receiving an adequate award very difficult, and J. Lowery asserted that there has not "been sufficient effort exerted to even determine even a ballpark figure . . . for the given number of members within the class" and their total damages.  Tr. at 33:9-15 (Lowery).  The Court inquired of Mr. Kennedy whether the class' estimated total damages of $2,200,000.00 included K. Lowery's claim, and Mr. Kennedy stated that it does not, because K. Lowery has not yet filed a claim form.  See Tr. at 33:16-24 (Court, Kennedy).  The Court inquired whether that number would need to be increased by a couple thousand dollars to accurate reflect K. Lowery's claim, and Mr. Kennedy stated that it would.  See Tr. at 33:25-34:3 (Court, Kennedy).  J. Lowery stated K. Lowery's total damages are difficult to estimate, given that he was in the process of purchasing his home, and could have acquired profit from the later sale of his home.  See Tr. at 34:23-35:8 (Court, Lowery).  The Court inquired of J. Lowery why he objects to bringing his claims for damages before the Special Master, as that process would be substantially similar to proceeding to trial and asking a jury to determine his total damages.  See Tr. at 35:25-36: (Court).  The Court asked J.

Lowery to explain his concerns with the proposed procedure for administering the Second Proposed Settlement.  See Tr. at 37:11-12 (Court).  J. Lowery stated that the $1,700,000.00 is not a sufficient sum of money to be "justly divided among the class."  Tr. at 37:16-21 (Court, Lowery). J. Lowery stated that he first of all wants more money.  See Tr. at 37:22-23 (Court, Lowery).  The Court inquired whether J. Lowery disagrees with the proposed procedure of filing a claim, the award for which the Special Master would determine.  See Tr. at 38:1-3 (Court).  J. Lowery stated that he believes that adequately compensating the entire class will be very difficult for the Special Master.  See Tr. at 38:4-12 (Lowery).  The Court inquired whether J. Lowery would be satisfied with the Second Proposed Settlement if the Special Master awards hard costs first, and then, after the class is compensated for those damages, the Special Master awarded the remaining funds to the class for their emotional and mental distress damages.  See Tr. at 38:13-25.  The Court noted that, if K. Lowery were dissatisfied with his award, he could appeal the Special Master's determination to the Court.  See Tr. at 39:1-7 (Court).  J. Lowery stated that his objection to the procedure is the absence of an "established baseline for any class member."  Tr. at 39:8-10 (Lowery).  The Court noted that J. Lowery is correct, but that in that regard the procedure is not different from a trial, and the Court noted that K. Lowery did not opt out before the trial date.  See Tr. at 39:13-17 (Court).  J. Lowery responded that the difference is that a jury trial would determine a "just amount," as opposed to the subjective figure provided in the Second Proposed Settlement.  Tr. at 39:18-21 (Lowery).  J. Lowery asserted that he is not objecting to a settlement, but that he objects to K. Lowery being removed as a class representative without the opportunity to argue against his removal.  See Tr. at 40:1-7 (Lowery).  The Court inquired of J. Lowery how he understands that K. Lowery was disadvantaged by being removed as a class representative, given that, when the Court

- 48 -

rejected the First Proposed Settlement, it held that class representatives cannot receive preferential treatment to class members.  See Tr. at 40:8-16 (Court).  J. Lowery asserted that, were K. Lowery a class representative, Mr. Kennedy would have consulted with J. Lowery regarding the nature of the case and the settlement.  See Tr. at 40:21-41:4 (Lowery).  J. Lowery stated that Mr. Kennedy "very mistakenly reported" that K. Lowery wanted to be removed as a class representative, which was "inaccurate."  Tr. at 36:20-23 (Lowery).  J. Lowery stated that Mr. Kennedy never contacted him regarding the K. Lowery Motion.  See Tr. at 36:23-25 (Lowery).

The Court inquired of J. Lowery about his concerns with K. Lowery's relationship with Mr. Kennedy.  See Tr. at 41:5-8 (Court).  J. Lowery stated that the Court's question relates to the breakdown of his son's attorney-client relationship with Mr. Kennedy, as K. Lowery expected Mr. Kennedy to "have his focus primarily" on K. Lowery, rather than on the class.  Tr. at 36:9-16, 41:19-24 (Lowery).   J. Lowery asserted that K. Lowery was not allowed to comment on or participate in the settlement negotiations.  See Tr. at 41:25-42:2 (Lowery).  J. Lowery asserted that, when K. Lowery was removed as a class representative, the Kennedy Firm created a conflict of interest because K. Lowery's interests were contrary to those of the class.  See Tr. at 42:3-9 (Lowery).  J. Lowery asserted that he is in an awkward position, given that K. Lowery had an attorney, but now K. Lowery is not updated as to the case's progress.  See Tr. at 42:12-15 (Lowery).  J. Lowery stated that he has only learned of the case's progress through the assistance of a friend with access to federal court filings.  See Tr. at 42:15-21 (Lowery).  J. Lowery stated that he was not contacted from the time that he appeared for his videotaped deposition on April 12, 2012, until he received the Second Proposed Settlement.  See Tr. at 42:22-23:2 (Lowery).

The Court inquired what K. Lowery's position is regarding Mr. Kennedy's suggestion that

K. Lowery and Mr. Kennedy handle their disagreement separately from the Court's approval of the Second Proposed Settlement.   See Tr. at 43:13-20 (Court).   J. Lowery asserted that K. Lowery's objections should be addressed before the Court approves the Second Proposed Settlement.   See Tr. at 43:21-24 (Lowery).   J. Lowery stated that he believes that the settlement negotiations should be reopened, with J. Lowery representing K. Lowery's interests so that K. Lowery's interests are addressed and justice is done.   See Tr. at 45:1-7 (Lowery).   The Court inquired what J. Lowery will do if the Court determines that K. Lowery had an opportunity to opt out and did not, and he is thus bound by the Second Proposed Settlement.   See Tr. at 45:8-13 (Court).   J. Lowery stated that starting his lawsuit over again would be a "real hardship," and create a "real financial burden," given that J. Lowery and K. Lowery now reside in Kentucky, and that K. Lowery has already expended resources and time with the Kennedy Firm.   Tr. at 45:14-24 (Lowery).   The Court stated that it is not suggesting that K. Lowery commence a new lawsuit, but, rather, that K. Lowery redress his damages through the class with the Second Proposed Settlement. See Tr. at 45:25-46:2 (Court).   The Court stated that the Second Proposed Settlement could settle K. Lowery's claims, and K. Lowery could resolve his difficulties with the Kennedy Firm through a different avenue.   See Tr. at 46:4-7 (Court).   The Court asked whether J. Lowery plans to file a claim on K. Lowery's behalf to participate in the Second Proposed Settlement, and J. Lowery stated that he has not considered whether he will.   See Tr. at 46:8-16 (Court, Lowery).

The Court then turned to the persons present in the audience and asked if anybody else in the courtroom, other than J. Lowery, objects to the Second Proposed Settlement.   See Tr. at 46:21-47:1 (Court).   No person stated an objection.   See Tr. at 47:2 (Court).   The Court asked whether any persons present were class members who wanted to speak in support of the Second

Proposed Settlement.  See Tr. at 47:8-11 (Court).  Robert Clauss addressed the Court.  See Tr. at 47:15-18 (Court, Clauss).  Clauss stated that his tenants were evicted from his property, pursuant to the Nuisance Abatement Team's practices, allegedly because the boyfriend of one of his tenants was "the largest meth dealer in the state of New Mexico."  Tr. at 47:20-48:5 (Clauss).  Clauss stated that he was required to test his property for methamphetamine, even though the police report stated that the Nuisance Abatement Team did not find drugs on his property.  See Tr. at 48:6-7 (Clauss).  Clauss stated that the environmental testing cost $1,250.00.  See Tr. at 48:8 (Clauss).  Clauss stated that he believes the settlement fund should be distributed first to cover class members' damages for hard costs.  See Tr. at 48:15-19 (Clauss).  Clauss stated that he has invested all of his money in his eleven properties.  See Tr. at 48:25-49:1 (Clauss).  He asserted that out-of-pocket expenses should be reimbursed before pain and suffering.  See Tr. at 49:2-5 (Clauss).  The Court inquired whether Clauss approves of the proposed plan for distributing settlement funds according to the Special Master's determination of all class members' damages, and Clauss stated that he does not agree with that plan, and that he believes that class members should be compensated for the costs they paid to "bring the apartment back to compliance," before anything else is paid.  Tr. at 49:8-15 (Court, Clauss).  Clauss stated that he has "the idea that Mr. Lowery has sums in mind that would take the entire amount if he had the opportunity."  Tr. at 49:20-22 (Clauss).  Clauss stated that he is nonetheless in favor of the Second Proposed Settlement, given that he can argue before the Special Master for the fund to be distributed towards hard costs first.  See Tr. at 50:17 (Clauss, Court).

Another class member, Julian Gutierrez, urged the Court to approve the Second Proposed Settlement.  See Tr. at 50:22-51:1 (Gutierrez); id. at 52:11-14 (Court, Gutierrez).  Gutierrez stated

that the settlement fund should award class members for the cost of professional cleaning and replacing the surfaces within their properties.  See Tr. at 51:2-24 (Gutierrez).  Gutierrez stated that he approves the Second Proposed Settlement's plan for administration of the settlement fund.  See Tr. at 52:1-13 (Court, Gutierrez).  Thomas addressed the Court, and stated that she "would love to see this settled as soon as possible.  It's gone on for a long long time."  Tr. at 52:19-53:16 (Thomas, Court).   Thomas stated that she still believes that the Second Proposed Settlement is fair after hearing K. Lowery's objections and the Court's discussion with Mr. Kennedy.  See Tr. at 53:17-54:4 (Court, Thomas).

The Plaintiffs spoke in closing in support of the Second Proposed Settlement.  The Plaintiffs stated that class members may argue that the Special Master award hard-cost damages before other damages and that, before the pro-rata reduction is made, reduction is necessary.  See Tr. at 54:17-24 (Kennedy, Court).  Mr. Kennedy stated that he is "very happy to have represented this class and very happy to have brought this case ultimately."  Tr. at 55:3-6 (Kennedy).  Mr. Kennedy stated that he has done his best to "exercise discretion on behalf of the class and to arrive at a settlement that gets this process over," with the class receiving fair compensation.  Tr. at 55:6-14 (Kennedy).

## LAW REGARDING APPROVAL OF CLASS-ACTION SETTLEMENTS

Rule 23 requires judicial approval of a class action settlement.  See Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.").  A district court considering a proposed class action settlement must determine whether the proposed settlement is fair, reasonable, and adequate.  See In re Integra Realty Res., Inc., 354 F.3d 1246, 1266 (10th Cir. 2004).  "It is

well-settled, as a matter of sound policy, that the law should favor the settlement of controversies." Grady v. De Ville Motor Hotel, Inc., 415 F.2d 449, 451 (10th Cir. 1969).

### 1.     The Jones v. Nuclear Pharmacy, Inc. Factors.

The Tenth Circuit, in Jones v. Nuclear Pharmacy, Inc., 741 F.2d 322 (10th Cir. 1984), established a four-factor test for assessing whether a proposed settlement is fair, reasonable, and adequate, which includes: (i) whether the proposed settlement was fairly and honestly negotiated; (ii) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (iii) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (iv) the parties' judgment that the settlement is fair and reasonable.  See 741 F.2d at 324.  In Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180 (10th Cir. 2002), the Tenth Circuit addressed objections to a class-action settlement, which the district court had approved.  See 314 F.3d at 1187.  The objectors argued that the class representatives and class counsel failed to adequately represent the class members, and/or suffered conflicts of interest.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  The objectors also challenged the settlements' fairness and reasonableness.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  The Tenth Circuit held that rule 23(a)(4)'s adequacy requirement was satisfied, because each subgroup had its own class representative during settlement negotiations.  See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1188.  With respect to the settlement's fairness and reasonableness, the Tenth Circuit found that the district court did not abuse its discretion in determining that the settlement, "from which an extremely small percentage of class members opted out, was fair, reasonable, and adequate."  Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d at 1189.

- 53 -

In Gottlieb v. Wiles, 11 F.3d 1004 (10th Cir. 1993), the Tenth Circuit ruled on a district court's approval of a class-action settlement, where objectors argued that the district court failed to consider "the ability of the defendants to withstand a greater judgment." 11 F.3d at 1007. Applying the Jones v. Nuclear Pharmacy, Inc. factors, the Tenth Circuit noted that district courts within the Tenth Circuit are not required to "consider the financial condition of the defendants in assessing the adequacy of the settlement." 11 F.3d at 1014. The Tenth Circuit explained that the third Jones v. Nuclear Pharmacy, Inc. factor, requiring a court to weigh the "value of an immediate recovery," was an inquiry into the settlement's monetary worth, and the financial condition of the defendant "is irrelevant to a determination of the value of the settlement." 11 F.3d at 1015. The Tenth Circuit noted that requiring an inquiry into the defendant's financial condition presupposes a belief that "'value' has some metaphysical import aside from its plain meaning," and the Tenth Circuit rejected the notion "that a settlement cannot have value to Plaintiffs unless it satisfies their desire for retribution by destroying the defendant." 11 F.3d at 1014-15. The Tenth Circuit explained that the third Jones v. Nuclear Pharmacy, Inc. factor did not weigh the value of the recovery against the defendant's net worth, but rather against the "possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation." 11 F.3d at 1015. The Tenth Circuit found that the district court had adequately weighed the settlement's value, by considering the defendants' exposure to liability in other lawsuits and the defendants' bankruptcy proceedings, which could reduce the amount of funds available for the class at a later date. See 11 F.3d at 1015. The Tenth Circuit explained that a district court need not conduct a "foray into the wilderness in search of evidence that might undermine the conclusion that the settlement is fair," but rather the district court must

independently analyze the evidence before it when determining whether to approve a proposed

settlement. 11 F.3d at 1015.  As such, the Tenth Circuit found that the district court had not abused

its discretion in approving a class-action settlement, because the evidence before the district court

showed that the settlement was in line with the <u>Jones v. Nuclear Pharmacy, Inc.</u> factors, and fair,

even though the district court had not weighed the defendants' ability to pay.  <u>See</u> 11 F.3d at 1015.

   In <u>DeJulius v. New England Health Care Emps. Pension Fund</u>, the Tenth Circuit addressed

the adequacy of class notice procedures.  It held that due process "does not require <u>actual</u> notice to

each party intended to be bound by the adjudication of a representative action."  <u>DeJulius v. New</u>

<u>England Health Care Emps. Pension Fund</u>, 429 F.3d at 944 (emphasis in original).   For

due-process purposes, Tenth Circuit precedent focuses upon whether the district court gave "the

best notice practicable under the circumstances including individual notice to all members who

can be identified through reasonable effort."  <u>In re Integra Realty Res., Inc.</u>, 262 F.3d at 1110.

With respect to the settlement's fairness and reasonableness, the Tenth Circuit has held that a

district court did not abuse its discretion in approving a class settlement from which an "extremely

small percentage of class members opted out."  <u>Rutter & Wilbanks Corp. v. Shell Oil Co.</u>, 314 F.3d

at 1188.

   In <u>Robles v. Brake Masters Systems, Inc.</u>, No. CIV 10-0135 JB/WPL, 2011 WL 9717448

(D.N.M. Jan. 31, 2011)(Browning, J.), the Court granted in part and denied in part the parties' joint

motion for approval of a class action settlement.  <u>See</u> 2011 WL 9717448 at *1.  The Court denied

the distribution of an incentive award to the class representative.  <u>See</u> 2011 WL 9717448, at

**9-17.  The Court held that the class representative was not entitled to an incentive award,

because he did not put forth more effort or incur more risk than any other plaintiff.  <u>See</u> 2011 WL

9717448, at **12-17.   The Court found that, other than the incentive award, the class-action settlement was fair and approved the settlement agreement.   The Court found that the settlement was fairly and honestly negotiated, as the parties' experienced counsel engaged in arm's length settlement discussions.   Numerous issues were contested, placing the outcome of the litigation in doubt.   Immediate recovery was preferable to future relief, as the plaintiffs may have recovered less, or even nothing at all, had the case proceeded to trial.   Lastly, it was the opinion of the parties' experience counsel that the settlement was fair, just, and adequate.   See 2011 WL 9717448, at *18. In the present matter, the Court found that the First Proposed settlement was unfair because the class representatives received a large lump sum award of $30,000.00, but the First Proposed Settlement proposed that the rest of the class received only a pro rata award of the remainder, that could be as little as $1,066.38.   See Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2012 WL 394392, at *23 (D.N.M. 2012)(Browning, J.).   The Court found troubling: (i) the disparity between the amount that the class representatives would receive, as opposed to the rest of the class; (ii) the set amount guaranteed to the class representatives; and (iii) that the amount for the class representatives decreased the award to the other class members and came out of the class fund rather than out of the attorneys' fees.   See Lowery v. City of Albuquerque, 2012 WL 394392, at *24.   In In re Thornburg Mortg., Inc., Sec. Litig., No. CIV 07-0814 JB/WDS, 2012 WL 6004176 (D.N.M. Nov. 26, 2012)(Browning, J.), the Court approved a settlement of $2,000,000.00 for a class of securities shareholders, even though that award could give the class as little as $.01 per share that was affected by the defendant's actions.   See 2012 WL 6004176, at ** 56-64.   The Court noted that, although the reward was "not a home run" for the class, had the case proceeded to trial, the insurance that was used to fund the settlement might have been completely exhausted, thus

giving the class no award.  2012 WL 6004176, at *56-61, *65,

Another district court in the Tenth Circuit has found that a settlement is fair even though the class received no monetary award.  See In Re Motor Fuel Temperature Sales Practices Litig., No. 07-MD-1840-KHV, 2012 WL 1415508 (D. Kan. April 24, 2012)(Vratil, J.).  The court preliminarily approved a settlement between Costco Wholesale Corp. and putative class of plaintiffs who purchased fuel from Costco in twenty-six states.  See 2012 WL 1415508, at *5, *13.  Approximately 410 putative class members objected to the proposed settlement.  See 2012 WL 1415508, at *6.  Most objectors argued that the settlement was unfair, because it paid no money to class members.  See 2012 WL 1415508, at *13.  Rather than a monetary award, the settlement enjoined Costco Wholesale from selling fuel that did not adjust for temperature expansion, the practice that allegedly caused plaintiffs' financial harm.  See 2012 WL 1415508, at *3, *12.  Nonetheless, the court found that the settlement's award of injunctive relief was fair, given the uncertainty that plaintiffs could prove liability, and especially because establishing a method for individual damages would be very difficult.  See 2012 WL 1415508, at *12.  The Court found that the proposed settlement "fairly responded to plaintiffs' claims" and thus approved the settlement. See 2012 WL 1415508, at *12, *16-*17.

**2.      Class Members' Ability to Opt Out of a Proposed Settlement.**

Rule 23(e)(4) of the Federal Rules of Civil Procedure provides that, for class actions certified under rule 23(b)(3), a "court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."  Fed. R. Civ. P. 23(e)(4).  The advisory committee explains that factors a court may consider under this rule include "the information available to class

members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims."  Fed. R. Civ. P. 23 advisory committee's note to the 2003 amendments.  The decision whether to reject a proposed settlement because class members were not given the opportunity to opt out is purely discretionary for the court, and courts "are not compelled to" reject a settlement on this basis.  Moulton v. United States Steel Corp., 581 F.3d 344, 354 (6th Cir. 2009).  See Healthsouth Corp. Sec. Litig., 334 F. App'x 248, 255 n.12 (11th Cir. 2009)("AIG Global's argument that it should be given an additional argument to opt out, under Rule 23(e)(4) after submission [of a proposed settlement] is without merit because . . . the decision is wholly within the discretion of the district court.").

　　For example, in Moulton v. United States Steel Corp., the United States Court of Appeals for the Sixth Circuit rejected the argument that a district court "had a duty to open another 'opt out opportunity'" for certain class members "'after the terms of the proposed settlement were published.'"  581 F.3d at 354.  The Sixth Circuit noted that the class members were given two distinct opportunities to opt out of the settlement, yet failed to file their requests with the class counsel.  Moreover, the Sixth Circuit expressed that relying on rule 23(e)(4) for the argument that the settlement should be rejected is unfounded, because the rule defers to the district court's discretion and does not proscribe that a fair settlement must allow class members the opportunity to opt out.  See 581 F.3d at 354.  The United States Court of Appeals for the Eleventh Circuit rejected a similar argument in Healthsouth Corp. Sec. Litig., when AIG Global Investment Corporation argued that a district court should have rejected a proposed settlement under rule 23(e)(4).  AIG Global received notice of the proposed settlement and the deadline for opting out, but filed its opt-out request nearly one month after the deadline.  See 344 F. App'x at 250, 253.

- 58 -

The Eleventh Circuit noted that rule 23(e)(4) does not apply to AIG Global's situation, because AIG Global was given the opportunity to opt out but failed to timely do so.  The Eleventh Circuit further noted that relying on rule 23(e)(4) was of no avail to AIG Global, because the decision to reject a settlement for the reason that a class did not have an opportunity to opt out is wholly within the district court's discretion.  See 344 F. App'x at 255 n.12.

### RELEVANT LAW REGARDING CLASS COUNSEL'S DUTY TO THE CLASS

Rule 23(g)(4) of the Federal Rules of Civil Procedure states: "Class counsel must fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  The advisory committee's notes clarify the scope of class counsels' duty:

> [Rule 23(g)(4)'s Duty of class counsel requirement] recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class.  The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients.  Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it.  The class representatives do not have an unfettered right to fire class counsel.  In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal.  To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

Fed. R. Civ. P. 23 advisory committee's note to the 1998 amendments.  Professor William B. Rubenstein explains that the advisory committee's notes indicate that "class counsel, once appointed, is now the paramount representative of the class, not the class representatives."  1 William B. Rubenstein, Newberg on Class Actions § 3:82, at 430 (5th ed. 2012).  "The Advisory Committee note implies, quite strongly, that it is class counsel who speaks for the class, not the class representatives."  Rubenstein, supra, at 430-31.  Professor Rubenstein also states that rule 23 and the advisory committee's notes make clear that it is the responsibility of the court, and not

class representatives, to monitor class counsel's performance.  See Rubenstein, supra ("The Advisory Committee note essentially acknowledges that Rule 23(g) is aimed at responding to the fiction inherent in the conventional pretense that the class representative monitored class counsel. Rule 23(g) shifts this counsel-monitoring function from the class representatives to the court . . . ."); Fed R. Civ. P. 23(g)(1)-(2)(D)(endowing the Court with the responsibility of overseeing class counsel regarding fees and nontaxable costs, and determining whether class counsel can fairly and adequately represent the class' interests).

Class counsel's duty to "fairly and adequately protect the interest of the class," requires class counsel to avoid a conflict of interest with the class.  Fed. R. Civ. P. 23(a).  The Tenth Circuit has held that avoiding a conflict of interest with the class is essential for class counsel to remain legally adequate: "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Rutter & Willbanks, Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002)(citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997); Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).  In Rutter & Willbanks, Corp. v. Shell Oil Co., the Tenth Circuit determined that a conflict of interest did not exist where class counsel represented a class that was divided into multiple subgroups for distribution of a settlement.  The objectors to the settlement argued that class counsel was conflicted, because it represented each of the subgroups collectively, but the subgroups had conflicting interests.  The Tenth Circuit explained that, to the extent the different subgroups interests' were in conflict, the conflict would only motivate class counsel to seek the largest overall award so that all of its clients could be adequately compensated.  See 314 F.3d at

1188.   Additionally, in In re Integra Realty Res., Inc. the Tenth Circuit determined that class counsel's receipt of attorneys' fees in a settlement agreement did not place class counsel's interests regarding the settlement in conflict with the class, and thus providing attorneys' fees did not render class counsel's representation inadequate.  See 262 F.3d at 1112.  On the other hand, the Tenth Circuit has found that class representatives were in conflict with a class where they demanded a fifteen-percent consultant's fee for their services as representatives.  See Carpenter v. Boeing, Co., 456 F.3d 1183, 1204 (10th Cir. 2006).  The class representatives publicly stated that they were privy to "privileged conversations with class counsel," which the district court found "strengthened its initial conclusion that they put their own interests above those of the class."  456 F.3d at 1204.  Accordingly, the Tenth Circuit affirmed the district court's removal of the class representatives.  See 456 F.3d at 1204.

## LAW REGARDING CLASS ACTIONS AND ATTORNEYS' FEES

"In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  "The duty to investigate the provisions of any proposed compromise or settlement of a class action 'includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services.'"  7 Newberg, supra § 14:1, at 506-07.  "A request for attorneys' fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee."  Hensley v. Eckerhart, 461 U.S. 424, 437(1983)(Powell, J.).  "In class actions, the district court has broad authority over awards of attorneys' fees."  Law v. Nat'l Collegiate Athletic Ass'n, 4 F. App'x. 749, 751 (10th Cir. 2001)(unpublished)(citing Hayes v. Haushalter (In re FPI/Agretech Sec. Litig.), 105 F.3d 469, 472 (9th Cir.1997)).  The Tenth Circuit has adopted a test that the

United States Court of Appeals for the Fifth Circuit adopted in <u>Johnson v. Ga. Highway Express,</u> <u>Inc.</u>, which analyzes the following twelve factors: (i) the time and labor required; (ii) the novelty and difficulty of the question presented in the case; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment because of acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) any time limitations the client or circumstances imposed; (viii) the amount involved and the results obtained; (ix) the attorneys' experience, reputation, and ability; (x) the undesirability of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases.  <u>See</u> <u>Gottlieb v.</u> <u>Barry</u>, 43 F.3d at 483 & n. 4 (citing <u>Johnson v. Ga. Highway Express, Inc.</u>, 488 F.2d at 717-19). "[R]arely are all of the Johnson factors applicable."  <u>Uselton v. Commercial Lovelace Motor</u> <u>Freight, Inc.</u>, 9 F.3d 849, 854 (10th Cir.1993).  The Tenth Circuit has also noted that, while the simultaneous negotiation of attorneys' fees and costs and the merits is potentially troubling, courts have focused on the results of those negotiations and the overall fairness to the parties.  <u>See</u> <u>In re</u> <u>Integra Realty Res., Inc.</u>, 262 F.3d at 1112.

## <u>ANALYSIS</u>

The Court will approve the Second Proposed Settlement.  The Court determines that the Second Proposed Settlement was fairly and honestly negotiated, as both parties report that they made concessions in reaching an agreement.  The ultimate outcome of the litigation was in doubt, as a jury may not have empathized with the class' position, because the Nuisance Abatement Team was popular in Albuquerque, and some class members had tenants or family members that possessed and used drugs at some of the properties.  The value of an immediate recovery outweighs the possibility of future relief, as a trial may yield an unpredictable result for the class,

and class members express that they strongly desire the litigation to end and to receive some compensation as soon as possible.  Lastly, the parties and the Kennedy Firm inform the Court that they believe the Second Proposed Settlement is fair and reasonable.  Although K. Lowery objects to the Second Proposed Settlement, his primary concern is that the settlement fund is insufficient to fully compensate him for his losses.  Such is the nature of a settlement; all parties view settling the matter now as preferential to future vindication of their rights and positions in a court of law. Additionally, although the Court may find that a settlement is unfair because it fails to adequately compensate a group of plaintiffs, the Court does not believe that the Second Proposed Settlement is so menial that it fails to vindicate the class' grievances.  The Court will, thus, overrule K. Lowery's objection to the Second Proposed Settlement.  K. Lowery's other objections arise from the breakdown of his attorney-client relationship with the Kennedy Firm, and are not directly relevant to the Court's approval of the Second Proposed Settlement.  To the extent that K. Lowery asserts that the Kennedy Firm has a conflict of interest with him, that conflict of interest does not alter the Kennedy Firm's duty, as Class Counsel, to fairly and adequately represent the class' interests above those of K. Lowery.  Lastly, the Court finds that the Kennedy Firm's requested award of thirty-percent of the settlement fund in attorneys' fees meets the requirements set forth in Johnson v. Ga. Highway Express, Inc., and the Court will thus grant the requested attorneys' fees.

## I.   THE COURT WILL OVERRULE K. LOWERY'S OBJECTIONS THAT DO NOT PERTAIN TO THE SETTLEMENT.

K. Lowery raises a number of objections, but much of his dissatisfaction arises from his relationship with the Kennedy Firm, and is not directed at the Second Proposed Settlement specifically.  The difficulties K. Lowery is experiencing with the Kennedy Firm do not render the Second Proposed Settlement unfair with respect to the class.

K. Lowery objects that the Kennedy Firm's entering into the Second Proposed Settlement without seeking his approval violated his retainer agreement.  See Objections at 5.  He also objects to being removed as a class representative, which he states was effectuated without his notice.  See Objections at 5 ("That motion was filed without either my or my son's knowledge or agreement.").  K. Lowery understands from his retainer agreement that the Kennedy Firm agreed to do its "utmost on behalf of Client and to utilize all ethical and legal procedures to advance Client's interests in this matter."  Objections at 4 (secondary quotations omitted).  K. Lowery also points out that his retainer agreement "expressly provides that 'Nor will the Attorneys compromise or settle the case without the Client's consent.'"  Objections at 4-5.  J. Lowery informed the Court at the hearing, speaking on behalf of his son, that he thought that "Mr. Kennedy was contracted to represent my son [and] we thought that basic[al]ly he would have his focus primarily [o]n my son."  Tr. at 36:9-12 (Lowery).  The Kennedy Firm admits that it did not provide K. Lowery with a retainer agreement that outlined its duties in a class-action lawsuit.  See Brief in Support at 10 (stating that the Kennedy Firm "erred in using a retainer agreement that his firm uses in individual civil rights cases" with K. Lowery.).  The Kennedy Firm nonetheless argues that using the wrong retainer agreement does not nullify his duties to the class: "The use of an individual civil rights retainer agreement that did not contain an explanation of class concepts and the responsibilities of class representatives does not change counsel's duty to represent the class as a whole."  Brief in Support at 18.  The Kennedy Firm is correct: its duty as Class Counsel is to "fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).  The Court, thus, overrules K. Lowery's objection that the Second Proposed Settlement violated his retainer agreement, because the Kennedy Firm would have violated its duties to the class if he had put K. Lowery's opinion and

interests above those of the class, as K. Lowery contends his retainer agreement provides.

Although K. Lowery asserts that entering into the Second Proposed Settlement without his approval created a conflict of interest between him and the Kennedy Firm, only a conflict of interest between the Kennedy Firm and the class would render the its representation legally inadequate as to the class.  See Rutter & Willbanks, Corp. v. Shell Oil Co., 314 F.3d at 1188 (finding that conflicts between different groups within a class does not create a conflict of interest between class counsel and the class, and, conversely, likely increases class counsel's incentive to secure the greatest award possible).  Additionally, even if K. Lowery were still a class representative, he would not have the ability to veto the Second Proposed Settlement.  See Fed. R. Civ. P. 23 advisory committee's note to the 1998 amendments ("[T]he class representatives cannot command class counsel to accept or reject a settlement proposal.").  A district court considering a proposed class action settlement must determine whether the proposed settlement is fair, reasonable, and adequate.  See In re Integra Realty Res., Inc., 354 F.3d at 1266.  To the extent that K. Lowery objects to the Second Proposed Settlement because he was unable to comment on its approval, that objection is not relevant to the Court's determination of fairness, reasonableness, and adequacy, and the Court will thus overrule it.

The Court does not comment whether, and does not disagree that, the Kennedy firm may have breached its contract with K. Lowery and/or some ethical duty to him.  The Court is troubled by the dispute, but ultimately decides that this issue remains a dispute between the Kennedy Firm and K. Lowery, and not a dispute between the class and the Kennedy Firm.  If K. Lowery remains unhappy with the Kennedy Firm, he can pursue relief through a malpractice action or through a complaint with the state bar of New Mexico.  The Kennedy Firm does not, however, appear to

have a conflict with the class, and appears to have negotiated a good settlement for the class.  The

Court believes it should put aside this disagreement between the Kennedy Firm and K. Lowery and

focus on the class' interests.

## II.   THE COURT WILL APPROVE THE SECOND PROPOSED SETTLEMENT AND OVERRULE K. LOWERY'S OBJECTIONS THERETO.

The four factors which the Tenth Circuit has provided for district courts to use when

determining whether to approve a class-action settlement favor the Court's approval of the Second

Proposed Settlement.  The Court determines that the Second Proposed Settlement is the result of

fair and honest arms' length negotiations, provides an immediate recovery that outweighs the

possibility of future relief because the outcome of the litigation was in doubt for the class, and,

apart from K. Lowery, is supported by both the parties and their counsel.  Accordingly, the Court

overrules K. Lowery's objections and approves the Second Proposed Settlement.

### A.   THE SECOND PROPOSED SETTLEMENT WAS FAIRLY AND HONESTLY NEGOTIATED.

The Kennedy Firm informs the Court that "[n]egotaitons in this matter were arms-length

and non-collusive."  Brief in Support at 13.  See Jones v. Nuclear Pharmacy, Inc., 741 F.2d at 324

("[T]he trial court must approve a settlement if it is fair, reasonable and adequate. . . .  [T]he trial

court should consider: whether the proposed settlement was fairly and honestly negotiated . . . .").

The Court has previously determined arms-length negotiations absent any allegations of collusion

demonstrate that a class action settlement was fairly and honestly negotiated.  See Robles v. Brake

Masters Systems, Inc., 2011 WL 9717448, at *18 (concluding that the motions and evidence

presented to the Court "reveal that the settlement was negotiated at arm's length by experienced

counsel concerning bona fide disputes").  Counsel for both parties met on multiple occasions to

discuss "the evidence and proof of the claims, the planned procedure for trial, and likely outcomes of trial." Brief in Support at 14. Additionally, both parties represent that they "moved from their original negotiation positions and compromised." Brief in Support at 14. The Defendants state that they "feel that after very difficult[] negotiations the City paid a fair amount," and counsel for the Defendants, Kathryn Levy, states that she "can assure [the Court] that the parties went back and forth and back and forth to arrive at these numbers." Tr. at 24:1-5 (Levy). That both sides made concessions over the course of drawn-out negotiations and discussions of the merits of the case indicates that the Second Proposed Settlement was fairly and honestly negotiated. The Court has been vigilant to protect the class. The Court rejected the First Proposed Settlement, because it compensated the class representatives at the expense of the class. This rejection brought the parties back to the bargaining table. The result has been a more favorable outcome. While it may not fully compensate the class, it may, or may come close. Not often does a settlement fully compensate a plaintiff, yet this one may do so for most, if not all, of the class. The result seems very good for the class.

### B.    THE OUTCOME OF THE CASE WAS IN DOUBT.

The Court determines that the outcome of the Plaintiffs' lawsuit was in doubt. See Jones v. Nuclear Pharmacy, Inc., 714 F.3d at 324 ("[T]he trial court should consider . . . whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt . . . ."). The Kennedy Firm "was concerned about many issues including proof of proximate cause and uncertainty as to how a jury would view the total lawsuit." Brief in Support at 14. The Plaintiffs assert that many class members were anxious about testifying before a jury and, thus, encouraged the Kennedy Firm to negotiate a settlement. See Brief in Support at 14. The Plaintiffs assert that

the outcome of a jury trial would have been unpredictable, because of the requirement of proving proximate cause, which the Kennedy Firm states "can sometimes be a confusing concept to jurors and can operate as a complete defense." Brief in Support at 15. The Plaintiffs state that, through discovery, they learned that the Nuisance Abatement Team was "extremely popular with the public," further placing the outcome of a jury trial in doubt for the Plaintiffs. Brief in Support at 15. The Plaintiffs inform the Court that many class members had family members or tenants that were known drug users living in their properties, and several class members were drug users, which could possibly create prejudice in a jury against the Plaintiffs' case. See Brief in Support at 15. Some of the evidence of the Nuisance Abatement Team's use of ace-of-spades playing cards as calling cards on the properties, which the Court ruled could be admitted, could have persuaded the jury of the Plaintiffs' case. See Plaintiffs' Exhibit List ¶¶ 7, 23-33, at 1-3; Pretrial Conference at 14:9-15:2 (tentatively admitting Plaintiffs to use the Nuisance Abatement Team's facsimile coversheet, photographs of tenants holding an ace-of-spades playing card in front of a substandard sign, and excerpts from a Nuisance Abatement Team videotape into evidence for trial). Nevertheless, the popularity of Mayor Chavez' efforts to clean up neighborhood would have been a formidable obstacle for the class to overcome, some of whom had drug problems. The Plaintiffs assert that the lawsuit, as one against the City of Albuquerque, "ultimately presents a sympathetic defendant in that the community literally relies upon the services local governments provide to its citizens." Brief in Support at 15. The Plaintiffs point out that a jury may be averse to awarding a large sum to them out of a fear of increasing local taxes. See Brief in Support at 15. The Plaintiffs also point out that proving loss in property value would be difficult, given that the Defendants' actions "coincided with a significant market loss of value of real estate in the United States and

Albuquerque."  Brief in Support at 16.  The Court and others have previously held that litigating a class action is difficult where the class' alleged monetary losses -- tied to real estate values -- occurred at the same time as the recent economic and real estate downturn.  See In re Thornburg Mortg., Inc. Sec. Litig., 2012 WL 6004176, at *69 ("Co-Lead Counsel was . . . faced with the difficulties and novelties of a securities action which was being litigated during 'The Great Recession.'"); Lane v. Page, 862 F. Supp. 2d 1182, 1253 (D.N.M. 2012)(Browning, J.)(same); In re Smith, 435 B.R. 637, 643 (9th Cir. 2010)("These appeals have arisen during the current difficult economic time which is being referred to as 'The Great Recession.'").  Accordingly, the Court agrees with the Plaintiffs that the difficult factual issues presented by a possibly less-than-sympathetic class coupled with the popularity of the Nuisance Abatement Team's practices, and the difficult legal issues which the Plaintiffs would have to overcome to prove their damages at trial, put the damages outcome of this litigation in doubt.  Moreover, while the Court granting summary judgment as to class' rights may have decided some legal issues in this case, the City of Albuquerque made it plain that it intended to contest liabilities for some of the class if the matter went to trial.  The Second Proposed Settlement eliminates the doubt about liability and goes a long way to take the doubt out of a lot of the damages issues.  The doubts about the overall economic success of this case were very real.

### C.   THE VALUE OF IMMEDIATE RECOVERY OUTWEIGHS THE POSSIBILITY OF FUTURE RELIEF.

The Court concludes that the value of immediate recovery for the Plaintiffs outweighs the possibility of future relief.  See Jones v. Nuclear Pharmacy, Inc., 714 F.2d at 324 ("[T]he trial could should consider . . . whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation . . . .").  The Plaintiffs point out

that most class members are retired and depend on their rental income for their livelihood, and thus

an immediate recovery is of great value to the class.  See Brief in Support at 17.  Much of the class

is not wealthy, and some are of lower-income and what many would call poor.  The Plaintiffs

assert that the "evidentiary rulings, liability rulings, jury instruction, and damages rulings"

inherent to a jury trial could have diminished the possibility of any real recovery for the class.

Brief in Support at 17.  The Plaintiffs state that many class members think that the litigation has

already taken too much time, and class members express that they "value . . . not being involved in

litigation."  Brief in Support at 17.  See Tr. at 52:19-53:16 (Thomas)("I would love to see this

settled as soon as possible.  It's gone on for a long time."); Tr. at 50:21-25 (Gutierrez)("I just want

to urge the settlement, only because it's been quite a long time and I'm out of a lot of money.").

For lower-income class members, the inability to wait is a potential a problem.  The Plaintiffs

assert that they were afraid that a jury trial would provide the class with an "uneven distribution or

un[]even result for different individuals," because of the proximate cause complexities or other

issues that may arise at trial, and the Plaintiffs thus state that they believe the Second Proposed

Settlement, which includes the use of the Special Master to divide the settlement fund, will result

in class members receiving fair and "significant compensation" for their damages.  Tr. at

12:15-13:12 (Kennedy).  The Court agrees with the Plaintiffs that the value of an immediate

recovery outweighs the possibility of future relief for the class, especially accounting for the

uncertainties of a jury trial and class members' stated desire to see the litigation come to an end.

Whereas a jury trial could leave the class with a smaller award, or no award at all, the Second

Proposed Settlement guarantees a favorable outcome for the class, and will facilitate a faster and

easier payment than the class would receive after a jury trial.  See Robles v. Brake Masters

Systems, Inc., 2011 WL 9717448, at *19 (applying the third Jones v. Nuclear Pharmacy, Inc. factor in favor of approving a settlement, because "[h]ad this case continued in litigation, the Collective Action Settlement Members may have recovered less or perhaps nothing at all, and the settlement will facilitate the prompt payment of their claims.").

### D.   COUNSEL AND PARTIES, SAVE FOR K. LOWERY, SUPPORT THE SECOND PROPOSED SETTLEMENT.

Both parties and their counsel believe that the Second Proposed Settlement is fair.  See Jones v. Nuclear Pharmacy, Inc., 741 F.2d at 324 ("[T]he trial court should consider . . . the judgment of the parties that the settlement is fair and reasonable.").  At the hearing, class members informed the Court that they are in favor of the Second Proposed Settlement.  See Tr. at 50:7 (Clauss)("I'm in favor of the settlement."); Tr. at 52:1-4 (Court, Gutierrez)( Gutierrez informing the Court that, despite K. Lowery's objections, he wants the Court to approve the Second Proposed Settlement); Tr. at 53:17-22 (Court, Thomas)(Thomas informing the Court that she wants the Court to approve the Second Proposed Settlement notwithstanding K. Lowery's objections).  After many class members have listened patiently to the discussion between the Kennedy Firm and K. Lowery, and are thus fully informed of the Second Proposed Settlement's weaknesses, they are still strongly in favor of the Second Proposed Settlement.  The Plaintiffs and the Defendants were required to address the Court's concerns with the First Proposed Settlement, and appear to have addressed those concerns.  The Defendants also believe that the Second Proposed Settlement is fair.  See Tr. at 24:2-5 (Levy)("We feel that after very difficult[] negotiations the City paid a fair amount . . . .").

The Honorable Richard D. Rogers, Senior United States District Judge for the District of Kansas, has noted: "Counsels' judgment as to the fairness of the agreement is entitled to

- 71 -

considerable weight."  Marcus v. Kan. Dep't of Revenue, 209 F. Supp. 2d 1179, 1183 (D. Kan.

2002).  The Kennedy Firm informs the Court that the "two attorneys involved in this action have

tried the majority of police cases in this district in the past ten years," and they both support the

Second Proposed Settlement.  Brief in Support at 18.  See Tr. at 55:3-14 (Kennedy)("[O]ur firm . .

. has done the best we can to exercise discretion on behalf of the class and to arrive at a settlement

that . . . p[u]ts people in a position to get compensation back for this and we think it provides

that."); Tr. at 30:12-25 (Court, Levy)(Ms. Levy states that she agrees with the Kennedy Firm's

assessment that the Second Proposed Settlement is fair, and believes that the process outlined in

the Second Proposed Settlement for administering the settlement fund "provides a full voice to

anyone that wants to come forward").  The Court has previously determined that the opinion of

experienced counsel that a settlement is fair is of great weight to the Court's decision to approve a

settlement.  See In re Thornburg Mortg., Inc. Sec. Litig., 2012 WL 6004176, at *60 (approving a

securities class action settlement that both parties counsel believe is fair); Robles v. Brake Mastery

Sys., Inc., 2011 WL 9717448, at *18 (approving a settlement which, "in counsel's extensive

experience, . . . is fair, just and adequate to settle the claims of the" class).  The Kennedy Firm's

economic interests are in line with the class' interests.  It did what it could to increase the recovery.

Its decision to settle is consistent with the class' judgment.  The fourth factor, thus, weighs in favor

of the Court approving the Second Proposed Settlement.

　　　　The only party who objects to the Second Proposed Settlement is K. Lowery .  K. Lowery

first objects to the Second Proposed Settlement because he asserts that it is too small to sufficiently

compensate him and other class members.  See Objections at 9.  He also argues that the City of

Albuquerque should cover the cost of the Special Master's services.  See K. Lowery Objection at

11-12.  K. Lowery's argument that the City of Albuquerque should pay for the Special Master's services beyond the settlement is essentially an argument that the settlement fund should be greater, so that class member's awards are not decreased by the use of a Special Master. Settlement is a compromise; neither party is likely to get everything they want; indeed, in this matter, the parties assert that they both made concessions in reaching the settlement.  "While the class may not receive everything that it desired, such is the nature of a compromise . . . ."  In re Thornburg Mortg., Inc. Sec. Litig., 2012 WL 6004176, at *59.  The Court does not, from a substantive standpoint, think the costs of a special master are unusual.  There are always administration costs.  See In re Thornburg Mortg., Inc. Sec. Litig., 2012 WL 6004176, at *62 (discussing methods for maximizing a class' recovery in a settlement that will require substantial costs to administer).  There would be costs if there were a number of damages claims.  The Court determines that the immediate recovery of a portion of the $1,120,000.00 in the settlement fund allocated for class members' damages is greater than the uncertain outcome a jury trial would provide.  Another district court in the Tenth Circuit has determined that a settlement was fair even when class members received no monetary award, because the district court enjoined defendants from the practice that inflated fuel prices and caused the class economic harm.  See In Re Motor Fuel Temperature Sales Practices Litig., 2012 WL 1415508, at *3, *12.  Here, the Defendants have ceased the Nuisance Abatement Team's practices, and, thus, the class has already received the benefit of knowing that they will not suffer under that policy any longer or in the future.  See Class Action Notice of Proposed Settlement at 5 ("On November 17, 2010, the City agreed to cease and desist from ordering environmental testing and industrial remediation of any residence of dwelling based solely upon knowledge or suspicion that illicit drugs have been . . . consumed in a residence

. . . ."). The class' award from the settlement fund will thus add to the victories they have already achieved in this case. Further, to the extent that K. Lowery believes he would have received a greater award at trial, the Court believes that trial would offer K. Lowery no guarantee of an increased award. See Tr. at 39:8-22 (Lowery, Court)(J. Lowery: "[T]hrough trial a number is fixed, which is according to the judicial system is a just amount. This here is a subjective amount."). The Court's task when evaluating a proposed settlement is not to ensure that plaintiffs receive every penny which they lost. "As the Tenth Circuit has explained, 'value' in terms of approving a Settlement is not a metaphysical term that assesses whether a Class will feel that all wrongs have been vindicated." In re Thornburg Mort., Inc. Sec. Litig., 2012 WL 6004176, at *59 (quoting Gottlieb v. Wiles, 11 F.3d at 1014-15). The Court's task is to weigh the value of immediate recovery against the possibility of future relief, with all of the risks and vagaries that trial may bring forth. As the Court has previously stated, "[h]ere, the parties would be without the guarantee of receiving even a dollar if this suit were to be resolved at a later time. The Settlement provides the class with 'substantial, guaranteed relief.'" In re Thornburg Mortg., Inc. Sec. Litig., 2012 WL 6004176, at *59 (quoting Lucas v. Kmart Corp., 234 F.R.D. at 694). It may be that K. Lowery would be right if he went to trial; but he might be wrong. The Kennedy Firm and the rest of the class think K. Lowery's claims might be too much. There is the possibility that K. Lowery is an outlier in his beliefs, and he may be an outlier in his damages. The Court thus overrules K. Lowery's objection to the Second Proposed Settlement that the settlement fund is too small.

K. Lowery also objects to the possibility in the Second Proposed Settlement that unallocated settlement funds be returned to the City of Albuquerque. See Objections at 10. K. Lowery asserts that "[j]ustice and fairness would dictate that the City should be required to pay at

least the entire $1.7 million recoupment . . . . [T]he City should not be allowed a 'refund.'" Objections at 10-11.  The only basis for the City of Albuquerque to receive back funds would be if each class member is fully compensated for their claims.  The Court has no sound basis in law to award the class members a monetary sum beyond that which they can legally prove they suffered in damages.  Justice and fairness, therefore, warrants returning unallocated funds to the City of Albuquerque, rather than imposing a penalty upon the City of Albuquerque that has no legal basis.[5]

K. Lowery also objects to the administration of the Second Proposed Settlement.  K. Lowery suggests that class members' claims be divided between "significant" and "insignificant' claims, and he proposes that the settlement fund be broken up into separate "pools" for the two categories.  Objections at 13.  K. Lowery is asking the Court to do that which it has previously determined is unfair: categorically compensate certain class members better than others.  See First Settlement MOO at 42-43 ("Because the proposed settlement allocates a greater award and priority position for the class representatives, the Court believes that the proposed settlement 'treats particular segments of the class differently from others' . . . ." (quoting In re Sprint Corp. ERISA

---

[5] The Court has rejected the use of the cy pres doctrine.  See In re Thornburg Mortg., Inc. Sec. Litig., No. CIV 07-0815 JB/WDS, 2012 WL 3150508, at *8 (D.N.M. July 24, 2012)(Browning, J.); Lane v. Page, 862 F. Supp. 2d 1182, 1229-35, 1249-51 (D.N.M. 2012)(Browning, J.).  The United States Court of Appeals for the Third Circuit requires a district court to weigh the "degree of direct benefit provided to the class," when analyzing a settlement that contains a cy pres award, and has stated that, "[b]arring sufficient justification, cy pres awards should generally represent a small percentage of total settlement funds."  In re Baby Products Antitrust Litig., Nos. CIV 12-1165, 12-1166, 12-1167, 2013 WL 599662, at *5 (3d Cir. Feb. 19, 2013).  The United States Court of Appeals for the Seventh Circuit criticized that doctrine, as well. See Mirfasihi v. Fleet Mortg. Corp., 356 F.3d 781, 784 (7th Cir. 2004)("[T]here is no indirect benefit to the class from the defendant's giving the money to someone else . . . .  [T]he 'cy pres' remedy (badly misnamed, . . .) is purely punitive.").  There are thus only two alternatives: (i) give the Plaintiffs a windfall after their claims are fully adjudicated; or (ii) return the remaining funds to the City of Albuquerque.  The Court cannot, find, from a justice standpoint, defects with the choice the class made.

Litig., 443 F.Supp.2d 1249, 1256 (D. Kan. 2006)(Lungstrum, J.)).  The Court should not approve a settlement that "treats particular segments of the class differently from others not only in terms of the type of relief, but more specifically in terms of the arguably significant disparity in the value of that relief."  In re Sprint Corp. ERISA Litig., 443 F.Supp.2d at1256 (citing Manual for Complex Litigation (Fourth), § 21.62, at 317 (2004)).  The Plaintiffs could have required a settlement that compensated hard costs first, and the then divide up the remaining settlement fund for softer damages.  They did not, in part because some class members do not have hard costs.  The Court could say that the settlement reached is fundamentally uniform, and, in fact, treats all class members the same.  The Second Proposed Settlement is probably the best way to go.  The Court will overrule this objection.

The Court has adequately addressed K. Lowery's remaining objections to the Second Proposed Settlement.  K. Lowery objects to the Second Proposed Settlement, because it does not set forth an estimated number of claimants; indeed, the Court found a similar problem with the First Proposed Settlement.  See Objections at 12; First Settlement MOO at 41.  The Plaintiffs have received claim forms from forty-seven class members, for claims totaling $2,200,000.00, which the Plaintiffs believe is close to the universe of possible claimants.  The Court may therefore adequately "determine the fairness of the Settlement Agreement" that will likely provide class members with a fifty-percent recovery on their claims.  Objections at 12.  Additionally, contrary to K. Lowery's objection that the Second Proposed Settlement does not provide an opportunity for each class member to present evidence of damages to the Special Master, the Plaintiffs have informed the Court that any class member who desires to do so may bring evidence to the Special Master regarding his or her claims.  See Objections at 12-13; Tr. at 12:5-9 (Court,

Kennedy)(Court: "Do you envision it to address Mr. Lowery's concern . . . where if the class member wants to speak to the special master he will be able to[?]" Kennedy: "Absolutely."). Lastly, although the Second Proposed Settlement does not provide the Special Master's hourly rate, once that is determined, class members may appeal that rate to the Court if they believe it is unfair.  See Objections at 11; Brief in Support at 20 (noting that the Court retains jurisdiction to approve the Special Master's hourly rate).  The Court thus overrules K. Lowery's objections to the Second Proposed Settlement.   Certainty of recovery is unusual at the approval stage.  The class members often have to submit claims after appeal.  There will be more money for each claimant if there are few claims.  This much does not undermine the fairness if reasonable estimates can be made.  Here, the number of claimants and the claims are relatively known.  Cf. First Settlement MOO at 43-45 (rejecting the First Proposed Settlement because the number of claimants and the estimated total amount of claims was unknown).  The approval is made on a firmer evidentiary basis than most settlements.

The Court also concludes that the Second Proposed Settlement is fair, even though the class was not given the opportunity to opt out of settlement.  See Fed. R. Civ. P. 23(e)(4) ("[T]he court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."). The Court's decision to reject a proposed settlement because class members were not given the opportunity to opt out is purely discretionary for the court, and courts "are not compelled to" reject a settlement on this basis.  Moulton v. United States Steel Corp., 581 F.3d at 354.  The Court concludes that class members were given an adequate opportunity to opt out earlier in this litigation, through both the Class Action Notice and the Second Class Action Notice.  See Class

- 77 -

Action Notice at 4, Second Class Action Notice at 5.  The Second Class Action Notice set an opt

out deadline for March 30, 2012.  See Second Class Action Notice at 5.  Because the class was

notified twice before of their ability to opt out, the Court cannot conclude that the Second

Proposed Settlement is unfair because it did not allow class members to opt out a third time at the

settlement stage.  See Moulton v. United States Steel Corp., 581 F. 3d 354 (finding that a district

court did not abuse its discretion in approving a class action settlement where the class was given

two opportunities to opt out before settlement was reached, although the settlement did not allow

class members to opt out).  Additionally, the Court does not believe that "the information available

to class members since expiration of the first opportunity to request exclusion, and the nature of

the individual class members' claims," has changed such that the class should have been allowed

to opt out of the Second Proposed Settlement. Fed. R. Civ. P. 23 advisory committee's note to the

2003 amendments.  Rather, the class' likelihood of a significant recovery has increased since the

opt out period transpired.  Although ten class members indicated that they wanted to opt out of the

First Proposed Settlement, the Second Proposed Settlement provides a much larger award and

equal treatment for all class members' claims, and thus, the Court believes that the Second

Proposed Settlement addresses the concerns which those who chose to opt out raised.  See First

Settlement MOO at 44-45 (noting that ten class members chose to opt out of the First Proposed

Settlement because the settlement fund was insufficient to redress their claims).  Moreover, K.

Lowery is the only class member who objects to the Second Proposed Settlement; the remainder of

the class has expressed only support for the Court's approval.  Further, K. Lowery's objection that

the K. Lowery Order prejudiced him by not allowing him to opt out of the First Proposed

Settlement is not relevant to the Second Proposed Settlement's fairness: K. Lowery was notified

twice of his opportunity to opt out.  See Class Action Notice at 4-5 (informing class members that they have the right to opt out and may do so by notifying the Kennedy Firm of their desire); Second Class Action Notice at 5 (informing class members that they have the right to opt out and must exercise that right by March 30, 2012 to not participate in the class).  K. Lowery informed the Court that he desired to opt out in April, 2011, because he did not approve of the First Proposed Settlement.  See K. Lowery Motion at 6 ("Kevin Lowery does not wish to participate in the proposed settlement.  Kevin Lowery is simply exercising his right to 'opt out' of the class action.").  Although the Court initially expressed concerns about allowing K. Lowery to opt out at this stage of the litigation, see K. Lowery Order at 2 ("The Court is not convinced, however, that Mr. Lowery should be able to opt-out at this late stage or that his claims should be severed."), the Court later clarified that, although K. Lowery was no longer a class representative, he may opt out of the class, see First Settlement MOO at 51-52 ("K. Lowery may still wish to opt out of the class and pursue compensation on his individual claims. . . .  [T]hose class members who wish to opt out of the class should file separate suits . . . .").  The Court rejected the First Proposed Settlement, which was the basis for K. Lowery's initial desire to opt out, and at the same time informed K. Lowery, along with the Prospective Intervenors and the remainder of the class, that they may opt out and pursue their claims individually.  See First Settlement MOO at 51-53.  K. Lowery was not prohibited from opting out of the class at that stage.  See First Settlement MOO at 51-52.  The Court also specifically ordered the parties to "send an opt-out notice to the members of the class so that they may decide whether they wish to pursue remedies as a class or whether they would be better off pursuing their own case."  First Settlement MOO at 51.  The Second Class Action Notice informed the class that they may opt out of the class action until March 30, 2012.  See Second

Class Action Notice at 5.  K. Lowery's decision to not opt out after the court rejected the First

Proposed Settlement, which motivated K. Lowery's desire to opt out, and the Second Class Action

Notice was sent does not render the Second Proposed Settlement unfair.  The Court concludes,

thus, that the Second Proposed Settlement is not unfair because class members, including K.

Lowery, were not allowed to opt out a second time at the settlement stage.

The Court concludes, therefore, that the factors which the Tenth Circuit set forth in Jones v.

Nuclear Pharmacy, Inc. for determining whether to approve a class action settlement counsel in

favor of approving the Second Proposed Settlement.  The Court believes that the Second Proposed

Settlement resolves the fairness issues which the Court found in the First Proposed Settlement.

The Court did not approve the First Proposed Settlement, because it was troubled by the class

representatives' receipt of a lump sum payment while the rest of the class received a pro rata

portion of the settlement fund, and because class members could not estimate what their individual

award would be because the total number of class members was unclear.  See First Settlement

MOO at 41.  The Second Proposed Settlement, however, does away with the lump sum award for

the class representatives and provides for the Special Master to judge all class members' claims on

an equal basis.  See Second Proposed Settlement at 5; Tr. at 13:13-14:1 (Kennedy)(Mr. Kennedy

informing the Court that the Special Master will receive all class members' claims for all damages

and then determine how to distribute the funds, either fully compensating each class member, or if

there are insufficient funds to fully compensate, dividing the settlement fun on a pro-rata basis).

Additionally, the Plaintiffs are able to estimate class member's total recovery, because class

members have submitted claim forms detailing their alleged damages.  See Brief in Support at 4

("Class Counsel received claim forms from 47 class members."); Tr. at 8:24-9:35 (Court,

Kennedy)(Mr. Kennedy informing the Court that he believes the forty-seven claim forms received thus far "pretty much represents the universe" of possible claims). The Plaintiffs estimate that the class' total damages will be close to $2,200,000.00, and thus class members are likely to be compensated for at least fifty-percent of their alleged damages, given that the "pool available for all claims is $1.12 million" after the Kennedy Firm is compensated. Brief in Support at 8; Tr. at 9:20-22 (Court, Kennedy)(Court: "So it's likely the recovery percentage of actual damages way be higher than 50 percent[?]" Kennedy: "[W]e believe so."). The Second Proposed Settlement thus overcomes the obstacles to fairness that the First Proposed Settlement presented. Accordingly, the Court approves the Second Proposed Settlement.

## III. THE COURT WILL GRANT THE KENNEDY FIRM'S REQUESTED ATTORNEYS' FEES.

"In a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Kennedy Firm requests thirty-percent of the settlement fund in attorneys' fees. See Brief in Support at 21. The Court concludes that the factors set forth in Johnson v. Ga. Highway Express, Inc. which the Tenth Circuit adopted in Gottlieb v. Barry counsel in favor of granting the requested award of attorneys' fees, and the Court accordingly grants the Kennedy Firm thirty-percent of the settlement fund in attorneys' fees.

"Courts have consistently held that the most important factor within this analysis is what results were obtained for the class." Lane v. Page, No. CIV 06-1071 JB/ACT, 2012 WL 1940574, at *65 (D.N.M. May 22, 2012)(Browning, J.). The First Proposed Settlement provided a fund of $213,276.91 to compensate the class, apart from the class representatives' lump sum award. See First Motion for Preliminary Approval at 3-4. The Kennedy Firm estimates that the class' total

damages are $2,200,000.00.   The Kennedy Firm has successfully negotiated in the Second

Proposed Settlement a fund of $1,200,000.00 to compensate the class.   Thus, rather than being

compensated for one-tenth of their damages, as initially proposed, the class will now receive

approximately fifty-percent of their damages from the Second Proposed Settlement.  This result is

a marked improvement and demonstrates that the class will receive a substantial recovery for their

losses.  This factor thus weighs in favor of approving the Kennedy Firm's requested fees.

Additionally, the time and labor extended warrant granting the Kennedy Firm's requested

award.  This litigation has been ongoing for nearly four years.  The Kennedy Firm reports that its

attorneys, and its paralegals have expended over 1,000 hours collectively on this matter.   The

Kennedy Firm estimates that another 200 hours will be expended in the administration of the

Second Proposed Settlement.  See Brief in Support at 23.  At a blanket rate, this comes out to about

$425.00 per hour, which is not considerably more than the going rate for New Mexico counsel in

this area.  And here, the Kennedy Firm had to take considerable risks so its hourly rate should be

more.   Given the length of this case, the Court does not believe that a combined 1,200 hours is

excessive.  Second, the skill required to perform the legal services properly, and the novelty and

difficulty of the case, warrants granting the Kennedy Firm's requested award.  As the Kennedy

Firm points out, "[l]ess experienced counsel may have approached the issue herein as primarily an

issue of deprivation of fourteenth amendment due process rights."  Brief in Support at 24.  The

Kennedy Firm, on the other hand, found that the case implicated the class' Fourth Amendment

right to be free from unreasonable search and seizure, and ultimately, the Plaintiffs won summary

judgment on that issue. Developing this legal theory broadened the class' chances of recovery, and

demonstrates that the Kennedy Firm's experience with difficult legal issues warrants granting his

requested award.  The Kennedy Firm developed a claim that the exigent circumstances exception to the Fourth Amendment did not justify the Nuisance Abatement Team's practices, and focused the Court on that sole issue for the purposes of the Plaintiffs' summary judgment motions; the Court granted the Plaintiffs summary judgment on the exigent circumstances issue.  See MSJ MOO at 30 n.28.  The Kennedy Firm's focus on the exigent circumstances issues for summary judgment shows that it could try the case efficiently and expeditiously.  Evidence supports a conclusion that this case was undesirable for the Kennedy Firm to take on: the Nuisance Abatement Team was popular with many Albuquerque residents, and the Kennedy Firm was required to prove that what many viewed as a community benefit was, in operation, a violation of the class' constitutional rights.  See Brief in Support at 24 ("Representation of a class of people who are accused of using drugs or having a loved one or tenant use drugs is not an ideal client profile.").  Lastly, while thirty-percent of the settlement fund may seem like a large award, the award is not out-of-step with the market, and the award is contingent.  See Been v. O.K. Indus., Inc., No. CIV-02-285-RAW, 2011 WL 4478766, at *9 (E.D. Okla. Aug. 16, 2011)("Courts agree that a larger fee is appropriate in contingent matters where payment depends on the attorneys' success."); Cimarron Pipeline Const., Inc. v. Nat'l Council On Comp. Ins., Nos. CIV 89-22-T and CIV 89-1186-T, 1993 WL 355466, at *2 (W.D. Okla. June 8, 1993)("Fees in the range of 30-40% of any amount recovered are common in complex and other cases taken on a contingent fee basis.").  Thirty-percent is also within the range of awards that other courts within the Tenth Circuit have approved.  See, e.g., Sanders v. MPRI, Inc., No. 5:08-cv-00345-R (W. D. Okla. July 9, 2009)(approving fees in an FLSA collective action of 38.5% of the total settlement plus litigation costs); McNeely v. Natl'l Mobile Health Care, LLC, No. CIV-7-933-M, 2008 WL

4816510, at *15 (W.D. Okla. Oct. 27, 2008)(approving fees equal to 33% of total settlement);

Ramah Navajo Chapter v. Norton, 250 F. Supp. 2d 1303, 1316 (D.N.M. 2002)(Hansen, J.)("Under the percentage-of-the-fund method, an appropriate starting point is the 25% benchmark established by the case law, with adjustments to be made up or down based on the factors articulated in Johnson v. Ga. Highway Express, Inc. . . ."); In re Pub. Serv. Co. of N. M., No. 91-0536M, 1992 WL 278452 (S.D. Cal. 1992)(approving a fee award of 33.4% on a $33 million recovery).  "The Tenth Circuit has held that a Court may approve attorneys' fees based on a percentage of the common fund bestowed upon the class, provided the fees are reasonable." Robles v. Brake Master Sys., Inc., 2011 WL 9717448, at *19 (citing Brown v. Phillips Petroleum Co., 838 F.2d 451, 454 (10th Cir. 1988)).  Lawyers in tort cases -- personal injury and wrongful death -- regularly receive a forty-percent contingency fee.  The Court concludes that the Kennedy Firm's requested award of thirty-percent of the settlement fund is reasonable, and grants the requested attorneys' fees.

IT IS ORDERED that: (i) the Objections by Plaintiff Kevin Lowery to Class Settlement, filed Aug. 1, 2012 (Doc. 133), are overruled; and (iii) the requests set forth in Plaintiffs' Brief in Support of Class Action Settlement, filed Aug. 31, 2012 (Doc. 137), are granted.  The Court approves the Settlement Agreement, filed May 17, 2012 (Doc. 129-1).

_____
UNITED STATES DISTRICT JUDGE

- 84 -

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Kennedy Law Firm
Albuquerque, New Mexico

> *Attorneys for the Plaintiffs*

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

> *Attorneys for the Defendants*