## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KEVIN LOWERY, on his behalf and
on behalf of similarly situated persons,

        Plaintiff,

JUDY LOVATO, DANNY GABALDON,
BARBARA THOMAS, each on his/her behalf
and on behalf of similarly situated persons,

        Plaintiffs-in-Intervention,

vs.                                                                   No. CIV 09-0457 JB/WDS

CITY OF ALBUQUERQUE, MARTIN CHAVEZ,
in his individual capacity as mayor of the City of
Albuquerque; RAY SCHULTZ, in his individual
capacity as chief of police of the City of Albuquerque
Police Department; JOHN OLMSTEAD; MARK
CRANDALL; and JOHN DOE POLICE OFFICERS,

        Defendants,

MICHELLE WALL, LARRY MOYA,

        Defendants-in-Intervention.

## <u>MEMORANDUM OPINION AND ORDER</u>

        **THIS MATTER** comes before the Court on: (i) the Objection to & Appeal of the Special

Master's Report of Carl Reazin, Class Member, filed April 3, 2014 (Doc. 161)("Reazin

Objection"); (ii) the Notice of Appeal of Carl Reazin, filed April 7, 2014 (Doc. 162)("Reazin

Appeal"); (iii) the Notice of Appeal of Joel Marks, filed April 7, 2014 (Doc. 163)("Marks

Appeal"); (iv) the Notice of Appeal of Donna Snyder, filed April 7, 2014 (Doc. 164)("Snyder

Appeal"); (v) Notice of Appeal of Tammy Gallegos and Ron Tapia, filed April 7, 2014

(Doc. 165)("Gallegos & Tapia Appeal"); (vi) the Notice of Appeal of Darlene Chavez, filed April

7, 2014 (Doc. 166)("Chavez Appeal"); (vii) the Notice of Appeal of Edna Carmichael, filed April 7, 2014 (Doc. 167)("Carmichael Appeal"); (viii) the Notice of Appeal of Mark Anthony Pena, filed April 7, 2014 (Doc. 168)("Peña Appeal"); (ix) the Notice of Appeal of Michael and Kathy Trudelle, filed April 7, 2014 (Doc. 169)("Trudelle Appeal"); (x) the Notice of Appeal of Barbara Thomas, filed April 7, 2014 (Doc. 170)("Thomas Appeal"); (xi) the Notice of Appeal of Monica Roybal, filed April 7, 2014 (Doc. 171)(" M. Roybal Appeal"); (xii) the Notice of Appeal of Karl Becker, filed April 7, 2014 (Doc. 172)("Becker Appeal"); (xiii) the Notice of Appeal of Theodore Roybal, filed April 7, 2014 (Doc. 173)("T. Roybal Appeal"); (xiv) the Notice of Appeal of Eugene Cinelli, filed April 7, 2014 (Doc. 174)("Cinelli Appeal"); and (xv) the Plaintiffs' Unopposed Motion to Distribute Class Fund and Pay Expenses, filed May 28, 2014 (Doc. 180)("Motion to Distribute"). The Court held a hearing on May 13, 204, and evidentiary hearings on May 29, 2014, May 30, 2014, and July 11, 20014. The primary issues are (i) whether the Court should modify the Special Master's Report, filed March 13, 2014 (Doc. 160-1)("Judge Lang's Report"), that the Special Master, the Honorable William F. Lang, retired District Judge, Second Judicial District Court, State of New Mexico, created and which proposes damages awards that each Class Action Plaintiff should receive; and (ii) whether the Court should permit the class settlement fund to be distributed to the Class Action Plaintiffs. Because some of Judge Lang's proposed awards are insufficient, the Court will modify some of them. Specifically, the Court will grant some of the requests in the Gallegos & Tapia Appeal, increasing Judge's Lang's total proposed award from $38,057.48 to $60,470.63. The Court will grant some of the requests in the Chavez Appeal, increasing Judge Lang's proposed award of $9,570.08 to $13,181.44. The Court will grant some of the requests in the Peña Appeal, increasing Judge Lang's proposed award of $2,000.00 to $17,278.40. The Court will grant some of the requests in the M. Roybal Appeal and the T. Roybal

Appeal, increasing Judge Lang's proposed award of $17,780.12 to $23,348.06.  The Court will grant the requests in the Becker Appeal, increasing Judge Lang's proposed award of $13,330.60 to $17,480.60.  Finally, the Court will grant some of the requests in the Cinelli Appeal, increasing Judge Lang's proposed award of $3,810.53 to $17,779.36.  The Court will deny the requests in the Reazin Objection, the Reazin Appeal, the Marks Appeal, the Snyder Appeal, the Carmichael Appeal, the Trudelle Appeal, and the Thomas Appeal.  Additionally, the Court will grant the Motion to Distribute and permit the class settlement fund to be distributed in accordance with this Memorandum Opinion and Order.

## **FACTUAL BACKGROUND**

The Court has previously reviewed the facts of this case in its Memorandum Opinion and Order, filed March 31, 2011 (Doc. 79)("MSJ MOO"), which granted summary judgment on the issue whether exigent circumstances existed to seize Plaintiffs Danny Gabaldon's, Judy Lovato's, Barbara Thomas' and Kevin Lowery's homes, its Memorandum Opinion and Order, filed April 13, 2011 (Doc. 83)("Certification MOO"), which certified the class action; its Memorandum Opinion and Order, filed Jan. 24, 2012 (Doc. 96)("First Settlement MOO"), which rejected the parties' first proposed settlement, and its Memorandum Opinion and Order, filed February 27, 2013 (Doc. 147)("Second Settlement MOO").  The Court adopts those facts for the purposes of this Memorandum Opinion and Order.  The also takes the facts regarding the Ordinances of the Defendant City of Albuquerque, New Mexico, and the practices of the Albuquerque Police Department's ("APD") Criminal Nuisance Abatement Team from the Second Settlement MOO. See Second Settlement MOO at 2-4.  The Court takes the facts concerning the individual class members, who have objected to Judge Lang's Report, from the hearings held before Judge Lang,

from the class member's Notices of Appeal, and from the evidentiary hearings held before the

Court.[1]

---

[1]The United States Court of Appeals for the Tenth Circuit has held: "'Where the district court rejects a factual finding by the master, [the Tenth Circuit], like a majority of circuit courts, directly reviews the findings of the special master, thereby effectively ignoring the district court's review of the master's findings.'" U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 830 (10th Cir. 2005)(quoting Gottlieb v. Barry, 43 F.3d 474, 486 (10th Cir. 1994)). The Tenth Circuit first formed this rule in the Bankruptcy setting before applying it to reviewing a Special Master's factual findings. See Poticek v. Cordeleria Lourdes, 310 F.2d 527, 530 (10th Cir. 1962). In the bankruptcy setting, the Tenth Circuit reasoned:

> The district court must accept the fact findings of the referee unless they are clearly erroneous. On this appeal we are in the same position as is the Supreme Court when it considers a case wherein the court of appeals has set aside a fact finding of the district court. In such a situation the Supreme Court has said that the question is whether the findings of the district court, not of the court of appeals, are clearly erroneous. A majority of the courts of appeals have held that where the district court rejects a referee's findings as clearly erroneous, the court of appeals applies the clearly erroneous test to the decision of the referee. Accordingly, our problem is whether the crucial fact finding of the Referee is clearly erroneous.

Poticek v. Cordeleria Lourdes, 310 F.2d at 530 (footnotes omitted). In Gottlieb v. Barry, the Tenth Circuit cited Poticek v. Cordeleria for the proposition that, "[w]here the district court rejects a factual finding by the master, we, like a majority of circuit courts, directly review the findings of the special master, thereby effectively ignoring the district court's review of the master's findings." 43 F.3d at 486 (citing Poticek v. Cordeleria, 310 F.2d at 530). Accordingly, the Tenth Circuit's reasoning for reviewing a Special Master's factual findings, rather than a district court's', is the same as the Supreme Court's reasoning for reviewing a district court's factual findings rather than a court of appeals'. See Poticek v. Cordeleria, 310 F.2d at 530. The Supreme Court's rationale for reviewing a district court's factual findings, rather than a court of appeals', is that the Supreme Court stands "in the same position as the Court of Appeals." McAllister v. United States, 348 U.S. 19, 20 (1954). The United States Court of Appeals for the Seventh Circuit noted "[n]o matter how thoroughly an appellate court combs the record, it has no more than a sterile and second-hand account of what occurred in the court below," and this same concern "can be said of a district court when it reviews a master's factual findings -- it too is one step removed." Cook v. Niedert, 142 F.3d 1004, 1010-11 (7th Cir. 1998).

Consequently, in the Factual Section, the Court will state the facts as the parties presented them before Judge Lang and will rely on the facts presented at the Court's evidentiary hearings only if the record from Judge Lang's hearings is inadequate. This case, however, is different than the ones in which the Tenth Circuit ignored the district courts' factual findings, because the Court, in accordance with rule 53(f)(1), conducted evidentiary hearings and received evidence from the parties. See Fed. R. Civ. P. 53(f)(1). The Court is not acting like a removed appellate court by merely reviewing Judge Lang's record. The Court, instead, has received evidence and observed

1.      **City Ordinances**.

In 2004, City of Albuquerque passed the Clean Up of Laboratory Sites Ordinance, Ord. 36-2004 ("Drug Lab Ordinance").  The Drug Lab Ordinance's purpose was to require remediation of clandestine drug laboratory sites "to assure the health, safety and welfare of the community."  Drug Lab Ordinance § 11-1-1-42.  <u>See</u> First Settlement MOO at 2.  The Drug Lab Ordinance defined clandestine drug laboratories as "property on which [a controlled substance] is being manufactured or on which there is an attempt to manufacture, or where a person is arrested for having on any property any chemicals or equipment used in manufacturing [a controlled substance]."  Drug Lab Ordinance § 11-1-1-42.  <u>See</u> First Settlement MOO at 2-3.  The Substandard Building Ordinance, Ord. 34-1985 ("Ord. 34-1985"), states that any building or portion of a building where there exists an inadequate sanitation condition "to the extent that [the condition] endangers the life, limb, health, property, safety or welfare of the public or occupants thereof shall be deemed and declared a SUBSTANDARD BUILDING."  Ord. 34-1985 § 14-3-4-1.  <u>See</u> First Settlement MOO at 3.  Substandard housing means that there is an immediate risk of harm to the resident.  <u>See</u> First Settlement MOO at 3.  Designation of a house as substandard

witness testimony, which the Court has used to supplement Judge Lang's record, which it is allowed to do.  <u>See</u> Fed. R. Civ. P. 53(f)(1) ("In acting on a master's order, report, or recommendations, the court . . . may receive evidence . . . .").  The Tenth Circuit has not yet been presented with such a case; however, other Circuit Courts of Appeals have given a district court some deference when the district court is more intimately familiar with the case than an appellate court and better suited for making certain factual findings, such as the reasonableness of an attorneys fees award.  <u>See</u> <u>Cook v. Niedert</u>, 142 F.3d at 1011 (holding that, because a case had been pending before the district court for five years and the district court had seen the parties throughout the case, the district court was "'far better suited than an appellate court to assess a reasonable fee'" (quoting <u>Harman v. Lyphomed, Inc.</u>, 945 F.2d 969, 973 (7th Cir. 1991)(alterations omitted))).  The Court believes that, in reviewing this case on appeal, the Tenth Circuit would grant the Court's factual findings greater deference because the Court has received evidence, including witness testimony, from which the Court has been able to observe witnesses and determine credibility.  The Court will, thus, rely on evidence from its evidentiary hearings in the Analysis Section in addition to the evidence that the parties presented before Judge Lang.

through "posting" or "red tagging" requires same-day eviction of all residents.  Ord. 34-1985 § 14-3-5-3(D); First Settlement MOO at 3.  Residents and homeowners who re-enter a property posted as substandard without a permit commit a misdemeanor offense.  See Drug Lab Ordinance; First Settlement MOO at 3.

When a property is deemed substandard because of drug contamination, occupants and homeowners are barred from entering the property until the homeowners pay for drug contaminant testing and remediation, which can cost thousands of dollars.  See First Settlement MOO at 3-4; Ord. 34-1986 § 14-3-5-4(D).

### 2.    APD's Criminal Nuisance Abatement Team Practices.

City Inspector Joseph Martinez wrote the initial draft of the Drug Lab Ordinance.  See First Settlement MOO at 4.  Martinez included language about possible contamination from drug use based on his belief that drug use could lead to property contamination.  See First Settlement MOO at 4.  Martinez' belief was not founded on scientific evidence.  See First Settlement MOO at 4.

Martinez enforced the draft ordinance he had written and not the ordinance that the City of Albuquerque put into law.  See First Settlement MOO at 4.  Martinez did not read the final version of the Drug Lab Ordinance that the City of Albuquerque passed until about a year after it had been in effect.  See First Settlement MOO at 4.  Members of the Nuisance Abatement Team enforced the Martinez draft and not the ordinance that the City of Albuquerque gave legal effect.  See First Settlement MOO at 4-5.

Some members of the Nuisance Abatement Team evicted residents and homeowners from their home based on the belief that drug use was occurring in the home.  See First Settlement MOO at 5.  Possible contamination because of drug use in a home was, in some cases, the sole basis for "red tagging" a home.  First Settlement MOO at 5.  Some members of the Nuisance Abatement

- 6 -

Team posted houses where there was evidence that drug use had occurred, even if the drug use was a onetime occurrence.  See First Settlement MOO at 5.

Members of the Nuisance Abatement Team knew that the Drug Lab Ordinance applied only to drug laboratories and expressed concerns that the Drug Lab Ordinance did not apply to drug use.  See First Settlement MOO at 5.  When a member of the Nuisance Abatement Team expressed concern that the Drug Lab Ordinance did not extend to evictions based on drug use, he was told that the Substandard Building Ordinance could be used to deem a house substandard based on drug use.  See First Settlement MOO at 5.  Members of the Nuisance Abatement Team were told that, if they found drug paraphernalia, they should post notices on those homes, because there might be contamination.  See First Settlement MOO at 5-6.  Inspectors used the Drug Lab Ordinance to evict suspected drug users from their homes.  See First Settlement MOO at 6.

### 3.     **Carl Reazin.**

Reazin owns a row of duplexes on General Marshall Street in Albuquerque.  See Transcript of Distribution Hearing Before Judge Lang at 49:11-16 (taken August 30, 2013)("August 30, 2013, Lang Tr.")(Kennedy, Reazin).  Reazin rented two of his duplexes, 220 General Marshall Street and 312 General Marshall Street, out to tenants, and APD red tagged the two duplexes.  See August 30, 2013, Lang Tr. at 48:15-17 (Kennedy, Reazin).  See also Reazin Appeal at 17.  When red tagging 312 General Marshall, APD closed down the streets, surrounded the duplex, and would not allow people in or out of the closed off area.  See August 30, 2013, Lang Tr. at 49:3-8 (Reazin).  During the raid of 312 General Marshall, there were police snipers, police dogs, and some police officers carrying machine guns with other police officers wearing hazmat suits.  See August 30, 2013, Lang Tr. at 57:19-58:2 (Levy, Reazin).  312 General Marshall may have been used as a methamphetamine laboratory, see August 30, 2013, Lang Tr. at 56:19-24 (Levy, Reazin)("Q. . . .

- 7 -

312 General Marshall was found to be a meth lab.  A. Well, it certainly wasn't found to be a m[e]th lab by any description of meth lab.  And if it was found to be a meth lab, it's trumped up."), and APD took away what appeared to be bottles of bleach, see August 30, 2013, Lang Tr. at 58:1-2 (Levy, Reazin).  After the raid on 312 General Marshall, APD officers went door-to-door to the other duplexes, informing the tenants that they should move, that there was a meth lab in 312 General Marshall, that Reazin was a bad landlord, and that they would not need to honor their leases.  See August 30, 2013, Lang Tr. at 51:22-52:2 (Kennedy, Reazin).  At 220 General Marshall, APD found paraphernalia that indicated that somebody had smoked cocaine in a pipe. See August 30, 2013, Lang Tr. at 56:12-18 (Levy, Reazin).

### 4.  Joel Marks.

Marks owned property at 221 Vassar SE in Albuquerque, which has two houses on it.  See Transcript of Distribution Hearing Before Judge Lang at 3:23-4:8 (taken May 21, 2013)("May 21, 2013, Lang Tr.")(Kennedy, Marks); id. at 6:20-21 (Marks).  Marks rented one of the houses to a lady named Gloria.  See May 21, 2013, Lang Tr. at 3:23-4:8 (Kennedy, Marks).  Gloria's son lived with her and was arrested for using illicit drugs -- either crack cocaine, heroin, or both.  See May 21, 2013, Lang Tr. at 4:8-12 (Marks).  The Nuisance Abatement Team informed Marks that he would need to have the house tested to see if it was contaminated, and the test came back positive. See May 21, 2013, Lang Tr. at 4:14-5:21 (Kennedy, Levy, Marks, Lang).  The Nuisance Abatement Team informed Marks that he would have to clean the house and that, if he ever sold the house, he would have to disclose that it had been contaminated with drugs.  See May 21, 2013, Lang Tr. at 5:21-6:1 (Marks, Lang).  Cleaning the house would have cost Marks between $15,000.00 and $20,000.00.  See May 21, 2013, Lang Tr. at 6:1-6 (Marks, Kennedy).  Because of the cleanup costs, and because Marks believed that no one would purchase the property if he

disclosed the drug use, Marks decided to tear down the house.  See May 21, 2013, Lang Tr. at 6:1-10 (Marks, Kennedy).

> **5.    Donna Snyder.**

Snyder owned property at 3831 Ladera N.W. in Albuquerque which she rented to tenants. See Transcript of Distribution Hearing Before Judge Lang at 86:7-18 (taken May 31, 2013)("May 31, 2013, Lang Tr.")(Kennedy, Snyder).  The Nuisance Abatement Team red tagged the property, because the tenants were growing marijuana[2] in the house.  See May 31, 2013, Lang Tr. at 86:17-19 (Snyder).  The police knocked over buckets of water on the second floor of the house and threw items from inside the house into the backyard, some landing in the backyard swimming pool.  See May 31, 2013, Lang Tr. at 87:6-8 (Snyder); id. at 87:22-23 (Snyder); id. at 91:23-92:2 (Snyder); id. at 93:1-5 (Snyder).  Snyder paid to have the house tested and to replace the swimming pool's lining.  See May 31, 2013, Lang Tr. at 86:20-87:8 (Snyder); id. at 88:25-89:12 (Kennedy, Snyder); id. at 91:11 (Snyder).  See also Snyder Appeal at 16.  The house's carpets and sheet rock also needed to be replaced, because the spilled buckets of water ruined them; however, it is unclear whether Snyder ever paid to replace them.  See May 31, 2013, Lang Tr. at 91:8-17 (Snyder)(noting that carpets and sheet rock needed to be redone, but that Snyder did not have the money to do it). See also Snyder Appeal at 16 (listing expenses from having house red tagged, but not listing replacing carpets or sheet rock).

---

[2]Snyder testified that the tenants were growing "pot" in the house.  May 31, 2013, Lang Tr. at 86:17 (Snyder).  "Pot" is a slang term for "marijuana."  Cannabis (Drug), Wikipedia.Org, http://en.wikipedia.org/wiki/Cannabis_%28drug%29 (last visited Nov. 3, 2014).  The Court will use the term "marijuana" in referring to the drugs grown on Snyder's property rather than the slang term "pot."

6.     **Tammy Gallegos and Ron Tapia.**

Gallegos, Tapia, and their daughter lived in a house when Nuisance Abatement Team members entered the house and forced them to leave.  See Transcript of Distribution Hearing Before Judge Lang at 34:14-35:3 (taken May 17, 2013)("May 17, 2013, Lang Tr.")(Kennedy, Tapia).  The Nuisance Abatement Team entered the house under the belief that drugs were being manufactured in the house.  See Gallegos & Tapia Appeal at 29.  The officers made Tapia sit in the front yard as APD searched the house by cutting open furniture, tearing down window curtains, turning over beds, and dumping out the contents of drawers.  See Gallegos & Tapia Appeal at 29. The officers did not find any evidence of drug manufacturing.  See Gallegos & Tapia Appeal at 29. A neighbor offered to take the daughter's dog to his house to watch it while APD searched the house, but APD instead called animal control to take the dog away.  See Gallegos & Tapia Appeal at 29.  APD arrested Tapia for a traffic warrant.  See Gallegos & Tapia Appeal at 29.

APD officers told Tapia that he would have to have the house tested and cleaned, which would cost about $10,000.00 and which he could not afford.  See Gallegos & Tapia Appeal at 29. Tapia told the APD officer that he could clean the house, because he was Hazmat Certified, but the APD officer got angry and informed Tapia that he had to hire someone else to clean the house.  See Gallegos & Tapia Appeal at 29.  Gallegos and Tapia were unable to reenter the house to retrieve Tapia's tools for work, which Tapia had to pay around $2,000.00 to replace.  See May 17, 2013, Lang Tr. at 40:25-41:19 (Kennedy, Gallegos, Tapia).  Gallegos, Tapia, and their daughter moved into an apartment, which cost around $800.00 a month.  See May 17, 2013, Lang Tr. at 41:20-23 (Kennedy, Tapia).  Gallegos and Tapia could not afford to pay the $2,000.00 to replace Tapia's tools, the $800.00 in apartment rent, and their $1,500.00 mortgage on the house, so they did not pay the mortgage, and their house was foreclosed on and sold with all of their belongings inside it.

See May 17, 2013, Lang Tr. at 40:22-23 (Tapia); id. at 42:6-44:15 (Levy, Kennedy, Gallegos, Tapia).  As a result of being forced out of their house and losing all of their personal belongings, Gallegos and Tapia's daughter became depressed.  See May 17, 2013, Lang Tr. at 45:21-47:8 (Kennedy, Gallegos, Tapia); Gallegos & Tapia Appeal at 31.  Their daughter went from being an "A" student in school to barely passing.  May 17, 2013, Lang Tr. at 39:19-40:4 (Kennedy, Tapia); id. at 52:9-53:16 (Kennedy, Gallegos, Tapia).  Doctors suggested putting their daughter on depression medication, but Gallegos and Tapia instead started her on an herbal regimen.  See May 17, 2013, Lang Tr. at 47:1-8 (Gallegos).

### 7.      **Darlene Chavez.**

Since 1989, Chavez has lived in a house at 7900 Frederick Lane, S.W., in Albuquerque. See August 30, 2013, Lang Tr. at 3:18-11 (Kennedy, Chavez).  The house is in Chavez' parents' name, although they do not live with her.  See August 30, 2013, Lang Tr. at 3:22-4 (Kennedy, Chavez).  In April, 2009, the Nuisance Abatement Team red tagged the house, because Chavez' boyfriend admitted to smoking methamphetamine in it.  See August 30, 2013, Lang Tr. at 5:2-4 (Chavez); id. at 3:18-4:11 (Kennedy, Chavez); id. at 6:20-23 (Kennedy, Chavez).  The Nuisance Abatement Team gave Chavez two hours to gather what she could and leave the house.  See August 30, 2013, Lang Tr. at 5:6-10 (Chavez).  Chavez decided to move into a motor home that her son owned in Rio Puerco, New Mexico.  See August 30, 2013, Lang Tr. at 5:10-18 (Chavez).  The motor home did not have running water or electricity.  See August 30, 2013, Lang Tr. at 5:16-18 (Chavez).  Chavez lived in the motor home for five months, and had to bring water to home drink and ice to keep her food fresh.  See August 30, 2013, Lang Tr. at 12:6-22 (Chavez).

Chavez had the house tested for drugs and the first test came back positive, which Chavez believed was because of improper procedures; however, the second test showed that the house was

clean, except for the air vents, which Chavez had cleaned.  See August 30, 2013, Lang Tr. at 8:2-9:1 (Chavez).  While the house was abandoned, it was vandalized several times, so Chavez' son slept in the backyard to ensure that no one broke into the house.  See August 30, 2013, Lang Tr. at 11:17-20 (Chavez).

    **8.    <u>Edna Carmichael</u>.**

    Carmichael owned a mobile home in Albuquerque that the Nuisance Abatement Team red tagged.  See Transcript of Evidentiary Hearing at 14:9-12 (taken May 29, 2014)("May 29, 2014, Tr.")(Kennedy, Carmichael).[3]  Carmichael and her son, David Martinez, had owned the mobile home since 2003, and, in 2008, Martinez lived in the mobile home.  See May 29, 2014, Tr. at 14:13-21 (Kennedy, Carmichael).  APD officers alleged that they found a methamphetamine laboratory in the mobile home, and they arrested and charged Martinez.  See May 29, 2014, Tr. at 15:12-20 (Kennedy, Carmichael); id. at 19:24-21:3 (Levy, Carmichael).  In searching the mobile home, the Nuisance Abatement Team broke every window and door in the mobile home.  See May 29, 2014, Tr. at 15:4-8 (Kennedy, Carmichael).  APD and the manager of the trailer park, where the mobile home was parked, ordered Carmichael to move the home within five days after the raid. See May 29, 2014, Tr. at 15:21-24 (Kennedy, Carmichael); id. at 16:7-12 (Kennedy, Carmichael). The mobile home was so destroyed that no trailer park would take the home.  See May 29, 2014, Tr. at 16:16-19 (Kennedy, Carmichael).  Because it would cost more money to repair the mobile home that it was worth, and because Carmichael could not find a place to park it, Carmichael gave the home away to a man who was willing to take it for free.  See May 29, 2014, Tr. at 17:7-18:8 (Kennedy, Carmichael).

----

[3]The Court's citations to the transcripts of the hearings held before the Court refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

9.     **Mark Anthony Peña.**

Peña lived at 1424 Los Tomases, N.W. in Albuquerque in a house that his father owned. See May 29, 2014, Tr. at 76:18-77:2 (Kennedy, Peña).  The Nuisance Abatement Team red tagged the property twice, once in late 2009 and again in early 2010.  See May 29, 2014, Tr. at 77:3-11 (Kennedy, Peña).  When the Nuisance Abatement Team red tagged the property in 2010, Peña was evicted from the house and allowed to return only to try to clean it.  See May 29, 2014, Tr. at 77:12-24 (Kennedy, Peña).  In searching the house during the 2010 raid, APD brought out large spotlights to search throughout the night and speakers, which they used to warn Peña's neighbors to stay in their homes.  See May 29, 2014, Tr. at 81:1-5 (Peña).  Peña was arrested, and charged with conspiracy to traffic and possess a controlled substance, for which Peña accepted a plea deal. See May 29, 2014, Tr. at 79:10-80:7 (Kennedy, Peña).  Peña was sentenced to imprisonment for three years as a part of the plea agreement.  See May 29, 2014, Tr. at 83:23-84:1 (Levy, Peña).

Peña was unable to clean up the house, and APD arrested him for trespassing on the property while he was in the house trying to clean it.  See May 29, 2014, Tr. at 77:25-78:7 (Kennedy, Peña).  Because Peña was not able to live in the house, he was forced to live on the streets. See May 29, 2014, Tr. at 78:14-16 (Kennedy, Peña).  Peña lived on the streets for several months until the stress of being forced out of his home and being forced to live on the streets caused him to suffer a heart attack.  See May 29, 2014, Tr. at 78:17-79:7 (Kennedy, Peña).  Peña's father eventually sold the house.  See May 29, 2014, Tr. at 83:12-18 (Levy, Peña).

### 10.   **Michael and Kathy Trudelle.**

M. Trudelle and K. Trudelle lived in a house at 1818 Ridgecrest in Albuquerque which a family trust owned.  See May 21, 2013, Lang Tr. at 39:19-40:11 (Kennedy, Trudelle[4]).  The Trudelles lived in the house since 2000.  See May 21, 2013, Lang Tr. at 40:15-16 (Kennedy, Trudelle).  The Nuisance Abatement Team red tagged the house on July 4, 2008, because APD found methamphetamine in the house.  See May 21, 2013, Lang Tr. at 40:12-19 (Kennedy, Trudelle).  The Trudelles appealed the red tagging, but, because they did not have the house tested within the appeals time period, they were evicted from the house.  See May 21, 2013, Lang Tr. at 40:20-41:8 (Kennedy, Trudelle).

The Trudelles had the house tested, cleaned, and retested, but, even after cleaning the house, the house tested positive for methamphetamine, and the Trudelles were not allowed to move back into the house.  See May 21, 2013, Lang Tr. at 41:-43:1 (Kennedy, Trudelle).  The Trudelles were never allowed back onto the property, and they lost all of their possessions that were inside the house, because the items were contaminated, or because the house was vandalized and items were stolen, including furniture, clothing, family heirlooms, and wedding presents.  See May 21, 2013, Lang Tr. at 43:3-10 (Kennedy, Trudelle); id. at 43:22-44:20 (Kennedy, Trudelle); id. at 45:20-24 (Kennedy, Trudelle); id. at 46:19-47:9 (Kennedy, Trudelle).

---

[4]It is not clear from the May 21, 2013, Lang Tr. when M. Trudelle was speaking and when K. Trudelle was speaking.  It appears that M. Trudelle and K. Trudelle testified at the same time, and the May 21, 2013, Lang Tr. does not differentiate between when M. Trudelle is speaking and when K. Trudelle is speaking.  Additionally, the May 21, 2013, Lang Tr. spells "Trudelle" as "Trudell."  See May 21, 2013, Lang Tr. at 39 ("Michael and Cathy Trudell").  In citing to the May 21, 2013, Lang Tr., the Court will spell "Trudelle" as it is spelled in the Trudelle Appeal and will attribute the testimony to "Trudelle," rather than trying to determine whether it is M. Trudelle or K. Trudelle who is testifying.

11.    **Barbara Thomas**.

Thomas owned a house at 300 Florida, N.E, in Albuquerque.  See May 31, 2013, Lang Tr. at 4:18-20 (Kennedy, Thomas).  Thomas had lived in the house for twenty-five years.  See May 31, 2013, Lang Tr. at 11:2-3 (Kennedy, Thomas).  In April, 2009, the Nuisance Abatement Team red tagged the house.  See May 31, 2013, Lang Tr. at 4:21-5:1 (Kennedy, Thomas).  At that time, Thomas, her daughter, her son -- Sean -- her son's baby's mother[5] -- Donna -- and her two grandchildren were living in the house.  See May 31, 2013, Lang Tr. at 5:8-24 (Kennedy, Thomas).  The Nuisance Abatement Team red tagged the house, because of Sean and Donna's drug use.  See May 31, 2013, Lang Tr. at 6:3-15 (Kennedy, Thomas).  When the Nuisance Abatement Team red tagged the house, Thomas and the others were allowed to grab a few belongings, but were forced to leave the house that day.  See May 31, 2013, Lang Tr. at 8:15-20 (Kennedy, Thomas).  Thomas and the others moved into a bed and breakfast that a friend of hers owned.  See May 31, 2013, Lang Tr. at 9:9-13 (Kennedy, Thomas).

To move back into the house, Thomas had to have the house cleaned.  See May 31, 2013, Lang Tr. at 9:14-18 (Thomas).  Thomas had to clear out all of her belongings and put them into storage units before she could clean the house.  See May 31, 2013, Lang Tr. at 11:8-19 (Thomas). The cleaning company broke the top of Thomas' stove, used wrong screws in replacing light switch plates, and replaced door covers upside down.  See May 31, 2013, Lang Tr. at 13:20-14:3 (Thomas).  Thomas was able to move back into the house six to eight weeks after the Nuisance Abatement Team red tagged the house.  See May 31, 2013, Lang Tr. at 14:17-19 (Thomas).

_____

[5]It is not clear what the relationship between Thomas' son, Sean, and his baby's mother, Donna, was at the time that the house was red tagged.  Thomas repeatedly referred to Donna as Sean's "baby's mom" or as the mother of her granddaughter rather than as Sean's significant-other, girlfriend, or partner.  See May 31, 2013, Lang Tr. at 5:6 (Thomas); id. at 5:23-24 (Thomas).  The Court will, thus, refer to Donna as either "Donna" or as "Thomas' son's baby's mother."

During the time in which Thomas was not allowed to move back into the house, she had to take care of her granddaughter: Sean and Donna's daughter.  See May 31, 2013, Lang Tr. at 18:21-19:6 (Kennedy, Thomas).   While Thomas was at work, her daughter took care of her granddaughter.  See May 31, 2013, Lang Tr. at 19:1-2 (Thomas).  During that time, Sean and Donna took their daughter back, and did not tell Thomas where they went.  See May 31, 2013, Lang Tr. at 19:7-13 (Thomas); id. at 23:3-10 (Levy, Thomas).   Thomas did not see her granddaughter for about eighteen months.  See May 31, 2013, Lang Tr. at 19:16-18 (Thomas). Thomas was worried for her granddaughter's well-being and even called the New Mexico Children, Youth, and Families Department ("CYFD"), reporting that her granddaughter was missing.  See May 31, 2013, Lang Tr. at 19:18-21:7 (Kennedy, Thomas); id. at 22:1-17 (Thomas). CYFD would not assist Thomas in getting back her granddaughter, because Thomas was not her granddaughter's legal guardian.  See May 31, 2013, Lang Tr. at 22:11-16 (Thomas).

### 12.    Monica and Theodore Roybal.

T. Roybal served in the Vietnam War in the 173rd Airborne and suffers from Post-Traumatic Stress Disorder ("PTSD") from his time at war.  August 30, 2013, Lang Tr. at 29:10-30:14 (Kennedy, Roybal).  T. Roybal, and his daughter, M. Roybal, inherited a house in Albuquerque from T. Roybal's parents.  See August 30, 2013, Lang Tr. at 25:13-15 (Kennedy); id. at 26:13-15 (T. Roybal).   APD  red tagged the house in September, 2008.  See August 30, 2013, Lang Tr. at 25:6-12 (Kennedy, T. Roybal).  M. Roybal lived in the house with her boyfriend at the time, while T. Roybal visited frequently.  See August 30, 2013, Lang Tr. at 25:20-26:6 (Kennedy, T. Roybal); id. at 35:18-20 (Kennedy, M. Roybal).  M. Roybal's boyfriend was the only person at the house when the Nuisance Abatement Team raided it.  See August 30, 2013, Lang Tr. at 34:23-35:12 (Kennedy, M. Roybal); id. at 35:20-23 (Kennedy, M. Roybal).   M. Roybal's

boyfriend was arrested for using drugs.  See August 30, 2013, Lang Tr. at 44:6-8 (Levy, M. Roybal).

When M. Roybal arrived home after the raid, she saw the red signs warning people to stay off the property, but she did not know what had happened until the next morning.  See August 30, 2013, Lang Tr. at 35:5-17 (M. Roybal).  M. Roybal had to live with her parents in Peralta, New Mexico, which made her commute to work long.  See August 30, 2013, Lang Tr. at 37:17-24 (Kennedy, M. Roybal).  M. Roybal called a Nuisance Abatement Team officer, who was "mean" to her over the telephone and who told her what she needed to do to move back into her house.  See August 30, 2013, Lang Tr. at 37:1-13 (M. Roybal).  M. Roybal and T. Roybal had the house tested for drug chemicals, and the garage tested positive.  See August 30, 2013, Lang Tr. at 39:9-40:2 (Kennedy, M. Roybal).  M. Roybal had to throw away a number of sentimental items that were in the garage, because they were contaminated.  See August 30, 2013, Lang Tr. at 40:2-13 (Kennedy, M. Roybal).  M. Roybal was not able to move back into the house for several months.  See August 30, 2013, Lang Tr. at 41:10-25 (Kennedy, M. Roybal).  The entire ordeal affected M. Roybal, because, around the same time, her grandmother was dying, and she was having issues with her boyfriend, including learning that her boyfriend was involved with drugs.  See August 30, 2013, Lang Tr. at 42:3-16 (Kennedy, M. Roybal); id. at 44:9-14 (Levy, M. Roybal).

T. Roybal endured "a lot of sadness" from losing the house, which was his inheritance from his parents, but he did not have any negative dealings with anyone on the Nuisance Abatement Team or with APD.  See August 30, 2013, Lang Tr. at 32:16-33:12 (Kennedy, Roybal, Lang).

**13.    Karl Becker.**

Becker owns Nothing But Net Properties, LLC, which owns a four-plex at 421 Indiana, S.E., in Albuquerque.  See Transcript of Distribution Hearing Before Judge Lang at 3:9-24 (taken

May 28, 2013)("May 28, 2013, Lang Tr.")(Kennedy, Becker).  The Nuisance Abatement Team red tagged Apartment C in the four-plex.  See May 28, 2013, Lang Tr. at 3:7-12 (Kennedy, Becker). Becker had to have the apartment tested and cleaned.  See May 28, 2013, Lang Tr. at 4:13-5:22 (Kennedy, Becker).  The cleaning process required all the cabinets and appliances be replaced. See May 28, 2013, Lang Tr. at 5:10-22 (Kennedy, Becker).  Becker did not immediately start the testing and cleaning process, but instead left the apartment vacant while he researched the costs for testing and cleaning and because he did not have to money to immediately begin testing and cleaning.  See May 28, 2013, Lang Tr. at 6:21-7:11 (Kennedy, Becker).  The red tag was removed from the property immediately before Becker was able to rent it to new tenants.  See May 28, 2013, Lang Tr. at 6:21-24 (Kennedy, Becker).  The apartment remained vacant from October, 2008 -- when the apartment was red tagged -- until July 28, 2010, when the new tenants moved into the apartment.  See May 28, 2013, Lang Tr. at 6:13-20 (Kennedy, Becker).

**14.    Eugene Cinelli.**

Cinelli owned and lived in a house at 915 Palisades Road in Albuquerque.  See May 21, 2013, Lang Tr. at 25:4-6 (Kennedy, Cinelli).  Cinelli lived in the house for over fifty years, and it was the only home he has ever owned.  See May 21, 2013, Lang Tr. at 25:7-9 (Kennedy, Cinelli). On April 1, 2009, the Nuisance Abatement Team red tagged the house.  See May 21, 2013, Lang Tr. at 25:1-3 (Kennedy, Cinelli); id. at 25:10-12 (Kennedy, Cinelli).  Cinelli heard a knock on his door, which he initially thought came from his son playing in his room with a friend.  See May 21, 2013, Lang Tr. at 25:20-24 (Cinelli).  Cinelli realized that the knock came from the front door, so he looked outside and, saw "a bunch [of] armed folks with their guns and masks," which scared Cinelli.  May 21, 2013, Lang Tr. at 26:1-4 (Cinelli).  The police officers at the door ordered Cinelli to open the door, and Cinelli told them he would have to get a key.  See May 21, 2013, Lang Tr. at

26:5-13 (Cinelli).  Within less than a minute, when Cinelli came back with the key, the officers had managed to open the door and were inside Cinelli's living room.  See May 21, 2013, Lang Tr. at 26:13-15 (Cinelli).  The officers grabbed Cinelli and handcuffed him.  See May 21, 2013, Lang Tr. at 26:15-16 (Cinelli).  The officers then began to "rough[] the hell out of [Cinelli's disabled] son." May 21, 2013, Lang Tr. at 26:16-18 (Cinelli).

Cinelli had his home tested, and his son's room and bathroom tested positive for marijuana residue.  See May 21, 2013, Lang Tr. at 27:14-19 (Cinelli).  APD did not arrest Cinelli or his son. See May 21, 2013, Lang Tr. at 28:3-5 (Cinelli).  Cinelli, his daughter, and his daughter's sister-in-law cleaned the room by scrubbing the walls, repainting the walls, replacing the rug in the room, and replacing the furniture.  See May 21, 2013, Lang Tr. at 28:16-29:9 (Kennedy, Cinelli). The cleaning process took three to four days.  See May 21, 2013, Lang Tr. at 29:18-21 (Kennedy, Cinelli).  After the raid, Cinelli was not allowed to live in house for about a month.  See May 21, 2013, Lang Tr. at 31:6-9 (Kennedy, Cinelli).  Cinelli and his son rented a hotel room the night after the raid, and, for the rest of the time that Cinelli could not live in his house, he lived with his daughter while his son lived with a friend.  See May 21, 2013, Lang Tr. at 32:16-3 (Kennedy, Cinelli).

## PROCEDURAL BACKGROUND

The Court more fully explained the case's procedural history in its prior Memorandum Opinion and Order, where it accepted the parties' class settlement agreement.  See Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2013 WL 1010384 (D.N.M. Feb. 27, 2013)(Browning, J.).  This Memorandum Opinion and Order concerns only the objections of several class members to the awards that, pursuant to the parties' settlement agreement, Judge

Lang proposed to award the various class members.  The Court will, thus, provide only a cursory review of the case's procedural background.

      1.      **The Complaint to the Settlement.**

On April 7, 2009, Lowery, on his behalf and on behalf of similarly situated persons, filed the Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting from a Deprivation of Constitutional Rights in the Second Judicial District of New Mexico.  See Doc 1-1 (dated April 7, 2009), filed May 8, 2009 ("Complaint").  The City of Albuquerque, and Defendants Martin Chavez, Ray Schultz, John Olmstead, Mark Crandall, and John Doe Police Officers (collectively the "Defendants"), removed the case to federal court on May 8, 2009.  Notice of Removal, filed May 8, 2009 (Doc. 1).  The Complaint alleges a number of constitutional and state law claims regarding the Nuisance Abatement Team's actions.  See Complaint ¶¶ 25-87, at 4-13.

On March 31, 2011, the Court granted summary judgment for the Plaintiffs on their claims brought under the Fourth Amendment to the Constitution of the United States of America.  See Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2011 WL 1336670 (D.N.M. Mar. 31, 2011)(Browning, J.).  On April 13, 2011, the Court granted the plaintiffs Motion for Class Certification, filed June 4, 2010 (Doc. 32).  See Lowery v. City of Albuquerque, 273 F.R.D. 668 (D.N.M. 2011)(Browning, J.).  On May 5, 2011, the Plaintiffs moved for the Court to approve a proposed class settlement agreement, which would have awarded the Plaintiffs $495,000.00.  See Motion for Preliminary Approval of Class Action Settlement at 3, filed May 5, 2011 (Doc. 90)("First Settlement Agreement").  Of the $495,000.00, $191,723.09 were to be paid to the Plaintiffs' counsel for fees and costs, each named plaintiff was to received $30,000.00, and the remaining $213,276.91 were to be used to as a class fund to compensate the class members for

their economic damages.  See First Settlement Agreement at 3.  The Court denied the First

Settlement Agreement.  See Lowery v. City of Albuquerque, No. CIV 09-0457 JB/WDS, 2012 WL

394392 (D.N.M. Jan. 24, 2012)(Browning, J.).  The parties entered into another settlement

agreement, and the Plaintiffs moved for the Court's approval of the settlement agreement.  See

Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, filed May 17,

2012 (Doc. 129).  The Court set a fairness hearing for September 5, 2012, and set a deadline of

August 1, 2012, for class members to object to the proposed settlement agreement.  See Order

Approving Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement

at 1, filed June 4, 2012 (Doc. 131)("Preliminary Approval of Settlement Agreement").  The Court

approved this settlement agreement.  See Lowery v. City of Albuquerque, No. CIV 09-0457

JB/WDS, 2013 WL 1010384 (D.N.M. Feb. 27, 2013)(Browning, J.).

       The Settlement Agreement provides that the parties agree to accept a lump-sum payment of

$1,700,000.00 from the City of Albuquerque, in exchange for a release of all claims "related to and

flowing from the class allegation that the City of Albuquerque had a policy of ordering testing and

remediation for any property it believed to have been contaminated with drug use or possession,

and of immediately evicting people from homes believed to be contaminated."  Settlement

Agreement at 2, filed May 17, 2012 (Doc. 129-1)("Settlement Agreement").  Attorneys' fees and

costs, as the Court approved, were to be deducted from the settlement fund.  See Settlement

Agreement at 2.  The Kennedy Law firm is to receive a fee of thirty percent of the settlement fund

and is to be paid the fee and costs when the settlement fund is approved and transferred to the

Kennedy Law Firm's IOLTA[6] account.  See Settlement Agreement at 2-3.  The Special Master

_____

       [6]An IOLTA, or Interest on Lawyer Trust Account, is an interest bearing account in which
attorneys can "receive client funds . . . to be held in trust for future use."  Interest on Lawyer Trust

will receive compensation from the settlement fund as well, at an hourly rate that the Court determines.  See Settlement Agreement at 4-5.  The Settlement Agreement provides that the Special Master "may communicate ex parte with counsel and the Court if necessary to facilitate a speedy and just resolution."  Settlement Agreement at 5.  The Settlement Agreement requires the Special Master to "receive testimony from each class member who requests to be heard on a claim for damages resulting from mental and emotional distress."  Settlement Agreement at 5. Regarding payment of class members' claims, the Special Master will determine the "legal sufficiency," "reasonableness," and "proximate cause" of all clams for "loss of use, loss of property value, other out of pocket expenses, and mental and emotional distress."  Settlement Agreement at 5.  The Special Master will determine a reasonable compensation for all class members' claims.  See Settlement Agreement at 5.  The Settlement Agreement provides that, "[s]hould all class members receive full compensation as determined by the Special Master, any remaining funds in the class fund shall be returned to the City of Albuquerque."  Settlement Agreement at 6.

###   2.   Judge Lang's Report.

Judge Lang completed his report on March 13, 2014.  See Notice of Filing of Master's Report at 1, filed March 3, 2014 (Doc. 160)("Notice of Judge Lang's Report").  See also Judge Lang's Report at 1.  Judge Lang stated that he "considered testimony, documentary evidence, objections of the Defendants and arguments of counsel in reviewing and quantifying all claims for testing and remediate expenses and all claims for loss of use, loss of value and other out-of-pocket expenses as well as claims for emotional distress."  Judge Lang's Report ¶ 4, at 1-2.  Judge Lang notes that $1,129,378.33 of the settlement fund is available after attorneys' fees and costs were

---

Accounts,   Wikipedia.org,   http://en.wikipedia.org/wiki/Interest_on_Lawyer_Trust_Accounts# How_it_works (last visited Dec. 15, 2014).

deducted.   <u>See</u> Judge Lang's Report ¶ 8, at 2.   Of that amount, Judge Lang proposes that $1,045,870.55 be distributed to the class members.   <u>See</u> Judge Lang's Report ¶ 9, at 2.   He notes that the court reporter's fees amount to $2,521.84, which he proposes be paid from the settlement fund.   <u>See</u> Judge Lang's Report ¶ 10, at 2.   He also notes that his fees amount to $11,796.75, which he also requests be paid from the settlement fund.   <u>See</u> Judge Lang's Report ¶ 11, at 2.  Judge Lang proposed the following amounts to be distributed to each class member:

[this portion left intentionally blank]

| Name | Stipulated | Testing/ Remidiation [sic] Costs | Lost Rental Income/ Lost Equity/ Diminished Property Value | Personal Property Loss | Emotional Distress | Other Costs | Total |
|---|---|---|---|---|---|---|---|
| Barnes, Charles | $4,156.12 | | | | | | $4,156.12 |
| Beck, Gary | | $ 2,573.53 | $1,125.00 | | | | $3,698.53 |
| Becker, Karl | | $ 6,480.60 | $5,500.00 | $ 1,350.00 | | | $13,330.60 |
| Bishop, Lynda and Gene | | $ 887.58 | $6,000.00 | | | | $6,887.58 |
| Buckner, Henry | | $ 3,619.86 | $3,750.00 | | | | $7,369.86 |
| Burrows, Jan | $3,220.89 | | | | | | $3,220.89 |
| Cancino, Robert | | $ 10,032.30 | $7,200.00 | | | | $17,232.30 |
| Carmichael, Edna | | $ 3,960.56 | $7,428.00 | | | | $11,388.56 |
| Chavez, Darlene | | $ 4,070.08 | $3,000.00 | | $2,500.00 | | $9,570.08 |
| Cinelli, Eugene | | $ 2,682.53 | | $ 1,128.00 | | | $3,810.53 |
| Clauss, Bob | | $ 23,259.00 | $5,500.00 | | | $12,980.00 (Misc. Rem'n | $41,739.98 |
| Coletto, Sarah | $7,540.77 | | | | | | $7,540.77 |
| Cruz, Bobby | $9,042.27 | | | | | | $9,042.27 |
| Estrada, Robert | | $ 3,005.57 | | | | | $3,005.57 |
| Fichtner, Bernard (Dale) | | $ 7,609.85 | $6,960.00 | | $5,000.00 | | $19,569.85 |
| Gabaldon, Danny | | $ 2,398.01 | $10,000.00 | $ 10,000.00 | | | $22,398.01 |
| Gallegos, Tammy/ Ron Tapia | | $ 557.48 | $ 15,000.00 | $15,000.00 | $7,500.00 | | $38,057.48 |
| Garner, Chistine | | $ 15,463.47 | $ 12,000.00 | | $5,000.00 | | $31,463.17 |
| Gonzales, Michael | $9,531.07 | | | | | | $9,531.07 |
| Griego, Johnny and Adeline | $20,579.73 | | | | | | $20,579.73 |
| Gutierrez, Julian | | $ 18,500.00 | | | | | $18,500.00 |
| Heller, Leslie | | $ 3,082.60 | $5,850.00 | | | | $8,932.60 |
| Hildebrandt, Corbin | | $ 9,356.45 | | $200.00 | | | $9,556.45 |
| Hilton, Jere | | $ 357.40 | | $4,000.00 | | | $4,357.40 |
| Jenkins, Rebecca/ Pat Valdez | | $ 11,135.19 | $7,000.00 | | | | $18,135.19 |
| Jensen, Peter | $588.16 | | | | | | $588.16 |
| Juarez, Benny and Rosalie | | $ 26,350.81 | | | | | $26,350.81 |
| Leyba, Rachel Julie | | $ 2,073.06 | $6,215.88 | $9,000.00 | $5,000.00 | | $22,288.94 |
| Lovato, Judy | | | $12,843.28 | | $2,500.00 | | $15,343.28 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Lowery, John for Kevin | | | $48,000.00 (use of property) $9,000.00 (Rental | $8,000.00 (business product) | $100,000.00 | | $165,000.00 |
| Mancha, Antonio (Jr.) | $ 3,940.06 | | | | | $3,940.96 |
| Marcilla, Javier | $ 8,510.26 | $2,750.00 | | | | $11,260.26 |
| Marks, Joel | $ 1,100.00 | $7,750.00 | | | | $8,850.00 |
| McCarty, Myra | $ 16,551.16 | $4,500.00 | | | | $21,051.16 |
| McCash, Charles | $ 5,763.74 | $5,500.00 | | | $ 692.90 (City Fees) | $11,956.94 |
| McClaine, Catherine and John | $ 7,548.43 | $6,000.00 | | | | $13,548.43 |
| Meurer, Sherry and Steve | $ 11,291.06 | | $ 3,600.00 | $5,000.00 (Sherry) | | $19,891.06 |
| Montoya, Danny | $ 7,891.43 | $862.40 | | | | $8,753.83 |
| Montoya, Eric | $ 14,345.83 | | | | | $14,345.83 |
| Morse, Lawrence | $ 7,297.33 | $2,750.00 | | | | $10,047.33 |
| Palmer, Robert | $ 24,959.88 | $24,000.00 (Rental Loss) $15,000.00 (Diminished Prop Value) | | | | $63,959.88 |
| Pearson, Emma | $ 10,422.98 | | | $2,500.00 | | $12,922.98 |
| Pena, Mark | $ 2,000.00 | | | | | $2,000.00 |
| Randolf, Ursula | $ 34,375.10 | $12,025.00 | | | | $46,400.10 |
| Rawley, James and Kelly Genova | $ 5,257.25 | $4,800.00 | | | | $10,057.25 |
| Reazin, Carl | $ 10,636.52 | $16,170.00 | | | | $26,806.52 |
| Redl, Franz | $ 3,114.90 | $1,100.00 | | | | $4,214.90 |
| Roybal, Theodore and Monica | $ 1,780.12 | $8,000.00 | $2,000.00 | $4,000.00 (Theodore) $ 2,000.00 (Monica) | | $17,780.12 |
| Russell, Perry and Vera | $19,393.91 | | | | | $19,939.91 |
| Schooley, Barry | $12.12 | | $4,000.00 | | | $4,012.12 |
| Sedillo, Mike | $9,908.53 | $10,500.00 | $2,500.00 | | | $22,908.53 |
| Serna, Rolando | $5,421.37 | $ 4,050.00 | | | | $9,421.37 |
| Shade, Michael | $3,515.63 | $2,100.00 | | | | $8,615.63 |
| Snyder, Donna | $2,978.87 | $5,675.57 | | | | $8,654.44 |

| Spaulding, George | | | | | No documents | $ |
|---|---|---|---|---|---|---|
| Sugarman, Jeffrey | | $1,416.92 | $4,950.00 (Rental Loss) $10,000.00 (Diminished | | | | $16,366.92 |
| Summers, David and Cheryl | | $12,471.54 | | $8,206.00 | | $ 2,500.00 | $23,177.54 |
| Thomas, Barbara | | $7,683.77 | | | | | $7,683.77 |
| Three Sons/ Al Matias | | $998.00 | $2,550.00 | | | | $3,548.00 |
| Trudelle, Cathy and Michael | | $7,012.27 | | $1,396.74 | | | $8,409.01 |
| Vasquez, Martha | | $17,543.61 | $2,250.00 | $5,000.00 | | | $24,793.61 |
| Zamora, Virgina/ Benjamin Marquez | | $7,906.37 | | | | | $7,906.37 |
| | | | | | | **Grand Total** | **$1,045,870.55** |

Lowery v. City of Albuquerque, et al. Spreadsheet of Calculations, filed March 13, 2014 (Doc. 160-2)("Proposed Distributions").

### 3. The Appeals.

Fifteen class members appeal Judge Lang's proposed distributions.

### a. Reazin's Appeal.

Judge Lang awarded Reazin $26,806.52.  See Proposed Distributions at 3.  Reazin objects to this amount by arguing that it is "is far from reasonable [and] fair."  Reazin Objection ¶ 1, at 1. He argues that he was awarded almost no money for emotional distress.  See Reazin Objection ¶ 2, at 1.  He also argues that Judge Lang lumps damages for diminished property value, with lost rental income and lost equity, so that "it is impossible to tell what was awarded as Diminished Property Value."  Reazin Objection ¶ 2, at 1.  He contends that he filed for a total of $48,097.33 in damages for repairs and lost rental income, for $200,000.00 in damages for emotional distress, and for $300,000.00 in diminished value.  See Reazin Objection ¶ 2, at 1.  See also Reazin Appeal at 1.

- 26 -

Reazin argues that he should be paid at least double the proposed amount to Lowery.  See Reazin Objection ¶ 4, at 2.   He also objects to the portion of Judge Lang's Report that states that, pursuant to the Settlement Agreement, the remainder of the settlement fund should be returned to the City of Albuquerque.  See Reazin Objection ¶ 5, at 2.

Reazin asserts that the Plaintiffs' counsel, the Kennedy Law Firm, told him that they would not represent him during the settlement proceedings in the case, so he retained his own attorney. See Reazin Objection ¶ 6, at 2.  Reazin contends that his new attorney quit before his hearing before Judge Lang, because his attorney did not have time to prepare for the hearing.  See Reazin Objection ¶ 6, at 2.  Reazin argues that he advised the Kennedy Law Firm that his attorney quit and that the Kennedy Law Firm told him that they would represent him at the hearing.  See Reazin Objection ¶ 6, at 2; Notice to the Honorable James O. Browning, United States District Judge ¶ 1, at 1-2, filed May 29, 2014 (Doc. 181)("Reazin Notice").  Reazin asserts that he does not believe that the Kennedy Law Firm truly represented him at the hearing or in presenting his case to Judge Lang.  Reazin Objection ¶ 6, at 2; Reazin Notice ¶ 1, at 2.  He contends that the "hearing was more like just something for the record, as if the case had already been settled and what [he] testified to was irrelevant."  Reazin Objection ¶ 6, at 2.  See Reazin Notice ¶ 1, at 2.  Reazin argues that Judge Lang did not provide the class members with fair treatment and that "the money in the fund should not be disbursed to the chosen few who for some reason were singled out from the rest of [the class members] to receive larger dollar amounts."  Reazin Notice ¶ 2, at 2.  Reazin objects to the other class members being paid before he gets "a fair and just amount," and is paid.  Reazin Notice ¶ 3, at 2.

Reazin contends that, if "fairness" is not done, he will appeal to the Tenth Circuit.  Reazin Notice ¶ 4, at 2.  He argues that it "is not acceptable" that he should have "to fight others who were

treated unfairly over the remaining $66,000 that is left after [the Kennedy Law Firm] and the [class members] who didn't appeal are paid."   Reazin Notice ¶ 4, at 2.   He contends "that the Kennedy Law Firm should [not] have been paid before the class," because the settlement did not benefit the class as a whole, but instead the settlement benefited "only a few select members" while "the rest [are] left out in the cold supposedly to fight over the scraps that are left."   Reazin Notice ¶ 5, at 3. He asserts that he has suffered "a lot of emotional distress," but that Judge Lang treated his emotional distress like diminished property value and that he disagrees that diminished property value is the same as emotional distress.   Reazin Notice ¶ 4, at 2.   Reazin contends that the Court should review Judge Lang's proposed awards on a case-by-case basis, and that "some of the awards [should] be decreased and some of the rest" be raised.   Reazin Notice ¶ 6, at 3.   He argues that this review "should be done by someone not involved with JUdge [sic]  Lang or the Kennedy Law Firm since that is where the problem lies."   Reazin Notice ¶ 6, at 3.

Reazin further argues that all of "the awards by Judge Lang [should] be thrown out as unjust and unfair as evidenced by the amounts awarded to [some of] the class members."   Letter From Carl Reazin, Member of the Class, to the Honorable Judge James O. Browning, filed July 10, 2014 (Doc. 189)('Reazin Letter").   Reazin asserts that "Judge Lang had a responsibility to be fair and just in deciding who received what amount," but Reazin argues that "whatever formula [Judge Lang] used was apparently in error as evidenced by his awards in the settlement agreement." Reazin Letter at 1.   Reazin contends that, if some "of Judge Langs [sic] awards are in error" or unfair, it can be assumed that "all [of] his awards are in error and should be thrown out" pursuant to "Rule 53, 2614."[7]   Reazin Letter at 1.   Reazin also asks the Court to "review the amount paid to

_____

[7]Reazin likely means rule 53(f)(1) of the Federal Rules of Civil Procedure, which gives courts authority to adopt, affirm, modify, reject, reverse, or resubmit to a Special Master a Special Master's report.

The Kennedy Law Firm since it is based on" the firm's contention that it "represents all of the class members," but Reazin does not see any evidence that the Kennedy Law Firm represented him. Reazin Letter at 1.   Reazin attached to his appeal a copy of the transcript from his hearing before Judge Lang and a copy of his claims form to support his appeal.  See Reazin at 2-17.

### b.    Marks' Appeal.

Judge Lang awarded Marks $8,850.00.  See Proposed Distributions at 3.  Marks states: "I believe the Special Master should have awarded me for the loss of my property."  Marks Appeal at 1.  Marks attached to his Appeal the transcript from his hearing before Judge Lang to support his appeal.  See Marks Appeal at 2-14.

### c.    Snyder's Appeal.

Judge Lang awarded Snyder $8,654.44.  See Proposed Distributions at 4.  Snyder states: "I am appealing the Special Master's decision based on the lack of award for emotional damages.  As a result of the City's actions, I was displaced from my home and suffered significant emotion [sic] distress, and feel that I should be compensated."  Snyder Appeal at 1.  She attached to her Appeal a copy of the transcript from her hearing before Judge Lang and a copy of her claims form stating the damages she suffered.  See Snyder Appeal at 2-16.

### d.    Gallegos and Tapia's Appeal.

Judge Lang awarded Gallegos and Tapia $38,057.48.  See Proposed Distributions at 2. Gallegos and Tapia argue that their "award amount should have been larger, in order to fully compensate them for the loss of personal items, loss of personal property, and for emotional distress."  Gallegos & Tapia Appeal at 1.  They attach to their Appeal a copy of the transcript from their hearing before Judge Lang, Gallegos and Tapia's written accounts of the incident, and a list of personal items that they lost.  See Gallegos & Tapia Appeal at 2-39.

- 29 -

### e.     **Chavez' Appeal**.

Judge Lang awarded Chavez $9,570.08. <u>See</u> Proposed Distributions at 1. Chavez states: "I should have been awarded more for the mental anxiety from having to live in a motor home. I was living with no water or electricity. I had to haul my water." Chavez Appeal at 1. Chavez attached to her Appeal a copy of the transcript from her hearing before Judge Lang and a copy of her written statement about the incident. <u>See</u> Chavez Appeal at 2-30.

### f.     **Carmichael's Appeal**.

Judge Lang awarded Carmichael $11,388.56. <u>See</u> Proposed Distributions at 1. Carmichael appeals Judge Lang's proposed award, because it does not include personal property loss for the mobile home that she lost. <u>See</u> Carmichael Appeal at 1. She contends that the mobile home was worth $19,079.08. <u>See</u> Carmichael Appeal at 1. She argues that, after the Nuisance Abatement Team incident, the mobile home park manager ordered her to move the mobile home out of the park. <u>See</u> Carmichael Appeal at 1. Carmichael contends that the park manager threatened to call APD if Carmichael did not move the mobile home, so Carmichael called APD to see what she should do. <u>See</u> Carmichael Appeal at 1. She asserts that APD told Carmichael to move the mobile home onto the street, but noted that she would probably be cited for illegal parking. <u>See</u> Carmichael Appeal at 1. Carmichael argues that she found someone to move the mobile home and that the person told her that it would cost more money to move the home than the home was worth, because of the dilapidated state in which the Nuisance Abatement Team left the home. <u>See</u> Carmichael Appeal at 1. The person agreed to take the home for free from Carmichael if she signed it over to him, which she did. <u>See</u> Carmichael Appeal at 1. Carmichael attached to her Appeal a sales contract stating that she paid $19,079.08 for the mobile home. <u>See</u> Carmichael Appeal at 2.

- 30 -

g.      <u>Peña's Appeal</u>.

Judge Lang awarded Peña $2,000.00.  <u>See</u> Proposed Distributions at 3.  Peña states that he should receive a larger award, "due to the loss of all my property and the emotional distress brought about by the eviction from my house."  Peña Appeal at 1.  Peña attaches to his Appeal a letter, his claims form, and a written statement detailing his incident with the Nuisance Abatement Team.  <u>See</u> Peña Appeal at 2-5.  In the letter, Peña states that, after he became a class member, he was incarcerated.  <u>See</u> Letter from Mark Peña, Class Action Member, to the Honorable James O. Browning, United States District Judge for the District of New Mexico (Apr. 3, 2014)("Peña Letter").  Peña argues that he suffered discrimination, because he was incarcerated and unable to appear before Judge Lang.  Peña Letter at 1.  He argues that the "pittance awarded" to him "only adds insult to injury."  Peña Letter at 1.  Peña also argues that his award does not properly punish the Defendants.  <u>See</u> Peña Letter at 1-2.  Peña contends that he asked to speak to the Court, but that he was not allowed to speak to the Court because he was in prison.  <u>See</u> Peña Letter at 2.  He asks for an extension, if necessary, to provide documentation to show that he lost his home and everything in it.  <u>See</u> Peña Letter at 2.

h.      <u>The Trudelles' Appeal</u>.

Judge Lang awarded the Trudelles $8,409.01.  <u>See</u> Proposed Distributions at 4.  The Trudelles argue that their hearings before Judge Lang "did not truly encapsulate the emotional hardship caused by the eviction from their home and the loss of family heirlooms and personal belongings, as they find themselves at a loss for explaining the emotional devastation of the events that have given rise to this lawsuit."  Trudelle Appeal at 1.  They assert that, during the hearing before Judge Lang, they "may not have fully explained that their home was owned 'in a trust,' and [that] they technically were partial owners of the property, to which they were monetarily (as well

as emotionally) tied." Trudelle Appeal at 1. The Trudelles contend that the process in which their house was red tagged and the remediation process afterwards were "strenuous and burdensome both monetarily and emotionally." Trudelle Appeal at 1. They argue that the "amounts awarded for emotional distress damages, loss of personal property, and diminished value of property should have been more, and that it has been difficult for them to articulate loss" throughout this case. Trudelle Appeal at 1-2. The Trudelles attached to their Appeal a copy of the transcript from their hearing before Judge Lang. See Trudelle Appeal at 3-16.

> i.    **Thomas' Appeal.**

Judge Lang awarded Thomas $7,683.77. See Proposed Distributions at 4. Thomas argues that Judge Lang's award "does not reflect the costs of alternative living expenses for" herself and her family, "nor does it encompass the monetary and emotional distress costs of [her] eviction from [her] home." Thomas Appeal at 1. She also contends that her "award for remediation and testing should be larger," because the remediation and testing companies that she paid "were not the only remediation which the City demanded that [she] perform" before she could reenter her property. Thomas Appeal at 1. Thomas asserts that her emotional distress from seeing her "family scattered between other households" and "the loss of familial contact with [her] grandchild during" her grandchild's "most vulnerable years, has left an indelible scar on the emotional tissue of [her] heart." Thomas Appeal at 1. She argues that Judge Lang did not address or award her damages for emotional distress. See Thomas Appeal at 1. She requests an award amount that is "larger than the Special Master's total" and "which would better compensate [her] for the monetary loss and emotional hardship that this event has brought to [her] life." Thomas Appeal at 1. Thomas attached to her Appeal a copy of the transcript from her hearing before Judge Lang. See Thomas Appeal at 3-26.

### j.      M. Roybal's Appeal.

Judge Lang awarded M. Roybal and T. Roybal $17,780.12.  See Proposed Distributions at 4.  M. Roybal argues that she suffered more than $2,000.00 "of emotional distress and should be awarded much more than the Special Master had calculated for emotional distress damages."  M. Roybal Appeal at 1.  She attached to her Appeal a copy of the transcript from her hearing before Judge Lang.  See M. Roybal Appeal at 2-27.

### k.      T. Roybal's Appeal.

Judge Lang awarded M. Roybal and T. Roybal $17,780.12.  See Proposed Distributions at 4.  T. Roybal argues that he suffers from PTSD and "should have been awarded more for mental distress."  T. Roybal Appeal at 1.  He attached to his Appeal a copy of the transcript from his hearing before Judge Lang.  See T. Roybal Appeal at 2-27.

### l.      Becker's Appeal.

Judge Lang awarded Becker $13,330.60.  See Proposed Distributions at 1.  Becker argues that he "should have been awarded an additional" $4,150.00 "for lost rent."  Becker Appeal at 1.  Becker attached to his Appeal a copy of the transcript from his hearing before Judge Lang.  See Becker Appeal at 2-12.

### m.      Cinelli's Appeal.

Judge Lang awarded Cinelli $3,810.53.  See Proposed Distributions at 1.  Cinelli argues that this amount "does not represent what [he] suffered by being excluded from [his] home."  Cinelli Appeal at 1.  Cinelli attached to his Appeal a copy of the transcript from his hearing before Judge Lang and his written account of his Nuisance and Abatement Team incident.  See Cinelli Appeal at 2-16.

4.    **Motion to Distribute Class Funds and Pay Expenses**.

On May 28, 2014, the Plaintiffs moved for authorization to distribute the class funds to the class members in accordance with Judge Lang's report.  See Motion to Distribute at 1.  The Plaintiffs note that, after attorney fees and costs were deducted from the Settlement Agreement amount, $1,129,870.33 remained to be distributed to the class members, and, of that amount, Judge Lang proposed that $1,045,870.55 be distributed to the class members.  See Motion to Distribute ¶¶ 3-4, at 1.  The Plaintiffs contend that fourteen[8] "of the fifty-three class members have appealed the Master's computation of their individual damages," but that those "fourteen class members do not challenge the computation of the damages to other class members."[9]  Motion to Distribute ¶¶ 5-6, at 1.  The Plaintiffs assert that the "Defendants have not disputed the computation of damages to any class members."  Motion to Distribute ¶ 7, at 1.

The Plaintiffs assert that rule 53(f)(2) of the Federal Rules of Civil Procedure states that a party can file objections to a Special Master's report "'no later than 21 days after a copy is served, unless the court sets a different time.'"  Motion to Distribute at 2 (quoting Fed. R. Civ. P. 53(f)(2)).  The Plaintiffs further assert that failure to meet the 21-day "'deadline results in permanent waiver of any objection to the Master's'" report, and that, "'[a]bsent timely objection, the . . . report[] . . . of the Master shall be deemed approved, accepted and ordered by the Court, unless the Court explicitly provides otherwise.'"  Motion to Distribute at 2 (quoting Sibley v. Sprint Nextel Corp.,

---

[8]The Plaintiffs assert that fourteen class members have appealed Judge Lang's report, but the Court's records show that fifteen class members have appealed Judge Lang's report through thirteen separate appeals.  See Reazin Appeal at 1; Marks Appeal at 1; Snyder Appeal at 1; Gallegos & Tapia Appeal at 1; Chavez Appeal at 1; Carmichael Appeal at 1; Peña Appeal at 1; Trudelle Appeal at 1; Thomas Appeal at 1; M. Roybal Appeal at 1; Becker Appeal at 1; T. Roybal Appeal at 1; Cinelli Appeal at 1.

[9]The Plaintiffs filed the Motion to Distribute before Reazin filed his Notice and Letter, requesting the Court to decrease the awards to other class members.  See Reazin Notice ¶ 6, at 3; Reazin Letter at 1.

No. CIV 08-2063 KHV, 2014 WL 1779363, at *4 (D. Kan. Apr. 14, 2014)(Vratil, J.)).   The Plaintiffs argue that no class member, nor the Defendants, has challenged the other class members' proposed awards, and that Judge Lang's proposed awards "will not be decreased for any party, as no individual has made any such objection or request."  Motion to Distribute at 2-3.  The Plaintiffs contend that the only remaining controversy concerns fourteen class members who seek increased awards and that, because Judge Lang's proposed distributions does not exceed the settlement fund, "funds remain to resolve the remaining controversy."  Motion to Distribute at 3.  The Plaintiffs request that the Court allocate the uncontested awards to the class members.  See Motion to Distribute at 3.

The Plaintiffs argue that the Court should not stay distribution of the settlement funds pending the Court's review of the class members' appeals.  See Motion to Distribute at 3.  The Plaintiffs also request that the Court pay Judge Lang and the court reporters from the hearings before Judge Lang.  The Plaintiffs request that the Court pay $1,045,870.55 of the settlement fund to the class members, in accordance with Judge Lang's report, that the Court pay Judge Lang $11,796.75[10] for his services, and that the Court pay the court reporters $5,129.72 for their services.  See Motion to Distribute at 3.

### 5.    Evidentiary Hearings Before the Court.

The Court held evidentiary hearings on the class member's appeals on May 29, 2014, May 30, 2014, and July 11, 2014.

---

[10]Judge Lang later supplemented his bill to account for his services in drafting the Supplement to Special Master's Report, filed July 15, 2014 (Doc. 194-1).  See Notice of Billing From Master, filed August 26, 2014 (Doc. 196).  Judge Lang requests an additional $1,591.63.  See Judge Lang Supplemental Invoice, filed August 26, 2014 (Doc. 196-1).

a.      **Reazin's Evidentiary Hearing.**

Reazin presented his objections to the Court pro se, without the assistance of the Kennedy Law Firm.  See Transcript of Evidentiary Hearing at 2:23-3:8 (taken July 11, 2014), filed July 23, 2014 (Doc. 195)("July 11, 2014, Tr.")(Kennedy, Reazin, Court).  Reazin asserted that he objects to not knowing the amount that the Kennedy Law Firm is being paid.  See July 11, 2014, Tr. at 4:25-5:1 (Reazin).  He again argued that he does not feel that the Kennedy Law Firm has represented him.  See July 11, 2014, Tr. at 4:1-10 (Reazin).  He contended that he has suffered "great emotional distress over the City attacking" him and his property.  See July 11, 2014, Tr. at 4:19-22 (Reazin).  Reazin argued that the Court should fine the Defendants as punishment and that he does not believe that the Defendants have been punished for what they did to him.  See July 11, 2014, Tr. at 4:23-5:4 (Reazin).  Reazin asserted that he is a property owner who rents out property for money and that the City of Albuquerque is trying to drive him out of the rental business.  See July 11, 2014, Tr. at 5:6-11 (Reazin).  Reazin argued that many of the class members did not receive any money for emotional distress and that he believes that all of the class members have suffered emotional distress.  See July 11, 2014, Tr. at 5:14-20 (Reazin).

Reazin argued that the case is "an extremely friendly case between the Kennedy Law Firm and the City of Albuquerque," and that the Settlement Agreement was intended to benefit the City of Albuquerque by removing "the deeds of the City from the Department of Justice."[11]  July 11, 2014, Tr. at 18:11-17 (Reazin).  He argued that a part of this "friendly deal" between the Kennedy

---

[11]The Department of Justice has investigated APD for its use-of-force practices and has recently entered into a settlement agreement with the City of Albuquerque that will require APD to implement a number of reforms.  See Press Release, United States Attorney's Office District of New Mexico, Justice Department Reaches Agreement With the City of Albuquerque to Implement Reforms on Use of Force by the Albuquerque Police Department (Oct. 31, 2014), available at, http://www.justice.gov/usao/nm/press-releases/2014/Oct/416-%202014-10-31_agreement__reac hed.html.

Law Firm and the City of Albuquerque was that he would not receive a large part of the settlement fund.  See July 11, 2014, Tr. at 18:23-19:1 (Reazin).  Reazin asserted that the case had been pre-decided, and that the hearings before Judge Lang and before the Court were meaningless, because there was not enough money left after the "exorbitant attorneys' fees and other costs" were taken out.  July 11, 2014, Tr. at 19:2-11 (Reazin).

Reazin testified that his property has lost value, because, after the raid, the police went door to door telling his tenants that he knowingly rents to drug manufacturers.  See July 11, 2014, Tr. at 6:3-16 (Kennedy, Reazin).  Reazin testified that many of his tenants moved and that he has a hard time renting the property, because of the stigma that the raid and the police created.  See July 11, 2014, Tr. at 6:17-21 (Reazin).  When asked how he reached the conclusion that his property had lost $300,000.00 in value, he testified that it is "hard to say exactly how [he] arrived at [that] conclusion[]."  July 11, 2014, Tr. at 9:24-10:3 (Kennedy, Reazin).  Reazin testified that he reached the $300,000.00 loss in value by evaluating the effect on his property that the police had when they went door to door, telling his tenants that their leases were not good and that they could move out if they wanted, and that the police refused to respond to calls his tenants made.  See July 11, 2014, Tr. at 10:3-11:8 (Kennedy, Reazin).   He later testified that he came up with the $300,000.00 amount by picking it out of the air.  See July 11, 2014, Tr. at 20:17-21:17 (Levy, Reazin).

b.  **Marks' Evidentiary Hearing.**

Marks testified to substantially the same facts as he did before Judge Lang.  See May 29, 2014, Tr. at 3:7-13:9 (Kennedy, Levy, Marks, Court).  Marks additionally testified that his property was red tagged during the recession and that he "was in dire straits for money," because of the poor economy.  May 29, 2014, Tr. at 5:12-19 (Marks).  Marks testified that his alternatives were to spend $15,000.00 to $25,000,000.00 to remediate the property or to knock the house down.

See May 29, 2014, Tr. at 5:15-20 (Marks).  He testified that, even if he cleaned the property, he would have had to disclose that it had been red tagged, which he thought would prevent people from buying the house.  See May 29, 2014, Tr. at 5:20-23 (Marks).  Marks testified that he believed that it would be cheaper to knock the house down than to clean it.  See May 29, 2014, Tr. at 5:23-24 (Marks).

Marks testified that, at the time the house was red tagged, he was receiving $575.00 per month in rent and that both houses together appraised for $196,000.00.  See May 29, 2014, Tr. at 5:25-6:9 (Kennedy, Marks).  Marks argued that, by knocking the house down, he lost half of the property's value, which, according to him, is about $92,000.00.  See May 29, 2014, Tr. at 8:5-7 (Marks).  Marks also contended that he continues to lose money each month for the loss of the house.  See May 29, 2014, Tr. at 8:4-5 (Marks).  Marks testified that he has not provided any documentation showing that he would have had to reveal that the house had been red tagged if he sold it or showing that the decontamination would cost as much as Marks alleged.  See May 29, 2014, Tr. at 8:19-9:24 (Levy, Marks).  Marks testified that he heard that the New Mexico Real Estate Board required him to disclose that the house had been red tagged and that he received verbal estimates on the amount that it would have taken to decontaminate the house.  See May 29, 2014, Tr. at 8:20-9:24 (Levy, Marks).

Marks testified that he concluded that he lost $92,000.00 in property value after the one house was destroyed by dividing the value of the two houses by two; he testified, however, that the property on which the destroyed house once stood still has value as real estate.  See May 29, 2014, Tr. at 10:18-25 (Levy, Marks).  Marks testified that, since tearing the house down, he has not taken any steps to develop the land, because he does not have the money to develop the land.  See May 29, 2014, Tr. at 11:4-7 (Levy, Marks).  Marks argued that it is not fair that he receive $8,800.00 for

losing half the rental value of his property and losing half of his property.  See May 29, 2014, Tr. at 13:1-4 (Marks).

      c.      **Snyder's Evidentiary Hearing.**

Snyder gave much of the same testimony that she gave before Judge Lang.  See May 29, 2014, Tr. at 95:20-103:19 (Kennedy, Levy, Snyder, Clerk, Court).  Additionally, she testified that she discovered that her rental house had been red tagged when her brother-in-law drove by the house and noticed the police activity in front of the house.  See May 29, 2014, Tr. at 97:17-23 (Kennedy, Snyder).  Snyder testified that her brother-in-law called her, and that she immediately drove to the house and saw all of the police around the house.  See May 29, 2014, Tr. at 97:23-24 (Snyder).  Snyder testified that the tenants who were living in the house were arrested.  See May 29, 2014, Tr. at 101:20-22 (Levy, Snyder).  She also testified that she wanted to clean and repair the damage that the Nuisance Abatement Team created, but that she was unable to enter the house until she paid to have it tested for mold.  See May 29, 2014, Tr. at 97:25-99:2 (Kennedy, Snyder).  Snyder testified that she was not able to enter the house to begin cleaning for about three to four weeks, during which time the house was being tested for mold.  See May 29, 2014, Tr. at 100:2-6 (Kennedy, Snyder).

Snyder testified that, because of the testing and cleaning costs, her family had to cancel their planned vacation, because they could no longer afford it.  See May 29, 2014, Tr. at 99:16-19 (Snyder).  She also testified that she and her husband had to miss work to clean the house and to repair the damage.  See May 29, 2014, Tr. at 99:14-15 (Snyder).  Snyder testified that she also had to make arrangements for her fourteen-year-old daughter to be taken to and picked up from after-school activities, because Snyder and her husband were cleaning and repairing the house.  See May 29, 2014, Tr. at 99:11-14 (Snyder).  Snyder testified that not receiving the $1,000.00 per

month rental income from the house impacted her emotionally, because she began to stress about paying bills and because she had to borrow money from her parents.  See May 29, 2014, Tr. at 100:24-101:5 (Kennedy, Snyder).  She testified that the incident has caused her to lose respect for the police.  See May 29, 2014, Tr. at 101:8-14 (Snyder).

### d. Tapia's Evidentiary Hearing.

Tapia gave much of the same testimony that he gave before Judge Lang.  See May 29, 2014, Tr. at 55:22-71:14 (Kennedy, Levy, Tapia, Clerk, Court).  Additionally, Tapia testified that he purchased the house in 2000 and that the house had a mortgage on it when it was red tagged.  See May 29, 2014, Tr. at 56:20-24 (Kennedy, Tapia).  He testified that the Nuisance Abatement Team searched his house based on probable cause that drugs were being manufactured in it.  See May 29, 2014, Tr. at 67:13-22 (Levy, Tapia).  He testified that, after the Nuisance Abatement Team failed to find evidence of drug activity, they cited him for code violations concerning the changing of the switches on the thermostat and redoing some wiring in the house, and that they arrested him for a traffic warrant.  See May 29, 2014, Tr. at 57:2-15 (Kennedy, Tapia).  Tapia testified that foreclosure proceedings had begun on his house before the raid, but that another mortgage company had purchased the loan and that he was going to start making payments to the new company.  See May 29, 2014, Tr. at 59:14-60:3 (Kennedy, Tapia); id. at 68:18-25 (Levy, Tapia).  He testified that, at the time, he was a year in arrears.  See May 29, 2014, Tr. at 69:1-8 (Levy, Tapia).  Tapia testified that, when he was evicted, the house was worth $180,000.00 and that he had a $140,000.00 or $146,000.00 mortgage on the house.  See May 29, 2014, Tr. at 60:4-13 (Kennedy, Tapia).

Tapia testified that he felt humiliated after the incident, because the police told his neighbors that they found drugs in his house when no drugs were found in the house.  See May 29,

2014, Tr. at 64:7-14 (Kennedy, Tapia).  He also testified that his daughter went from being a straight "A" student to flunking and that people began "shunning" his family.  May 29, 2014, Tr. at 64:15-24 (Kennedy, Tapia).  Tapia testified that the event emotionally impacted him, because his family lost everything that they owned in the house.  See May 29, 2014, Tr. at 65:15-18 (Kennedy, Tapia).  Tapia testified that he never attempted to recover his personal property from inside the house, because a police officer warned him that, if he entered the house, he would likely be arrested.  See May 29, 2014, Tr. at 70:20-71:5 (Kennedy, Tapia).

e.      **Gallegos' Evidentiary Hearing.**

Gallegos' testimony was substantially similar to the testimony that she gave before Judge Lang.   See May 29, 2014, Tr. at 71:14-75:20 (Kennedy, Levy, Gallegos, Clerk, Court). Additionally, Gallegos testified that she was unable to enter the house to retrieve clothing or any other items.  See May 29, 2014, Tr. at 72:11-17 (Kennedy, Gallegos).  Gallegos testified that she was advised that she should set up an appointment to enter the house to retrieve personal items and that, when she tried to set up the appointment, no one called her back until a week later, when she was informed that the house had been boarded up.  See May 29, 2014, Tr. at 72:19-24 (Kennedy, Gallegos).  Gallegos testified that she felt humiliated after the raid.  See May 29, 2014, Tr. at 73:8-12 (Kennedy, Gallegos).  She testified that herself, Tapia, and their daughter stayed in a hotel that her sister rented for them for a few days before moving into a small trailer.  See May 29, 2014, Tr. at 73:18-21 (Kennedy, Gallegos).  She also testified that she wanted to keep her daughter in the same school, so Gallegos had to commute across town to take her daughter to school.  See May 29, 2014, Tr. at 73:25-74:17 (Kennedy, Gallegos).  Gallegos testified that her daughter was eventually withdrawn from school, because she became depressed and did not want to attend school after classmates kept asking her why she could not return home.  See May 29, 2014, Tr. at 74:18-75:2

(Kennedy, Gallegos).  Gallegos testified that her daughter is still depressed and attends counseling.
<u>See</u> May 29, 2014, Tr. at 75:2-4 (Kennedy, Gallegos).  Gallegos testified that she has suffered
emotionally from watching her daughter go from being happy to being depressed.  <u>See</u> May 29,
2014, Tr. at 75:5-13 (Kennedy, Gallegos).

        **f.**       **<u>Chavez' Evidentiary Hearing</u>.**

Chavez gave similar testimony as she did before Judge Lang.  <u>See</u> Transcript of
Evidentiary Hearing at 1:5-13:16 (taken May 30, 2014)("May 30, 2014, Tr.")(Kennedy, Levy,
Chavez, Clerk, Court).   Additionally, Chavez testified that her son's motor home, into which she
moved, was not modern and was rundown.  <u>See</u> May 30, 2014, Tr. at 4:4-5:6 (Kennedy, Chavez).
She testified that the motor home had no water or electricity, so she had to haul in water and ice.
<u>See</u> May 30, 2014, Tr. at 5:10-13 (Chavez).  She testified that she did not have hot water and that,
to shower, she had to use a portable shower or drive back into town.  <u>See</u> May 30, 2014, Tr. at
5:14-17 (Kennedy, Chavez).  Chavez testified that the motor home had mice and that the mice
attracted snakes.  <u>See</u> May 30, 2014, Tr. at 5:23-25 (Chavez).  She also testified that the soil around
the motor home became thick and sticky when wet, so that, when it rained, it felt like she was
walking on stilts, because of the mud sticking to her shoes, and that the mud was difficult to drive
on.  <u>See</u> May 30, 2014, Tr. at 6:3-6 (Chavez).  Chavez testified that the motor home did not have
electricity and that she feared for her dogs' safety, because of the coyotes and mountain lions.  <u>See</u>
May 30, 2014, Tr. at 7:3-22 (Chavez).  She testified that the motor home had holes in it, which
made it difficult to keep warm in the winter.  <u>See</u> May 30, 2014, Tr. at 8:21-9:2 (Chavez).  Chavez
testified that the wind constantly blew around dirt, which made her want to shower daily, but that
daily showers quickly depleted her water supply.  <u>See</u> May 30, 2014, Tr. at 9:8-19 (Chavez).
Chavez testified that she was unable to live in her house for five months.  <u>See</u> May 30, 2014, Tr. at

12: 6-8 (Levy, Chavez).  She testified that the police had a search warrant to raid her house and that she was arrested two to three weeks after the raid for possession of methamphetamine.  <u>See</u> May 30, 2014, Tr. at 11:11-25 (Levy, Chavez).  She also testified that her boyfriend was arrested as well.  <u>See</u> May 30, 2014, Tr. at 12:1-3 (Levy, Chavez).

g.      **Carmichael's Evidentiary Hearing.**

Carmichael testified that she owned a mobile home in Albuquerque that the Nuisance Abatement Team red tagged.  <u>See</u> May 29, 2014, Tr. at 14:9-12 (Kennedy, Carmichael). Carmichael testified that she and her son had owned the mobile home for five years, and that, in 2008, her son lived in the mobile home.  <u>See</u> May 29, 2014, Tr. at 14:13-21 (Kennedy, Carmichael).  Carmichael testified that she was not present when the Nuisance Abatement Team raided the mobile home.  <u>See</u> May 29, 2014, Tr. at 20:7-8 (Levy, Carmichael).  Carmichael testified that APD alleged that it found a methamphetamine laboratory in the mobile home, and that they arrested and charged her son.  <u>See</u> May 29, 2014, Tr. at 15:12-20 (Kennedy, Carmichael); <u>id.</u> at 19:24-21:3 (Levy, Carmichael).  According to Carmichael, her son had criminal charges pending against him as of May 29, 2014.  <u>See</u> May 29, 2014, Tr. at 20:9-14 (Levy, Carmichael). Carmichael testified that, in searching the mobile home, the Nuisance Abatement Team broke every window and door.  <u>See</u> May 29, 2014, Tr. at 15:4-8 (Kennedy, Carmichael).  She testified that APD and the manager of the trailer park, where the mobile home was parked, ordered her to move the home within five days after the raid.  <u>See</u> May 29, 2014, Tr. at 15:21-24 (Kennedy, Carmichael); <u>id.</u> at 16:7-12 (Kennedy, Carmichael).  Carmichael testified that the mobile home was so destroyed that no trailer park would take it.  <u>See</u> May 29, 2014, Tr. at 16:16-19 (Kennedy, Carmichael).  She testified that she found a man who was willing to take the mobile home from her to see if he could fix it, and, because she had been spending a lot of her money on her son's court

case, she let the man take the mobile home from her for free.  See May 29, 2014, Tr. at 17:7-18:8 (Kennedy, Carmichael).

Carmichael testified that, because of the stress from a number of surgeries she has endured and because of the stress from her son's legal troubles, she has lost a lot of weight.  See May 29, 2014, Tr. at 22:4-10 (Carmichael).  She testified, however, that most of the stress is a result of her son's situation.  See May 29, 2014, Tr. at 22:25-23:4 (Levy, Carmichael).

### h.      Peña's Evidentiary Hearing.

Peña testified that his dad and his dad's naturally born heirs owned the house that was red tagged.  See May 29, 2014, Tr. at 76:21-22 (Kennedy, Peña).  He testified that he has not provided the Court with a title to the property.  See May 29, 2014, Tr. at 81:4-6 (Levy, Peña).  Peña testified that APD did not find any drugs in the house.  See May 29, 2014, Tr. at 80:17-81:5 (Kennedy, Peña).  Peña testified that, after he got out of jail, he tried to clean up the property, so that he could move back into it.  See May 29, 2014, Tr. at 77:20-78:24 (Kennedy, Peña).  Peña testified that APD gave him permission to enter the house to clean it.  See May 29, 2014, Tr. at 77:20-24 (Kennedy, Peña).  He testified that he was not able to fully clean the property, because, on one day in which he was cleaning it, detectives came by the house to check on it and arrested him for trespassing.  See May 29, 2014, Tr. at 77:25-78:7 (Kennedy, Peña).  Peña said this repeated several times; he would get out of jail for trespassing, obtain permission to clean the house, and then be arrested for trespassing.  See May 29, 2014, Tr. at 78:10-13 (Peña).  Peña testified that he lost all of his belongings in the house because the house was boarded up.  See May 29, 2014, Tr. at 84:7-19 (Kennedy, Peña).  He testified that his son was able to retrieve a few items from the house, but that most of his things remained in the house and were lost.  See May 29, 2014, Tr. at 84:20-85:1 (Kennedy, Peña).

Peña testified that he had to live on the streets during that time.  See May 29, 2014, Tr. at 78:14-16 (Kennedy, Peña).  He testified that he lived on the streets for several months and that the stress eventually caused him to have a heart attack, at which point he was admitted to Presbyterian Hospital for ten days.  See May 29, 2014, Tr. at 79:3-8 (Kennedy, Peña).  Peña testified that he was eventually charged with conspiracy to traffic and possess a controlled substance, and that he was scared into accepting a plea deal.  See May 29, 2014, Tr. at 79:10-21 (Kennedy, Peña).  Peña testified that, pursuant to the plea deal, he was sentenced to three years imprisonment.  See May 29, 2014, Tr. at 83:23-84:1 (Levy, Peña).  He testified that there were about a year-and-a-half to two years between the date he was charged and the date in which he accepted the plea deal.  See May 29, 2014, Tr. at 80:2-7 (Kennedy, Peña).  Peña testified that, during that time, he lived at his father's house.  See May 29, 2014, Tr. at 80:8-10 (Kennedy, Peña).

Peña testified that losing the house impacted him emotionally, because he had lived in the house since 1986, and because he had raised his family and four children in that house.  See May 29, 2014, Tr. at 78:22-25 (Kennedy, Peña).  He also testified that he felt like Rodney King and that the City of Albuquerque beat him by evicting him from his house without a hearing.  See May 29, 2014, Tr. at 80:14-17 (Kennedy, Peña).  Peña testified that his father eventually sold the house. See May 29, 2014, Tr. at 83:14-19 (Levy, Peña).

i.    **K. Trudelle's Evidentiary Hearing.**

K. Trudelle gave substantially similar testimony as she did before Judge Lang.  See May 29, 2014, Tr. at 104:7-114:11 (Kennedy, Levy, K. Trudelle, Clerk, Court).   Additionally, K. Trudelle testified that, after her house was red tagged, she was threatened with arrest for trespassing if she tried to enter the house.  See May 29, 2014, Tr. at 106:7-10 (Kennedy, K. Trudelle).  She testified that the team that remediated her house took a lot of her personal

property to the dump, and she testified that some of her personal property was stolen out of the house because she and her husband -- M. Trudelle -- were not at the house to safe-guard their property.   See May 29, 2014, Tr. at 107:7-13 (Kennedy, K. Trudelle); id. at 108:12-14 (K. Trudelle).  K. Trudelle testified that she and her husband were unable to live in their house for about three to four months.  See May 29, 2014, Tr. at 108:5-9 (Kennedy, K. Trudelle).  K. Trudelle testified that a family trust owned the house, and that she and her husband rented the house from the trust.  See May 29, 2014, Tr. at 111:3-5 (Levy, K. Trudelle).  She testified that she and her husband never moved back into the house, because she was afraid that she would be arrested for trespassing, and because the family trust rented the house to other tenants for a higher rent that K. Trudelle and her husband were paying.  See May 29, 2014, Tr. at 113:2-17 (Levy, K. Trudelle).  K. Trudelle testified that the police found a bag with methamphetamine residue in it and that they arrested her husband.  See May 29, 2014, Tr. at 111:23-112:4 (Levy, K. Trudelle).  K. Trudelle further testified that her husband was charged with possession of methamphetamine, but that the charge was eventually dropped.  See May 29, 2014, Tr. at 112:18-22 (Levy, K. Trudelle).

K. Trudelle testified that her life was "complete[ly] upheav[ed]" as a result of being evicted and that she did not know if she would ever be allowed to return to her house.  May 29, 2014, Tr. at 109:10-15 (Kennedy, K. Trudelle).  She testified that, after she was evicted, it was difficult to find places to keep her pets.  See May 29, 2014, Tr. at (K. Trudelle).  K. Trudelle also testified that the incident caused her family to assume that the allegations against her and her husband were true, which caused her family to treat them as outcasts and to be unsupportive.  See May 29, 2014, Tr. at 109:20-110:1 (K. Trudelle).  She testified that some of her emotional distress arose from her husband being arrested and charged with possession of methamphetamine.  See May 29, 2014, Tr. at 113:18-22 (Levy, K. Trudelle).  She also testified that some of the discord she experienced with

her family arose because her husband was arrested and charged with possessing methamphetamine.  See May 29, 2014, Tr. at 113:23-5 (Levy, K. Trudelle).

### j.    M. Trudelle's Evidentiary Hearing.

M. Trudelle testified to many of the same things as he did before Judge Lang.  See May 29, 2014, Tr. at 114:11-123:5 (Kennedy, Levy, M. Trudelle, Clerk, Court).  Additionally, M. Trudelle testified that he lost his personal property, because he was forced to move out of his house in less than an hour after it was red tagged and that he was not allowed back on the property.  See May 29, 2014, Tr. at 115:11-15 (Kennedy, M. Trudelle).  He testified that the family trust, which owns the house, was started after his father passed away and that his sisters manage the trust.  See May 29, 2014, Tr. at 116:5-7 (M. Trudelle).  M. Trudelle testified that, after being evicted, he and K. Trudelle lived with family until they were able to rent an apartment.  See May 29, 2014, Tr. at 116:16-21 (Kennedy, M. Trudelle).  M. Trudelle testified that the incident affected him by lowering his standard of life, by alienating his family, and by causing him to lose respect for the police.  See May 29, 2014, Tr. at 116:22-6 (Kennedy, M. Trudelle).  He testified that he could not calculate the total cost of the lost personal property, because a lot of the lost property was gifts from others.  See May 29, 2014, Tr. at 118:5-17 (Kennedy, M. Trudelle).  M. Trudelle testified that the lost property was worth more than Judge Lang awarded K. Trudelle and M. Trudelle for their lost personal property.  See May 29, 2014, Tr. at 119:3-5 (M. Trudelle).

M. Trudelle testified that he has multiple sources of emotional distress.   See May 29, 2014, Tr. at 121:3-6 (Levy, M. Trudelle).  M. Trudelle testified that not being able to live in the house that his grandmother owned impacted him emotionally.  See May 29, 2014, Tr. at 119:6-12 (Kennedy, M. Trudelle).  He testified that he was emotionally impacted by his family assuming that he was lying about not possessing drugs.  See May 29, 2014, Tr. at 119:12-16 (M. Trudelle);

id. at 122:10-16 (Levy, M. Trudelle).  He also testified that being charged with possession of drugs impacted him emotionally.  See May 29, 2014, Tr. at 119:23 (M. Trudelle); id. at 121:19-21 (Levy, M. Trudelle).  M. Trudelle testified that the charges did not result in a trial, because a judge ruled that the search of his house was illegal.  See May 29, 2014, Tr. at 119:23-120:1 (M. Trudelle).  M. Trudelle testified that it is still hard for him to find work.  See May 29, 2014, Tr. at 120:8-10 (M. Trudelle).  He further testified that K. Trudelle's mother omitted K. Trudelle from her will.  See May 29, 2014, Tr. at 120:15-18 (M. Trudelle).

### k.    Thomas' Evidentiary Hearing.

Thomas gave substantially similar testimony as she did before Judge Lang.  See May 29, 2014, Tr. at 86:8-95:8 (Kennedy, Levy, Thomas, Clerk, Court).  Additionally, Thomas testified that she was at work when the Nuisance Abatement Team red tagged the house.  See May 29, 2014, Tr. at 88:7-12 (Kennedy, Thomas).  She testified that it took two months for the house to be inspected and cleaned before she could move back into it.  See May 29, 2014, Tr. at 90:10-14 (Kennedy, Thomas).  Thomas testified that it was traumatic not being able to live in the house that she had owned for a long time.  See May 29, 2014, Tr. at 91:11-12 (Kennedy, Thomas).  She also testified that, when her son and Donna took her granddaughter away for eighteen months, she believed that they were living on the streets.  See May 29, 2014, Tr. at 93:5-12 (Thomas).  Thomas testified, however, that her son had legal custody of her granddaughter and that it was within his legal right to take her granddaughter.  See May 29, 2014, Tr. at 94:9-16 (Levy, Thomas).  Thomas testified that she thinks she endured PTSD after the eviction, because there are times in which she is unable to answer people when they talk to her and when she is unable to remember things.  See May 29, 2014, Tr. at 93:17-25 (Thomas).  Thomas testified that, before the house was red tagged,

she was dealing with a family crisis and that she was enduring emotional trauma because of the situation with her son and granddaughter.  See May 29, 2014, Tr. at 94:17-24 (Levy, Thomas).

<b><i>l</i>.        <u>M. Roybal's Evidentiary Hearing</u>.</b>

M. Roybal's testimony was substantially similar to the testimony she gave before Judge Lang.  See May 29, 2014, Tr. at 130:11-138:8 (Kennedy, Levy, M. Roybal, Clerk, Court). Additionally, M. Roybal testified that she did not know that the house had been red tagged until she arrived around 10:00 p.m. and discovered that it had been red tagged.  See May 29, 2014, Tr. at 131:24-132:5 (M. Roybal).  She testified that she called APD, who allowed her to enter the house to retrieve some clothes and her pets.  See May 29, 2014, Tr. at 132:5-17 (Kennedy, M. Roybal). M. Roybal testified that she was not able to live in the house for about ten months.  See May 29, 2014, Tr. at 133:1-4 (Kennedy, M. Roybal).

She testified that the incident emotionally impacted her, because she and her pets were forced to relocate and because she had to live out of a suitcase.  See May 29, 2014, Tr. at 133:5-15 (Kennedy, M. Roybal).  She also testified that the news featured her house and that the news reported that her house was a methamphetamine laboratory, which she testified was not true.  See May 29, 2014, Tr. at 133:18-25 (M. Roybal).  She also testified that her co-workers and family learned about the incident from the news report.  See May 29, 2014, Tr. at 134:1-4 (M. Roybal). M. Roybal testified that she called Officer Crandall, whose name was listed on the red tag, and Crandall called her stupid and dumb for not realizing what was occurring in her house.  See May 29, 2014, Tr. at 134:4-7 (M. Roybal).  M. Roybal testified that, when the news reporters came to her house, she was driving by the house, and that she got out of her car and begged the news reporter not to air the story, because it was not true.  See May 29, 2014, Tr. at 134:13-17 (M. Roybal).  She testified that the reporter called the police and that the police sent a helicopter to

- 49 -

the house, which flew over her and shined a spotlight on her.  See May 29, 2014, Tr. at 134:18-20 (M. Roybal).  M. Roybal testified that, after the incident, she had multiple stressors in her life, including her grandmother dying, discovering that her boyfriend possessed drugs, and the news station filming her house.  See May 29, 2014, Tr. at 136:5-137:3 (Levy, M. Roybal).  M. Roybal argued, however, that the news station would not have filmed her house but for the Nuisance Abatement Team's actions.  See May 29, 2014, Tr. at 137:3-11 (M. Roybal).  She also testified that her grandmother's death did not add that much stress to her life.  See May 29, 2014, Tr. at 137:11-16 (M. Roybal).

  **m.**  **T. Roybal's Evidentiary Hearing.**

   T. Roybal gave much of the same testimony as he did before Judge Lang.  See May 29, 2014, Tr. at 123:15-130:9 (Kennedy, Levy, M. Roybal, Clerk, Court).  Additionally, T. Roybal testified that the red tagging of his house made him angry and that he had to attend anger management classes.  See May 29, 2014, Tr. at 126:9-13 (Kennedy, T. Roybal).  He testified that he was angry, because he could not do anything to stop his house from being red tagged.  See May 29, 2014, Tr. at 126:17-127:2 (Kennedy, T. Roybal).  T. Roybal testified that his anger has interfered with his life and work.  See May 29, 2014, Tr. at 127:3-10 (Kennedy, T. Roybal).  T. Roybal also testified that he did not know that M. Roybal's boyfriend was using drugs at the house.  See May 29, 2014, Tr. at 128:18-129:4 (Levy, T. Roybal); id. at 129:20-24 (Levy, T. Roybal).

  **n.**  **Becker's Evidentiary Hearing.**

   Becker gave similar testimony as he did before Judge Lang.  Additionally, Becker clarified that his objection is that he was not fully compensated for loss of rental income for his property that was red tagged.  See May 29, 2014, Tr. at 25:12-15 (Kennedy, Becker).  He asserted that he

was unable to rent out his property for twenty-two months.  See May 29, 2014, Tr. at 25:16-18 (Kennedy, Becker).  Becker testified that he had been receiving $525.00 per month in rental income from the property when it was red tagged.  See May 29, 2014, Tr. at 25:19-21 (Kennedy, Becker).  Becker estimated that the rental value would have remained at $525.00 for the months that the house was vacant.  See May 29, 2014, Tr. at 27:24-25 (Kennedy, Becker).  He testified that it took him twenty-one months to remediate the property, because he did not have the financial reserves to remediate the property after it was red tagged.  See May 29, 2014, Tr. at 26:7-13 (Becker).  Becker testified that, when he finally remediated the property, it was because some of his other properties were doing well financially and because he was able pull financial reserves from those properties.  See May 29, 2014, Tr. at 26:18-23 (Kennedy, Becker).  He also testified that he knew that a lawsuit was filed to stop the red tagging and that, because of the lawsuit, he felt like the threat of other properties being red tagged was lessened.  See May 29, 2014, Tr. at 26:23-27:2 (Kennedy, Becker).  Becker testified that, once he learned about the lawsuit, he felt more comfortable paying to remediate the house.  See May 29, 2014, Tr. at 29:21-24 (Levy, Becker).

Becker testified that he and his business partner own thirty units in Albuquerque and that his mother and father own one hundred and thirty units.  See May 29, 2014, Tr. at 27:12-14 (Becker).  He testified that, if ten units were red tagged in Albuquerque and each unit required $6,480.00 to remediate, he would be required to expend a significant investment remediating properties and losing rental income.  See May 29, 2014, Tr. at 27:14-19 (Becker).  Becker contended that this fear of expending a substantial investment on remediation "paralyzed" him into not making the decision to immediately remediate the house.  May 29, 2014, Tr. at 27:18-19 (Becker).  He contended that part of his reason for waiting to remediate the house was that he

wanted to wait and see what happened with his other properties.  See May 29, 2014, Tr. at 29:13-16 (Levy, Becker).  Becker testified that none of his other properties were red tagged but that two of his father's properties were.  See May 29, 2014, Tr. at 29:25-30:3 (Levy, Becker). Becker argued that, with a $6,480.00 remediation cost and a $525.00 per month rental income, it would have taken thirteen months, not counting any outside costs, such as utilities and maintenance, to recoup his remediation investment.  See May 29, 2014, Tr. at 28:3-9 (Becker). Becker contended that the Albuquerque rental market is a difficult rental market, because a low socioeconomic group live in Albuquerque.  See May 29, 2014, Tr. at 30:25-31:2  (Becker).  He asserted that there are a lot of problems with drug use in Albuquerque and that, while he tries to screen potential tenants, relatives of the person to whom he rents a property will move onto the property.  See May 29, 2014, Tr. at 31:3-8 (Becker).  Becker argued that he cannot micromanage every one of his tenants and that property owners should not be held responsible for other person's personal actions.  See May 29, 2014, Tr. at 31:11-17 (Becker).

o.    **Cinelli's Evidentiary Hearing.**

Cinelli testified to substantially the same facts as he did before Judge Lang.  See May 29, 2014, Tr. at 35:5-55:10  (Kenney, Levy, Cinelli, Clerk, Court).  Additionally, Cinelli testified that his disabled son lived with him when his house was red tagged and that he was taking care of his son.  See May 29, 2014, Tr. at 36:5-8 (Kennedy, Cinelli).  He testified that, because of his son's disability, it takes his son a lot of effort to stand up and walk to the door, and that his friends will talk to him through his window.  See May 29, 2014, Tr. at 51:24-52:4 (Cinelli).  Cinelli contended that the Nuisance Abatement Team did not find any drugs or drug paraphernalia in his house, otherwise they would have arrested him and his son.  See May 29, 2014, Tr. at 38:4-7 (Kennedy, Cinelli); id. at 44:14-20 (Levy, Cinelli).  Cinelli testified that he was shot five times during an

attempted robbery of his business in 1973.  See May 29, 2014, Tr. at 39:2-8 (Cinelli).  He testified that when the Nuisance Abatement Team raided his house the terrors of the night he was robbed came back to him and he was frightened.  See May 29, 2014, Tr. at 39:8-12 (Cinelli).  Cinelli testified that, after the raid, he tells people that, if they are going to visit him at his house, they should call him rather than ringing the doorbell, because the ringing of the doorbell scares him. See May 29, 2014, Tr. at 40:21-25 (Cinelli).

Cinelli contended that he was required to sign paperwork, evicting his son from his house. See May 29, 2014, Tr. at 41:5-12 (Cinelli).  He testified that he was not told to bring a lawyer to the meeting in which he was asked to sign the paperwork.  See May 29, 2014, Tr. at 41:13-14 (Cinelli). Cinelli testified that he was told that, if he did not sign the paperwork evicting his son, there was a good chance that the City of Albuquerque was going to take away his house.  See May 29, 2014, Tr. at 41:15-18 (Cinelli).  Cinelli testified that he was forced to sign the agreement, because, when he said that he would not sign the agreement, he was threatened that there was a strong chance he would lose his house if he did not sign it.  See May 29, 2014, Tr. at 47:8-23 (Levy, Cinelli); id. at 49:5-13 (Kennedy, Cinelli); id. at 53:11-13 (Cinelli).  Cinelli testified that his son was not able to live in the house for a long period of time until he talked to the Plaintiffs' counsel in this case.  See May 29, 2014, Tr. at 41:20-24 (Kennedy, Cinelli).  Cinelli testified that the eviction of his son had an emotional impact on Cinelli, because he is the only person who could take care of his son, who Cinelli asserted is a criminal and is disabled.  See May 29, 2014, Tr. at 42:4-10 (Kennedy, Cinelli). Cinelli testified that the incident has made him nervous and apprehensive.  See May 29, 2014, Tr. at 42:11-16 (Kennedy, Cinelli).

Cinelli testified that he has stipulated that the Nuisance Abatement Team raided his house pursuant to a search warrant.  See May 29, 2014, Tr. at 43:21-44:2 (Levy, Cinelli).  He also

testified that the Nuisance Abatement Team probably raided his house because his son was alleged to be involved in selling drugs.  See May 29, 2014, Tr. at 54:25-55:5 (Levy, Cinelli).  Cinelli testified, however, that he was not told why the Nuisance Abatement Team raided his house.  See May 29, 2014, Tr. at 54:17-24 (Levy, Cinelli).

      **6.**      **Supplement to Judge Lang's Report.**

Judge Lang filed a supplement to his report in response to the class members' appeals.  See Supplement to Special Master's Report, filed July 15, 2014 (Doc. 194-1)(" Supplement").  Judge Lang asserts that he did not consider any new evidence or testimony, beyond that which formed the basis of his original report, in creating the Supplement.  See Supplement at 1.  Concerning Marks' Appeal, Judge Lang contends that Marks' decision to demolish the house, from which Marks asserts that he would have received $7,000.00 per year in rental income, was a choice that Marks made rather than choosing to invest $15,000 to remediate the property.  See Supplement at 1.  Judge Lang asserts that the "fact that demolition cost less than remediation is not the end of the inquiry given the property's income production."  Supplement at 1.  He contends that there "was no evidence that the actions of the Defendants necessitated the destruction of the structure, which was a choice Mr. Marks made," and that Marks did not provide an appraisal report to Judge Lang. Supplement at 1.

Concerning Carmichael's Appeal, Judge Lang asserts that Carmichael did not testify before him and that she did not present any "evidence that the alleged diminished value of her property was attributable to the acts of Defendants."  Supplement at 2.  Concerning Becker's Appeal, Judge Lang asserts that three of the four units in Becker's four-plex were rented during the twenty-one months in which the fourth unit was not rented.  See Supplement at 2.  Judge Lang contends that Becker did not present any evidence of steps that he took to secure the $4,200.00 it

took to remediate the fourth unit during the twenty-one months that it took him to finance the remediation of the unit.  See Supplement at 2.  Because of "the income producing nature of the property and the amount of money needed to remediate," Judge Lange states that the Becker's twenty-one month delay in remediating the property should not be attributed to the Defendants. Supplement at 2.

Concerning Cinelli's Appeal, Judge Lang asserts that Cinelli did not present any evidence showing the value that Cinelli alleges he lost in his property.  See Supplement at 2.  Judge Lang states that Cinelli did not present any evidence that he was fearful for his life, as Judge Lang notes may have been the case in May, 1973, when Cinelli was shot five times during the attempted robbery of Cinelli's business.  See Supplement at 2.  Judge Lang notes that Cinelli does not allege that his PTSD is related the Defendants' conduct.  See Supplement at 2.  Concerning Gallegos and Tapia's appeal, Judge Lang states that they were "in arrears on their mortgage payments at the time of the Defendant's' [sic] actions."  Supplement at 2-3.  Judge Lang asserts that Gallegos and Tapia did not present any evidence "to support the contention that [the] foreclosure was attributable to Defendants' actions."  Supplement at 3.

Regarding Peña's Appeal, Judge Lang states that Peña did not present any evidence on damages, but only on remediation.  See Supplement at 3.  Regarding the Trudelles' Appeal, Judge Lang asserts that the only evidence concerning the value of the Trudelles' lost property is a statement that it was "hard to value" the loss.  Supplement at 3.  He contends that there was no evidence to support an award of emotional distress other than a "broad statement that they suffered significant emotional distress for which they should be compensated."  Supplement at 3.  Judge Lang asserts that there was no visible "or other supporting evidence" to support the Trudelles' emotional distress claim.  Supplement at 3.

Concerning Thomas' Appeal, Judge Lang contends that Thomas and her family were in a crisis around the time her house was red tagged, and that there "is no claim that the Defendants precipitated the crisis, which calls into question the claim that Defendants' actions caused any emotional distress."  Supplement at 3.  Regarding Snyder's Appeal, Judge Lang asserts that the relevant property was owned by Snyder, "but rented to and occupied by tenants at the time of Defendants' actions."  Supplement at 4.  Judge Lang contends that Snyder and her family were not displaced from their home, and that Snyder did not present any evidence that she suffered from emotional distress as a result of the Defendants' actions.  See Supplement at 4.

Regarding T. Roybal's and M. Roybal's Appeals, Judge Lang asserts that he awarded emotional distress damages to M. Roybal and T. Roybal, but that he awarded more to T. Roybal because T. Roybal was able to more clearly articulate his emotional distress, and because he is a combat veteran and suffers PTSD.  See Supplement at 4.  Regarding Chavez' Appeal, Judge Lang contends that he awarded Chavez emotional distress damages in accordance with Chavez' behavior during her testimony, her living circumstances, and evidence of the Defendants' actions. See Supplement at 4.

Concerning Reazin's Appeal, Judge Lang asserts that Reazin did not present competent evidence of emotional distress.  See Supplement at 4.  Judge Lang contends that Reazin's claim for $300,000.00 in damages for emotional distress lacks evidentiary support.  See Supplement at 4-5. Judge Lang also argues that Reazin did not produce any evidence to support his contention that his property was devalued by $200,000.00, and that Reazin did not attempt to sell the property or to receive a market valuation to support his assertion that his property was devalued by $200,000.00. See Supplement at 5.

## **LAW REGARDING REVIEW OF SPECIAL MASTER'S REPORTS**

Rule 53 of the Federal Rules of Civil Procedure permits a court, unless a statute provides otherwise, to appoint a special master to:

**(A)**    perform duties consented to by the parties;

**(B)**    hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:

**(i)**    some exceptional condition; or

**(ii)**    the need to perform an accounting or resolve a difficult computation of damages; or

**(C)**    address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53(a).  A court must allow the parties to be heard before appointing a special master, and "[a]ny party may suggest candidates for appointment."  Fed. R. Civ. P. 53(b)(1).

A court's order appointing a special master must state:

**(A)**    the master's duties, including any investigation or enforcement duties, and any limits on the master's authority under Rule 53(c);

**(B)**    the circumstances, if any, in which the master may communicate ex parte with the court or a party;

**(C)**    the nature of the materials to be preserved and filed as the record of the master's activities;

**(D)**    the time limits, method of filing the record, other procedures, and standards for reviewing the master's orders, findings, and recommendations; and

**(E)**    the basis, terms, and procedure for fixing the master's compensation under Rule 53(g).

Fed. R. Civ. P. 53(b)(2).  "In acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard . . . ."  Fed. R. Civ. P. 53(f)(1).  The court can also receive evidence, and can "adopt or affirm, modify, wholly or partly or reverse, or

resubmit to the master with instructions" the Special Master's order, report, or recommendations. Fed. R. Civ. P. 53(f)(1).

A party can file objections or file a motion to adopt or modify "the master's order, report, or recommendations no later than 21 days after a copy is served, unless the court sets a different time."  Fed. R. Civ. P. 53(f)(2).  The court must review all objections to the Special Master's factual findings de novo, unless, with the court's approval, the parties stipulate that the master's findings will be reviewed for clear error or the master's findings are final.  See Fed. R. Civ. P. 53(f)(3).  The reviewing court must review all legal conclusions de novo and, "[u]nless the appointing order establishes a different standard of review," a court can set aside a master's ruling on a procedural matter if the ruling was an abuse of discretion.  Fed. R. Civ. P. 53(f)(4)-(5).

"'Where the district court rejects a factual finding by the master, [the Tenth Circuit], like a majority of circuit courts, directly reviews the findings of the special master, thereby effectively ignoring the district court's review of the master's findings.'"  U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 830 (10th Cir. 2005)(alterations omitted)(quoting Gottlieb v. Barry, 43 F.3d 474, 486 (10th Cir. 1994)).  Additionally, the Tenth Circuit reviews district court's legal conclusions de novo as well.  See U.S. Energy Corp. v. Nukem, Inc., 400 F.3d at 830 ("Although this court has not previously stated a standard of review for a district court's review of a special master's legal conclusions, since the district court's review is de novo, it follows that we in turn would review the district court's legal conclusions de novo.").  A district court's failure to review a special master's legal conclusions violates rule 53 and mandates reversal.  See Polin v. Dun & Bradstreet, Inc., 634 F.2d 1319, 1321 (10th Cir. 1980).

## RELEVANT NEW MEXICO LAW REGARDING DAMAGES

In New Mexico, "[a] party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty."  Sanchez v. Martinez, 1982-NMCA-168, ¶ 20, 653 P.2d 897, 902-03 (N.M. Ct. App. 1982).  An award of damages is improper if it is predicated "upon conjecture, guess, surmise or speculation."  Sanchez v. Martinez, 1982-NMCA-168, ¶ 20.  The underlying theory of a damages award is making the injured party whole.  See Abbinett v. Fox, 1985-NMCA-017, ¶ 21, 703 P.2d 177, 183 (N.M. Ct. App. 1985); Pub. Serv. Co. of N.M. v. Jasso, 1981-NMCA-112, ¶ 6, 635 P.2d 1003, 1005 (N.M. Ct. App. 1981)("The theory of damages in New Mexico is to make an injured party whole, not to allow him a profit on damages.").  In computing damages, the object is to afford just and reasonable compensation for the injuries the party sustained.  See Abbinett v. Fox, 1985-NMCA-017, ¶ 21.

### 1.     Damages for Harm to Property.

In New Mexico, to determine property damage, the fact finder can either award (i) the reasonable expense necessary to repair the property or (ii) the difference between the fair market value of the damaged property immediately before the relevant incident and its fair market value immediately after the incident.  See State v. Barreras, 2007-NMCA-067, ¶ 7, 159 P.3d 1138, 1141 (N.M. Ct. App. 2007)(citing NMRA, Civ. UJI 13-1813 ("In determining property damages, if any, you may award the reasonable expense of necessary repairs to the property which was damaged."); NMRA, Civ. UJI 12-1814 ("In determining property damage, if any, you may award the difference between the fair market value of the damaged personal property immediately before the occurrence and its fair market value immediately after the occurrence.")).  Whether the expense of repairs or decrease in value damage calculation should be used turns on whether the injury is

permanent or temporary.  See McNeill v. Burlington Res. Oil. & Gas Co., 2007-NMCA-024, ¶ 2,

153 P.3d 46, 48 (N.M. Ct. App. 2007).

> We conclude that the correct measure of damages depends on whether the injury is
> permanent or temporary, which is an issue of fact for the jury.  Where the injury is
> permanent, the correct measure of damages is the diminution in the fair market
> value of the property.  Conversely, where the injury is temporary, the correct
> measure of damages is the cost of repair or remediation, as long as the cost is less
> than the diminution in fair market value.

McNeill v. Burlington Res. Oil. & Gas Co., 2007-NMCA-024, ¶ 2.  "Temporary damages are

generally defined as damages that can be remedied, removed, or abated within a reasonable period

and at a reasonable expense."  McNeill v. Burlington Res. Oil. & Gas Co., 2007-NMCA-024, ¶ 27

(citing Morsey v. Chevron, USA, Inc., 94 F.3d 1470, 1476 (10th Cir. 1996)).  "[P]ermanent

damages are defined as those damages caused by an injury that is fixed and where the property will

always remain subject to that injury."   McNeill v. Burlington Res. Oil. & Gas Co.,

2007-NMCA-024, ¶ 28 (citing Morsey v. Chevron, USA, Inc., 94 F.3d at 1476).

Regardless which damage calculation is used, a court should normally consider the cost of

repair or remediation.  See McNeill v. Burlington Res. Oil. & Gas Co., 2007-NMCA-024, ¶ 2

("Furthermore, the Plaintiff should be allowed to present evidence on the cost of repair or

remediation in either situation because such evidence will normally be relevant in both cases.").

Additionally, in "determining the diminution in value of damaged property, the [fact finder]

should consider the decrease in value to the entire property, not just the damaged portion of land."

McNeill v. Burlington Res. Oil. & Gas Co., 2007-NMCA-024, ¶ 2.  Requiring repairs to be

necessary means that the repairs were for damages that the defendant's wrongdoing caused.  See

Camino Real Mobile Home Park P'ship v. Wolfe, 1995-NMSC-013, ¶ 26, 891 P.2d 1190, 1198

(N.M. 1995)("The requirement of 'necessity' is better stated as a requirement that the plaintiff

show that the alleged damages were actually caused by the wrong of the defendant."), overruled on

other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc., 2013-NMSC-017, 301 P.3d 387 (N.M. 2013).

### 2.        Damages for Lost Rental Income.

A plaintiff, whose property is damaged, but is repairable, may recover damages for his or her loss of use of the property.  See Brehens v. Gateway Court, LLC, 2013-NMCA-097, ¶ 11, 311 P.3d 822, 826 (N.M. Ct. App. 2013)("Our New Mexico appellate cases have long recognized that a plaintiff may make a claim for loss of use damages arising from the tortious conduct of a defendant where personal property is damaged, but reparable.").  The fact finder calculates the loss of use damages by "[t]he reasonable rental value of similar property during the period reasonably required for the repair of the damaged property."  NMRA, Civ. UJI 13-1818.  The reasonable rental value is the correct standard for calculating damages even if there is no actual rental.  See Cress v. Scott, 1994-NMSC-008, ¶ 7, 868 P.2d 648, 651 (N.M. 1994)("We today reaffirm that loss-of-use damages may be measured by the reasonable rental value of a substitute vehicle, even in the absence of actual rental.").

### 3.        Damages for Diminished Property Value.

For harm done to real property, the fact finder should generally determine the appropriate damages by measuring the difference between the value of the property immediately before the relevant incident and the value of the property immediately after the relevant incident.  See Ruiz v. Varan, 1990-NMSC-081, ¶ 9, 797 P.2d 267, 270 (N.M 1990)(citing NMRA, Civ. UJI 13-1819 ("You shall determine what was the value of the property immediately before the occurrence and immediately after the occurrence.  The difference between these two figures is the legal measure of damages to real property.").  This manner is not the only one that the fact finder can use to calculate damages for harm to real property.  See NMRA, Civ. UJI 13-1819, Use Note ("The

general rule on the measure of damages to real property is stated in the foregoing instruction. However, in certain peculiar situations, the courts have determined that there are other damages and other measures thereof."); McNeill v. Burlington Res. Oil & Gas Co., 2008-NMSC-022, ¶ 26, 182 P.3d 121, 128 (N.M. 2008)("However, as our case law and the use notes to UJI 13-1819 make clear, this Court has recognized that under certain circumstances the measure of damages to real property may vary." (citation omitted)(internal quotation marks omitted)).  Cost of repairs may be an appropriate calculation of damages, depending on the proof offered to "establish and quantify the harm," and if the calculation is reasonable.  McNeill v. Burlington Res. Oil & Gas Co., 2008-NMSC-022, ¶ 27 (internal quotation marks omitted).  Regardless what damages calculation the fact finder uses, "the cap on damages will be the diminution in value of the property." McNeill v. Burlington Res. Oil & Gas Co., 2008-NMSC-022, ¶ 27.

### 4.    Damages for Loss of Personal Property.

Damages for loss of personal property are measured by "repair costs plus depreciation or reduction in market value, whichever is less."   Hubbard v. Albuquerque Truck Ctr. Ltd., 1998-NMSC-058, ¶ 26, 958 P.2d 111, 117 (N.M. 1998).  If the personal property has no salvage value remaining, then damages are calculated by "the fair market value of the property immediately before the occurrence."  NMRA, Civ. UJI 13-1812.  See NMRA, Civ. UJI 13-1812, Committee Commentary ("This instruction is intended to be used when the damaged property has no salvage value, and it may also be used where the salvage is of doubtful value, if any.").  If the personal property has salvage value, damages are determined by "the reasonable expense of necessary repairs to the property which was damaged."  NMRA, Civ. UJI 13-1813.  See NMRA, Civ. UJI 13-1812, Use Note ("If the property has any salvage value, then UJI 13-1813 will be used and not this instruction.").   "A party can recover only the smaller of these amounts, the cost of

repairs or the differential." Hale v. Basin Motor Co., 1990-NMSC-068, ¶ 16, 795 P.2d 1006, 1011 (N.M. 1990)("The cost of repairs must be compared to the difference between the fair market value of the property before and after the damage took place. A party can recover only the smaller of these amounts, the cost of repairs or the differential." (emphases in original)).

### RELEVANT LAW REGARDING DAMAGES FOR EMOTIONAL DISTRESS

The Supreme Court of the United States has held that damages for emotional distress are recoverable in 42 U.S.C. § 1983 actions. See Carey v. Piphus, 435 U.S. 247, 264 (1978)("[M]ental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983 . . . ."). "Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff." Carey v. Piphus, 435 U.S. at 263-64. "Although expert testimony is one way of proving emotional distress damages, expert testimony is not required." Montoya v. Sheldon, No. CIV 10-0360 JB/WDS, 2012 WL 5378288, at *7 (D.N.M. Oct. 29, 2012)(Browning, J.)(citing Cadena v. Pacesetter Corp., 30 F. Supp. 2d 1333, 1340 (D. Kan. 1998)(Vratil, J.)("Expert testimony is one method of proving emotional damages, but it is not required.")). Emotional distress includes "mental suffering or emotional anguish," and while it is "essentially subjective," a person's conduct and other's observations may be used to show whether a person is suffering emotional distress. Carey v. Piphus, 435 U.S. at 264, n.20.

Emotional distress damages can "be inferred from circumstances beyond the ordinary" and "and by testimony." Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d 1451, 1459 (10th Cir. 1993)(citing Sec'y of U.S. Dep't of Hous. & Urban Dev. v. Blackwell, 908 F.2d 864, 879 (11th Cir. 1990)). "Such damages 'will not be presumed, but they are easily proved by testimony showing the nature and circumstances of the wrong and its effect on the plaintiff." Jolivet v.

Deland, 966 F.2d 573, 577 (1992)(quoting Santiago v. Garcia, 821 F.2d 822, 829 (1st Cir. 1987)).

Evidence of "physical symptoms is not required" to award emotional distress damages.  Morgan v.

Sec'y of Hous. & Urban Dev., 985 F.2d at 1459 (citing Marable v. Walker, 704 F.2d 1219, 1220

(11th Cir. 1983)).   "The fact that the damages for [emotional] distress are not capable of precise

measurement does not bar recovery."  Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d at 1459.

There must, however, be a causal connection "between the illegal action and the complainant's

injuries."  Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d at 1459 (citing Gore v. Turner,

563 F.2d 159, 164 (5th Cir. 1977)).

## MITIGATION OF DAMAGES UNDER NEW MEXICO LAW

"Under the doctrine of avoidable consequences a person injured by the tort of another is not

entitled to damages for harm which he could have avoided by the use of due care after the

commission of the tort."  Rutledge v. Johnson, 1970-NMSC-023, ¶ 10, 465 P.2d 274, 277

(N.M. 1970).  As the New Mexico Uniform Jury Instructions state:

> In fixing the amount of money which will reasonably and fairly compensate the
> plaintiff, you are to consider that a person who is damaged must exercise ordinary
> care to minimize existing damages and to prevent further damages.  Plaintiff may
> not recover for losses which could have been prevented by reasonable efforts on
> [his] [her] part.

NMRA, Civ. 13-1820.  The duty to mitigate damages applies to harm to both personal and real

property.  See NMRA, Civ. 13-1820, Use Note ("This mitigation of damages instruction can apply

both to personal property and real property situations.").  "'Mitigation of damages is an affirmative

defense, and its burden of proof is entirely on the contract breaker.'"  Collado v. City of

Albuquerque, 2002-NMCA-048, ¶ 31, 45 P.3d 73, 79 (N.M. Ct. App. 2002)(quoting Bd. of Educ.

v. Jennings, 1985-NMSC-054 ¶ 12, 701 P.2d 361, 364 (1985)).  See Hunt v. Cent. Consol. Sch.

Dist., 951 F. Supp. 2d 1136, 1237 (D.N.M. 2013)(Browning, J.)(refusing to dismiss complaint for

failing to mitigate damages, because, as an affirmative defense, the plaintiffs were not required to plead that they took steps to mitigate the defendants' damages).

## **RELEVANT LAW REGARDING DAMAGES FOR § 1983 VIOLATIONS**

In discussing the principles that should govern damages in suits brought under 42 U.S.C. § 1983, the Supreme Court of the United States has explained: "'The cardinal principle of damages in Anglo-American law is that of <u>compensation</u> for injury caused to plaintiff by defendant's breach of duty.'"  <u>Carey v. Piphus</u>, 435 U.S. at 254-55 (quoting 2 F. Harper & F. James, <u>Law of Torts</u> § 25.1, at 1299 (1956))(emphasis in Harper & James).  Writing for the Supreme Court in <u>Carey v. Piphus</u>, the Honorable Lewis F. Powell, then-Associate Justice for the Supreme Court of the United States, noted that, while the rules of common law developed over the centuries "defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983," he also recognized that, "[i]t is not clear . . . that common-law tort rules of damages will provide a complete solution to the damages issues in every § 1983 case." <u>Carey v. Piphus</u>, 435 U.S. at 254-55.  Thus, the Supreme Court in <u>Carey v. Piphus</u> recognized:

> In some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right. In such cases, it may be appropriate to apply the tort rules of damages directly to the § 1983 action . . . .  In other cases, the interests protected by a particular constitutional right may not also be protected by an analogous branch of the common law of torts . . . .  In those cases, the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right.

<u>Carey v. Piphus</u>, 435 U.S. at 258.  In light of such concerns, the Supreme Court in <u>Carey v. Piphus</u> held:

> [T]o further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question -- just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law.

Carey v. Piphus, 435 U.S. at 258.

**ANALYSIS**

The Court will: (i) grant some of the requests in the Gallegos & Tapia Appeal, increasing Judge's Lang's total proposed award from $38,057.48 to $60,470.63; (ii) grant some of the requests in the Chavez Appeal, increasing Judge Lang's proposed award of $9,570.08 to $13,181.44; (iii) grant some of the requests in the Peña Appeal, increasing Judge Lang's proposed award of $2,000.00 to $17,278.40; (iv) grant some of the requests in the M. Roybal Appeal and the T. Roybal Appeal, increasing Judge Lang's proposed award of $17,780.12 to $23,348.06; (v) grant the requests in the Becker Appeal, increasing Judge Lang's proposed award of $13,330.60 to $17,480.60; and (vi) grant some of the requests in the Cinelli Appeal, increasing Judge Lang's proposed award of $3,810.53 to $17,779.36. The Court will overrule the Reazin Objection, and deny the requests in the Reazin Appeal, the Marks Appeal, the Snyder Appeal, the Carmichael Appeal, the Trudelle Appeal, and the Thomas Appeal. Additionally, the Court will grant the Motion to Distribute and permit the class settlement fund to be distributed in accordance with this Memorandum Opinion and Order.

## I.   THE COURT WILL OVERRULE ALL OF REAZIN'S OBJECTIONS AND DENY THE REQUESTS IN HIS APPEAL.

The Court will overrule all of Reazin's objections. Judge Lang awarded Reazin $10,636.52 for testing/remediation costs and $16,170.00 for lost rental income/lost equity/diminished property value. See Proposed Distributions at 3. Judge Lang's total proposed award for Reazin is $26,806.52. See Proposed Distributions at 3. Reazin argues that Judge Lang should have awarded him $200,000.00 in emotional distress damages and $300,000.00 for the diminished value in his property. See Reazin Objection ¶ 2, at 1. The Court will overrule these

objections, because Reazin has not presented evidence that would suggest that he has suffered emotional distress and because the diminished value in his property is mere conjecture.  Reazin additionally argues that he objects to the remainder of the settlement fund being returned to the City of Albuquerque.  See Reazin Objection ¶ 2, at 2.  The Court will overrule this objection because the parties have already agreed, pursuant to the Settlement Agreement, that the remaining funds would be returned to the City of Albuquerque and the Court has already approved this agreement.  Reazin also argues that the Kennedy Law Firm should not have been paid before the class members, that the Court should review each of Judge Lang's awards and decrease some of them, see Reazin Notice ¶¶ 5-6, at 3, and that the Court should throw out all of Judge Lang's proposed awards because they are unjust and unfair, see Reazin Letter at 1.  The Court will overrule these objections as untimely.

Reazin asserts that he should receive $200,000.00 for emotional distress.  See Reazin Objection ¶ 2, at 1.  The only evidence supporting Reazin's claim for emotional distress is his own testimony that he is suffering from emotional distress.  See July 11, 2014, Tr. at 4:20-4:22 (Reazin)("I've had great emotional distress over the City attacking my property and me.").  See Dill v. City of Edmond, 155 F.3d 1193, 1209 (10th Cir. 1998)("Plaintiff's uncorroborated testimony of his emotional or mental state is insufficient to prove emotional distress.").  Reazin has not presented any evidence showing how the Defendants' conduct has affected him emotionally or mentally.  See Jolivet v. Deland, 966 F.2d at 577 ("Such damages will not be presumed, but they are easily proved by testimony showing the nature and circumstances of the wrong and its effect on the plaintiff."   (citation omitted)(internal quotation marks omitted)); Jacobs v. Meister, 1989-NMCA-033, ¶ 7, 775 P.2d 254,  261 (N.M. Ct. App. 1989)(holding that "New Mexico courts have placed the burden of proving the existence of injury and resulting damages with reasonable

certainty on the plaintiff who is seeking compensatory damages"); Ettenson v. Burke,

2001-NMCA-003, ¶ 34, 17 P.3d 440, 451 (N.M. Ct. App. 2001)("Additionally, to recover

emotional damages, the distress must be severe and 'of such nature that a reasonable person,

normally constituted, would be unable to cope adequately with the mental distress engendered by

the circumstances of the case.'" (quoting Madrid v. Lincoln Cnty. Med. Ctr., 1995-NMCA-126

¶ 15, 909 P.2d 14, 20 (N.M. Ct. App. 1995))).[12]  Additionally, while Reazin has suffered a wrong

---

[12]The parties do not specify whether federal or New Mexico law applies in calculating damages pursuant to the Settlement Agreement.  The Plaintiffs allege both federal claims under 42 U.S.C. § 1983 and state law claims.  See Complaint ¶¶ 25-87 at 4-13; Amended Class Action Complaint for Injunctive Relief, Declaratory Relief and for Recovery of Damages Resulting From a Deprivation of Constitutional Rights ¶¶ 37-107, at 6-16, filed August 10, 2010 (Doc. 48).  The Settlement Agreement states that the Plaintiffs "will dismiss all Individual Defendants from this action with prejudice."  Settlement Agreement at 3.  It also states that Judge Lang will determine the legal sufficiency and reasonableness -- including the proximate cause -- of all "claims for environmental testing and professional remediation and claims to loss of use, loss of property value, other out of pocket expenses, and mental and emotional distress."  Settlement Agreement at 5.  The Settlement Agreement does not state whether the legal sufficiency and reasonableness of the claims should be determined by federal or state law.  The Plaintiffs submitted a brief to assist the Court in its review of Judge Lang's report that summarized damages law.  See Class Brief Regarding New Mexico Damages Law and Claims of Objectors, filed July 14, 2014 (Doc. 188)("Damages Law Brief").  In this brief, the Plaintiffs summarize New Mexico law on damages for harm to property and on damages for other costs, and summarize federal law on emotional distress damages.  See Damages Law Brief at 3-12.  It, thus, appears that the Plaintiffs believe that the Court should apply New Mexico Damages law for all but the class members' emotional distress damages claims.  The Court is not sure that this proposed analysis is correct, because the Court is to apply federal damages law for federal constitutional claims, see Carey v. Piphus, 435 U.S. at 258, and state damages law for state law claims, see Hoffman v. Martinez, 92 F. App'x 628, 633 (10th Cir. 2004)(unpublished)(applying New Mexico damages law for New Mexico defamation claim).  Accordingly, if the parties intend for the federal claims to govern the damages award, the Court should apply federal law, but if the parties intend for the New Mexico state claims to govern the damages award, the Court should apply New Mexico law.  The Court cannot, however, apply federal law for one harm and New Mexico law for a different harm under the same claim.  What law the Court should apply is unclear, probably because this is a Settlement Agreement, and not a platform for more litigation.  Because the Settlement Agreement is unclear, and the parties have not specified the applicable law, the Court will refer to both federal and state law in reviewing Judge Lang's proposed awards.  After reviewing the objecting class members' appeals, the Court concludes that the result would be the same regardless whether it applies New Mexico or federal law.  The Court will, thus, cite to both federal and New Mexico cases in

at the Defendants' hands, Reazin was not impacted in the manner as some of the other class members.  Reazin did not live at the property that was red tagged, was not present when the property was raided, and was not evicted from his home.  See August 30, 2013, Lang Tr. at 57:10-58:2 (Levy, Reazin, Lang)(testifying that Reazin was not present during the raid, but read about it in the newspaper and heard about it from his tenants).  Reazin has not presented evidence that the Defendants' conduct has emotionally or mentally affected him, and he has not endured an extraordinary event that would likely cause emotional distress.  Accordingly, the Court will overrule Reazin's objections in this portion of Reazin's Appeal.

Reazin also asserts that he should receive $300,000.00 for the diminished value of his property.  See Reazin Objection ¶ 2, at 1.  Once again, Reazin has not presented any evidence to support this objection.  Reazin has not appraised the property.  See August 30, 2013, Lang Tr. at 54:18-20 (Kennedy, Reazin).  Before Judge Lang, Reazin testified that he came to the $300,000.00 figure by picking "it out of the blue."  August 30, 2013, Lang Tr. at 53:23-25 (Kennedy, Reazin).  He testified that he "can only estimate in [his] mind what all of this adverse publicity that the City brought upon" him has done to the value of his property.  August 30, 2013, Lang Tr. at 58:3-10 (Levy, Reazin).  At the hearing before the Court, Reazin testified that he picked the number "out of the air."  July 11, 2014, Tr. at 20:24-25 (Reazin); id. at 21:16-17 (Reazin)("Well, it was 300,000. And I picked it out of the air, in my head, in my brain.").  Reazin's objection concerning the diminished value in his property is based purely on "conjecture, guess, surmise, or speculation."  Sanchez v. Martinez, 1982-NMCA-168, ¶ 20 ("An award of damages predicated upon conjecture, guess, surmise or speculation is improper.").  See Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d 1509, 1526 (10th Cir. 1984)("The [Supreme] Court has emphasized that the trier of

_____

resolving the appeals to Judge Lang's report, and use that general law of damages to tether its findings to the law as much as possible.

fact can determine the amount of damages from 'a just and reasonable estimate of the damage based on relevant data.'  The damage award, however, may not be based on 'speculation or conjecture.'"  (citation omitted)(quoting <u>Bigelow v. RKO Radio Pictures</u>, 327 U.S. 251, 264 (1946))).  The Court will, thus, overrule Reazin's objections in this portion of his appeal.

Reazin objects to the remainder of the Settlement Fund being returned to the City of Albuquerque.  <u>See</u> Reazin Objection ¶ 5, at 2.  The Settlement Agreement states that "any remaining funds in the class fund shall be returned to the City of Albuquerque."  Settlement Agreement at 5-6.  Judge Lang was appointed to determine what each class member should be awarded and not to determine what to do with the remaining class funds.  <u>See</u> Settlement Agreement at 4-5 (stating the Judge Lang should be appointed to determine what awards each class member should receive).  Reazin's objection is not to Judge Lang's report, and, accordingly, should be overruled as irrelevant.[13]  Moreover, the Court already approved the Settlement Agreement, including its provision that the remaining funds be returned to the City of Albuquerque.  <u>See</u> <u>Lowery v. City of Albuquerque</u>, 2013 WL 1010384, at *41 (overruling Lowery's objection to Settlement Agreement's provision that the remaining funds be returned to the City of Albuquerque).  The Court previously reasoned:

> The only basis for the City of Albuquerque to receive back funds would be if each class member is fully compensated for their claims.  The Court has no sound basis in law to award the class members a monetary sum beyond that which they can legally prove they suffered in damages.  Justice and fairness, therefore, warrants

---

[13]Reazin's objection may be relevant if he is objecting to the amount that is being returned to the City of Albuquerque, because the class members have not received adequate awards, rather than the fact that the parties agreed that the remainder should be returned to the City of Albuquerque.  The Court has reviewed each class member's appeal, and, in modifying Judge Lang's report, has awarded the remaining class fund to some of the objecting class members.  If Reazin's objection is that Judge Lang did not compensate the class members with sufficient awards, such that there is no remaining money in the class fund, the Court agrees.  In either case, his objection is mooted by the Court's additional awards in this Memorandum Opinion and Order.

returning unallocated funds to the City of Albuquerque, rather than imposing a penalty upon the City of Albuquerque that has no legal basis.

Lowery v. City of Albuquerque, 2013 WL 1010384, at *41.  The Court will, thus, overrule Reazin's objections in this portion of his appeal.

Finally, Reazin argues that the Kennedy Law Firm should not have been paid before the class members, that the Court should review each of Judge Lang's awards and decrease some awards, see Reazin Notice ¶¶ 5-6, at 3, and that the Court should throw out all of Judge Lang's proposed awards, because they are unjust and unfair, see Reazin Letter at 1.  Reazin raises these objections in his Notice, which he filed on May 29, 2014, and his Letter to the Court, which he filed July 10, 2014.  See Reazin Notice at 1 (filed May 29, 2014); Reazin Letter at 1 (filed July 10, 2014).  Rule 53(f)(2) states that a party must file objections to a Special Master's report "no later than 21 days after a copy is served, unless the court sets a different time."  Fed. R. Civ. P. 53(f)(2). Judge Lang's report was filed on March 13, 2014.  See Notice of Judge Lang's Report at 1 (filed on March 13, 2014).  The Notice of Judge Lang's report states that Plaintiffs' counsel anticipated that it would mail a copy of Judge Lang's report to all class members on March 14, 2014.  See Notice of Judge Lang's Report at 1.  Reazin must have received his copy of the report by April 3, 2014, when he filed his Objections to Judge Lang's report.  See Reazin Objection at 1 (filed April 3, 2014).  Reazin did not, however, file his Notice until May 29, 2014, almost two months after he filed his Objections and more than two months after Judge Lang's report was filed.  Reazin did not file his Letter until July 10, 2014, over three months after he filed his Objections.  Reazin filed these two filings -- his Notice and his Letter -- well after rule 53(f)(2)'s 21-day time limit.  See Fed. R. Civ. P. 53(f)(2).  The Court has not set a different deadline for filing objections in this case. Reazin was able to raise his contentions against Judge Lang's report in both his Objections and his Appeal.  If he wished to make additional objections to Judge Lang's report, he should have raised

them in his Objections or in his Appeal, Complaint/Title 42 U.S.C. Section 1983 Civil Action, filed March 25, 2014 (Doc. 8) or he should have filed them within rule 53(f)(2)'s relevant time period.  He did not.  Accordingly, the Court overrules Reazin's objections that he raises in his Notice and in his Letter as untimely.

Additionally, even if Reazin timely filed his Notice and Letter, the Court would overrule his objections.  Reazin argues that the Kennedy Law Firm should not have been paid before the individual class members are paid.  See Reazin Notice ¶ 5, at 3.  The Kennedy Law Firm's payment, before the class members, was done pursuant to the Settlement Agreement.  The Settlement Agreement provides:

> After final approval of the settlement, the class fund shall be transferred to the IOLTA account of the Kennedy Law Firm.  Payment of fees and costs incurred, as approved by the District Court, shall be paid from the class fund upon transfer.  The remainder of the Class Fund shall be held in trust pursuant to the terms of this agreement.

Settlement Agreement at 2.  The Court has already approved this Settlement Agreement.  See Lowery v. City of Albuquerque, 2013 WL 1010384, at *45.  Reazin did not object to the Settlement Agreement when the Court approved it.  See Lowery v. City of Albuquerque, 2013 WL 1010384, at *40 (noting that Lowery was the only class member who objected to the Settlement Agreement).  See also Preliminary Approval of Settlement Agreement at 1 (setting deadline for class members to object to proposed settlement agreement).  Lowery, the sole objector to the Settlement Agreement, did not object to this provision, thus no one timely objected to this provision.  At this stage in the case, the only remaining issue is whether Judge Lang's proposed awards are appropriate, and not whether the Settlement Agreement is fair; the Court has already found that to be the case, that issue was not before Judge Lang, and he did not comment or rule on this provision.  Reazin's objection is not to Judge Lang's proposed award or even to the amount

that the Kennedy Law Firm was paid and which the Court has already approved.  See Lowery v. City of Albuquerque, 2013 WL 1010384, at *43-44 (approving the Kennedy Law Firm's requested fees).  Reazin's objection is only to the timing of the payment.  Because that issue is not relevant at this stage of the case, because the Court has already approved the Settlement agreement permitting the Kennedy Law Firm to be paid before the class fund is distributed to the class members, and because the Kennedy Law Firm has long been paid, the Court will overrule this objection.

Reazin's next two objections are essentially the same.  Reazin requests that the Court review each of Judge Lang's awards and decrease some awards, see Reazin Notice ¶¶ 5-6, at 3, and requests that the Court throw out all of Judge Lang's proposed awards, because they are unjust and unfair, see Reazin Letter at 1.  Reazin's requests would essentially render Judge Lang's services useless.  If the Court individually reviewed each award, even those to which there were no objections, then Judge Lang's appointment would have been meaningless, and the Court and parties would have wasted over $15,000.00 of the class fund to pay Judge Lang and the court reporters.  Part of the reasoning for appointing a Special Master is to improve a case's efficiency. See Commissariat A L'Energie Atomique v. Samsung Elecs. Co., 245 F.R.D. 177, 180, n.14 (D. Del. 2007)(Thynge, M.J.)("In other words, the purpose of Rule 53 is [sic] allow the court to be more responsive to counsel and litigants and to improve its efficiency.").  Reazin's request would destroy any benefit that Judge Lang may have contributed to this case, set the case back several months, and waste class funds.  The Court will not indulge such waste and inefficiency.  Moreover, Reazin has not gone to the trouble of pointing out why any particular award by Judge Lang is unfair and should be reduced.  For example, while he objects to Bob Claus', Charles Barnes', and Gary Back's awards, he does not offer any reason that the awards are improper.  The Court thus

has no basis to toss out Judge Lang's awards.  In any case, the Court has independently reviewed each and every award amounts that Judge Lang proposes for each individual class member, but because neither Reazin nor anyone has given the Court the hearings or documents for any class member that did not object to Judge Lang's report, the Court can do no more than compare the awards with the other awards.  The Court finds that Judge Lang's proposed awards appear reasonable in all respects.  The Court will, thus, deny Reazin's request to review each class member's award and to throw out all of Judge Lang's proposed awards.  In the end, Reazin's requests is to deny all other's awards and give him more of the money; that reason is not sound enough to toss out everyone else's award; Reazin's award must stand on its own.  If he deserves more, he should receive more because he deserves more not because others deserve less.

## II.    THE COURT WILL DENY THE REQUESTS IN MARKS' APPEAL.

Judge Lang awarded Marks $1,100.00 for testing/remediation costs and $7,750.00 for lost rental income/lost equity/diminished property value.  See Proposed Distributions at 3.  Marks argues that "the Special Master should have awarded [him] for the loss of his property."  Marks Appeal at 1.  Specifically, Marks requests restitution for the house on his property that he demolished, rather than paying $15,000.00 to $25,000.00 to remediate.  See May 29, 2014, Tr. at 5:14-16 (Marks).  The Court will deny this request, because Marks failed to present any evidence of the property's current value to determine any loss in value, and because the destruction of the house was a result of Marks' actions and not the Defendants'.

Marks testified that the house was red tagged during the recession and that he "was in dire straits for money" at the time.  May 29, 2014, Tr. at 5:13-19 (Marks).  Marks also testified that, if he ever sold the property, he would have to disclose that it was red tagged and that he believed that no one would buy the property.  See May 29, 2014, Tr. at 5:20-25 (Marks).  Marks spent $4,000.00

to $5,000.00 to demolish the house.  See May 29, 2014, Tr. at 9:8-10 (Levy, Marks).  Marks

thought that it was cheaper to demolish the house than remediate the house.  See May 29, 2014, Tr.

at 5:19-20 (Marks).  Marks provided an appraisal of the property that estimated the property's

value before the house was demolished.  See Appraisal Report for a Single Family Residence at 2

("Hearing Ex. 1").  The report estimates that, before the raid, the property was worth $196,000.00.

See Hearing Ex. 1 at 2.  Marks did not provide any evidence on the value of the property after the

house was demolished.  Marks estimates that, because one of the two houses on the property was

demolished, his property has lost about $92,000.00 in value, which is about half of $196,000.00.

See May 29, 2014, Tr. at 8:5-7 (Marks).  In making this estimate, however, Marks did not take into

consideration the value that the land, which remains even in the house's absence.  See May 29,

2014, Tr. at 10:13-22 (Levy, Marks).

　　　　The Court will overrule Marks' objection, because Marks has not presented any evidence

for the Court to determine the decrease in his property's value.  In New Mexico, damages for

diminished property value are determined by measuring the difference between the value of the

property immediately before the relevant incident and the value of the property immediately after

the relevant incident.  See Ruiz v. Varan, 1990-NMSC-081, ¶ 9; NMRA, Civ. UJI 13-1819 ("You

shall determine what was the value of the property immediately before the occurrence and

immediately after the occurrence.  The difference between these two figures is the legal measure of

damages to real property.").  The Court concludes that this is a reasonable measurement of

damages, even under federal law, because, to compensate Marks for his loss, Marks should be

awarded the value of his property when it was lost and not the value of his property when it was

new.  See Carey v. Piphus, 435 U.S. at 254-55 (noting that the "cardinal principle of damages in

Anglo-American law is that of compensation for injury caused to plaintiff by defendant's breach

of duty."   (internal quotation marks omitted)(emphasis omitted)).  Marks has not presented any evidence of his property's value immediately after he demolished the house.  He merely estimates that the property's value has been cut in half, because one of the two houses on the property is gone.  Marks does not, however, take into account the land's value in making this estimate.  His estimate is, at best, a guess.  Because a damages award cannot be based on "conjecture, guess, surmise, or speculation," Sanchez v. Martinez, 1982-NMCA-168, ¶ 20, the Court will overrule Marks' objection, see Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d at 1526 ("The damage award, however, may not be based on speculation or conjecture."   (citation omitted)(internal quotation marks omitted)).

Moreover, the Court cannot faithfully attribute Marks' decision to demolish the house, rather than repair it, to the Defendants.  Marks testified that he was receiving $575.00 in rent each month.  See May 29, 2014, Tr. at 5:25-2 (Kennedy, Marks).  $575.00 per month results in $6,900 per year.  Marks testified that it would cost $15,000.00 to $25,000.00 to remediate the house, see May 29, 2014, Tr. at 5:14-16 (Marks), and that he spent $4,000.00 to $5,000.00 to demolish the house, see May 29, 2014, Tr. at 9:8-10 (Levy, Marks).  Marks, thus, saved between $10,000 to $21,000 by demolishing the house rather than remediating it.  Marks, however, estimates that he lost $92,000.00 by tearing the house down rather than remediating it.  See May 29, 2014, Tr. at 8:5-7 (Marks).  According to Marks, he chose to lose $92,000.00, rather than spending an additional $10,000.00 to $21,000.00, which he would have recouped within two to three years.[14] Rather than mitigating his damages, see Rutledge v. Johnson, 1970-NMSC-023 ¶ 10, Marks

---

[14]This seemingly poor investment decision may be more of a testament to Marks' overestimation of his loss in property value than it is to Marks' investment choices.  His decision to demolish the house may not have resulted in a $92,000.00 decrease in property value, which is all the more reason to deny his request as conjectural.

- 76 -

exacerbated them.  Because the loss of the house was a result of Marks' decision to exacerbate his damages, rather than mitigating them, he cannot recover the loss of the house.

III.     **THE COURT WILL DENY THE REQUESTS IN SNYDER'S APPEAL.**

Judge Lang awarded Snyder $2,978.87 for testing/remediation and $5,675.75 for lost income/lost equity/diminished property value, resulting in a total award of $8,654.44.  See Proposed Distributions at 4.  Snyder appeals this award, arguing that she should have been awarded damages for emotional distress, because she "was displaced from [her] home and suffered significant emotion[al] distress."  Snyder Appeal at 1.  The Court will deny the requests in Snyder's Appeal, because there is no evidence that the Defendants' actions caused Snyder to suffer emotional or mental distress, and because Snyder did not live in the house that was red tagged and because her family was not displaced.

Snyder was renting out the house that was red tagged.  See May 29, 2014, Tr. at 97:22 (Snyder); id. at 98:14-17 (Kennedy, Snyder)(testifying that tenants were growing marijuana); id. at 102:9-11 (Levy, Snyder)("Q.  And you were not residing in the home at the time?  A.  No.").  To support her emotional distress damages claim, Snyder testified that she became stressed about paying bills, because she was no longer receiving the $1,000.00 per month rental income from the house, and she testified that she no longer holds the police in high regard or respects them.  See May 29, 2014, Tr. at 100:24-101:14 (Kennedy, Snyder).  Snyder has not shown any wrong that would cause emotional distress nor that the Defendants conduct has emotionally affected her.  See Jolivet v. Deland, 966 F.2d at 577 ("Such damages will not be presumed, but they are easily proved by testimony showing the nature and circumstances of the wrong and its effect on the plaintiff."); Jones v. Schoellkopf, 2005-NMCA-124, ¶ 29, 122 P.3d 844, 853 (N.M. Ct. App. 2005)("The only evidence of emotional distress presented below was that Plaintiff suffered

tension from this dispute with his neighbors.  This is precisely the type of emotional distress that our cases require to be suffered by people living in society without resorting to the courts for redress.").

To support her emotional distress claim, Snyder asserts that she lost $1,000.00 per month in rental income.  See May 29, 2014, Tr. at 100:24-101:14 (Kennedy, Snyder).  Snyder also testified that the house remained unrented for two to three months.  See May 31, 2013, Lang Tr. at 90:4-7 (Kennedy, Snyder).  Snyder's emotional distress claim is, thus, founded on not receiving two to three $1,000.00 payments over the course of two to three months.  This loss is not sufficient to create an inference that Snyder suffered emotional distress.  Additionally, Snyder has not provided any corroborating testimony to her emotional distress claim.  See Koopman v. Water Dist.  No. 1, 41 F.3d 1417, 1420 (10th Cir. 1994)(holding that the plaintiff could not recover damages for emotional distress when he "offered no witness to corroborate his testimony as to his mental state," and the "circumstances of the case" -- being denied due process to challenge his termination from his job -- "afford no basis for inferring the cause of [the plaintiff's] reported stress was the denial of due process rather than his termination").  While Snyder testified that she no longer respects the police, see May 29, 2014, Tr. at 101:6-14 (Kennedy, Snyder), she has not shown how this loss of respect has caused her any emotional or mental distress.  Ettenson v. Burke, 2001-NMCA-003, ¶ 34 (noting that emotional distress must be severe).  Accordingly, the Court will overrule Snyder's Appeal.

## IV.   **THE COURT WILL GRANT SOME OF THE REQUESTS IN GALLEGOS & TAPIA'S APPEAL.**

Judge Lang awarded Gallegos and Tapia $557.48 for testing/remediation costs, $15,000.00 for lost rental income/lost equity/diminished property value, $15,000.00 for personal property loss, and $7,500.00 for emotional distress, totaling $38,057.48.  See Proposed Distributions at 2.

Gallegos and Tapia argue that the "award amount should have been larger, in order to fully compensate them for the loss of personal items, loss of personal property, and for emotional distress." Gallegos & Tapia Appeal at 1. They also object to Judge Lang's loss of equity award. See May 29, 2014, Tr. at 61:9-12 (Kennedy, Tapia).[15] The Court will overrule Gallegos and Tapia's objection to Judge Lang's loss of personal property award. The Court will, however, sustain Gallegos' and Tapia's objection to Judge Lang's loss of equity award, and increase their loss of equity award from $15,000.00 to $34,000.00. The Court will, additionally, sustain Gallegos' and Tapia's objection to Judge Lang's emotional distress award, increasing it from $7,500.00 to $10,913.15.

The Court will overrule Gallegos and Tapia's objection to Judge Lang's loss of personal property award. Judge Lang awarded Gallegos and Tapia $15,000.00 for their loss of personal property. See Proposed Distributions at 2. Gallegos and Tapia were not able to reenter their house to retrieve any of their personal items after it was red tagged. See May 29, 2014, Tr. at 72:19-24 (Kennedy, Gallegos). To show the value of their personal property that they lost in the house, Gallegos and Tapia submitted detailed lists of their personal property. See Tapia & Gallegos

_____

[15]It is not clear whether Gallegos and Tapia objected to Judge Lang's Loss of Equity award in their original appeal. In the Gallegos & Tapia Appeal, they argue that Judge Lang's "award amount should have been larger," but then state that the reason it should have been larger is to "fully compensate them for the loss of personal items, loss of personal property, and for emotional distress," without mentioning loss of equity. Gallegos & Tapia Appeal at 1. While a party cannot properly object to a Special Master's findings after 21 days of receiving the report, see Fed. R. Civ. P. 53(f)(2), rule 53 does not say that a court may not modify a portion of a Special Master's report to which there is no objection. Instead, rule 53(f)(1) states that, "[i]n acting on a master's order, report, or recommendations, the court . . . may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1). The Court believes that Gallegos and Tapia intended to object to Judge Lang's loss of equity award, because their statements in their appeal mentions the loss of equity in the house, see Gallegos & Tapia Appeal at 30, and, at the hearing before the Court, Tapia testified about the loss of equity in the house, see May 29, 2014, Tr. at 59:1-61:15 (Kennedy, Tapia); id. at 65:21-66:19 (Kennedy, Gallegos, Court). Additionally, even if the Gallegos and Tapia had not objected to Judge Lang's loss of equity award, the Court would modify this award.

- 79 -

Personal Property Lists ("Hearing Ex. 2").  Their list states the amount that they paid to purchase

each item.  See Hearing Ex. 2 at 1-6; May 29, 2014, Tr. at 62:23-25 (Kennedy, Tapia).  On the first

page of the list, they list $5,050.00 in personal property; on the second page $2,539.00; on the third

page $5,700.00; on the fourth page $13,925.00; on the fifth page $26,819; and on the sixth page

$1,199.00.[16]  See Hearing Ex. 2 at 1-6.  These amounts result in a total of $55,232.00.  The last two

pages of the list states a number of items that their daughter owned, but no monetary value has

been attributed to those items.  See Hearing Ex. 2 at 7-8.

 In New Mexico, damages for personal property should be calculated by "the fair market

value of the property immediately before the occurrence."  NMRA, Civ. UJI 13-1812.  Gallegos

and Tapia provided their personal property's value from when the property was new, but not the

value immediately before their house was red tagged.  Judge Lang's award of $15,000.00 is

approximately one-fourth of the value of Gallegos' and Tapia's personal property when it was

new.  Personal property, however, depreciates in value over time.  It is not unreasonable to assume

that some of Gallegos' and Tapia's personal property depreciated to one-fourth of its original

value and some to even less.  Because Gallegos and Tapia have not provided an appraisal of their

personal property's value immediately before the raid -- and indeed it would likely have been

impossible or unduly burdensome to do so -- an award of one-fourth the value of the personal

property's original value is a reasonable damage award.  Accordingly, the Court will overrule this

portion of Gallegos and Tapia's objection.

 The Court will increase Gallegos and Tapia's emotional distress award.  Tapia testified that

he was humiliated when the Nuisance Abatement Team told his neighbors that they found drugs at

---

[16]In their list, Gallegos and Tapia also included non-personal property, such as motel rental, cost of buying a mobile home, and a dog pound fee.  See Hearing Ex. 1-2.  The Court has thus excluded these non-personal property amounts in its calculations of damages for personal property.

Gallegos' and Tapia's house when no drugs were found.  See May 29, 2014, Tr. at 64:7-14 (Kennedy, Tapia).  Tapia also testified that losing all of his personal belongings inside the house emotionally impacted him.  See May 29, 2014, Tr. at 65:15-18 (Kennedy, Tapia).  Tapia further testified that, because of the red tagging, people began to shun his family.  See May 29, 2014, Tr. at 64:17-20 (Tapia).  Gallegos and Tapia's daughter went from an "A" student to failing her classes. May 29, 2014, Tr. at 64:16-17 (Tapia).  Their daughter eventually had to withdraw from school and became depressed.  See May 29, 2014, Tr. at 75:18-15:2 (Kennedy, Gallegos).  Their daughter has to attend counseling for her depression.  See May 29, 2014, Tr. at 75:2-4 (Gallegos).  Gallegos testified that she has suffered emotionally from watching her daughter transform from a happy person to being depressed.  See May 29, 2014, Tr. at 75:5-13 (Kennedy, Gallegos).  Judge Lang found that these facts entitled Gallegos and Tapia to an emotional distress award, and awarded them $7,500.00 in emotional distress damages.  See Proposed Distributions at 2.  The Court agrees that Gallegos' and Tapia are entitled to emotional distress damages, but concludes that they are entitled to a larger award.  The Court will modify Judge Lang's proposed award by increasing Gallegos and Tapia's emotional distress damages by $3,413.15, increasing their total emotional distress damages from $7,500.00 to $10,913.15.

The Court will sustain Gallegos and Tapia's objection concerning their loss of equity and award them an additional $19,000.00 in damages.  Before the house was red tagged, Gallegos and Tapia had their mortgage refinanced with a $146,000.00 loan.  See May 29, 2014, Tr. at 69:11-16 (Levy, Tapia).  See also Mortgage at 1 ("Hearing Ex. 6").  In obtaining the loan, the loan company appraised the house at $180,000.00.  See May 29, 2014, Tr. at 69:13-20 (Levy, Tapia).  Gallegos and Tapia, thus, had $34,000.00 in equity in the house.  Tapia testified that he was a year in arrears and that foreclosure proceedings had begun on his house, but that another company purchased his

loan and was going to allow him to start making payments to that company. See May 29, 2014, Tr. at 59:14-60:3 (Levy, Tapia). Thus, if not for the Defendants' actions, Tapia would have been able to continue paying his mortgage to prevent foreclosure. He was prevented from paying the mortgage, because he had to pay rent on an apartment for his family, purchase new clothes and personal items for his family, and purchase new tools for work. See May 17, 2013, Lang Tr. at 40:22-23 (Tapia); id. at 42:6-44:15 (Levy, Kennedy, Gallegos, Tapia). Because of the Defendants' actions, Tapia was faced with a decision: pay the mortgage and keep his house, or provide his family with clothing and shelter. Tapia chose to provide for his family and, as a result, lost his house and the $34,000.00 in equity that he had in it. Tapia should be compensated for this loss and be made whole. See Pub. Serv. Co. of N.M. v. Jasso, 1981-NMCA-112, ¶ 6 ("The theory of damages in New Mexico is to make an injured party whole . . . ."). Accordingly, the Court will grant this request in this portion of Gallegos' and Tapia's Appeal and modify their damages for lost rental income/lost equity/diminished property value from $15,000.00 to $34,000.00. With the increase in emotional distress damages, this addition brings their total damages to $60,470.63.

## V.    THE COURT WILL GRANT THE REQUESTS IN CHAVEZ' APPEAL.

Judge Lang awarded Chavez $4,070.08 for testing/remediation costs, $3,000.00 for lost rental income/lost equity/diminished property value, and $2,500.00 for emotional distress, totaling $9,570.08 in damages. See Proposed Distributions at 1. Chavez argues that she "should have been awarded more for the mental anxiety from having to live in a motor home . . . with no water or electricity." Chavez Appeal at 1. The Court will sustain Chavez' objection and increase her emotional distress award from $2,500.00 to $6,111.36.

Chavez testified that, because she was evicted from her house, she had to live in her son's motor home in the desert for five months. See May 30, 2014, Tr. at 4:22-5:4 (Kennedy, Chavez);

id. at 12:6-8 (Levy, Chavez).  The motor home did not have electricity, which made it hot in the summer and cold in the winter.  See May 30, 2014, Tr. at 7:10-11 (Chavez); id. at 7:16 (Chavez); id. at 8:9-12 (Chavez); id. at 8:21-9:4 (Chavez).  Chavez testified that the wind was constantly blowing, covering her in dirt, and that, if she bathed daily to clean the dirt off of her, she would run out of water at a quicker rate.  See May 30, 2914, Tr. at 9:8-20 (Chavez).  Chavez testified that the motor home had mice, which attracted snakes.  See May 30, 2014, Tr. at 5:23-25 (Chavez).  Finally, she testified that she feared for her dog's safety, because of the coyotes and mountain lions in the desert.  See May 30, 2014, Tr. at 7:21-22 (Chavez).

Judge Lang found that these facts entitled Chavez to an award of damages for emotional distress in the amount of $2,500.00.  The Court agrees that Chavez is entitled to emotional distress damages, but believes that the award should be greater.  The Court will modify Judge Lang's report and increase Chavez' emotional distress damages from $2,500.00 to $6,111.36.  This addition results in her total damages being increased from $9,570.08 to $13,181.44.

## VI.    THE COURT WILL DENY THE REQUESTS IN CARMICHAEL'S APPEAL.

Judge Lang awarded Carmichael $4,960.56 in testing/remediation costs and $7,428.00 in lost rental income/lost equity/diminished property value, totaling $11,388.56.  See Proposed Distributions at 1.  Carmichael appeals this award by arguing that she should have been compensated for the loss of her mobile home, which she contends costs $19,079.08.  See Carmichael Appeal at 1.  To support her Appeal, Carmichael introduced, at the hearing before the Court, a sales contract from 2003, which states that she purchased the mobile home for $19,079.08.  See Medowbrook Mobile Homes Contract at 1 ("Hearing Ex. 2").  The Court will overrule this objection, because there is no evidence to show what the mobile home's value was in 2008, when it was red tagged.

The sales contract, which Carmichael provided, is from 2003.  See Hearing Ex. 2 at 1. Accordingly, the mobile home's value in 2003 was $19,079.08, but the home's value would have depreciated by the time it was red tagged in 2008.  Carmichael did not provide any evidence to show what the mobile home's value was in 2008.  See NMRA, Civ. UJI 13-1812 ("In determining property damages, if any, you may award the fair market value of the property immediately before the occurrence.").   Judge Lang awarded Carmichael $7,428.00 for lost rental income/lost equity/diminished property value.  See Proposed Distributions at 1.  It is not clear whether this award is for loss rental income or for the destruction of the mobile home.  Because loss of use damages -- i.e. rental income -- is only available when property is damaged, but reparable, see Brehens v. Gateway Court, LLC, 2013-NMCA-097, ¶ 11, Judge Lang's award must be for the value of the mobile home, which was destroyed.  Judge Lang, thus, awarded Carmichael $7,428.00 for the loss of her mobile home rather than the $19,079.08 that she paid for it in 2003.

Because an award for destroyed personal property should be based on the fair market value of the property immediately before the incident, the $7,428.00 award is based on the assumption that the mobile home depreciated from $19,079.08 to $7,428.00 within five years.   This assumption may not be unreasonable in light of the APD's findings in the mobile home.  APD contends that a "clandestine drug laboratory was seized or a person was arrested on the property for having chemicals or equipment used in the manufacturing of methamphetamine, LSD or any other controlled substance on the property."  Albuquerque Police Department Notice and Order ("Hearing Ex. 3").  Carmichael contends that the police could not have found a methamphetamine laboratory in the mobile home, May 29, 2014, Tr. at 15:12-15 (Kennedy, Carmichael), but she does not provide any evidence to support this contention.  Additionally, Carmichael testified that she was in the hospital during this time and, thus, could not have known whether there was a

methamphetamine laboratory in the mobile home even though she visited her son in the mobile home before being admitted into the hospital.  See May 29, 2014, Tr. at 15:15-18 (Carmichael). As of May 29, 2014, Carmichael's son continued to have criminal charges pending against him for his arrest on the night the mobile home was red tagged.  See May 29, 2014, Tr. at 20:9-14 (Levy, Carmichael).  $7,428.00 may, thus, be a reasonable estimate of the value of a mobile home that cost $19,000.00 five years earlier but which housed a methamphetamine laboratory.  If the Court were to modify this award in any way, the modification would be a guess.  See Sanchez v. Martinez, 1982-NMCA-168, ¶ 20 ("An award of damages predicated upon conjecture, guess, surmise or speculation is improper."); Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d at 1526 ("The [Supreme] Court has emphasized that the trier of fact can determine the amount of damages from 'a just and reasonable estimate of the damage based on relevant data.'  The damage award, however, may not be based on 'speculation or conjecture.'"  (citation omitted)). Accordingly, the Court will deny the requests in Carmichael's Appeal and not disturb Judge Lang's proposed award.

## VII.   THE COURT WILL GRANT SOME OF THE REQUESTS IN PEÑA'S APPEAL.

Judge Lang awarded Peña $2,000.00 for testing/remediation costs.   See Proposed Distributions at 3.  Peña argues that he should have received a larger award "due to the loss of all [his] personal property and the emotional distress brought about by the eviction from his home." Peña Appeal at 1.  The Court will overrule Peña's objection to the proposed award for his loss of personal property, because he has not presented any evidence of his personal property's value or what personal property was lost.   The Court will sustain Peña's objection to the denial of emotional distress damages and award Peña $15,278.40 in emotional distress damages.

- 85 -

Peña argues that the Court should award him for his loss of personal property.  See Peña Appeal at 1.  In his class action claims form, Peña asserted for "Loss of Personal Property" that he "lost everything, all personal property was left in the house."  Lowery Class Action Claim Form ("Hearing Ex. A").  Peña does not give a number for his lost property's value or state what items were lost.  Hearing Ex. A.  His only elaboration on the personal property that he lost was when he stated at the hearing before the Court that he lost everything in the house, including "clothes, furniture, tools."  May 29, 2014, Tr. at 84:14-15 (Peña).  Peña does not state how many or what kinds of clothes, furniture, or tools were lost.  Moreover, he testified that, before his father sold the house with his personal property in it, his son went to the house and recovered some of his personal property.  See May 29, 2014, Tr. at 84:20-85:1 (Kennedy, Peña).  Again, Peña does not state what items his son recovered and what items his son left.  Any number the Court used to value Peña's personal property would be conjecture.  See Sanchez v. Martinez, 1982-NMCA-168, ¶ 20; Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d at 1526.  The Court will, thus, deny the requests in this portion of Peña's Appeal and not award Peña damages for lost personal property.

The Court will sustain Peña's objection to his denial of emotional distress damages and award Peña $15,278.40 in damages for emotional distress.  Peña testified that, after being evicted from his house, he lived on the streets for several months.  See May 29, 2014, Tr. at 78:14-16 (Kennedy, Peña).  He also testified that each time he tried to return to his house to clean it, so that he could move back into the house, he was arrested for trespassing.  See May 29, 2014, Tr. at 77:25-78:7 (Kennedy, Peña).  He testified that the stress of living on the streets and being evicted from his house was so severe that he eventually suffered a heart attack and was hospitalized for ten days.  See May 29, 2014, Tr. at 79:3-8 (Kennedy, Peña).  These facts are sufficient to find that Peña suffered emotional distress.  The circumstances that he endured -- having to live on the streets

- 86 -

and being arrested when trying to clean his house to move back into it -- are "beyond the ordinary." Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d at 1459. The emotional and mental effect of the Defendants' actions is also evident, in that Peña suffered a heart attack from the stress of his situation that the Defendants caused. See Jolivet v. Deland, 966 F.2d at 577 ("Such damages will not be presumed, but they are easily proved by testimony showing the nature and circumstances of the wrong and its effect on the plaintiff." (citation omitted)(internal quotation marks omitted)). Peña suffered emotional distress. The Court concludes that to compensate for the severity of Peña's emotional distress, which caused a heart attack, he should be awarded $15,278.40. The Court will, thus, sustain this portion of Peña's Appeal and modify Judge Lang's award by awarding Peña $15,278.40 for the emotional distress that he endured, bringing his total damages award to $17,278.40.

## VIII.   THE COURT WILL DENY THE REQUESTS IN THE TRUDELLES' APPEAL.

Judge Lang awarded the Trudelles $7,012.27 for testing/remediation costs and $1,396.74 for personal property loss, totaling $8,409.01. See Proposed Distributions at 4. The Trudelles argue that they should have been awarded damages for emotional distress and for diminished property value, and that they should have been given a greater award for lost personal property. See Trudelles' Appeal at 1-2. The Court will overrule their objection to the lack of an emotional distress award, because they have not demonstrated that the Defendants' actions caused their emotional distress. The Court will overrule their objection concerning diminished property value, because a family trust owned the house and because they have not presented any evidence suggesting that the house has diminished in value. Finally the Court will overrule their objection to their personal property award, because they have not presented any evidence showing the value of the personal property that they lost.

First, the Court will overrule the Trudelles' objection to not being awarded emotional distress damages, because factors other than the Defendants' actions caused their emotional distress.  K. Trudelle testified that she suffered emotional distress from not knowing if she would be able to return to her house, from trying to find a place to live that accepted pets, from having their family assume that the police's allegations were true, from their family treating them as outcasts, and from her husband being arrested and charged with possession of methamphetamine.  See May 29, 2014, Tr. at 109:10-110:1 (Kennedy, K. Trudelle); id. at 113:18-22 (Levy, K. Trudelle).  M. Trudelle testified that he suffered emotional distress from not being able to live in his grandmother's house, from their family assuming that APD's allegations were true, and from being charged with possessing drugs.  See May 29, 2014, Tr. at 119:9-17 (M. Trudelle).  The Trudelles list several potential sources of emotional distress, but did not testify to how these sources of emotional distress affected them.  They have, thus, failed to show an emotional or mental effect, see Carey v. Piphus, 435 U.S. at 263-64 ("Distress is a personal injury familiar to the law, customarily proved by showing the nature and circumstances of the wrong and its effect on the plaintiff."), other than their own assertions that they have suffered emotional distress, see Dill v. City of Edmond, 155 F.3d at 1209 ("Plaintiff's uncorroborated testimony of his emotional or mental state is insufficient to prove emotional distress.").  This uncorroborated testimony is "insufficient to prove emotional distress."  Dill v. City of Edmond, 155 F.3d at 1209.

Additionally, if the Trudelles suffered emotional distress, it is unclear whether the Defendants' actions or other circumstances caused this distress.  The Trudelles name a number of potential sources of emotional distress, but the only potential source that is attributable to the Defendants is being evicted from their house.  Both Trudelles testified that they have suffered emotional distress from their family members assuming that the police's allegations were true.

See May 29, 2014, Tr. at 109:10-110:1 (Kennedy, K. Trudelle); id. at 119:9-17 (M. Trudelle). APD's allegations, however, were true, because the police found a bag with methamphetamine residue in the Trudelles' house.  See May 29, 2014, Tr. at 111:23-112:4 (Levy, M. Trudelle). M. Trudelle was charged with possession of methamphetamine, but the charge was dismissed after the search was deemed illegal.  See May 29, 2014, Tr. at 119:23-120:1 (M. Trudelle).  All of the Trudelles' family problems and M. Trudelle being charged with a crime were a result of M. Trudelle's possession of methamphetamine, and not a result of the Defendants' actions. Consequently, there are no circumstances to infer that the Defendants' actions rather than M. Trudelle's own conduct caused the Trudelles' emotional distress.  See Koopman v. Water Dist. No. 1, 41 F.3d at 1420 ("Here, Koopman offered no witness to corroborate his testimony as to his mental state.  The circumstances of the case afford no basis for inferring the cause of Koopman's reported stress was the denial of due process rather than his termination."); Ettenson v. Burke, 2001-NMCA-003, ¶ 34 (holding that emotional distress must be causally connected to the defendants' breach of duty and that it "would be inappropriate . . . to award [the plaintiff] emotional damages . . . , which were caused by" another source).  The Court will, thus, deny the requests in this portion of the Trudelles' Appeal.

The Court will also overrule the Trudelles' objection to their loss-of-personal-property award.  K. Trudelle testified that a lot of their personal property was lost, because the remediation team that they hired threw away their property, or because people broke into their house and stole their property.  See May 29, 2014, Tr. at 107:7-13 (Kennedy, K. Trudelle).  M. Trudelle testified that it is "impossible" to determine the value of their personal property that they lost, because a lot of their personal property was gifts from people who are now deceased.  May 29, 2014, Tr. at 118:5-17 (Kennedy, M. Trudelle).  He further testified that it is hard to determine a dollar amount

for their personal property, but that he thinks it is more than Judge Lang awarded them.  See May

29, 2014, Tr. at 119:3-5 (M. Trudelle)("It's hard to figure a dollar [amount] really the [sic] hard.

But I think it's more than what I [sic] more than we were awarded.").  To support their objection to

Judge Lang's personal property award, the Trudelles presented at the hearing before the Court a

list of jewelry that they lost.  See Jewelry List (Hearing Ex. 7).  The list, however, does not state the

value of the items listed.  See Jewelry List at 1.  K. Trudelle testified that she was not able to get

estimates on the value of the jewelry, because many of the jewelry pieces were gifts and because

she did not have receipts for them.  See May 29, 2014, Tr. at 110:2-6 (Kennedy, K. Trudelle).  Any

value the Court attributes to these items would be a guess.  See Sanchez v. Martinez,

1982-NMCA-168, ¶ 20; Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d at 1526.

The Court will, thus, overrule this portion of the Trudelles' objections.

Finally, the Trudelles request that the Court award them damages for the diminished value

of their property.  See Trudelle Appeal at 1-2.  The Trudelles did not, however, own the house that

was red tagged; a family trust owned it, and the Trudelles rented the house from the trust.  See May

29, 2014, Tr. at 111:3-5 (Levy, K. Trudelle).  After the Trudelles were evicted, the family trust

rented the house to new tenants for a higher rent than the Trudelles were paying.  See May 29,

2014, Tr. at 113:14-17 (Levy, K. Trudelle).  M. Trudelle's sister manages the trust, and the trust

eventually sold the house.  See May 29, 2014, Tr. at 116:6-8 (M. Trudelle).  The Court will

overrule this objection for two reasons.  First, there is no evidence that the property lost value after

it was red tagged.  Neither of the Trudelles testified that the house was sold for less than it would

have if it were sold before the red tagging.  Second, the Trudelles did not own the house.  The

family trust owned the house and received money for the house's sale.  Accordingly, the Court will

overrule this portion of the Trudelles' objections and will affirm Judge Lang's proposed award.

## IX.    THE COURT WILL DENY THE REQUESTS IN THOMAS' APPEAL.

Judge Lang awarded Thomas $7,683.77 for testing/remediation.   See Proposed Distributions at 4.  Thomas argues that Judge Lang's award "does not reflect the cost of alternative living expenses" that she had to pay for herself and her family.  Thomas Appeal at 1.  She also argues that Judge Lang's award does not "encompass the monetary and emotional distress costs" from the eviction from her house.  Thomas Appeal at 1.  Finally, she argues that Judge Lang's award does not cover the remediation and testing costs that she paid.  See Thomas Appeal at 1. The Court will overrule these objections and affirm Judge Lang's award.

In her Appeal, Thomas argues that Judge Lang's award does not reflect the cost of living expenses that she had to expend on her family.  See Thomas Appeal at 1.  It is not clear to what living expenses Thomas is referring.  At the hearing before the Court, Thomas testified that she and her family lived with a friend during the time in which they were not permitted to live in her house.  See July 29, 2014, Tr. at 91:2-5 (Kennedy, Thomas).  Thomas, thus, did not have to pay rent to provide her family with a place to live during the time in which they could not stay in her house.  Thomas testified, however, that her family was forced "to eat all of [their] meals out."  July 29, 2014, Tr. at 91:5 (Thomas).  While Thomas may have spent more money on food during this time than she would have if she had been able to cook all of her meals, Thomas would still have had to spend money on food.  Additionally, Thomas did not present any evidence concerning the difference in price that her meals out cost compared to cooking her own meals.  There is no evidence showing how much money Thomas was required to spend on meals that she would not have otherwise spent.  The Court will, thus, deny the requests in this portion of Thomas' Appeal.

In her Appeal, Thomas argues that Judge Lang's award does not cover the amount that she spent on remediation and testing costs.  See Thomas Appeal at 1.  It appears that Thomas may have

waived this objection, or conceded that Judge Lang's award is sufficient to cover her remediation and testing costs.  See May 29, 2014, Tr. at 90:5-9 (Kennedy, Thomas).  At the hearing, the following interaction took place: "Q.  And now you understand that the special master proposed to award you the actual bills that you incurred for the drug testing remediation, is that correct?  A.  Yes."  May 29, 2014, Tr. at 90:5-9 (Kennedy, Thomas).  It appears that Thomas has conceded that Judge Lang's proposed award will cover her testing and remediation costs.  Even if Thomas has not conceded this objection, however, the Court would overrule it.  Thomas did not present any evidence showing how much she spent on testing and remediation.  The Court will, thus, overrule this objection, because any award would be based on conjecture.  See Sanchez v. Martinez, 1982-NMCA-168, ¶ 20; Aspen Highlands Skiing Corp. v. Aspen Skiing Co., 738 F.2d at 1526.

Thomas also argues that Judge Lang should have awarded her emotional distress damages. See Thomas Appeal at 1.  The Court will overrule this objection, because, although it appears that Thomas may have endured emotional distress, the Defendants' actions did not cause her emotional distress.  In her Appeal, Thomas states: "I feel that the emotional distress of seeing my family scattered between other households, specifically the loss of familial contact with my grandchild during her most vulnerable years, has left an indelible scar on the emotional tissue of my heart."  Thomas Appeal at 1.  At the hearing, Thomas testified that, after her family was evicted, her son and Donna took away her granddaughter and that she did not see her granddaughter for eighteen months.  See May 29, 2014, Tr. at 91:5-11 (Thomas).  Thomas testified that not being able to see her granddaughter was traumatic.  See May 29, 2014, Tr. at 91:10-11 (Thomas).  She did not testify or present any evidence showing that her son taking away her granddaughter was connected to the Defendants' actions or to being evicted.  Thomas and her family were able to move back into the house two months after it was red tagged.  See May 29, 2014, Tr. at 90:10-14 (Kennedy, Thomas).  Yet, Thomas' son did not allow her to see her granddaughter for eighteen months.  See May 29, 2014, Tr. at 91:5-11 (Thomas).  For

sixteen months, Thomas' son refused to allow Thomas to see her granddaughter even though she was living in her house.  Thomas' son and Donna taking Thomas' granddaughter away appear to be independent of Thomas' house being red tagged.[17]

Thomas also testified that it was traumatic not being able to live in her house.  See May 29, 2014, Tr. at 91:11-12 (Thomas).  Being separated from her granddaughter, however, appears to be the source of Thomas' emotional distress rather than being evicted from her house.  In her Appeal, Thomas focused on her emotional distress from the separation from her granddaughter.  See Thomas Appeal at 1.  The majority of her testimony on her emotional distress centered on her granddaughter.  See May 29, 2014, Tr. at 93:3-25 (Kennedy, Thomas).  Thomas even testified that she was enduring emotional trauma before her house was red tagged, because of her family situation.  See May 29, 2014, Tr. at 94:17-24 (Levy, Thomas).  The evidence shows the situation with her son and granddaughter, and not the Defendants' actions, caused Thomas' emotional distress.  See Koopman v. Water Dist. No. 1, 41 F.3d at 1420; Ettenson v. Burke, 2001-NMCA-003, ¶ 34 ("It would be inappropriate . . . to award [the plaintiff] emotional damages . . . , which were caused by" a source other than the defendants.).  Accordingly, the Court will overrule Thomas' objection, because it cannot reasonably hold the Defendants liable for harm which they did not cause.

---

[17]An inference may arise that the red tagging of the house is connected to Thomas' son taking the granddaughter.  The house was red tagged because of her son's and Donna's drug use. See May 31, 2013, Lang Tr. at 6:4-15 (Thomas).  The red tagging of the house, and the discovery of her son's and Donna's drug use, may have influenced Thomas' son to move away from Thomas and her family.  The red tagging and discovery of the drug use also may have expedited Thomas' son's decision to move out.  There is not, however, any evidence showing that the red tagging was the decisive factor in the son's decision to move out and take the granddaughter, or even a factor other than the circumstantial evidence that the son moved out shortly after the red tagging. Thomas even testified at the hearing that her family was enduring a family crisis before the house was red tagged, because of her son's parenting skills.  See May 29, 2014, Tr. at 94:19-24 (Levy, Thomas).  Based on the evidence before it, the Court cannot say, by a preponderance of the evidence, that the Defendants' actions caused Thomas' son to take away her granddaughter.

The Court is sympathetic for Thomas. Thomas appears to be a grandmother who is working hard to hold her family together and to provide for them in any way that she can, even allowing her son and his significant other to live in her garage when they needed a place to live. The Court can sympathize with the stress and anxiety Thomas endured as she worried about the well-being of her granddaughter whom she did not see for eighteen months and feared was living on the streets. This anxiety and distress, however, was not the result of the Defendants' actions, and the law does not permit Thomas to recover damages for a harm that the Defendants did not cause. See Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d at 1459 (noting that there must be a causal connection "between the illegal action and the complainant's injuries"). The Court will, thus, overrule Thomas' Appeal and affirm Judge Lang's proposed award.

## X.    THE COURT WILL GRANT THE REQUESTS IN M. ROYBAL'S APPEAL.

Judge Lang awarded M. Roybal and T. Roybal, collectively, $1,780.12 for testing/remediation costs, $8,000.00 for lost income/lost equity/diminished property value, $2,000.00 for personal property loss, and $6,000.00 for emotional distress, totaling $17,780.12. See Proposed Distributions at 4. Of the $6,000.00 for emotional distress, Judge Lang designated $4,000.00 for T. Roybal and $2,000.00 for M. Roybal. See Proposed Distributions at 4. M. Roybal argues that she should have been awarded more emotional distress damages. See M. Roybal Appeal at 1. The Court agrees and will sustain her objection. The Court will increase Judge Lang's proposed award for emotional distress damages from $2,000.00 to $5,893.10.

M. Roybal testified that, after her house was red tagged, she was forced to move and live out of a suitcase. See May 29, 2014, Tr. at 133:5-15 (Kennedy, M. Roybal). She also testified that the news featured her house and reported that it was used as a methamphetamine laboratory, even though it was not. See May 29, 2014, Tr. at 133:18-25 (M. Roybal). M. Roybal happened to drive

by the house when the news report was being filmed, and she begged the reporter not to air the report.  See May 29, 2014, Tr. at 134:13-17 (M. Roybal).  The reporter called APD, who sent a helicopter to the house.  See May 29, 2014, Tr. at 134:18-20 (M. Roybal).  The APD helicopter flew over M. Roybal and shined a spotlight on her.  See May 29, 2014, Tr. at 134:18-20 (M. Roybal).  Because of the news report, M. Roybal's family and co-workers learned of the red tagging incident.  See May 29, 2014, Tr. at 134:1-4 (M. Roybal).  Crandall, of the Nuisance Abatement Team, called M. Roybal stupid and dumb for not realizing what was occurring at her house.  See May 29, 2014, Tr. at 134:4-7 (M. Roybal).  Judge Lang concluded that these facts are sufficient to award emotional distress damages, but only $2,000.00 worth of emotional distress damages.  See Proposed Distributions at 4.  The Court concludes that, because of the humiliation that M. Roybal endured through both the news report[18] and Crandall's ridicule, M. Roybal endured emotional distress that deserves a larger award.  The Court will, thus, sustain M. Roybal's appeal and modify Judge Lang's emotional distress award from $2,000.00 to $5,893.10.

## XI.    THE COURT WILL GRANT THE REQUESTS IN T. ROYBAL'S APPEAL.

Judge Lang awarded M. Roybal and T. Roybal, collectively, $1,780.12 for testing/remediation costs, $8,000.00 for lost income/lost equity/diminished property value,

---

[18]The Court is aware that it cannot generally attribute the actions of the news media to the Defendants, Carey v. Piphus, 435 U.S. at 254-55 ("The cardinal principle of damages in Anglo-American law is that of compensation for injury caused to plaintiff by defendant's breach of duty."); Uhlrig v. Harder, 64 F.3d 567, 571-72 (10th Cir. 1995)(noting that state could not be liable for substantive due process violation for conduct of private third party unless the state had a special relationship with the plaintiff or the state recklessly caused the plaintiff's danger); however, as M. Roybal argued at the hearing before the Court, the news reporters would not have run the story about her house but for the Defendants' conduct.  See May 26, 2014, Tr. at 136:25-137:7 (Levy, M. Roybal).  The news wrongly reported that M. Roybal's house was being used as a methamphetamine laboratory.  See May 29, 2014, Tr. at 133:18-25 (M. Roybal).  It is likely that the news reporter believed that M. Roybal's house was being used as a methamphetamine laboratory because the Defendants reported that it was.  Accordingly, the news report was a reasonably foreseeable consequence of the Defendants' actions, and the report's harm is fairly attributable to the Defendants.

$2,000.00 for personal property loss, and $6,000.00 for emotional distress, totaling $17,780.12. See Proposed Distributions at 4. Of the $6,000.00 for emotional distress, $4,000.00 was awarded to T. Roybal. See Proposed Distributions at 4. T. Roybal argues that he suffers from PTSD and that he should have been awarded more for emotional distress. See T. Roybal Appeal at 1. The Court agrees and will increase T. Roybal's emotional distress award from $4,000.00 to $5,674.84.

T. Roybal testified that, after the red tagging, he suffers from anger and that he has to attend anger management classes. See May 29, 2014, Tr. at 126:9-13 (Kennedy, T. Roybal). He further testified that his anger has interfered with his life and work. See May 29, 2014, Tr. at 127:3-5 (Kennedy, T. Roybal). T. Roybal testified that, once his anger is triggered, he remains upset for months and that he has to take medicine to control his emotions. See May 29, 2014, Tr. at 127:5-10 (T. Roybal). Judge Lang found that T. Roybal suffered emotional distress and awarded him $6,000.00 in damages. See Proposed Distributions at 4. The Court agrees that T. Roybal has suffered emotional distress, but concludes that he is entitled to greater damages for his emotional distress. The Court will increase his emotional distress award from $4,000.00 to $5,674.84. This amount, and the $3,893.10 increase in M. Roybal's emotional distress damages -- from $2,000.00 to $5,893.10 -- brings M. Roybal's and T. Roybal's total damages to $23,348.06.

## XII.   THE COURT WILL GRANT THE REQUESTS IN BECKER'S APPEAL.

Judge Lang awarded Becker $6,480.60 for testing/remediation costs, $5,500.00 for lost rental income/lost equity/diminished property value, and $1,350.00 for personal property loss, totaling $13,330.60. See Proposed Distributions at 1. Becker argues that Judge Lang should have awarded him an additional $4,150.00 for lost rent. See Becker Appeal at 1. The Court agrees, will grant the requests in Becker's Appeal, and will increase Becker's award for lost rental income from $5,500.00 to $9,650.00.

Becker waited twenty-one months after his rental house was red tagged to remediate it. See May 29, 2014, Tr. at 26:14-17 (Kennedy, Becker). Becker testified that he was renting the property out for $525.00 per month. See May 29, 2014, Tr. at 25:19-21 (Kennedy, Becker). Judge Lang's award of $5,500 for lost rental income appears to be for around eleven months of lost rent. Becker's house, however, sat vacant for twenty-two months. See May 29, 2014, Tr. at 25:16-18 (Kennedy, Becker). In his Supplement, Judge Lang explained that Becker did not take steps during those twenty-two months to obtain financing to remediate the apartment, which would have resulted in the apartment producing income that could pay off the remediation costs, and, thus, Becker's twenty-one month delay should not be attributed to the Defendants. See Supplement at 2. The Court disagrees. Becker's delay in remediating the house was a business decision that he made out of fear that more of his rental properties in Albuquerque could be red tagged, resulting in a significant investment to remediate several properties. See May 29, 2014, Tr. at 27:14-19 (Becker). Becker decided to wait and see what happened to his other properties before acting and remediating the house. See May 29, 2014, Tr. at 29:13-16 (Levy, Becker). He testified that part of the reason he decided to remediate the house was that he learned about the lawsuit to stop the red tagging and, thus, felt more comfortable remediating the property without having to fear that other properties would need remediating as well. See May 29, 2014, Tr. at 26:23-27:2 (Kennedy, Becker); id. at 29:21-24 (Levy, Becker). Consequently, the Defendants caused Becker's delay.

The Defendants placed Becker in a difficult business situation. He could spend the money to remediate the property and begin receiving income, but then risk that the property would be red tagged again and risk having other properties be red tagged, or he could wait and see if other properties were red tagged and potentially consider terminating his investments in the Albuquerque housing market because of the costs and risks. Becker appears to have chosen the

second option: wait and see what happens before making any investment decisions that could prove detrimental in the future.  The Court should not penalize Becker for making a conservative investment decision, rather than making a more aggressive decision that could have created a larger risk.  This conclusion is especially true when the Defendants caused the investment risk. While the Plaintiffs filed the lawsuit in 2009 and Becker waited until 2010 to remediate the house, see May 29, 2014, Tr. at 29:17-20 (Levy, Becker), this waiting does not affect his business decision.  In 2009, it was not certain that the Plaintiffs would prevail.  The Court did not grant the Plaintiffs summary judgment until March 31, 2011.  See Lowery v. City of Albuquerque, 2011 WL 1336670, at *1.  Accordingly, the Court concludes that Becker is entitled to lost rental income for the period in which the house remained vacant.

Using Becker's $525.00 per month rental income, Becker is entitled to $11,550.00 in lost rental income for the twenty-two months in which the property was vacant.  Judge Lang awarded Becker $5,500.00 in lost rental income, see Proposed Distributions at 1, and Becker requests an additional $4,150.00, see Becker Appeal at 1.  This award results in a total of $9,650.00.  The Court will honor Becker's request and modify Judge Lang's proposed award for lost rental income from $5,500.00 to $9,650.00.[19]  This increase brings Becker's total award from $13,330.60 to $17,480.60.

---

[19]It is unclear why Becker requested an additional $4,150.00 in lost rental income rather than an additional $6,050.00, which would reimburse him for the full twenty-two months in which the house was vacant.  Becker's requested award reimburses him for about eighteen and a half months of lost rent.  Perhaps Becker received some additional rent from evicted tenants to make up for this difference or perhaps for some other reason Becker felt that he should receive only a little over eighteen months of lost rent rather than twenty-two months in lost rental income.  Because the Court is unsure why Becker requested the amount that he did, the Court will sustain Becker's objection and grant him his requested award, rather than going beyond the amount that he requested and reimbursing him for the full twenty-two months in which the house remained vacant.

**XIII.   THE COURT WILL GRANT THE REQUESTS IN CINELLI'S APPEAL.**

Judge Lang awarded Cinelli $2,682.53 for testing/remediation costs and $1,128.00 for personal property loss, totaling $3,810.53.  See Proposed Distributions at 1.  Cinelli argues that this amount "does not represent what [he] suffered by being excluded from [his] home."  Cinelli Appeal at 1.  The Court will sustain his objection and award him $13,968.83 in emotional distress damages.

Cinelli testified before Judge Lang that the Nuisance Abatement Team arrived at his house armed with guns and wearing masks.  See May 21, 2013, Lang Tr. at 26:1-4 (Cinelli).  He also testified that the officers managed to open his door while he left to grab a key and that they handcuffed him.  See May 21, 2013, Lang Tr. at 26:13-16 (Cinelli).  Cinelli testified that the officers began to "rough[] the hell out of [his] son."  May 21, 2013, Lang Tr. at 26:16-18 (Cinelli).  The Nuisance Abatement Team did not, however, find any drugs in his house.  See May 29, 2014, Tr. at 38:4-7 (Kennedy, Cinelli).  Cinelli also testified that the City of Albuquerque forced him to sign papers to evict his son from his house by threatening that, if he did not sign the papers, there was a good chance that the City would take his house from him.  See May 29, 2014, Tr. at 41:5-18 (Kennedy, Cinelli); id. at 47:8-23 (Levy, Cinelli); id. at 49:5-13 (Kennedy, Cinelli); id. at 53:11-13 (Cinelli).  Cinelli testified that the raid brought back memories of the time that he was shot five times during a robbery.  See May 29, 2014, Tr. at 38:23-39:12 (Kennedy, Cinelli).  He also testified that he now tells people who are coming to his house to call rather than ringing the doorbell, because the ringing of the doorbell scares him.  See May 29, 2014, Tr. at 40:21-25 (Cinelli)("[I]f you come to my front door and ring the doorbell I'm telling you it just does things to me, it scares me.").

These facts are sufficient to conclude that Cinelli suffered emotional distress because of the Defendants' actions.  Having armed, masked officers break into Cinelli's house, handcuff him, and rough up his son, and then be forced to evict his son from his house, are circumstances that are "beyond the ordinary," creating the inference that Cinelli suffered emotional distress.  Carey v. Piphus, 435 U.S. at 264, n.20.  Cinelli's testimony that he still fears the sound of his doorbell and that the raid brought back memories of the prior robbery support a finding that he endured emotional distress.  See Jolivet v. Deland, 966 F.2d at 577 (noting that circumstances and testimony can be used to show the emotional effect that a defendant's actions had on a plaintiff).  The Court, thus, finds that Cinelli suffered emotional distress and will award him damages for that emotional distress.  The Court will award Cinelli $13,968.83 in emotional distress damages, bringing his total damages award from $3,810.53 to $17,779.36.

## XIV.   THE COURT WILL GRANT THE PLAINTIFFS' MOTION TO DISTRIBUTE IN ACCORDANCE WITH THE MODIFICATIONS TO JUDGE LANG'S REPORT THAT THIS MEMORANDUM OPINION AND ORDER CONTAINS.

The Court will grant the Plaintiffs' Motion to Distribute and permit the Settlement Funds to be distributed in accordance with the portions of Judge Lang's report to which there were no objections and in accordance with the modifications to Judge Lang's report that are contained within this Memorandum Opinion and Order.  The Court will also permit Judge Lang and the court reporters from the hearings before Judge Lang to be paid from the settlement fund.

The following table contains the Court's modifications to Judge Lang's report.[20]  The Settlement funds should be distributed in accordance with this table:

[this portion left intentionally blank]

---

[20]The Court's modifications are in bold.

| Name | Stipulated | Testing/ Remediation Costs | Lost Rental Income/ Lost Equity/ Diminished Property Value | Personal Property Loss | Emotional Distress | Other Costs | Total |
|---|---|---|---|---|---|---|---|
| Barnes, Charles | $4,156.12 | | | | | | $4,156.12 |
| Beck, Gary | | $2,573.53 | $1,125.00 | | | | $3,698.53 |
| **Becker, Karl** | | $6,480.60 | **$9,650.00** | $1,350.00 | | | **$17,480.60** |
| Bishop, Lynda and Gene Goldman | | $887.58 | $6,000.00 | | | | $6,887.58 |
| Buckner, Henry | | $3,619.86 | $3,750.00 | | | | $7,369.86 |
| Burrows, Jan | $3,220.89 | | | | | | $3,220.89 |
| Cancino, Robert | | $10,032.30 | $7,200.00 | | | | $17,232.30 |
| Carmichael, Edna | | $3,960.56 | $7,428.00 | | | | $11,388.56 |
| **Chavez, Darlene** | | $4,070.08 | $3,000.00 | | **$6,111.36** | | **$13,181.44** |
| **Cinelli, Eugene** | | $2,682.53 | | $1,128.00 | **$13,968.83** | | **$17,779.36** |
| Clauss, Bob | | $23,259.00 | $5,500.00 | | | $12,980.00 (Misc. Rem'n Expenses) | $41,739.98 |
| Coletto, Sarah | $ 7,540.77 | | | | | | $7,540.77 |
| Cruz, Bobby | $ 9,042.27 | | | | | | $9,042.27 |
| Estrada, Robert | | $3,005.57 | | | | | $3,005.57 |
| Fichtner, Bernard (Dale) | | $7,609.85 | $6,960.00 | | $5,000.00 | | $19,569.85 |
| Gabaldon, Danny | | $2,398.01 | $10,000.00 | $10,000.00 | | | $22,398.01 |
| **Gallegos, Tammy/ Ron Tapia** | | $557.48 | **$ 34,000.00** | $15,000.00 | **$10,913.15** | | **$60,470.63** |
| Garner, Chistine | | $15,463.47 | $ 12,000.00 | | $5,000.00 | | $31,463.17 |
| Gonzales, Michael | $9,531.07 | | | | | | $9,531.07 |
| Griego, Johnny and Adeline | $20,579.73 | | | | | | $20,579.73 |
| Gutierrez, Julian | | $18,500.00 | | | | | $18,500.00 |
| Heller, Leslie | | $3,082.60 | $5,850.00 | | | | $8,932.60 |
| Hildebrandt, Corbin | | $9,356.45 | | $200.00 | | | $9,556.45 |
| Hilton, Jere | | $357.40 | | $4,000.00 | | | $4,357.40 |
| Jenkins, Rebecca/ Pat Valdez | | $11,135.19 | $7,000.00 | | | | $18,135.19 |
| Jensen, Peter | $588.16 | | | | | | $588.16 |
| Juarez, Benny and Rosalie | | $26,350.81 | | | | | $26,350.81 |
| Leyba, Rachel Julie | | $2,073.06 | $6,215.88 | $9,000.00 | $5,000.00 | | $22,288.94 |
| Lovato, Judy | | | $12,843.28 | | $2,500.00 | | $15,343.28 |
| Lowery, John for Kevin | | | $48,000.00 (use of property) $9,000.00 (Rental Loss) | $8,000.00 (business product) | $100,000.00 | | $165,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Mancha, Antonio (Jr.) | $3,940.06 | | | | $3,940.96 |
| Marcilla, Javier | $8,510.26 | $2,750.00 | | | $11,260.26 |
| Marks, Joel | $1,100.00 | $7,750.00 | | | $8,850.00 |
| McCarty, Myra | $16,551.16 | $4,500.00 | | | $21,051.16 |
| McCash, Charles | $5,763.74 | $5,500.00 | | $ 692.90 (City Fees) | $11,956.94 |
| McClaine, Catherine and John Schooley | $7,548.43 | $6,000.00 | | | $13,548.43 |
| Meurer, Sherry and Steve | $11,291.06 | | $3,600.00 | $5,000.00 (Sherry) | $19,891.06 |
| Montoya, Danny | $7,891.43 | $862.40 | | | $8,753.83 |
| Montoya, Eric | $14,345.83 | | | | $14,345.83 |
| Morse, Lawrence | $7,297.33 | $2,750.00 | | | $10,047.33 |
| Palmer, Robert | $24,959.88 | $24,000.00 (Rental Loss) $15,000.00 (Diminished Prop Value) | | | $63,959.88 |
| Pearson, Emma | $10,422.98 | | | $2,500.00 | $12,922.98 |
| **Peña, Mark** | $2,000.00 | | | **$15,278.40** | **$17,278.40** |
| Randolf, Ursula | $34,375.10 | $12,025.00 | | | $46,400.10 |
| Rawley, James and Kelly Genova | $5,257.25 | $4,800.00 | | | $10,057.25 |
| Reazin, Carl | $10,636.52 | $16,170.00 | | | $26,806.52 |
| Redl, Franz | $ 3,114.90 | $1,100.00 | | | $4,214.90 |
| **Roybal, Theodore and Monica** | $ 1,780.12 | $8,000.00 | $2,000.00 | **$5,674.84 (Theodore) $5,893.10 (Monica)** | **$23,348.06** |
| Russell, Perry and Vera | $19,393.91 | | | | $19,939.91 |
| Schooley, Barry | $12.12 | | $4,000.00 | | $4,012.12 |
| Sedillo, Mike | $9,908.53 | $10,500.00 | $2,500.00 | | $22,908.53 |
| Serna, Rolando | $5,421.37 | $ 4,050.00 | | | $9,421.37 |
| Shade, Michael | $3,515.63 | $2,100.00 | | | $8,615.63 |
| Snyder, Donna | $2,978.87 | $5,675.57 | | | $8,654.44 |
| Spaulding, George | | | | No documents | $ |
| Sugarman, Jeffrey | $1,416.92 | $4,950.00 (Rental Loss) $10,000.00 (Diminished Value) | | | $16,366.92 |
| Summers, David and Cheryl | $12,471.54 | | $8,206.00 | $ 2,500.00 | $23,177.54 |
| Thomas, Barbara | $7,683.77 | | | | $7,683.77 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Three Sons/<br>Al Matias | | $998.00 | $2,550.00 | | | | $3,548.00 |
| Trudelle, Cathy<br>and Michael | | $7,012.27 | | $1,396.74 | | | $8,409.01 |
| Vasquez, Martha | | $17,543.61 | $2,250.00 | $5,000.00 | | | $24,793.61 |
| Zamora, Virgina/<br>Benjamin Marquez | | $7,906.37 | | | | | $7,906.37 |
| | | | | | | **Grand Total** | **$1,110,860.23** |

The Court will also permit Judge Lang and the court reporters from the hearings before Judge Lang to be paid.  Judge Lang originally requested $11,796.75 for his services.  See Judge Lang's Report ¶ 11, at 2.  Judge Lang later requested an additional $1,591.63 for his services in preparing the Supplement.  See Notice of Billing From Master at 1, filed August, 26, 2014 (Doc. 196)("Notice of Billing").  This addition results in a total of $13,388.38 for Judge Lang's services.  Judge Lang is to be paid this amount from the settlement fund.[21]  Additionally, the Plaintiffs have requested that the court reporters be paid $5,129.72 from the settlement fund.  See Motion to Distribute at 3.  The Court will also permit this amount to be paid from the settlement fund.

From the settlement fund, the class members are to be paid $1,110,860.23, Judge Lang is to be paid $13,388.38, and the court reporters are to be paid $5,129.72.  These amounts result in a total of $1,129,378.33.  The total amount available for distribution after the Kennedy Law Firm's

---

[21]Judge Lang indicated that he has already been paid $11,796.75 on June 17, 2014.  See Judge Lang Supplemental Invoice at 1, filed August 26, 2014 (Doc. 196-1).  On May 9, 2014, the Court denied the Plaintiffs' Unopposed Motion to Permit Payment of Master Fees and Court Reporter Fees, filed May 5, 2014 (Doc. 175).  See Order Denying Plaintiffs' Unopposed Motion to Permit Payment of Master Fees and Court Reporter Fees, filed May 9, 2014 (Doc. 177).  In accordance with the Court's Order, Judge Lang should not have been paid from the settlement fund.  Accordingly, if the Kennedy Law Firm, forwarded Judge Lang the $11,796.75 for his services, the Kennedy Law Firm can be reimbursed for this amount, and Judge Lang may be paid $1,591.63 from the settlement fund.  If Judge Lang has not yet been paid and his invoice is incorrect, he may be paid the full $13,388.38 from the settlement fund.  If Judge Lang was paid the $11,796.75 from the settlement fund, then Judge Lang is entitled only to $1,591.63 more from the settlement fund.

fees and costs were deducted is $1,129,378.33.  Accordingly, there are no funds remaining to be

returned to the City of Albuquerque.[22]

_____

[22]The Court has not distributed the remaining settlement fund in an attempt to deprive the City of Albuquerque of funds or to punish the City of Albuquerque, but in an attempt to fully compensate the injured class members.  While the Settlement Agreement states that "[s]hould all class members receive full compensation as determined by the Special Master, any remaining funds in the class fund shall be returned to the City of Albuquerque," it also states that "[s]hould there be insufficient money available in the fund, the fund shall be divided on a pro rata basis to the class members."  Settlement Agreement at 5-6.  After reviewing Judge Lang's report and the class members' objections, the Court concludes that there are insufficient funds in the settlement fund to fully compensate the class members.   If a number of the objecting class members brought individual actions, rather than being compensated from a class action settlement fund, the Court believes that they would be awarded a greater amount than is available in the settlement fund.  The Settlement Agreement's provision requiring the settlement fund to be distributed on a pro rata basis should thus go into effect.  This provision should likely be applied to the entire class, as a whole, rather than solely to the objecting class members.  The Court, however, is unable to determine the extent of the harm suffered by the thirty-eight class members who did not object to Judge Lang's report.  It is unclear whether they have been undercompensated, and thus should have their awards increased in proportion with the amount that all of the class members' awards are increased, or whether they have been overcompensated, and should have their awards decreased proportionately to the amount that all of the class members' awards are decreased; no one has presented the Court with transcripts of the hearings before Judge Lang or any documentation on their claims.  These class members have not objected to Judge Lang's proposed awards and, accordingly, appear to be satisfied with their proposed awards.  Additionally, the Court cannot determine the sufficiency of their awards.   The Court will thus leave them undisturbed.

The Court can, however, determine the adequacy of the objecting class members' awards, and the Court will distribute the remaining settlement fund pro rata among the objecting class members.  Specifically, the Court will distribute the funds pro rata and in proportion to the amount of emotional distress that the objecting class members have suffered.  Loss of property damages and loss of rent are concrete figures from which, with reasonable certainty, the Court can give a fixed amount.  Emotional distress damages, on the other hand, cannot be given a "precise measurement."  Morgan v. Sec'y of Hous. & Urban Dev., 985 F.2d at 1459.  Even though these damages cannot be given a precise number, the Court concludes that there are insufficient funds to fully compensate the objecting class members for their emotional distress, because, even with the additional emotional distress damages awarded in this Memorandum Opinion and Order, the objecting class members who suffered emotional distress have not been fully compensated.  Accordingly, the Court will distribute the remaining funds among the objecting class members in proportion to the amount of emotional distress that each class member suffered.  While no objecting class member has been fully compensated for the emotional distress that he or she suffered, the Court has granted larger awards to the class members who endured the most emotional distress and smaller awards to the class members who endured the least emotional distress.  The Court concludes that this method is the fairest manner in which to distribute the

remaining class funds in accordance with the Settlement Agreement and in light of the limited evidence before the Court.

While it is hard for the Court to say that one person endured more emotional distress than another, especially in close cases, the Court must do just that. The Court concludes that, of the objecting class members, Peña has suffered the most emotional distress. Peña was forced to live on the streets, suffered a heart attack, and was hospitalized for ten days because of the Defendants' actions. Cinelli endured the second most emotional distress. The APD's raid of his house was violent and intense and triggered flash backs of being shot with a firearm. Cinelli observed APD officers beat his disabled son and then was forced to sign an agreement evicting his son from his house. Cinelli still fears the sound of his doorbell in his house. Gallegos and Tapia are next. They lost their house and their belongings. They have watched their daughter transform from a happy, straight "A" student to a depressed person who had to withdraw from school because of her failing grades. Chavez is next. Chavez lived in a motor home in the middle of the dessert without many of the modern conveniences on which society has come to rely. Finally, the Court concludes that M. Roybal and T. Roybal have suffered the least amount of emotional distress of the objecting class members. M. Roybal was evicted from her house and ridiculed by Crandall. Additionally, her house was featured on the news as a methamphetamine laboratory. T. Roybal was not displaced from his house; however, he suffers from bouts of anger and even has to attend anger-management classes. Based on the evidence presented before it and before Judge Lang, the Court concludes that the amount of emotional distress that each class member has suffered, is as follows: (i) Peña; (ii) Cinelli; (iii) Gallegos and Tapia; (iv) Chavez, (v) M. Roybal; and (vi) T. Roybal.

Black's Law Dictionary defines "pro rata" as: "Proportionately; according to an exact rate, measure, or interest." Black's Law Dictionary 1340 (9th ed. 2009). The Court will thus reduce each objecting class member's emotional distress award in proportion to the amount remaining in the fund. The Court concludes that Peña has suffered $350,000.00 in emotional distress damages; Cinelli $320,000.00; Gallegos and Tapia $250,000.00; Chavez $140,000.00; M. Roybal $135,000.00; and T. Roybal $130,000.00. These six class members' total awards for emotional compensation should be $1,325,000.00. After deducting Judge Lang's proposed awards for the non-objecting class members and the Court's loss of equity/loss of rental value/loss of property awards for the objecting class members, there is $57,893.68 available to distribute for emotional distress damages. $41,839.68 of that amount is from money that Judge Lang did not distribute but proposed to be returned to the City of Albuquerque and $16,000.00 is from money that Judge Lang proposed to be distributed to the objecting class members for emotional distress damages. The Court concludes that these six class members should be awarded $1,325,000.00, but there is only $57,893.68 available; thus, the Court can only award 4.365% of these class members' total emotional distress damages ($57,893.68/$1,325,000.00). In conformance with the Settlement Agreement, the Court will award each objecting class member 4.365% of their total emotional distress damages. The Court will thus award: (i) Peña $15,278.40 ($350,000.00 * 4.365%) in emotional distress damages; (ii) Cinelli $13,968.83 ($320,000.00 * 4.365%) in emotional distress damages; (iii) Gallegos and Tapia $10,913.15 ($250,000.00 * 4.365%) in emotional distress damages; (iv) Chavez $6,111.36 ($140,000.00 * 4.365%) in emotional distress damages; (v) M. Roybal $5,893.10 ($135,000.00 * 4.365%) in emotional distress damages; and (vi) T. Roybal $5,674.84 ($130,000.00 * 4.365%) in emotional distress damages. As for objecting class members who the Court concludes are not entitled to emotional distress damages, they will

**IT IS ORDERED** that the some of the requests in the (i) Notice of Appeal of Tammy Gallegos and Ron Tapia, filed April 7, 2014 (Doc. 165); (ii) Notice of Appeal of Darlene Chavez, filed April 7, 2014 (Doc. 166); (iii) Notice of Appeal of Mark Anthony Pena, filed April 7, 2014 (Doc. 168); (vi) Notice of Appeal of Monica Roybal, filed April 7, 2014 (Doc. 171); (v) Notice of Appeal of Karl Becker, filed April 7, 2014 (Doc. 172); (vi) Notice of Appeal of Theodore Roybal, filed April 7, 2014 (Doc. 173); and (vii) Notice of Appeal of Eugene Cinelli, filed April 7, 2014 (Doc. 174), are granted.  The requests in the: (i) Objection to & Appeal of the Special Masters' Report of Carl Reazin, Class Member, filed April 3, 2014 (Doc. 161); (ii) Notice of Appeal of Carl Reazin, filed April 7, 2014 (Doc. 162); (iii) the Notice of Appeal of Joel Marks, filed April 7, 2014 (Doc. 163); (iv) Notice of Appeal of Donna Snyder, filed April 7, 2014 (Doc. 164); (v) Notice of Appeal of Edna Carmichael, filed April 7, 2014 (Doc. 167); (vi) Notice of Appeal of Michael and Kathy Trudelle, filed April 7, 2014 (Doc. 169); and (vii) Notice of Appeal of Barbara Thomas, filed April 7, 2014 (Doc. 170), are denied.  Additionally, the Plaintiffs' Unopposed Motion to Distribute Class Fund and Pay Expenses, filed May 28, 2014 (Doc. 180), is granted and the class settlement fund is to be distributed in accordance with this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

---

still receive no emotional distress damages.  Even if their award of zero dollars is reduced to 4.365% of their total award, the resulting award is still zero.  Thus, while the City of Albuquerque does not get any money back under this Memorandum Opinion and Order, the City of Albuquerque, in the Court's view, did well with this settlement by reducing its expenses and potential sting of a much larger jury verdict.

*Counsel:*

Joseph P. Kennedy
Shannon L. Kennedy
Laura S. Ives
Kennedy, Kennedy, & Ives, LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

    *Attorneys for the Defendants*